**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
In re:                                                       :
                                                             :   Chapter 15 Case No. 07-12383 (BRL)
BEAR STEARNS HIGH-GRADE STRUCTURED                           :
CREDIT STRATEGIES MASTER FUND, LTD.                          :
(IN PROVISIONAL LIQUIDATION)¹                                :   Civil Case No. 07-8730 (RWS)
                                                             :
Debtor in a Foreign Proceeding and Appellant.                :
------------------------------------------------------------ x
In re:                                                       :
                                                             :   Chapter 15 Case No. 07-12384 (BRL)
BEAR STEARNS HIGH-GRADE STRUCTURED                           :
CREDIT STRATEGIES ENHANCED LEVERAGE                          :
MASTER FUND, LTD.                                            :   Civil Case No. 07-8746 (RWS)
(IN PROVISIONAL LIQUIDATION)                                 :
                                                             :   ORAL ARGUMENT REQUESTED
Debtor in a Foreign Proceeding and Appellant.                :
------------------------------------------------------------ x
```

## APPELLANTS' OPENING BRIEF

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York  10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel for Joint Official Liquidators

November 7, 2007

---

¹ On September 14, 2007, the Grand Court of the Cayman Islands (the "Cayman Court") entered orders with respect to both Foreign Debtors (as defined below) converting the Foreign Proceedings (as defined below) from provisional to official liquidations.

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................1

II.   BASIS OF APPELLATE JURISDICTION ............................................4

III.  STATEMENT OF ISSUES ON APPEAL ............................................4

IV.   STANDARD OF REVIEW ....................................................................5

V.    STATEMENT OF UNCONTESTED FACTS ......................................6

    A.    The Foreign Debtors. ..................................................................6

    B.    The Foreign Proceedings and the Appointment  of the Foreign
           Representatives as the Joint Official Liquidators. ....................7

    C.    The Chapter 15 Cases. ...............................................................10

    D.    The Decision and Stay Pending Appeal.....................................13

VI.   ARGUMENT ...........................................................................................15

    A.    The Bankruptcy Court's Decision Is In Conflict with the Basic
           Tenets of  Chapter 15 of the Bankruptcy Code.........................15

          1.    Chapter 15 Was Enacted to Foster Comity and  Cooperation
                Between American and Foreign Courts. ...............................15

          2.    Chapter 15 Was Designed to Streamline the Process of
                Granting Recognition to Foreign Insolvency Proceedings. ......20

                a.    Congress devised "a simple documentary process"  for
                      granting recognition.......................................................20

                b.    The recognition process devised by Congress honors
                      creditors' expectations. ..................................................23

    B.    The Bankruptcy Court's Refusal to Recognize the Foreign
           Proceedings as Foreign Main Proceedings is Based on an
           Erroneous Interpretation of Chapter 15's COMI Presumption. ............26

          1.    These Cases Present Circumstances Clearly Warranting
                Recognition as Foreign Main Proceedings under the Plain
                Language of Chapter 15 and the Approach Employed in
                *SPhinX*...........................................................................26

          2.    The Bankruptcy Court Ignored Relevant Evidence that
                 Buttresses the Presumption that the Foreign Debtors'
                COMI is in the Cayman Islands...........................................31

    C.    Alternatively, the Bankruptcy Court Erred in Failing to Recognize
           the Foreign Proceedings as Foreign Nonmain Proceedings Because
            the Foreign Debtors' Have Establishments in the Cayman Islands. ......32

|  | 1. | The Bankruptcy Court's Elevated Standard for Achieving Foreign Nonmain Recognition Contradicts Both the Plain Language And Intent of Chapter 15............................34 |
|---|---|---|
|  | 2. | Cayman Islands Law Does Not Preclude Exempted Companies from Having Establishments in the Cayman Islands. .................................................................36 |
| D. |  | The Bankruptcy Court's Reading of Chapter 15 Should Be Rejected Because It Injects Uncertainty and Unwarranted Complexity into the Recognition Process...........................39 |
| VII. |  | CONCLUSION..............................................................42 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) .............................18

*In re Amerindo Internet Growth Group Fund Limited*, Chapter 15 Case No. 07-10327 (RDD) (Bankr. S.D.N.Y. March 7, 2007) ...........................................................19, 37

*In re AroChem Corp.*, 176 F.3d 610 (2d Cir. 1999) ........................................................................5

*In re Bancredit Cayman Limited (In Liquidation)*, Chapter 15 Case No. 06-11026 (SMB) (Bankr. S.D.N.Y. June 15, 2006).....................................................................................19

*Bank of N.Y. v. Treco*, 240 F.3d 148, 157-58 (2d Cir. 2001).........................................................18

*In re Basis Yield Alpha Fund (Master)*, Chapter 15 Case No. 07-12762 (REG) (Bankr. S.D.N.Y. Sept. 12, 2007)..................................................................................................40

*In re Blackwell*, 270 B.R. 814 (Bankr. W.D. Tex. 2001)..............................................................18

*In re Caldor Corp.,* 303 F.3d 161 (2d Cir. 2002) ............................................................................5

*Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527 (1883)....................................................................23

*Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) .............................18

*In re Ephedra Products Liab. Lit.*, 349 B.R. 333 (S.D.N.Y. 2006)...........................................22, 39

*Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999)..................................18

*In re Gee*, 53 B.R. 891 (Bankr. S.D.N.Y. 1985)...........................................................................18

*Hilton v. Guyot*, 159 U.S. 113 (1895) .........................................................................................19

*Hoffman v. Bullmore (In re Nat'l Warranty Ins. Risk Retention Group)*, 384 F.3d 959 (8th Cir. 2004) ...................................................................................................................18

*Jacques v. United States R.R. Retirement Bd.*, 736 F.2d 34, 40 (2d Cir. 1984).....................15 n.11

*Krys v. Official Comm. of Unsecured Creditors (In re SPhinX, Ltd)*, No. 06-13215 (RWS), 2007 U.S. Dist. LEXIS 48962 ......................................................................................5

*Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996)............................................................................................18

*In re MMG LLC*, 256 B.R. 544 (Bankr. S.D.N.Y. 2000) ...............................................................19

*In re National Warranty Ins. Risk Retention Group*, 384 F.3d 959 (8th Cir. 2004) .......................23

*In re Schefenacker PLC*, Chapter 15 Case No. 07-11482
(Bankr. S.D.N.Y. June 15, 2007).................................................................................20, 29 n. 20

*In re SPhinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y.
2007) ...................................................................................................................... *passim*

*In re Tri-Continental Exchange Ltd.*, 349 B.R. 627 (Bankr. E.D. Cal. 2006).........................16, 26

*United States v. J.A. Jones Constr. Group, LLC*, 333 B.R. 637 (E.D.N.Y. 2005) .........................16

## FOREIGN CASES

*Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.* Case C-341/04 (Grand
Chamber), 2006 WL 1142304 (ECJ May 2, 2006) .......................................... 24, 27-28

*In re Daisytek-ISA Ltd.*, [2003] All ER (D) 312 (J. McGonigal May 16, 2003)............................24

*In re Eurofood IFSC, Ltd.*, [2004] IEHC 54, [2004] 4 IR 370, (J. Kelly March 23, 2004) ...........25

*Gveran Trading Co., Ltd. v. Skjevesland*, [2003 BCC 209], [2002] E.W.H.C 2898 .....................24

*In re Philadelphia Alternative Asset Fund.*, Cause No. 440 of 2005 at 2-3 (Cayman
Grand Court, J. Henderson Feb 22, 2006) ...................................................................25

## STATUTES

11 U.S.C. § 101(24) ..................................................................................................................21 n.16

11 U.S.C. § 101(41) ..................................................................................................................21 n.16

11 U.S.C. § 1501(23) ................................................................................................................21 n.15

11 U.S.C. § 1501(a) .....................................................................................................................17, 40

11 U.S.C. § 1502(2) .....................................................................................................................22, 32

11 U.S.C. § 1502(4) .....................................................................................................................22, 26

11 U.S.C. § 1502(5) .....................................................................................................................22, 32

11 U.S.C. § 1505 .................................................................................................34

11 U.S.C. § 1507 .................................................................................................16

11 U.S.C. § 1508 .................................................................................................26

11 U.S.C. § 1515 ............................................................................................21 n.17

11 U.S.C. § 1515(b) ...............................................................................12 n.9, 21n.17

11 U.S.C. § 1515(2) .........................................................................................22 n.17

11 U.S.C. § 1516(b) .............................................................................................12 n.9

11 U.S.C. § 1516(c) ..........................................................................................22, 26

11 U.S.C. § 1517(a) ................................................................................................22

11 U.S.C. § 1517(b)(1).............................................................................................26

Fed R. Bankr. P. 8013 ..............................................................................................5

H.R. Rep. No. 109-31, pt. 1, at 109 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88 ............ *passim*

## OTHER AUTHORITIES

Allen & Overy eBulletin: *Pre-Bankruptcy Planning Needed to Overcome Hurdles to
    Recognition under Chapter 15 of the U.S. Bankruptcy Code* (October 2007) ......39, 41

Bryan Stark, *Chapter 15 and the Advancement of International Cooperation in Cross-
    Border Bankruptcy Proceedings*, 6 Rich. J. Global L. & Bus. 203 (2006).................17

Burton Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-
    by-Section Analysis,* A US-EU Experience (George Affaki ed., Bruyland &
    FEC 2007) ................................................................................. 17, 22-3

Jay Westbrook, *Locating the Eye of the Financial Storm*,
    32 Brook. J. Int'l. L. 1019 (2007).............................................17, 25 n.19, 38

Jay Westbrook, *Multinational Enterprises in General Default: Chapter 15, The ALI
    Principles, and the EU Insolvency Regulation*, 76 Am. Bankr. L.J. 1 (2002) .......17, 20

John Chung, *The New Chapter 15 of the Bankruptcy Code: A Step Toward Erosion of
    National Sovereignty*, 27 N.W.J. Int'l L. & Bus. J. 89 (2006) .....................................17

Karen Ostad & Julie Dyas, *U.S. Bankruptcy Court Declines to Recognize Bear Stearns'
Cayman Liquidation*, Morrison & Foerster Legal Updates & News
(September 2007)..........................................................................................41

Kurt Mayr, *Enforcing Prepackaged Restructurings of Foreign Debtors Under the U.S.
Bankruptcy Code*, 14 Am. Bankr. Inst. L. Rev. 469....................................20

Lavovitz & Greenblatt, *Chapter 15 Denied – The Impact of 'Bear Stearns,'* N.Y.L.J. No.
64, Vol. 238 (Oct. 1, 2007)..........................................................................41

Leslie Salafia, *Cross-Border Insolvency Law in the United States and Its Application to
Multinational Corporate Groups*, 21 Conn. J. Int'l L. 297 (2006)..............20

Miguel Virgos & Etienne Schmit, *Report on the Convention on Insolvency Proceedings*
(1996).........................................................................................................34

Patrick Wantelet, *Some Considerations on the Center of Main Interests as Jurisdictional
Test Under the European Insolvency Regulation*, A US-EU Experience
(George Affaki ed., Bruyland & FEC 2007)................................................24

Roger Hanson & Ronan Guilfoyle, *Back to the Ten Commandments?*
(September 12, 2007)....................................................................................41

Samuel L. Bufford, *Center of Main Interests, International Solvency Case Venue, and
Equality of Arms: The Eurofood Decision of the European Court of Justice*,
27 Nw. J. Int'l L. & Bus. 351 (2007)..........................................................27

*What Price COMI-ty?*, Newsletter Contributed by Appleby, dated October 4, 2007 ...................41

United Nations Commission on International Trade Law (UNCITRAL) – UNCITRAL
Model Law on Cross-Border Insolvency with Guide to Enactment.....................21, 34

Simon Lovell Clayton Whicker and Kristen Beighton, the joint official liquidators and duly-authorized foreign representatives (the "Foreign Representatives") of Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (in Official Liquidation) ("High-Grade Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (in Official Liquidation) ("Enhanced Fund"; collectively, the "Foreign Debtors"), respectfully submit this brief in support of their appeal from the September 5, 2007 order (the "Decision") of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") denying their petitions (the "Petitions") for recognition of winding-up proceedings pending in the Cayman Court (the "Foreign Proceedings"), either as "foreign main proceedings" or as "foreign nonmain proceedings" pursuant to chapter 15 of title 11 of the Bankruptcy Code.[2]

## I.     <u>PRELIMINARY STATEMENT</u>

Enacted in 2005, chapter 15 of the Bankruptcy Code establishes a simple and straightforward statutory procedure for recognition of foreign insolvency proceedings. The legislative history of chapter 15, international commentary, and the case law of this District all support a reading of chapter 15 that is flexible and pragmatic, reflecting Congress's intent to foster comity and cooperation between U.S. and foreign courts. The Bankruptcy Court's Decision contradicts this reading. It should be reversed.

Recognition is the starting point and necessary precondition to granting comity to foreign insolvency proceedings. Under chapter 15, U.S. courts must afford "main" recognition to a foreign proceeding if the debtor's center of main interest ("COMI") is in the same country as the

---

[2] All statutory references are to title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.

foreign insolvency proceeding, or "nonmain" recognition if the debtor's COMI is elsewhere but the debtor has an "establishment" in that country. There is a statutory presumption that the COMI is the place where the debtor has its registered office.

The Foreign Debtors are investment companies designed for sophisticated investors and counterparties to various types of securities contracts. Indeed, the Foreign Debtors' investors consisted of only four total investors and less than twenty creditors which are all large, international financial institutions. While the Foreign Debtors had contacts with many countries, their registered offices were in the Cayman Islands, where they were incorporated as "exempted" companies (exempt from certain local laws, but whose taxation is determined pursuant to Cayman Islands tax laws). The Foreign Debtors also had other substantial contacts in the Cayman Islands, including, among the others set forth below at pages 11-13): Cayman Islands-registered corporations were among their direct investors; their two independent directors, who were the same for each Foreign Debtor, resided in the Cayman Islands; and their investments included collateralized debt obligations constituted under Cayman Islands law. Winding-up proceedings were initiated in August 2007 in the Cayman Court, where the Foreign Representatives reside – the jurisdiction in which a Cayman Islands incorporated entity is required by Cayman Islands law to wind up its existence – and are proceeding there now under the auspices of official liquidators appointed by that Court. None of the creditors, or any other interested party, has ever objected to the petitions brought by the Foreign Representatives for chapter 15 recognition of the Cayman Islands proceedings.

Under these circumstances, the Bankruptcy Court should have recognized the Cayman Islands proceedings as "main" for chapter 15 purposes in keeping with the statute's COMI presumption in favor of the place of the debtor's registered office. At the very least, it should

have recognized the Cayman Islands proceedings as "nonmain" because the evidence squarely

showed that the debtors maintained the requisite "establishment" in the Cayman Islands.  But the

Bankruptcy Court declined to recognize the foreign proceedings *at all*.  Based on extremely

narrow and unprecedented interpretations of COMI and "establishment" under chapter 15, the

Bankruptcy Court selectively considered the evidence before it and denied the chapter 15

petitions, insisting instead that the Foreign Representatives file chapter 7 or 11 petitions in the

U.S. Court.  By basing its Decision largely on facts adduced from the July 31 filings and not

considering the facts subsequently presented, the Bankruptcy Court ignored the developing

factual landscape resulting from the Foreign Representatives' continuing investigation.

Moreover, in addition to the facts overlooked by the Bankruptcy Court, undergirding the

Bankruptcy Court's ruling was an inappropriate digression into substantive Cayman Islands law

and the Court's erroneous view that companies registered as "exempted" under Cayman Islands

law can never have sufficient business in that country to satisfy chapter 15's recognition test.

But, chapter 15 does not contemplate that U.S. courts would pass judgment on the particulars of

foreign law.  Indeed, that prospect flies in the face of the principles of international comity

underpinning chapter 15.  And, an examination of substantive Cayman Islands law reveals that

there is nothing about the Companies Law that prevents an exempted company from having its

COMI or maintaining an "establishment" in the Cayman Islands.

      The Bankruptcy Court conceded that its reasoning conflicts with that of *SPhinX*, the only

published decision on point in this District.  *In re SPhinX, Ltd*., 351 B.R. 103 (Bankr. S.D.N.Y.

2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).  Unlike the Bankruptcy Court in this case, the

Bankruptcy Court and this Court in *SPhinX* applied chapter 15 pragmatically, based on their

understanding that recognition should be withheld only in very limited circumstances.  *SPhinX*

denied "main" recognition to proceedings in the Cayman Islands, where there were vociferous objections to recognition, because it found the request for chapter 15 recognition was brought for a starkly improper purpose. The Court in *SPhinX* nevertheless afforded "nonmain" recognition so that winding up could proceed without undue cost or delay.

The Foreign Representatives respectfully submit that the Bankruptcy Court's refusal to grant recognition and comity to the Foreign Proceedings frustrates chapter 15's goals by turning what is intended to be a simple and streamlined legal proceeding into a complex, cumbersome, and time consuming process. Most critically, the Bankruptcy Court's reading of the statute adds a new layer of analysis – review and judgment of the substantive laws of another country – that chapter 15 was designed to eliminate. And, as a practical matter, the Bankruptcy Court's decision undermines the Foreign Proceedings and prevents the Foreign Representatives from acting to protect the Foreign Debtors' assets in the United States.

This Court should reverse the Bankruptcy Court's decision and instruct it to grant the Foreign Representatives' request for main recognition, or, in the alternative, grant the Foreign Representatives' request for nonmain recognition. The Court should also set forth guidelines on the interpretation of "establishment" under chapter 15, a matter of first impression.

## II.    BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction over appeals from final judgments, orders, and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). On September 10, 2007, the Foreign Representatives timely filed their notices of appeal from the Decision pursuant to Rule 8002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III.    STATEMENT OF ISSUES ON APPEAL

Whether the Bankruptcy Court's decision denying the Foreign Representatives' unopposed petitions for recognition of winding-up proceedings before the Cayman Court (the

"Petitions") as foreign "main" or as foreign "nonmain" proceedings under chapter 15 conflicts

with this Court's opinion in *SPhinX* and with chapter 15's purpose of furthering comity and

cooperation between American and foreign courts?

      a.    Whether the Bankruptcy Court erred in refusing to recognize the Cayman

Islands proceedings as foreign "main" proceedings, based on its conclusion that the Foreign

Debtors' COMI is in the United States, even though (i) the Foreign Debtors' registered offices

are in the Cayman Islands; (ii) there is a statutory presumption that a foreign debtor's COMI is

the place where it has its registered offices; and (iii) the Foreign Debtors have additional

substantial contacts with the Cayman Islands?

      b.    Whether the Bankruptcy Court erred in refusing to recognize the Cayman

Islands proceedings as foreign "nonmain" proceedings, based on its conclusion that the Foreign

Debtors do not have an "establishment" for purposes of chapter 15, even though the Foreign

Debtors are not only registered in the Cayman Islands, but have numerous other substantial

contacts with that jurisdiction?

### IV.  <u>STANDARD OF REVIEW</u>

When a district court reviews a decision of the Bankruptcy Court, it is authorized to

"affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with

instructions for further proceedings." Fed. R. Bankr. P. 8013. Findings of fact are reviewed for

clear error. *Id*. Conclusions of law are reviewed de novo. *Krys v. Official Comm. of Unsecured

Creditors (In re SPhinX, Ltd.)*, No. 06-13215 (RWS), 2007 U.S. Dist. LEXIS 48962 at *16-17; *In

re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir. 1999). A bankruptcy court's interpretation of the

Bankruptcy Code is reviewed de novo. *In re Caldor Corp.*, 303 F.3d 161, 166 (2d Cir. 2002).

## V.    <u>STATEMENT OF UNCONTESTED FACTS</u>

### A.    The Foreign Debtors.

The Foreign Debtors are open-ended investment companies incorporated in the Cayman Islands as limited liability companies subject to Cayman Islands tax law.[3]  Record on Appeal ("ROA")-2 (Addendum Tab 1), 14 ¶2 (Addendum Tab 7).[4]  High-Grade Fund was incorporated on September 3, 2003 and Enhanced Fund was incorporated on April 27, 2006.  ROA-2 ¶2 (Addendum Tab 1); ROA-14 ¶2 (Addendum Tab 7).  From their inception, the Foreign Debtors have maintained their registered offices in the Cayman Islands.  ROA-11 ¶ 27 (Addendum Tab 5); ROA-12 at 11:7-9 (Addendum Tab 6).  Both of the Foreign Debtors are registered as "exempted" companies under Cayman Islands law, which allows qualifying companies to trade in the Cayman Islands provided that they seek to further business outside of the Cayman Islands and not to compete with local businesses.  Affidavit of Richard L. Finlay (the "Finlay Affidavit") ¶12 (Addendum Tab 12, Exhibit B); ROA-12 at 15:15-17 (Addendum Tab 6).

The Foreign Debtors were established to attract sophisticated investors who understood, and were willing to accept, the risk of loss attendant to high income and capital appreciation investments.  ROA-9 at 14:16-18 (Addendum Tab 3).[5]  With respect to High-Grade Fund, such

---

[3] The Foreign Debtors are not subject to United States income tax.  ROA-11 ¶27 (Addendum Tab 5).

[4] For the Court's convenience, along with this brief, the Foreign Representatives have manually filed an addendum (the "Addendum") containing (i) those documents designated as the record on appeal that are cited herein and (ii) unpublished decisions, authorities and foreign cases not readily available via routine legal research.

[5] The Foreign Debtors invested, *inter alia*, in:  (i) investment-grade structured finance securities; (ii) asset-backed securities ("ABSs"); (iii) synthetic ABSs; (iv) mortgage-backed securities; (v) global structured asset securitizations; (vi) derivatives; (vii) options; (viii) swaps; (ix) swaptions; (x) futures; (xi) forward contracts; (xii) equity securities; and (xiii) currencies.  ROA-2 ¶2 (Addendum Tab 1); ROA-14 ¶2 (Addendum Tab 7).  The Foreign Debtors also

investors were "feeder funds," and are the only investors in High-Grade Fund which, like

Enhanced Fund, is a master fund.[6]  These investors were sophisticated parties who were

informed that they were dealing with Cayman Islands incorporated entities and knew, or should

have reasonably known, of the risks and benefits of doing business with such entities.  There

were only three investors in High-Grade Fund, two of which were registered in the Cayman

Islands.  *Id.* at 14:19-23.  The third investor was a U.S. entity.  There was only one investor in the

Enhanced Fund.  That investor was a large financial institution based in the United Kingdom.

ROA-12 at 16:7-10 (Addendum Tab 6).  In addition, the creditor constituency of the Foreign

Debtors consists of less than twenty large, international financial institutions who also were, or

should have been aware, of the Foreign Debtors' connections to the Cayman Islands.

> **B.**      **The Foreign Proceedings and the Appointment**
> **of the Foreign Representatives as the Joint Official Liquidators.**

In May 2007, following the well-publicized volatility in the capital markets arising from

defaults on mortgages by sub-prime borrowers in the United States, the Foreign Debtors began to

suffer a significant devaluation of their asset portfolios.  *Id.* at 11:25-12:1-10.  This prompted

many of the Foreign Debtors' trading counterparties to make margin calls, which the Foreign

Debtors ultimately were unable to meet.  *Id.* at 12:3-6.  As the market for the Foreign Debtors'

investments continued to deteriorate, most of the Foreign Debtors' secured creditors accelerated

---

invested in collateralized debt obligations constituted under Cayman Islands law.  ROA-11 ¶27
(Addendum Tab 5).

[6] Diagrams depicting the master and feeder fund relationship with respect to the Foreign Debtors
are contained in Addendum Tabs 9 and 10, respectively.  There were additional feeder funds
which had a contractual relationship with Enhanced Fund's sole investor.  *See* Addendum Tab
10.  Because the identity of Enhanced Fund's sole investor is confidential and disclosure thereof
would be in violation of Cayman Islands law, the Enhanced Leverage chart has been slightly
redacted.

repurchase rights or sold off assets that were the subject of repurchase agreements or in which the counterparties held security interests. *Id*. at 12:19-23.

In light of these events, the Foreign Debtors' boards of directors (the "Boards of Directors") determined that it was in the best interest of the Foreign Debtors to file winding-up petitions in the Cayman Islands. ROA-12 at 9:1-6 (Addendum Tab 6). Accordingly, the Boards of Directors passed resolutions authorizing the Foreign Debtors to file petitions in the Cayman Court (i) seeking orders that they be wound up under the provisions of the Companies Law (2007 Revision) of the Cayman Islands (the "Companies Law"), and (ii) applying for the appointment of the Foreign Representatives, subject to the supervision of the Cayman Court. *Id.* at 9:17-24. The petitions were filed on behalf of the Foreign Debtors by their pre-petition Cayman Islands attorneys, and were supported by affidavits filed by one of the Foreign Debtors' two independent directors, both of whom reside in the Cayman Islands. ROA-2, Exhibit C at 2 (Addendum Tab 1); ROA-15, Exhibit C at 2 (Addendum Tab 8).

On July 31, 2007, the Cayman Court entered Orders (the "JPL Orders") appointing the Foreign Representatives as the joint provisional liquidators (the "JPLs") of the Foreign Debtors. ROA-9 at 16:18-25 (Addendum Tab 3). The broad powers of the JPLs, as set out in the JPL Orders, derive from Section 109 of the Companies Law. ROA-2, Exhibit A ¶10 (Addendum Tab 1); ROA-14, Exhibit A ¶10 (Addendum Tab 7). Provisional liquidators are officers of the Cayman Court. ROA-9 at 13:22-23 (Addendum Tab 3). They are required to be independent of the management of the company and its creditors and to act in an even-handed fashion when dealing with creditors or groups of creditors. ROA-2, Exhibit A ¶14 (Addendum Tab 1). The powers of a provisional liquidator with respect to a particular winding-up proceeding are

established by the Cayman Court and set out in its appointment orders. *Id.* at ¶16 (citing sections 109 and 110 of the Companies Law).

The JPL Orders here authorized the JPLs "to do any acts or things considered by them to be necessary or desirable for the protection of the assets and property of the Company" in connection with the liquidation of the Foreign Debtors and the winding up of their affairs. *Id.* at ¶10. Specifically, the JPL Orders authorized the JPLs to "locate, protect, secure, and take into their possession and control all assets and property to which the Company is or appears to be entitled," to "retain and employ barristers, solicitors, or attorneys and/or such agents or professional persons," and to "take any such action as may be necessary or desirable to obtain the recognition of the appointment of the JPLs in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose, including, without limitation, the filing of a petition under Chapter 15 of the US Bankruptcy Code." *Id.*

On September 14, 2007, the Cayman Court entered orders converting the Foreign Proceedings from provisional to official liquidations and directing that the Foreign Debtors be wound up under the Companies Law. Pursuant to these orders, the JPLs became the joint official liquidators (the "JOLs"), which did not materially change the duties of the Foreign Representatives.

The Foreign Debtors and the Foreign Representatives are governed by the laws and regulations of the Cayman Islands and the Foreign Debtors' estates will be distributed in accordance with Cayman Islands insolvency law, which is based on the Companies Law (2007 Revision) and the Insolvency Rules (1986) of England and Wales, as adopted in the Cayman

Islands pursuant to rule 17 of Order 102 of the Cayman Court Rules. *Id.* at ¶18.[7]  As under U.S.

law, the liquidator must first pay creditors afforded preferential treatment out of the estate's

assets. *Id.* at ¶19.  In the event these creditors are paid in full, the rule of *pari passu* (ratable)

distribution to unsecured creditors applies. *Id.*  If creditors claims are satisfied in full, any

surplus assets would then be distributed *pari passu* to investors. *Id.*

Cayman Islands law accommodates foreign creditors by allowing them to assert their

claims by mail; they are not required to appear before the Cayman Court or the liquidator. *Id.* at

¶20.

### C.    The Chapter 15 Cases.

Because the Foreign Debtors had assets located in the United States, the Foreign

Representatives needed to initiate proceedings in the U.S. Bankruptcy Court to protect U.S.

assets from attachment by creditors – thereby preventing U.S. creditors from obtaining assets at

the expense of other creditors.  The Foreign Representatives determined that chapter 15 petitions

would facilitate an efficient, prompt, and orderly conduct of the Foreign Proceedings, and that,

by contrast, petitions under chapter 7 or 11 of the Bankruptcy Code would exact unnecessary

costs and delays based on the facts and circumstances then known to the Foreign

Representatives.  Accordingly, on the day they initiated the Foreign Proceedings in the Cayman

Islands, the Foreign Representatives also filed petitions in the Bankruptcy Court seeking

recognition of the Foreign Proceedings as foreign main proceedings, or, in the alternative, as

---

[7] Except for the chapter 15 cases, the only other insolvency proceedings pending with respect to
the Foreign Debtors are in the Cayman Islands.

foreign nonmain proceedings, under chapter 15. *See* ROA-11 at ¶6 (Addendum Tab 5). The petitions were, and are, unopposed.[8]

To protect the Foreign Debtors' assets and maintain the status quo pending the Foreign Debtors' request for recognition, the Foreign Debtors requested, pursuant to section 1519 of the Bankruptcy Code, entry of an order (i) staying execution against the Foreign Debtors' assets, (ii) prohibiting all persons from commencing or continuing any litigation or any other proceeding, including, without limitation, appeals, mediation or any judicial, quasi judicial, administrative or regulatory action, proceeding or process whatsoever, or taking any other actions against or involving the Foreign Representatives (with respect to the Foreign Debtors), the Foreign Debtors and its property in the United States, and (iii) entrusting the administration or realization of the Foreign Debtors to the Foreign Representatives. *See generally* ROA-4 (Addendum Tab 2); ROA-15 (Addendum Tab 8). On August 1, 2007, the Bankruptcy Court, Judge Lifland presiding, entered a temporary restraining order pending a hearing on a preliminary injunction. *Id.* ¶7.

On August 9, 2007, the Bankruptcy Court held a hearing on the applications for a preliminary injunction. ROA-9 (Addendum Tab 3). Testimony from Simon Whicker, one of the Foreign Representatives, was proffered without objection or cross examination, and the

---

[8] Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International and Merrill Lynch Capital Services, Inc. (collectively, the "Merrill Lynch Entities") filed a statement (the "Merrill Lynch Statement") requesting that no choice of law determination be made regarding potential U.S. actions in conjunction with a "finding or conclusion as to the Foreign Debtors' [COMI]." ROA-10 at 2 (Addendum Tab 4). Although the Bankruptcy Court suggested the statement could be read to support recognition as a nonmain proceeding, and thus as a "partial objection" to recognition as a main proceeding, Decision at 5 n.2, this reading reaches beyond the plain language of the statement. The Merrill Lynch Entities have never challenged the Cayman Islands proceeding or raised any objection to its recognition as a main or nonmain proceeding. Indeed, at the August 27, 2007 hearing, Mr. Eskew, counsel for the Merrill Lynch Entities, stated that the Merrill Lynch Statement presupposed the Court's entry of an order recognizing the Foreign Proceedings. *See* ROA-12 at 25:24-25; 26:1-3 (Addendum Tab 6).

Bankruptcy Court granted the Foreign Representatives a preliminary injunction pending the disposition of the Foreign Debtors' chapter 15 petitions. *See generally id.*

On August 27, 2007, the Bankruptcy Court held a hearing on the Foreign Debtors' unopposed chapter 15 petitions. ROA-12 (Addendum Tab 6). It was undisputed that the Foreign Representatives satisfied the threshold requirements for recognition of the Foreign Proceedings. *Id.* at 29-31. The Foreign Representatives presented unrefuted testimony and other evidence[9] regarding the Foreign Debtors' connections to the Cayman Islands, showing, *inter alia,* that:

    (i)      two of the three investors in High-Grade Fund are registered in the Cayman Islands;

    (ii)     two of the five members of the pre-filing board of directors (the only independent directors) who presided over both Foreign Debtors reside in the Cayman Islands;

    (iii)    upon the appointment of the Foreign Representatives as joint provisional liquidators, the powers of the boards of directors ceased and the control of the Foreign Debtors was transferred to Cayman Islands-based official liquidators – the only persons authorized to act on behalf of the Foreign Debtors;

    (iv)    the Foreign Debtors' pre-filing attorneys are in the Cayman Islands;

    (v)     the Foreign Debtors' pre-filing auditors, Deloitte & Touche, performed certain auditing work in the Cayman Islands;

    (vi)    most, if not all, of the Foreign Debtors' remaining liquid assets are in bank accounts in the Cayman Islands;[10]

---

[9] Evidentiary documents submitted in support of a petition for recognition are presumed to be authentic in the absence of evidence to the contrary. *See* 11 U.S.C. §§ 1515(b), 1516(b).

[10] To protect the Foreign Debtors' remaining assets (as required by Cayman Islands law), the Foreign Representatives opened accounts in the Cayman Islands to hold receivables collected post-filing. These post-filing collections are the only funds that have been "transferred" to Cayman Islands accounts. *See* ROA-12 at 18:22-4; 19:1-8 (Addendum Tab 6); Decision at 13 n.10. At this time, except as required by the Bankruptcy Court's stay order (discussed *infra*), virtually all of the Foreign Debtors' remaining liquid assets are in Cayman Islands bank accounts. ROA-12 at 17:4-6 (Addendum Tab 6).

(vii)    the Foreign Debtors are subject to Cayman Islands tax law and are not subject to United States income tax;

(viii)    certain investments made by the Foreign Debtors were in collateralized debt obligations constituted under Cayman Islands law;

(ix)    at all times the Foreign Debtors held themselves out to investors and creditors as Cayman Islands based companies and these investors in, and counter-parties of, the Foreign Debtors knew or should have reasonably known that they were dealing with Cayman Islands incorporated entities and understood the economic advantages and consequences of the Foreign Debtors being Cayman Islands entities; and

(x)    the Foreign Representatives and the Foreign Debtors are governed by the laws and regulations of the Cayman Islands, where the only foreign proceedings, other than these chapter 15 cases, are pending and where a Cayman Islands incorporated company is required, under Cayman Islands law, to wind-up its affairs.

*See generally* ROA-11 (Addendum Tab 5); ROA-12 (Addendum Tab 6).

The Foreign Debtors also presented testimony and evidence of contacts with other jurisdictions, showing, *inter alia*, that:

(i)    the sole investor in Enhanced Leverage Fund is a large financial institution based in the United Kingdom (*See* ROA-12 at 16:8-10 (Addendum Tab 6));

(ii)    certain of the Foreign Debtors' accounts receivables are located outside the United States (*See id.* at 20:21-25); and

(iii)    some of the counterparties with which the Foreign Debtors regularly entered into securities-related agreements are based outside of the United States (*Id.*).

Despite the substantial connections to the Cayman Islands set forth above, the Bankruptcy Court found that "[t]he only adhesive connection with the Cayman Islands that the Funds have is the fact that they are registered there."  Decision at 12.

### D.    The Decision and Stay Pending Appeal.

Although the Bankruptcy Court conceded, as it had to, that the location of the Foreign Debtors' registered office in the Cayman Islands triggered the presumption in favor of finding

that the Foreign Debtors' COMI is in the Cayman Islands, it ruled that the Foreign Debtors'

COMI was actually in the United States, because the Foreign Debtors' investment manager, Bear

Stearns Asset Management, Inc. ("BSAM") is located in New York, certain administrative tasks

are performed in the United States, and all of the Foreign Debtors' liquid assets were located in

the U.S. prior to the commencement of the Foreign Proceedings. Based on this conclusion, the

Court ruled that the Foreign Proceedings did not qualify as foreign main proceedings within the

meaning of chapter 15. Decision at 12-14.

The Bankruptcy Court also ruled that the Cayman Islands liquidation proceedings did not

qualify as foreign nonmain proceedings, based on its conclusion that the Foreign Debtors do not

have an "establishment" in the Cayman Islands within the meaning of chapter 15. *Id*. at 16.

The Bankruptcy Court extended the preliminary injunction it previously issued until

September 29, 2007 to give "parties in interest an opportunity to file a petition for relief under

chapters 7 or 11 of the Bankruptcy Code[.]" *Id*. at 19.

On September 10, 2007, the Foreign Representatives appealed the Bankruptcy Court's

Decision denying recognition to the Foreign Proceedings either as foreign main or as foreign

nonmain proceedings. Because the Petitions were uncontested, there are no appellees.

On September 21, 2007, the Foreign Representatives filed an unopposed motion for a

stay pending appeal pursuant to Bankruptcy Rule 8005. *See* Addendum Tab 11. The Bankruptcy

Court held a hearing on September 24, 2007, at which the Foreign Representatives presented

newly discovered evidence from the Foreign Representatives' continuing investigation, after the

Bankruptcy Court issued its Decision and the appeal was noticed.[11]  *See* Addendum Tab 14.

---

[11] This new evidence came to light after (i) the commencement of this appeal and (ii) the time to
file a motion for reconsideration pursuant to Rule 59 of the Federal Rules of Civil (*cont.)*

This evidence showed that the Foreign Debtors regularly entered into a substantial number of securities-trading transactions (the "Principal Transactions") with The Bear Stearns Companies, Inc., or its affiliates (collectively, "Bear Stearns"), each of which required the prior review and written approval of at least one of the independent directors, both of whom reside in the Cayman Islands. (*See* Declaration of Simon Lovell Clayton Whicker (the "Whicker Declaration") ¶7 (Addendum Tab 12, Exhibit C).

On September 27, 2007, the Bankruptcy Court entered an order requiring that $4 million be maintained in U.S. bank accounts established with respect to each Foreign Debtor and continuing the preliminary injunction pending final disposition of this appeal. *See* Addendum Tab 13.

## VI.   ARGUMENT

The Bankruptcy Court's failure to confer either main or nonmain recognition on the Cayman Islands proceedings was based on its erroneous interpretation of chapter 15, its selective use of the evidence presented, and its unwarranted and incorrect analysis of Cayman Islands law. Because the Bankruptcy Court's conclusions were based on mistaken interpretations of law, they are to be reviewed de novo by this Court.

### A.   The Bankruptcy Court's Decision Is In Conflict with the Basic Tenets of Chapter 15 of the Bankruptcy Code.

#### 1.   Chapter 15 Was Enacted to Foster Comity and Cooperation Between American and Foreign Courts.

Enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Prevention Act ("BAPCPA"), chapter 15 establishes a new bankruptcy case category designed to coordinate

---

(*cont.*) Procedure. This Court may take judicial notice of "a pleading and official court record of an inferior court in [this] jurisdiction in a case that is related to this one." *Jacques v. United States R.R. Retirement Bd.*, 736 F.2d 34, 40 (2d Cir. 1984).

cross-border insolvency proceedings.  Chapter 15 is the United States' version of the Model Law

on Cross-Border Insolvency (the "Model Law"), drafted by the United Nations Commission on

International Trade Law ("UNCITRAL") and promulgated in 1997.  *See In re Tri-Continental*

*Exchange Ltd.*, 349 B.R. 627, 631-32 (Bankr. E.D. Cal. 2006).

Comity and cooperation between American and foreign courts are the principles driving

the new statutory regime.  As the House Judiciary Committee noted in its report, comity is so

important to chapter 15 that it is set forth in the introductory language as the statute's

overarching goal, "mak[ing] clear that it is the central concept to be addressed."  *United States v.*

*J.A. Jones Constr. Group, LLC*, 333 B.R. 637, 638 (E.D.N.Y. 2005) (quoting H.R. Rep. No. 109-

31, pt. 1, at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172) (hereinafter, the "House Report");

*see also* 11 U.S.C. § 1507 (stating that any determination of a request for assistance under

chapter 15 must be "consistent with principles of comity").

As set forth in chapter 15's statement of purpose, its express purpose is "to incorporate

the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing

with cases of cross-border insolvency with the objectives of—"

    (1)    cooperation between –

        (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

        (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

    (2)    greater legal certainty for trade and investment;

    (3)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

    (4)    protection and maximization of the value of the debtor's assets; and

(5)    facilitation of the rescue of financially troubled businesses, thereby
       protecting investment and preserving employment.

11 U.S.C. § 1501(a).[12]

Scholars of chapter 15 – including Professor Jay Westbrook, whose then-unpublished[13]

article on the subject – *Locating the Eye of the Financial Storm*, 32 Brook. J. Int'l. L. 1019

(2007) (hereafter, "*Locating the Eye*") – is cited throughout the Bankruptcy Court's Decision –

uniformly stress (and almost uniformly laud) chapter 15's purpose of maximizing cooperation

with foreign courts. *See, e.g.*, Jay Westbrook, *Multinational Enterprises in General Default:*

*Chapter 15, The ALI Principles, and the EU Insolvency Regulation*, 76 Am. Bankr. L.J. 1, 5-24

(2002) (hereafter, "*Multinational Enterprises*"); John Chung, *The New Chapter 15 of the*

*Bankruptcy Code: A Step Toward Erosion of National Sovereignty*, 27 N.W. J. Int'l L. & Bus. J.

89, 97 & n.29 (2006) (chapter 15 "requires American courts to 'cooperate to the maximum extent

possible with a foreign court or foreign representative'") (quoting BAPCPA § 801); Bryan Stark,

*Chapter 15 and the Advancement of International Cooperation in Cross-Border Bankruptcy*

*Proceedings*, 6 Rich. J. Global L. & Bus. 203, 215 (2006).

Judge Lifland himself has recognized the central role played by comity in chapter 15.

*See* Burton Lifland, *Chapter 15 of the United States Bankruptcy Code:  An Annotated Section-*

*by-Section Analysis,* A US-EU Experience (George Affaki ed., Bruyland & FEC 2007) at 45, ¶ 35

(Addendum Tab 23).

The principles embraced by chapter 15 are not new to U.S. law, but are fully in keeping

with longstanding recognition by U.S. courts of the "particular need to extend comity to foreign

---

[12] Chapter 15's statutory statement of purpose is taken from the Preamble to the Model Law,
available with the Guide at http://www.uncitral.org/pdf/english/texts/insolven/insolvency-e.pdf.

[13] At the time the Bankruptcy Court issued its Decision, the article was unpublished.

bankruptcy proceedings." *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 247 (2d

Cir. 1999); *see also Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n*

*Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996) ("deference to foreign insolvency proceedings will, in

many cases, facilitate 'equitable, orderly and systematic' distribution of the debtor's assets")

(quoting *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985); *Allstate*

*Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993).

Before chapter 15 was enacted, U.S. courts granted comity to foreign insolvency

proceedings under former section 304 of the Bankruptcy Code so long as the foreign proceedings

were substantially similar and not repugnant to U.S. law. *See, e.g.*, *Bank of N.Y. v. Treco*, 240

F.3d 148, 157-58 (2d Cir. 2001). In keeping with this principle, U.S. courts regularly granted

comity to Cayman Islands insolvency proceedings under former section 304. *See, e.g.*, *Hoffman*

*v. Bullmore (In re Nat'l Warranty Ins. Risk Retention Group)*, 384 F.3d 959 (8th Cir. 2004)

(upholding bankruptcy court's granting of relief under section 304 of the Bankruptcy Code in

favor of an exempted Cayman Islands company and noting that the Court "respects our sister

common law jurisdiction in the Cayman Islands" and that the "Cayman Companies Law was

similar to but not exactly the same as the Bankruptcy Code"); *In re Blackwell*, 270 B.R. 814, 829

(Bankr. W.D. Tex. 2001) (recognizing that Cayman Islands proceedings are "appropriate

candidates" for extending comity and cooperation because the Court had "been presented with

no evidence (and no credible argument) that the courts of the Cayman Islands are courts to which

this court would not or should not extend recognition and cooperation in the interests of comity"

and that the Court "doubts that any such evidence could ever be mustered"); *In re Gee*, 53 B.R.

891, 905 (Bankr. S.D.N.Y. 1985) (granting petition for ancillary relief relating to Cayman Islands

proceeding noting that the Companies Law is derived from the British Companies Act "and is

similar to our Bankruptcy Code"); *In re MMG LLC*, 256 B.R. 544, 552 (Bankr. S.D.N.Y. 2000)

(finding that Cayman Islands liquidators were likely to succeed on the merits when applying the

section 304(c) factors).[14]

Moreover, since chapter 15 was enacted in 2005, U.S. Courts have continued to grant

comity and recognition to Cayman Islands proceedings.  *See, e.g., In re SPhinX, Ltd.*, 351 B.R.

103, 112 (Bankr. S.D.N.Y. 2006) (granting nonmain recognition); *In re Amerindo Internet*

*Growth Fund Limited*, Chapter 15 Case No. 07-10327 (RDD) (Bankr. S.D.N.Y. March 7, 2007)

(granting main recognition) (Addendum Tab 18) ; *In re Bancredit Cayman Limited (In*

*Liquidation)*, Chapter 15 Case No. 06-11026 (SMB) (Bankr. S.D.N.Y. June 15, 2006) (granting

main recognition) (Addendum Tab 19).

Indeed, as the Supreme Court recognized long before the enactment of either section 304

or chapter 15, comity can be the basis for recognition of foreign proceedings:

> [W]here there has been opportunity for a full and fair trial abroad before a
> court of competent jurisdiction, conducting the trial upon regular
> proceedings, after due citation or voluntary appearance of the defendant,
> and under a system of jurisprudence likely to secure an impartial
> administration of justice between the citizens of its own country and those
> of other countries, and there is nothing to show either prejudice in the
> court, or in the system of laws under which it was sitting, or fraud in
> procuring the judgment, or any other special reason why the comity of this
> nation should not allow it full effect . . . .

*Hilton v. Guyot*, 159 U.S. 113, 202 (1895).

---

[14] Although the Bankruptcy Court stated that the Foreign Representatives' "reliance on the
discretionary and flexibility attributes of case law under former section 304 of the Bankruptcy
Code is misplaced," such cases were cited not to suggest that the section 304 standard applies
under chapter 15, but rather to highlight the United States' longstanding and consistent practice
of affording comity to Cayman Islands insolvency proceedings.

As we explain next, chapter 15 was intended to simplify and render objective the process established by section 304, and to ensure that American courts respect insolvency proceedings in foreign courts – a result consistent with the pragmatic approaches employed in *SPhinX* and *Schefenacker*, as discussed further below.

      **2.       Chapter 15 Was Designed to Streamline the Process of Granting Recognition to Foreign Insolvency Proceedings.**

          **a.       Congress devised "a simple documentary process" for granting recognition.**

The starting point for cooperation with foreign courts under chapter 15 is recognition of foreign insolvency proceedings by the United States bankruptcy court.  While former section 304 entailed a relatively extensive and subjective recognition analysis, chapter 15 streamlines the process, making it "as simple, fast and inexpensive as possible," by reducing it to "a simple documentary process, unless challenged."  Westbrook, *Multinational Enterprises, supra*, at 14. As the legislative commentary to section 1517 states,

> [T]he decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code.  The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24) are all that must be fulfilled to attain recognition.

House Report at 175; *see also SPhinX*, 351 B.R. at 112 (observing that "chapter 15 maintains – and in some respects enhances – the 'maximum flexibility' that section 304 provided bankruptcy courts") (citations omitted); *accord*, Kurt Mayr, *Enforcing Prepackaged Restructurings of Foreign Debtors Under the U.S. Bankruptcy Code*, 14 Am. Bankr. Inst. L. Rev. 469, 513 & n.135; *id.* nn.59, 91; Lesley Salafia, Comment, *Cross-Border Insolvency Law in the United States and Its Application to Multinational Corporate Groups*, 21 Conn. J. Int'l L. 297, 316-317 (2006) (explaining that chapter 15 seeks to enhance recognition of foreign bankruptcy proceedings).

The same idea is reflected in the UNCITRAL Model Law, which lists as one of its key objectives provision of a system designed "to provide expedited and direct access for foreign representatives to the courts of the enacting State" and to "avoid[] the need to rely on cumbersome and time-consuming letters rogatory or other forms of diplomatic or consular communications that might otherwise have to be used."  Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (the "Guide") (prepared at the request of UNCITRAL ), ¶ 28.

The process devised by Congress works as follows.  Chapter 15 requires recognition of a foreign proceeding[15] when:

> (i)   such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (ii)  the foreign representative applying for recognition is a person or body;[16] and
>
> (iii) the petition meets the requirements of section 1515.[17]

---

[15] Chapter 15 broadly defines "foreign proceeding" to include any collective judicial or administrative proceeding in a foreign country pursuant to a law relating to insolvency, in which the assets and affairs of the debtor are subject to control or supervision by a foreign court (or administrative agency) for the purpose of reorganization or liquidation of the debtor.  11 U.S.C. § 1501(23).

[16] Bankruptcy Code Section 101(24) defines a "foreign representative" in pertinent part as a "person or body . . .  authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."  Section 101(41) defines "person" as an "individual . . . that  . . . acquires an asset from a person . . . as a receiver or liquidating agent of a person."

[17] The requirements of section 1515 are met if the petition includes (i) a certified copy of the decision commencing the foreign proceeding (§ 1515(b)(1)); (ii) a certificate from the foreign court affirming the existence of the foreign proceeding and appointment of the foreign representative (§ 1515(b)(2)); and (iii) any other evidence that is acceptable (*cont.*)

11 U.S.C. § 1517(a).

In keeping with subsection (i) of section 1517(a), the foreign representative must demonstrate that the foreign proceeding is either a "main" or "nonmain" proceeding. A foreign main proceeding is one that is brought in the courts of the country where the debtor has the "center of its main interests" (COMI) is located, 11 U.S.C. § 1502(4), while a foreign nonmain proceeding is one that is brought in a country outside the place of the COMI, *id*. § 1502(2), where the debtor has an "establishment," defined as "any place of operations where the debtor carries out a nontransitory economic activity." *Id.* § 1502(5). The Bankruptcy Code does not define "nontransitory economic activity."

Chapter 15 includes a statutory presumption that, *in the absence of evidence to the contrary,* a foreign debtor's COMI is the place where its registered offices are located. *See* 11 U.S.C. § 1516(c). This presumption was "included for speed and convenience of proof where there is no serious controversy." House Report at 175 (quoted in *SPhinX*, 351 B.R. at 117, 121-22); *see also* Lifland, *supra*, at 53, ¶ 64 (Addendum Tab 23). This statutory presumption may be challenged only on the basis of evidence that the COMI is in another country, or on the basis of the very narrow public policy exception in section 1506, which permits courts to refuse to take actions "manifestly contrary to the public policy of the United States." *In re Ephedra Products Liab. Lit.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (quoting the House Report in observing that exception is restricted "'to the most fundamental policies of the United States'"); *see id*. at 336-37 (rejecting argument that foreign tribunal's failure to provide objectors with right to a jury trial

---

(*cont.*) to the Bankruptcy Court if the requirements of section 1515(b)(1)-(2) cannot be satisfied (§ 1515(2)).

constituted grounds for applying the exception); *see also* Lifland, *supra*, at 43, ¶ 32 (emphasizing narrowness of this exception) (Addendum Tab 23).[18]

### b. The recognition process devised by Congress honors creditors' expectations.

One of the key reasons for streamlining the recognition process is predictability.  A predictable recognition process is essential to the insolvent entity's creditors.  The Supreme Court has long recognized the importance of creditor expectations:

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government . . . .  To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy, which binds those in like situation with himself[.].

*Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 537-38 (1883).  Echoing that theme with respect to chapter 15, Judge Drain admonished in *SPhinX* that, "one generally should defer … to the creditors' acquiescence in or support of a proposed COMI … [b]ecause their money is ultimately at stake":

> It is reasonable to assume that the debtor and its creditors … can, absent an improper purpose, best determine how to maximize the efficiency of a liquidation or reorganization and ultimately, the value of the debtor, assuming also, of course, that chapter 15 requires the court to protect the legitimate interests of dissenters[.]

*Id*. at 117, 120 (citing *In re National Warranty Ins. Risk Retention Group*, 384 F.3d 959, 963 (8th Cir. 2004), upholding recognition of a Cayman Islands winding up proceeding under section 304, notwithstanding that the debtor's headquarters and all of its business were in the United States).

---

[18] The Bankruptcy Court did not suggest that it was relying on the public policy exception to recognition, nor would it have had any reason to do so.  *See* discussion below at pages 37-38.

23

Judge Drain's emphasis on honoring creditors' expectations mirrors the decision of the European Court of Justice (the "ECJ") in *Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.* Case C-341/04 (Grand Chamber), 2006 WL 1142304, ¶ 34-35 (ECJ May 2, 2006) ("*Eurofood*").  There, the Court stressed that the place where the COMI is located must be "ascertainable by third parties."  *Id.* ¶34.  The ECJ – the highest court in the European Union – emphasized that courts should honor the presumption that the COMI is the place where a company has its registered offices and depart from it "only if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect."  *Id.*  Commenting on this decision, one scholar has observed that,

> 'The rationale of this rule is not difficult to explain.  Insolvency is a foreseeable risk.  It is therefore important that international jurisdiction . . . be based on a place known to the debtor's potential creditors.  This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.'

Patrick Wantelet, *Some Considerations on the Center of Main Interests as Jurisdictional Test Under the European Insolvency Regulation*, A US-EU Experience at 100 (George Affaki ed., Bruyland & FEC 2007) (quotation omitted) (Addendum Tab 23).

Other European courts have followed suit.  *In re Daisytek-ISA Ltd.*, [2003] All ER (D) 312 (J. McGonigal May 16, 2003) (quoting *Gveran Trading Co., Ltd. v. Skjevesland*, [2003 BCC 209], [2002] E.W.H.C. 2898 (Ch.) (noting that the most important third parties in an insolvency are the creditors and that "[i]t is the need for third parties to ascertain the centre of a debtor's main interests that is important, because if there are to be insolvency proceedings, the creditors need to know where to go to contact the debtor.")  (Addendum Tab 15).

And in an earlier *Eurofood* decision, the High Court of Ireland focused on the ability of creditors to anticipate where insolvency proceedings would take place:

24

> [T]he evidence from [the creditors] as to their understanding and perception . . . is very strong. Their clear perception was that they were dealing with instruments issued by a company that was located in Ireland and was subject to Irish fiscal and regulatory provisions.

*In re Eurofood IFSC, Ltd.*, [2004] IEHC 54, [2004] 4 IR 370, ¶62 (J. Kelly March 23, 2004)

("'[The COMI presumption] is intended to provide a test in which the attributes of transparency and objective ascertainability are dominant factors. This should enable parties who have dealings with the debtor to found their expectations on the reasonable conclusions to be drawn from systematic conduct and arrangements for which the debtor is responsible.'") (citations omitted) (Addendum Tab 16); *see also In re Philadelphia Alternative Asset Fund*, Cause No. 440 of 2005 at 2-3 (Cayman Grand Court, J. Henderson Feb. 22, 2006) ("When the petitioners made the decision to invest in a company domiciled in the Cayman Islands they would have had a reasonable and legitimate expectation that, in the event a winding up is necessary, it would occur in the Cayman Islands under the applicable law here.") (Addendum Tab 17).

In sum, in considering whether to recognize foreign insolvency proceedings under chapter 15, courts and commentators agree that, in ruling on recognition, a Bankruptcy Court should heed the goals of respecting international comity and meeting the reasonable expectations of creditors.[19]

---

[19] In the article cited by the Bankruptcy Court, Professor Westbrook agrees that predictability is key "in determining the best standard for interpreting the COMI factor," and observes that creditors' reliance on "the laws of a corporation's state of incorporation or principal place of business to regulate the management of a general default by the corporation … [is] important to the interpretation of COMI." *Locating the Eye* at 1022. However, Professor Westbrook would inject a new factor into the process: he invites courts to review the "quality" of the substantive law of the country in which the foreign proceeding has been brought. *Id*. at 1022-23, 1029-32. According to Professor Westbrook, predictability should be discounted whenever a court has doubts about the quality of law. *See id*. This Court should decline the Bankruptcy Court's implied invitation to take up Professor Westbrook's suggestion, which is entirely without support in chapter 15, the Model Law, or any precedent (as far as we are aware). We respectfully submit that Professor Westbrook's proposal contradicts the principle of comity and previous (*cont.*)

**B.    The Bankruptcy Court's Refusal to Recognize the Foreign Proceedings as Foreign Main Proceedings is Based on an Erroneous Interpretation of Chapter 15's COMI Presumption.**

**1.    These Cases Present Circumstances Clearly Warranting Recognition as Foreign Main Proceedings under the Plain Language of Chapter 15 and the Approach Employed in *SPhinX*.**

Under sections 1502(4) and 1517(b)(1) of the Bankruptcy Code, the Foreign Proceedings are to be given the status of "foreign main proceedings" if they are "pending in the country where the debtor has the center of its main interests [COMI]." As discussed above, both the Model Law and chapter 15 include a presumption that, in the absence of evidence to the contrary, the COMI is "the place of the registered office." 11 U.S.C. § 1516(c); *see also* Model Law at art. 16 ¶3. This presumption is subject to challenge only on the basis of evidence that the COMI is in another country, or on the basis of the very narrow public policy exception set forth in section 1506.

COMI is not defined by the Bankruptcy Code, but section 1508 of the Bankruptcy Code directs courts to "consider [the chapter's] international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508; *see also In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633 (Bankr. E.D. Cal. 2006). European courts have stressed the importance of respecting the COMI presumption in keeping with the policy favoring predictability. In *Eurofood*, the European Union's highest court was asked to decide under the European Union's counterpart to chapter 15 whether debtor Eurofood's COMI was in Ireland, where Eurofood had its registered office, or in Italy, the site of Eurofood's Italian parent company, Parmalat. *See* Samuel L.

_____

*(cont.)* decisions of U.S. courts recognizing the integrity of Cayman Islands law by granting recognition to Cayman Islands proceedings, and is entirely out of place in reviewing insolvency proceedings in a common law country like the Cayman Islands.

Bufford, *Center of Main Interests, International Solvency Case Venue, and Equality of Arms: The Eurofood Decision of the European Court of Justice*, 27 Nw. J. Int'l L. & Bus. 351 (2007). Prior to the ECJ proceeding, two European courts had issued conflicting opinions on the issue. *See id.* at 361-76. The Irish court determined that Eurofood's COMI was in Ireland, where insolvency actions were initiated, based on the fact that Eurofood's registered office was there. *Id*. at 369-70. The Italian court tried to wrest jurisdiction away from Ireland based on its finding that Eurofood was merely a corporate shell ("an empty box"), controlled and managed from Italy by Parmalat, which established Eurofood in Dublin to take advantage of favorable tax treatment accorded to businesses registered there. *Id*. at 364, 367-68.

The ECJ ruled that the COMI was in Ireland, Eurofood's place of registration. The ECJ stressed the importance of the COMI presumption that an entity's registered office is its COMI, explaining that the interests of legal certainty and foreseeability require courts to apply criteria that are "objective and ascertainable by third parties." *Eurofood*, 2006 WL 1142304, ¶ 34. Accordingly, while the ECJ observed that the COMI presumption might be rebutted "in the case of a letterbox company not carrying out *any* business in the territory of the Member State in which its registered office is situated," it admonished that the COMI presumption should be set aside "*only* if factors which are both objective and ascertainable by third parties enable it to be established that an actual situation exists which is different from that which locating it at that registered office is deemed to reflect." *Id*. ¶¶ 34-35 (emphasis added). The fact that an Italian company controlled Eurofood or made economic choices on its behalf was not enough to rebut the COMI presumption. *Id*. ¶ 36; *see* Bufford, *supra*, at pp. 381-85. One of the primary reasons the Bankruptcy Court found COMI to be located in the U.S. in this case, however, was for this

very reason – appropriately rejected in *Eurofood* – that the investment manager, BSAM, which made investment decisions on behalf of the Foreign Debtors, was located in the U.S.

The Bankruptcy Court in *SPhinX* likewise afforded substantial deference to the COMI presumption.  As Judge Drain explained, "where the court is asked under chapter 15 to reconcile conflicting claims to primacy between or among proceedings, … the interests of the debtor's estate, creditors and other parties, absent evidence that they support a 'primary' proceeding for an improper purpose, should generally be a significant and perhaps deciding factor."  *SPhinX*, 351 B.R. at 115; *see id*. at 116 (observing that "the reasonable interests of creditors and the maximization of value, as well as considerations of international comity, generally support the bankruptcy court's deference to [a foreign] proceeding.").

*SPhinX* involved a petition to recognize winding up proceedings of an exempted company in the Cayman Islands.  Unlike this case, however, there was an objecting party and evidence that the Cayman Islands proceeding was initiated for an improper purpose – to frustrate a settlement in which the debtors had an interest.  351 B.R. at 119, 122.  Also unlike this case, the facts strongly suggested that the COMI was *not* in the Cayman Islands, as no board members resided in the Cayman Islands, and most, if not all, of the creditors and investors were outside the Cayman Islands.  *Id*. at 119-20.  Judge Drain nevertheless observed that, but for the petitioners' improper motive (which was apparently the *only* reason behind the request for recognition), he would have recognized the proceedings as foreign main proceedings in keeping with the COMI presumption.

Although Judge Drain determined that main recognition was not appropriate in light of the petitioners' shady motives, he afforded the Cayman Islands proceedings nonmain recognition.  *Id*. at 122.  Recognition was the proper choice for practical as well policy reasons,

because, as Judge Drain noted, "these are liquidation cases in which competent JOLs under the supervision of the Cayman Court are the only parties ready to perform the winding-up function, and importantly, the vast majority of the parties in interest tacitly support that approach." *Id.* at 121.

This Court affirmed in full Judge Drain's decision, observing that "it was appropriate for the Bankruptcy Court to consider the factors it considered, to retain its flexibility, and to reach a pragmatic resolution supported by the facts[.]"  371 B.R. 10 at 19.[20]

It is undisputed here that Foreign Debtors' submitted all of the requisite documents to satisfy the threshold requirements for chapter 15 recognition.  *See* Decision at 7-8.  It is also undisputed that the Foreign Debtors' place of registration is in the Cayman Islands.  *Id*. at 5.  The Cayman Islands are thus the presumptive site of the Foreign Debtors' COMI.  No interested party has challenged recognition, and there is nothing to suggest that the petitions were filed for anything but proper purposes.  Furthermore, initiation of the Foreign Proceedings in the Cayman Islands is consistent with the expectations of the interested parties, which consist of four investors and less than twenty creditors, many of which were represented by Cayman Islands counsel prior to the commencement of the Foreign Proceedings.  All of these parties are sophisticated institutional entities who knowingly invested or did business with these Cayman Islands-registered entities and reaped the benefits of doing so while the Foreign Debtors were performing well.  All of them knew or reasonably should have known that, in the event

---

[20] The Bankruptcy Court in *In re Schefenacker PLC* followed a similar pragmatic approach. Chapter 15 Case No. 07-11482 (Bankr. S.D.N.Y. June 15, 2007) (granting recognition to a U.K. proceeding without making a finding as to whether the proceedings constituted foreign main or foreign nonmain proceedings because the enforcement of a company voluntary arrangement approved in the United Kingdom would be accomplished under either) (Addendum Tab 21).

insolvency proceedings needed to be commenced, such proceedings would most likely be based in the Cayman Islands.

The analysis of the COMI of a hedge fund cannot be considered as if the hedge fund were a company that manufactures products or provides services. Typically, a hedge fund will have no office or employees – because, unlike a typical business, there are no "operations" in the traditional sense. Instead, hedge funds, by the actions of their boards of directors, enter into various service contracts with investment managers, administrators, attorneys, and auditors.[21] Therefore, in the hedge fund context, the pivotal analysis must focus on the expectations of creditors and investors that the law of the country where the fund is incorporated will control both prior to, and after commencement of, any insolvency proceedings.

This case thus presents circumstances clearly warranting recognition as a foreign main proceeding under the plain language of chapter 15 and the approach employed in *SPhinX*. The Bankruptcy Court nevertheless declined to honor the COMI presumption, asserting that Judge Drain's approach to COMI and, by extension, the affirmance of Judge Drain's decision by this Court, could be viewed as "rubber stamping." *See* Decision at 14. But even if this were true – the Foreign Representatives do not believe it is[22] – the facts in this case dispel the notion that recognition here would amount to a "rubber stamp." Judge Lifland's conclusion that the Cayman

---

[21] It should be noted, however, that the Foreign Debtors' relationship with their investment manager, did not alter the duties and obligations of the boards of directors regarding the investments made by the Foreign Debtors and, particularly, the role of the independent directors who were both based in the Cayman Islands, to review and pass judgment on all Principal Transactions as discussed in more detail below.

[22] Judge Drain made clear that he did not believe chapter 15 required "across-the-board deference," 351 B.R. at 114, and his carefully reasoned and fact-sensitive opinion in *SPhinX* is hardly indicative of a "rubber stamp" approach.

Islands are not the COMI because they served only a "letterbox" function in this case, does not

withstand scrutiny.  Decision at 12 n.8

> ### 2.    The Bankruptcy Court Ignored Relevant Evidence that Buttresses the Presumption that the Foreign Debtors' COMI is in the Cayman Islands.

The Bankruptcy Court here appears willfully to have ignored the picture that emerged as

the Foreign Representatives conducted their investigation.  First, the Bankruptcy Court focused

on facts set forth in pleadings filed at the very outset of these cases, before the Foreign

Representatives had had a chance to investigate.  For example, the Bankruptcy Court stated that

"assets managed by BSAM are located within the Southern District of New York" and that "all

(or virtually all) [assets] are also located within this judicial district."  Decision at 3.  But

evidence presented prior to and at the Recognition hearings shows that BSAM managed

investments located in numerous jurisdictions, including the Cayman Islands and Europe.  ROA-

12 at 21:15-19 (Addendum Tab 6).

The Bankruptcy Court also discounted a number of relevant facts that contradicted its

view of the Cayman Islands office as a "letterbox."  While the Bankruptcy Court acknowledged

that two of High-Grade Fund's three investors are registered Cayman Islands companies, it

purported to dismiss this fact on the grounds that the investors were themselves exempted

foreign entities.  Decision at 13.  And it relegated to a footnote the fact that two of the Foreign

Debtors' directors – the only independent directors and the ones therefore tasked with reviewing

and approving the Principal Transactions – reside in the Cayman Islands.  *Id*. at n.9.  The

Bankruptcy Court gave no consideration to the fact that upon the appointment of the Foreign

Representatives as joint provisional liquidators, the powers of the boards of directors ceased and

the absolute control of the Foreign Debtors was transferred to Cayman Islands-based official

liquidators.  Finally, the Bankruptcy Court completely ignored other facts adduced at the August

31

27 hearing, namely, that (i) the Foreign Debtors' pre-filing attorneys are in the Cayman Islands; (ii) the Foreign Debtors' pre-filing auditors, Deloitte & Touche, performed auditing work in the Cayman Islands; (iii) most, if not all, of the Foreign Debtors' remaining liquid assets are in bank accounts in the Cayman Islands;[23] (iv) the Foreign Representatives and the Foreign Debtors are governed by the laws and regulations of the Cayman Islands, where the only foreign proceedings, other than these chapter 15 cases, are pending; (v) the Foreign Debtors are subject to Cayman Islands tax law and are not subject to United States income tax; and (vi) the Foreign Debtors' investments included collateralized debt obligations constituted under Cayman Islands law.  *See* ROA-11 ¶27 (Addendum Tab 5); Whicker Declaration ¶7 (Addendum Tab 12, Exhibit C).

The Bankruptcy Court even attempted to discount the lack of objection by any interested party, musing that, "[t]here may be many reasons for the lack of objections including the fact that many members of the financial communities have their own similar relationships with offshore jurisdictions."  Decision at 12 n.7.  This conjecture is unsupported by the record.

> **C.** **Alternatively, the Bankruptcy Court Erred in Failing to Recognize the Foreign Proceedings as Foreign Nonmain Proceedings Because the Foreign Debtors' Have Establishments in the Cayman Islands.**

As noted above, a foreign nonmain proceeding is one that is brought in a country where the debtor does not have its COMI, but where it has an "establishment," defined by the statute as "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2), (5).  The Bankruptcy Court's Decision is the first and only published opinion

---

[23] As set forth above, the Foreign Representatives opened accounts in the Cayman Islands to hold receivables collected post-filing to "locate, protect, secure, and take into their possession and control all assets and property to which the Company is or appears to be entitled," which was mandated pursuant to the JPL Orders and Cayman Islands law.

(as far as the Foreign Representatives are aware) to treat the issue of what constitutes an establishment for purposes of chapter 15.[24]

The Foreign Representatives' evidentiary showing of the business conducted in the Cayman Islands amply supports recognition of the Cayman Islands proceedings at least as foreign nonmain proceedings based on a "place of operations where the debtor carries out a nontransitory economic activity." The Bankruptcy Court disagreed. Having made up its mind that the Cayman Islands served only as a "letterbox" site for the Foreign Debtors, the Bankruptcy Court concluded the Foreign Debtors did not even have an "establishment," or "local place of business" for carrying out "nontransitory economic activity," in the Cayman Islands. Decision at 15.

Language in the Decision suggests that, in the Bankruptcy Court's view, "exempted" companies conducting business in the Cayman Islands can never have an "establishment," and thus may *never* bring insolvency actions in the Cayman Islands that qualify for recognition under chapter 15: "Here the bar is rather high, especially in view of the Cayman Islands' statutory prohibition against 'exempted companies' engaging in business in the Cayman Islands except in furtherance of their business otherwise carried on *outside* of the Cayman Islands." *Id*. (emphasis in original). As we explain, the Court's view of Cayman Islands law is inaccurate and at variance with the principal of comity that, for decades, has been consistently applied by U.S. courts to Cayman Islands insolvency proceedings involving exempt companies.

---

[24] Although the *SPhinX* court granted nonmain recognition, it did not, as the Bankruptcy Court noted, directly address the standard that must be satisfied for a finding of an establishment. Decision at 16.

1.    **The Bankruptcy Court's Elevated Standard for Achieving Foreign Nonmain Recognition Contradicts Both the Plain Language And Intent of Chapter 15.**

While chapter 15 of the Bankruptcy Code does not define "nontransitory economic activity," U.S. courts are directed to look at international resources, as discussed above. 11 U.S.C. § 1505; Decision at 11; *see also* House Report at 109 ("Interpretation of this chapter on a uniform basis will be aided by reference to the Guide and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."). The Guide states that the term "nontransitory economic activity" "has been inspired by … the European Union Convention on Insolvency Proceedings." Guide ¶75. Under the European Convention, "establishment" is defined as "any place of operations where the debtor carries out a non-transitory economic activity with human means and goods." European Convention at art. 2(h) (Addendum Tab 5, Exhibit C). According to the principal report on the European Convention, an establishment is "a place of operations through which the debtor carries out "economic activities . . . on the market (i.e., externally), whether the said activities are commercial, industrial or professional." Miguel Virgos & Etienne Schmit, *Report on the Convention on Insolvency Proceedings* (1996) ¶71, *available at* http://aei.pitt.edu/952/ (further elaborating that "a purely occasional place of operations cannot be classified as 'an establishment.' A certain stability is required. . . .").

The Foreign Debtors' presence in the Cayman Islands readily meets these establishment standards. As discussed above, the Foreign Debtors here have numerous substantial and nontransitory economic contacts with the Cayman Islands. To recap, two of the Foreign Debtors' four investors are located in the Cayman Islands; both of the Foreign Debtors' independent directors reside in the Cayman Islands and reviewed relevant transactions there; the Foreign Debtors' pre-filing attorneys were located, and performed services, in the Cayman Islands; the

34

Foreign Debtors' pre-filing auditors, Deloitte & Touche, performed certain auditing work in the Cayman Islands; and most, if not all, of the Foreign Debtors' remaining liquid assets are in bank accounts in the Cayman Islands.  In addition, the Foreign Debtors were subject to Cayman Islands tax law and not subject to United States income tax; the Foreign Debtors invested in collateralized debt obligations constituted under Cayman Islands law; the Foreign Debtors held themselves out to investors and creditors as Cayman Islands based companies; the Foreign Representatives and the Foreign Debtors were (and are) governed by the laws and regulations of the Cayman Islands, where the only foreign proceedings, other than these chapter 15 cases, are pending and where a Cayman Islands incorporated company is required, under Cayman Islands law, to wind-up its affairs.  Finally, upon the appointment of the Foreign Representatives as JPLs, the powers of the boards of directors ceased.  The Foreign Debtors are now under the exclusive absolute control of the Cayman Islands-based JOLs – the only persons authorized to act on behalf of the Foreign Debtors.

By contrast, the debtors in *SPhinX*, who were granted nonmain recognition (and would have been granted main recognition but for their improper motive in seeking recognition), had far fewer Cayman Islands contacts.  *See* 351 B.R. at 107-09 and n.4 (observing that none of the debtors' directors resided in the Cayman Islands, that the debtors had no assets, apart from corporate books and records, in the Cayman Islands, and that over 90% of the debtors' liquid assets were located in the United States).

In sum, the Bankruptcy Court's decision to deny nonmain recognition to the Foreign Proceedings, in light of the undisputed evidence listed above, is at odds with the establishment standards articulated by European authorities and by the decision reached by the Bankruptcy Court, and affirmed by this Court, in *SPhinX*.

35

In addition, the purpose of chapter 15 and comity would be completely obviated if, notwithstanding a company's incorporation and registration in one country, such company would not be considered to have at least an establishment there, especially when the laws of such country mandate that any insolvency proceedings be commenced there. If the Court upholds the Bankruptcy Court's determination that the Foreign Debtors' COMI is not in the Cayman Islands **and** that the Foreign Debtors do not maintain an establishment therein, U.S. courts would effectively be overruling Cayman Islands law requiring liquidation to occur there. This cannot be what Congress envisioned in adopting the "establishment" standard.

> 2.  **Cayman Islands Law Does Not Preclude Exempted Companies from Having Establishments in the Cayman Islands.**

The Bankruptcy Court apparently concluded that, because the Foreign Debtors are registered as exempted companies in the Cayman Islands, their Representatives were not entitled to initiate insolvency proceedings there – at least not if they wished to be recognized by U.S. courts. This conclusion makes no sense, and appears to be based on unsupported apprehensions about Cayman Islands law. Without the benefit of expert testimony, the Bankruptcy Court purported to review Cayman Islands law and concluded that section 193 of the Companies Law precludes exempted companies from having "establishments" in the Cayman Islands. But section 193 does not prohibit "exempted" companies from having "nontransitory economic activity" in the Islands. Finlay Declaration ¶11 (Addendum Tab 12, Exhibit B). As Cayman Islands counsel explains, the statute distinguishes between exempt and nonexempt companies to ensure that local businesses are protected from competition by non-locally controlled businesses, which are exempt from certain local laws. To that end, section 193 provides that:

> An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the business of the exempted company carried on outside the Islands.

36

Companies Law (2007 Revision) § 193.  It further provides that "nothing in [section 193] shall be construed so as to prevent the exempted company effecting and concluding contracts in the Islands and exercising in the Islands all of its powers necessary for the carrying on of its business outside the Islands." *Id.*

As Cayman Islands counsel also explains, an exempted company may carry on business from a principal office in the Cayman Islands, and may effect or conclude contracts in the Cayman Islands and exercise all other powers necessary to carry on the business of that company outside the Cayman Islands.  *Id.*  For example, an exempted company may hire employees in the Cayman Islands, lease or own premises in the Cayman Islands, operate bank accounts in the Cayman Islands, and hire fund administrators, auditors, and legal counsel in the Cayman Islands. *Id.*

Properly understood, then, registration of a company as exempted is not indicative of the degree to which it has a local establishment in the Cayman Islands.  Nor is it determinative of the permanence of its business or economic activity.  *Id.* ¶13.  Indeed, a foreign debtor's status as an exempted company under Cayman Islands law has not precluded recognition of its foreign proceedings in this District.  *See, e.g., In re SPhinX, Ltd.*, 351 B.R. 103, 120 (Bankr. S.D.N.Y. 2006) (foreign nonmain proceeding); *In re Amerindo Internet Growth Fund Limited*, Chapter 15 Case No. 07-10327 (RDD) (Bankr. S.D.N.Y. March 7, 2007) (foreign main proceeding) (Addendum Tab 18).  As the Foreign Representatives demonstrated here, notwithstanding the Foreign Debtors' exempted status, the Foreign Debtors had extensive connections with, and significant economic activity was conducted in, the Cayman Islands.

This digression into Cayman Islands law demonstrates the error of the Bankruptcy Court's opinion.  Instead of treating chapter 15's recognition process as a simple documentary

process unless challenged, in accordance with the requirements of section 1515, the Foreign

Representatives respectfully submit that the Bankruptcy Court made unwarranted assumptions

about foreign law and legal proceedings.

The Bankruptcy Court's jaundiced view of the Cayman Islands may have been shaped by

the Westbrook article, *Locating the Eye*, on which it relied.  In that article, Professor Westbrook

expresses his unsubstantiated views on the Cayman Islands, to which he transparently refers not

by name but as a fictional island called "Outlier," a place "where the laws are attractive to the

management of corporations that are . . . 'exempted' so that they do no real business in Outlier."

*Locating the Eye* at 1029.[25]  Westbrook contends that the substantive law of the Cayman Islands

is questionable and opines that the COMI presumption should not apply there, because

"[c]reditors often include involuntary creditors" who "have little or no opportunity to understand

or make credit judgments about the substantive effect of Outlier's laws."  *Id.* at 1031.  These

allegations are unfounded and inapplicable here.[26]

The Bankruptcy Court did not rely on, or even mention, the public policy exception to

recognition in its Decision.  But in declining to recognize the Cayman Islands proceeding based

on its blinkered view of Cayman Islands law (which is based on the insolvency regime adopted

---

[25] Professor Westbrook's views on Cayman Islands law and its attractiveness to "management" are uninformed and irrelevant.  Upon the commencement of insolvency proceedings under Cayman Islands law, management is replaced by independent liquidators, who divest management of its authority.  Thus, it is highly unlikely that management would find Cayman Islands insolvency proceedings more "attractive" than proceedings in other jurisdictions, such as the United States, where management remains in place and retains its authority.

[26] To the extent the Bankruptcy Court was concerned, like Professor Westbrook, with the fate of involuntary creditors it should be noted that there was no grounds for such concern here.  The creditors of the Foreign Debtors at issue here are large international financial institutions who knew or should have reasonably known that they were dealing with Cayman Islands incorporated entities and understood the economic advantages of the Foreign Debtors being Cayman Islands entities.

in the United Kingdom), the Court implicitly made a policy ruling in favor of U.S. law.  This Court should issue an opinion making clear that, absent the extremely limited circumstances in which a court may refuse to recognize a proceeding that is "manifestly contrary to the public policy of the United States," *In re Ephedra*, 349 B.R. at 336, chapter 15 does not authorize U.S. bankruptcy courts to favor their own jurisdiction over foreign jurisdictions where proceedings were initiated.  *See* Allen & Overy eBulletin: *Pre-Bankruptcy Planning Needed to Overcome Hurdles to Recognition under Chapter 15 of the U.S. Bankruptcy Code* (October 2007) (observing that the Bankruptcy Court's decision "requiring plenary U.S. cases … [denies] the Cayman Islands' courts primacy in determining how best to liquidate Cayman organized entities, a result that seems to disregard the robust insolvency process that applies in the Cayman Islands, a sister common law jurisdiction where parties in interest are subject to the same principles of fairness and due process that would apply in any U.S. court.") (Addendum Tab 22).

Because the facts show that the Foreign Debtors have establishments in the Cayman Islands, and there is no policy reason weighing against recognition, this Court should reverse the Decision and instruct the Bankruptcy Court to grant foreign nonmain, if not foreign main, recognition to the Foreign Proceedings.

>    D.    **The Bankruptcy Court's Reading of Chapter 15 Should Be Rejected Because It Injects Uncertainty and Unwarranted Complexity into the Recognition Process.**

By reading into chapter 15 more onerous hurdles to recognition than former section 304, the Bankruptcy Court departed from longstanding U.S. Court tradition of affording comity to Cayman Islands insolvency proceedings under section 304, and from the *SPhinX* court's (and scholars') understanding of chapter 15 as enhancing comity.  *See* Decision at 16-17 ("[s]ection 304 simply gave the United States courts the authority to open an ancillary proceeding . . . [c]hapter 15, on the other hand, imposes a rigid procedural structure for recognition").  If the

Bankruptcy Court's approach is followed, it will convert recognition from a streamlined process that is simple, fast and inexpensive into a complex and cumbersome evidentiary procedure, at least where exempted companies are concerned. This will have a far-ranging effect, because many hedge funds and similar investment vehicles are incorporated and registered in the Cayman Islands and/or are registered as "exempted" companies.

The troubling effects of the Bankruptcy Court's approach may already be seen. In its aftermath, one bankruptcy judge in this District has issued an order requiring a chapter 15 petitioner to present evidence on a lengthy list of topics, outside of anything chapter 15 requires. *See In re Basis Yield Alpha Fund (Master)*, Chapter 15 Case No. 07-12762 (REG) (Bankr. S.D.N.Y. Sept. 12, 2007) (Addendum Tab 20). The order requires petitioner to respond to 21 evidentiary categories of questions "whether or not any party in interest ultimately objects." *Id.* at 2. This sort of elaborate inquiry does nothing to further comity and cooperation, to create "greater legal certainty for trade and investment," to ensure "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor," or to foster "protection and maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a). Nor does it correspond to the simple and straightforward process established by section 1515. Indeed, it effectively reads the COMI presumption out of the statute.

Significant press coverage and commentary both in the United States and elsewhere highlight the uncertainty wrought on the financial markets by the Bankruptcy Court's Decision. One reviewer has questioned whether the Decision has created "a distinct impression of judicial xenophobia towards Cayman's legal system," which, coupled with the apparent route of the Bankruptcy Court in the *Basis Yield* case, "could turn [c]hapter 15 into a closed book for the

offshore funds industry." *What Price COMI-ty?*, Newsletter Contributed by Appleby, dated

October 4, 2007 (Addendum Tab 27). *See also, e.g.,* Lavovitz & Greenblatt, *Chapter 15 Denied

– The Impact of 'Bear Stearns,'* N.Y.L.J. No. 64, Vol. 238 (Oct. 1, 2007) ( "[a]fter the *Bear

Stearns* ruling, careful planning is required, ideally well before problems arise, to ensure that a

company can reorganize or liquidate so as to provide the best protection to decision makers and

all constituents" and that "entities incorporated offshore without business operations in their

home jurisdictions will likely resort to the panoply of ad hoc reorganization techniques that were

the norm before chapter 15" where "it is difficult to predict the business impact or ultimate

outcome of their own restructuring"); Allen & Overy eBulletin, *Pre-Bankruptcy Planning

Needed to Overcome Hurdles to Recognition under Chapter 15 of the U.S. Bankruptcy Code*

(October 2007) (in light of the Decision, "debtors (and their advisors) might be advised to

undertake pre-bankruptcy planning to increase the likelihood the debtor will satisfy the formulaic

determination of eligibility for relief under chapter 15") (Addendum Tab 22); Roger Hanson &

Ronan Guilfoyle, *Back to the Ten Commandments?* (September 12, 2007) ("it may behoove

offshore fund sponsors to consider certain structuring elements of their offshore funds . . . [to]

produce the desired legal recognition and treatment of investor and creditor interests")

(Addendum Tab 26); Karen Ostad & Julie Dyas, *U.S. Bankruptcy Court Declines to Recognize

Bear Stearns Cayman Liquidation*, Morrison & Foerster Legal Updates & News (September

2007) ("Troubled offshore funds may have to become more creative in looking to protect their

U.S. assets from creditors, if a controversial new bankruptcy court decision is upheld.")

(Addendum Tab 24).

All told, the Bankruptcy Court's denial of recognition to the Cayman Islands liquidation

as a foreign main proceeding contravenes the only other published bankruptcy decision on point

– a decision that was affirmed in full by this Court – and rests on an interpretation of the law that is at odds with the plain language of chapter 15, its legislative history, decades of decisions of U.S. courts granting comity to Cayman Islands insolvency proceedings, previous orders of the Bankruptcy Court in this district recognizing Cayman Islands' proceedings as foreign main proceedings, European cases applying the European counterpart to chapter 15, and the bulk of scholarly authority.

## VII.   CONCLUSION

For the foregoing reasons, the Decision denying recognition of the Foreign Proceedings should be reversed and the Foreign Proceedings should be recognized as foreign main proceedings or, in the alternative, foreign nonmain proceedings.

Dated:    November 7, 2007
          New York, NY

AKIN GUMP STRAUSS HAUER & FELD LLP


By:   _/s/ Fred S. Hodara_____
        Fred S. Hodara (FH-7947)
        Lisa G. Beckerman (LB-9655)
        Abid Qureshi (AQ-4882)
        Brian D. Geldert (BG-4146)
        AKIN GUMP STRAUSS HAUER & FELD LLP
        590 Madison Avenue
        New York, New York  10022-2524
        (212) 872-1000 (Telephone)
        (212) 872-1002 (Facsimile)

        Counsel for the Joint Official Liquidators

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that he is an attorney admitted to practice before this Court and that on November 7, 2007 he caused a true and correct copy of the Appellants' Opening Brief and Addendum in Case Nos. 07-CV-8730 (RWS) and 07-8746 (RWS) pending before the District Court for the Southern District of New York to be served via first class mail on:

KAYE SCHOLER LLP
Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch International and Merrill Lynch Capital Services, Inc.
425 Park Avenue
New York, New York 10022
(212) 836-3000 (Telephone)
Attention:      Madlyn Gleich Primoff, Esq.
                Jeffrey A. Fuisz, Esq.
                David M. Eskew, Esq.

_____        */s/ Fred S. Hodara*_____
                Fred. S. Hodara

43