Lance Gotthoffer<br>
First Affidavit<br>
Applicant<br>
Exhibits LG-1 and LG-2<br>
7 December 2007

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

CAUSE NO. 551 of 2007

**IN THE MATTER OF THE COMPANIES LAW (2007 REVISION)**

**AND IN THE MATTER OF BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE (OVERSEAS) LTD. (IN VOLUNTARY LIQUIDATION)**

---

**AFFIDAVIT OF**
**LANCE GOTTHOFFER**

---

I, **LANCE GOTTHOFFER**, of Reed Smith LLP, 599 Lexington Avenue, New York, New York 10022, MAKE OATH and say as follows:

1. I am a partner of Reed Smith LLP, U.S. attorneys acting for FairFax Fund Limited, Sciens Global Opportunity Fund and certain other investors (collectively referred to as the "Investor Funds") in the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Fund Ltd (the "HGEL Overseas Fund").

2. The matters contained within this affidavit are true to the best of my knowledge and belief. Where matters stated herein are not within my direct knowledge, I have set out the source of knowledge and believe such matters to be true. There is now produced and shown to me marked "**LG-1**" a bundle containing true copies of documents to which I propose to refer in this affidavit.

**Introduction**

3.  I make this affidavit in opposition to the Petition of Simon Whicker and Kris Beighton of KPMG (Cayman) (the "KPMG liquidators"), in their capacity as Joint Voluntary Liquidators of the HGEL Overseas Fund, to bring the voluntary liquidation of the HGEL Overseas Fund under court supervision. More particularly, I make this affidavit in support of the following orders:

    (1) an order setting aside the vote for the voluntary liquidation and discharging the liquidators; alternatively

    (2) a stay of the voluntary liquidation of the HGEL Overseas Fund and of all proceedings in relation thereto; alternatively

    (3) an order sanctioning the continuance of the directors' powers for the purpose of investigating and prosecuting any claims on behalf of the HGEL Overseas Fund against Bear Stearns Asset Management, Inc ("BSAM") and related parties; alternatively

    (4) the appointment of Geoff Varga and Bill Cleghorn of Kinetic Partners Cayman LLP as additional or replacement liquidators of the HGEL Overseas Fund.

    (5) An order that the KPMG liquidators produce forthwith copies of certain documents which they have, to date, declined to produce.

**Fund Structure**

4.  The HGEL Overseas Fund is an off-shore Feeder Fund that was established by Bear Stearns Asset Management ("BSAM") in 2006

alongside a US Feeder Fund established as a Limited Partnership. The structure of the HGEL Funds is shown in the diagram which appears at p3 of the Offering Memorandum. Between 2003 and 2007 BSAM solicited hundreds of millions of dollars for the two Feeder Funds. BSAM was the Investment Manager for the HGEL Overseas Fund. BSAM charged annual management fees of 2% of the capital and was entitled to a "carry" of 20% of the profits of the Fund. PFPC Inc, a Massachusetts corporation, was the Fund Administrator and Deloitte & Touche, Cayman were the Fund Auditors.

5. The investment objective was to seek high current income and capital appreciation relative to LIBOR through leveraged investments in "investment grade structured finance securities" with an emphasis on AAA and AA securities. The strategy was to acquire mortgage backed securities known as "collateral debt obligations" or "CDOs" which are formed by packaging together bundles of loans which are divided into tranches which are the rated and sold on to investors.

6. Unusually, according to the KPMG liquidators, the HGEL Overseas Fund does not appear to be a shareholder in its Master Fund. I note in contrast the US mirror Feeder Fund ("HGEL Domestic"), which was supposed to be structured in the same way, was said by the Massachusetts regulator to have a beneficial interest of 28% in its Master Fund. Instead the subscriptions were paid to Barclays Bank as counter-party to a derivative instrument, called a total return swap and described in the Offering Memorandum as a "Leverage Instrument".

7. The funds provided by Barclays Bank, as the "Leverage Instrument Counterparty", were made available to the Master Fund where those funds were then supposed to be used by BSAM to pursue the investment strategy. The finance provided by Barclays Bank is said by the KPMG liquidators to have been non-recourse because Barclays had some form of security over the Master Fund. Indeed Barclays may have been the

principal shareholder. I do not believe Barclays was ever a creditor of the HGEL Overseas Fund. Despite repeated requests made by Appleby and my firm for a copy of the "Leverage Instrument" at the date of this affidavit it has not been supplied by the KPMG liquidators.

8. The HGEL Overseas Fund's share classes are described in the Offering Memorandum as "Ordinary Shares" and "Participating Shares". These classes must have been created by resolutions of the board of directors because they were not created by the Articles of Association. The Ordinary Shares have a par value of US$3000. They have the entire voting power but no rights to participate in the Fund's profits beyond return of the par value. The Participating Shareholders have the right to vote for the removal and replacement of directors and the Investment Manager.

9. It was the Ordinary shares that were used to resolve to place the HGEL Overseas Fund in voluntary liquidation. According to the Offering Memorandum, the Ordinary shares are held under a STAR Trust of which Walkers SPV is Trustee and ATC Trustee Ltd the Enforcer; and this Trust exists for the sole purpose of holding the shares and enforcing the rights of the shareholder. Despite requests made by Appleby for a copy of the Trust Deed at the date of swearing this affidavit it has not been supplied by the KPMG liquidators.

10. Nevertheless I believe that the voting power of the Ordinary Shares was exercised either on the instructions of or in collaboration with BSAM. I say this because the HGEL Overseas Fund was at the time of the voluntary liquidation, largely controlled by BSAM. BSAM and other Bear Stearns entities were clearly significant clients of Walkers SPV. At the time of the voluntary liquidation, the board of directors of HGEL Overseas Fund consisted of 3 individuals who were/are also officers of BSAM and two Walkers SPV individuals. Walkers were the attorneys to the Feeder and Master Funds, and according to the Massachusetts complaint were also attorneys for 16 other Bear Stearns funds. It is plain that Walkers drafted

4

the Articles and other fund documents. Walkers acted on behalf of the HGEL Master Fund after it was placed in voluntary liquidation and provided evidence in the unsuccessful attempt to obtain Chapter 15 recognition in New York. Guy Locke, a partner of Walkers, appeared at a meeting of the Participating Shareholders as counsel for the (outgoing) HGEL Overseas Fund board of directors. Walkers Fund Services were also retained for a number of the Bear Stearns funds.

11. I would also draw attention to the fact that in a November 8, 2007 letter to the HGEL Overseas Fund's Investors, KPMG stated: "*BSAM, the independent directors [Walkers SPV employees] and the voting shareholder [Walkers SPV as trustee of the STAR Trust] felt it would be most efficient and practical to appoint individuals from KPMG as Liquidators of the entities whose funds were indirectly invested into the Master Fund (collectively "the feeder funds"), including the Feeder Fund...*". That sentence squarely implicates BSAM and Walkers SPV in a collective decision to put HGEL Overseas Fund into liquidation and to appoint the same liquidators. It should also be noted that the equity partners of Walkers (who include Guy Locke) own Walkers SPV.

**Devaluation of the HGEL Overseas Fund**

12. The HGEL Overseas Fund received more than US$600 million in total investments from investors to whom participating shares were issued according to press reports (requests by the new directors and my firm, asking BSAM and KPMG for a list of other investors so as to be able to contact them, have been rebuffed). As the latest financial figures produced by KPMG demonstrate, those funds have been substantially lost.

13. Reports of a deteriorating position began to emerge from about April 2007. However, the losses were reported to be minimal. On May 16, 2007, BSAM notified investors that the HGEL Overseas Fund had sustained a

loss of approximately 6.57% in April 2007 (see LG-1 page 132). At or around that time, I was advised by our clients that HGEL Domestic had reported identical losses. In response to the notice, I am informed that the Investor Funds, through their representatives, communicated with BSAM and received multiple assurances that this was an accurate statement of the loss sustained by the HGEL Overseas Fund.

14. On June 7, 2007 less than three weeks after notifying HGEL Overseas Fund investors of a 6.57% loss for April, BSAM sent a revised notice, now stating an 18.97% loss for April 2007. I also learned that HGEL Domestic had restated its losses for April 2007, in proportion. On June 29, 2007 BSAM told investors it had been unable to strike NAVs. Investors were then informed in writing on July 18, 2007 that the HGEL Overseas Fund's losses were catastrophic, and all equity value had been lost (see LG-1 page 136).

15. According to the Verified Petition for Recognition of Foreign Main Proceedings dated July 31, 2007 filed in the unsuccessful New York Chapter 15 proceedings (see LG-1 pages 166-175), the High Grade Enhanced Leverage Master Fund was unable to meet margin calls from its trading counterparties. A resolution was passed for a voluntary winding up on 31 July 2007 and KPMG were appointed as provisional liquidators by the Court. I understand that the Master Funds have a number of outstanding creditors. I respectfully point out that nothing was done at that time to put either of the HGEL Feeder Funds into liquidation or any similar process. No doubt it was appreciated that these were not insolvent.

**Potential Defendants**

16. Naturally, the investors wish to ascertain whether BSAM, its affiliated entities, or any of the service providers such as fund administrators, accountants or attorneys can be held accountable for the losses that have been sustained. The scope and nature of possible claims against the

Master Fund will not be known until a close and careful investigation is undertaken and completed. However, they may include claims related to (1) the manner in which funds supplied to the Master Fund by the HGEL Overseas Fund were invested and/or used, (2) the management of the Master Fund, or (3) the manner in which transactions between the HGEL Overseas Fund and the Master Fund were executed and recorded.

17. As it happens, numerous investors have commenced arbitrations against BSAM or affiliated entities in respect of the Feeder Fund; and a class action was already commenced against BSAM and affiliated entities in August 2007 by investors in a related US Feeder Fund. A copy of this complaint appears at pages 196-220 of LG-1 and a press report of the other arbitration is at pages 221-222. Furthermore a formal Massachusetts complaint was recently instituted by the State of Massachusetts against BSAM, a copy of which appears at pages 223-267 of LG-1. It is therefore clear that a regulator and a number of investors have formed the view that BSAM should be held accountable.

18. The Offering Memorandum disclosed that there would be conflicts of interest and set out a methodology for managing those conflicts. Disclosure of conflicts by BSAM is required by US Federal Securities Laws. The procedure for monitoring these transactions was designed to ensure that they could be justified as suitable and that the fees charged by BSAM and affiliated entities were appropriate. According to the Massachusetts complaint, a very substantial proportion of the transactions concluded by the Master Fund involved BSAM and affiliated entities. The CDO obligations themselves acquired by the Master Fund had been packaged by BSAM or affiliated entities.

19. The Massachusetts complaint is essentially based on the allegation that the approval mechanism was not operated at all or only sporadically. There are examples of transactions with a BSAM affiliated entity called "*Rampart*" where it can be seen that the transaction caused the funds a

US$20m loss and had no commercial justification. However, that example merely shows the effect of the conflicts.

20. If it is correct that the procedure for managing conflicts broke down then it would mean that BSAM would not have escaped liability for the conflicts arising from investments in the affected securities. The HGEL Overseas Fund may be entitled to reverse these transactions or to damages on that footing alone.

21. The Complaint filed in New York by investors in the related U.S. Feeder Fund is that the CDOs were backed by sub-prime mortgages which BSAM ought to have appreciated were riskier and less creditworthy than traditional mortgage-backed borrowing. BSAM was apparently one of the largest managers of CDOs backed by sub-prime loans. The U.S. housing market deteriorated from January 2006 and even as other Bear Stearns entities were reducing their exposure to this market, the related U.S. Feeder Fund (and HGEL Overseas Fund) remained invested in them. The complaint is that the investments were not consistent with BSAM's obligations to monitor and assess risks. The same arguments pertain to the HGEL Overseas Fund.

22. Other associated entities and service providers may well have accessory liability if these breaches on the part of BSAM are established, the classic cause of action invoked in the U.S. in those circumstances being "*aiding and abetting a breach of fiduciary duty*". For example, the failure to follow procedures may well be something for which the Fund Administrators could be held accountable. The Massachusetts complaint is also highly critical of the directors of the funds who failed to operate the approvals process.

23. According to the KPMG liquidators, the Investment Management Agreement includes substantial limitations of liability and indemnities. Indeed the indemnities and limitations of directors, BSAM and the Fund

Administrators are described in the Offering Memoranda. However, despite repeated requests made for the Investment Management Agreement by Appleby we have not yet at the date of this affidavit been supplied with a copy by the KPMG liquidators. I would not begin to rule out a claim even with such indemnities. Similar provisions are regularly addressed in proceedings in the U.S. courts. In particular, I observe that pursuant to the Offering Memorandum (page 42) the investment manager will not be indemnified in cases of *"fraud, bad faith, gross negligence or willful misconduct"*. The Offering Memorandum also provides that the indemnity and exculpation provisions in the Investment Management Agreement *"shall not be construed as a waiver of any rights of the* [HGEL Overseas] *Fund or any investor under U.S. securities laws"*. I am also advised and believe that they may not apply to restitutionary claims.

24. It might be helpful if I explained to the Court in very general terms what I consider would be involved in typical litigation of this kind in the U.S. Claims against financial institutions or large firms of accountants or similar service providers can be expected to be the subject of fierce opposition. During the proceedings, I would expect several motions to be made and a number of these could lead to appeals. Proceedings would normally be brought in State Courts. A case of this kind can take several years and cost in excess of $10 million to fight to a conclusion.

25. There is considerable emphasis in most U.S. litigation of this kind on front-loading and early stage investigations. A great deal of these investigations is court-assisted and is carried out before proceedings commence. Claims against BSAM would require analysis of the paper trail relating to thousands of transactions. There may be several hundred thousand emails to examine. A forensic analysis would need to be carried out. These early stage processes ensure that the claims that are brought are sustainable and can be established with evidence. However they are