Directors may compel the redemption of any Shareholder from the Fund, in whole or in part, at any time upon 90 days' prior written notice if such Shareholder's continued participation in the Fund would, in the reasonable judgment of the Directors, put the Fund or the other Shareholders at a material administrative disadvantage; *provided that* the Directors may not so compel the redemption of any Shareholder during the pendency of a Removal Petition as defined below under *"Board of Directors-Removal of a Director"*.

DISTRIBUTIONS    The Directors do not anticipate that the Fund will make any distributions.

## MISCELLANEOUS

REPORTS    Shareholders will receive monthly account statements and audited annual financial statements for the Fund.

FISCAL YEAR END    December 31.

BUSINESS DAY    A day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in the Cayman Islands and New York City and/or such other day as the Investment Manager may from time to time determine.

AUDITORS    Deloitte & Touche, 1 Capital Place, P.O. Box 1787 GT, Grand Cayman, Cayman Islands.

LISTING    The Fund does not currently intend, but reserves the right to list the Shares on a foreign exchange.

LEGAL COUNSEL TO THE INVESTMENT MANAGER    Sidley Austin LLP, New York, New York served as U.S. legal counsel to the Investment Manager in connection with the organization of the Fund and the preparation of this Memorandum. Sidley Austin LLP may continue to serve in such capacity in the future, but has not assumed any obligation to update this Memorandum. Sidley Austin LLP may also advise the Investment Manager in matters relating to the operation of the Fund — including, without limitation, on matters relating to its fiduciary obligations to Shareholders — on an ongoing basis. Sidley Austin LLP does not represent and has not represented the prospective investors or the Fund in the course of the organization of the Fund, the negotiation of its business terms, the offering of the Shares or in respect of its ongoing operations. *Prospective investors must recognize that, as they have had no representation in the organization process, the terms of the Fund relating to themselves and the Shares have not been negotiated at arm's length.*

Sidley Austin LLP's engagement by the Investment Manager in respect of the Fund is limited to the specific matters as to which it is consulted by the Investment Manager and, therefore, there may exist facts or circumstances which could have a bearing on the Fund's (or the Investment Manager's) financial condition or operations with respect to which Sidley Austin LLP has not been consulted and for which Sidley Austin LLP expressly disclaims any responsibility.

LEGAL COUNSEL TO THE FUND AND MASTER FUND

Walkers, Walker House, Box 265, George Town, Grand Cayman, Cayman Islands, serves as counsel to the Fund and Master Fund as to matters of Cayman Islands law.

*AN INVESTMENT IN THE FUND IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. NO SUBSCRIBER SHOULD HAVE ANY NEED FOR ANY MONIES INVESTED IN THE FUND TO MEET CURRENT NEEDS OR ONGOING FINANCIAL REQUIREMENTS. EACH PROSPECTIVE INVESTOR MUST CAREFULLY ASSESS THE RISKS OF SECURITIES TRADING AND, PARTICULARLY, TRADING AND INVESTING IN COLLATERALIZED DEBT OBLIGATIONS BEFORE DETERMINING WHETHER TO SUBSCRIBE FOR A SHARE.*

———————————

## THE INVESTMENT PROGRAM

**Investment Objective**

The Fund's primary objective is to seek high current income and capital appreciation relative to LIBOR. The Fund does not currently trade directly but rather invests synthetically in the Master Fund generally on a 2.75 times leveraged basis through the Leverage Instrument. The Master Fund intends to achieve its investment objective primarily through leveraged investments in investment-grade structured finance securities, although the Master Fund intends to seek investment opportunities beyond the structured finance asset category. The Master Fund will make investments in CDOs and other structured finance assets, including ABSs, synthetic ABSs, MBSs, and global structured asset securitizations. The Master Fund will make investments (or otherwise take on risk) in both the traditional "cash" market and the derivatives market. In addition, the Master Fund may invest in various derivatives, including primarily credit-default swaps, but also options, swaps, swaptions, futures and forward contracts (both listed and over-the-counter) on various financial instruments, equity securities and currencies.

**Structure of the Fund**

The Fund will invest substantially all of its assets synthetically through the Leverage Instrument in a "master-feeder" structure, conducting most if not all of its investment and trading activities indirectly through an investment in the Master Fund, a company formed to conduct trading activities on behalf of the Fund and other entities managed by BSAM or its affiliates. The purpose of the Master Fund is to achieve trading and administrative efficiencies. The Fund may, however, invest a portion of its assets directly rather than investing through the Master Fund. Master Fund positions may be financed by various sources of funding, including bank lines and the repurchase markets. As the Fund is expected to have up to 2.75 times leveraged exposure to the Master Fund, and the Master Fund's positions in turn are expected to be highly leveraged, the Fund's Net Asset Value may increase or decrease at a greater rate than if leverage were not used.

While the Master Fund's investment objective may be achieved through direct, leveraged investments in investment-grade structured finance securities and other structured finance assets, the Master Fund intends, as part of its strategy, to gain exposure, on a non-recourse, leveraged basis, to investment-grade structured finance securities by means of the Master Fund's purchase of the equity securities and other securities issued by structured vehicles (such as CDOs) that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities (such as CDOs). Each such structured vehicle is referred to herein as a "Repackaging Vehicle". The Investment Manager or an affiliate thereof may, but need not, be the collateral manager or similar service provider with respect to a Repackaging Vehicle (each a "Repackaging Vehicle Manager").

**Investment Strategy**

Structured finance securities are the securities of special purpose vehicles ("SPVs") that purchase diversified pools of assets. The assets held by the SPV are financed through the issuance of several classes, or tranches, of securities each of which has a specific right to the interest and principal payments from the underlying diversified pool of assets held by the SPV. Each of the tranches issued by an SPV has a credit quality rating that is determined by the tranche's repayment priority to the interest and principal payments generated by the underlying assets. The Master Fund will focus on the senior securities issued by SPVs that are rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AA- by Fitch.

14

The Investment Manager will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively. A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation.

As part of the Master Fund's investment strategy, the Investment Manager intends, subject to market conditions and other relevant factors, to invest up to 40% of the net asset value of the Master Fund, as measured at the time any investment is made, in equity tranches (or equivalent securities) of Repackaging Vehicles (the "Repackaging Vehicle Junior Interests"), subject to the portfolio guidelines imposed by the Leverage Instrument, which may restrict such holding to significantly less than 40%. The returns of Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABSs, investment-grade CDOs and other investment-grade assets selected by the Investment Manager in its capacity as collateral manager of the Repackaging Vehicles (in such capacity, the "Repackaging Vehicle Collateral Manager"). The ability of a Repackaging Vehicle Collateral Manager to manage the assets of each Repackaging Vehicle will be restricted by the guidelines set forth in the operative documents relating to such Repackaging Vehicle. Repackaging Vehicle Junior Interests may be held directly or indirectly through an investment in a structured product that invests all or a substantial portion of its assets in Repackaging Vehicle Junior Interests. Such an investment will be considered to be a direct investment in the Repackaging Vehicle Junior Interests for the purpose of determining the portfolio limitations applicable to Repackaging Vehicle Junior Interests.

The equity securities issued by Repackaging Vehicles will generally not be secured or rated investment grade and will be subordinated to all other securities of the relevant Repackaging Vehicle and all other amounts due under the priority of payments set forth in the operative documents of such Repackaging Vehicle.

The Master Fund may also invest in other securities issued by a Repackaging Vehicle, including rated and secured securities, including investment-grade debt securities (the "Repackaging Vehicle Notes", together with the "Repackaging Vehicle Junior Interests", the "Repackaging Vehicle Securities"). In addition, all or a substantial portion of the Repackaging Vehicle Securities held by the Master Fund may be held indirectly through an investment in a secondary Repackaging Vehicle, Rampart Financial Ltd. ("Rampart"), a company incorporated under the laws of the Cayman Islands, for which BSAM and Stone Tower Debt Advisors LLC together act as investment managers. The shares of Rampart may be (but are not required to be) registered under the Securities Act and offered to, and traded by, the public. There can be no assurance that such shares will in fact be registered under the Securities Act, or if so registered, when such registration will be effective. Prospective investors should not invest in the Fund in anticipation of any such registration of the shares.

The operative documents of Rampart and the offering documents of any other Repackaging Vehicle in which the Master Fund invests, and any operative documents referred to therein will, subject to any confidentiality requirements imposed on the Master Fund, be sent to Shareholders and prospective investors without charge upon request to the Investment Manager at Bear Stearns Asset Management Inc., 383 Madison Avenue, New York, New York 10179, Attention: Alternative Fund Services; telephone: 212-272-1630; facsimile: 917-849-3018.

The Master Fund will also seek to generate returns by engaging in structured finance capital structure arbitrage transactions. In these transactions the Master Fund will purchase structured finance securities that the Investment Manager believes can be restructured in a more efficient manner. The

Master Fund will realize a gain if the restructured securities are then sold or valued at market prices above the aggregate level of the securities prior to the restructuring.

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

The returns of the Master Fund are intended to be generated primarily from the cash flow performance of the securities selected by the Investment Manager. The performance of the Master Fund will be related to trends in the credit markets, but the Investment Manager believes the Master Fund will not be highly correlated to short-term equity market returns. Additionally, the Master Fund intends to construct a portfolio that minimizes correlation with short term movements in interest rates. To accomplish this goal the Master Fund will invest primarily in floating-rate assets or fixed-rate assets with an interest rate hedge. It is the intention of the Investment Manager to hedge the exposure of any assets to interest rate changes with interest rate swaps or by selling treasuries short. The Investment Manager will attempt to keep the effective interest rate duration of the Master Fund's investment portfolio close to zero.

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund.

The Master Fund may also enter into other transactions where the Master Fund is paid to take on risks the managers believe to be negatively correlated with the principal credit risk inherent in the Master Fund's principal investments. These investments are not hedges in the strict sense but the managers believe the risk/reward characteristics of these investments serve to decrease the overall volatility of the Master Fund.

*BSAM also operates Bear Stearns High-Grade Structured Credit Strategies Master Fund, Limited (the "High-Grade Fund"), an investment vehicle which has an investment strategy similar to that of the Master Fund, but is not subject to the same investment restrictions or considerations relating to the additional leverage provided under the Leverage Instrument. Accordingly, the investment portfolio and strategies of the Master Fund may differ substantially from those of the High-Grade Fund, and past performance of the High-Grade Fund or any of its feeder funds is not necessarily indicative of the future performance of the Master Fund or the Fund.*

**Leverage Instrument**

THIS DESCRIPTION IS PROVIDED FOR ILLUSTRATIVE PURPOSES ONLY AND THE ACTUAL TERMS, CONDITIONS, AND PERFORMANCE OF THE LEVERAGE INSTRUMENT MAY VARY. IN THE EVENT THERE IS ANY INCONSISTENCY BETWEEN THE DESCRIPTION CONTAINED HEREIN AND THE LEVERAGE INSTRUMENT'S ACTUAL TERMS AND CONDITIONS AS EVIDENCED BY ONE OR MORE EXECUTED DOCUMENTS, THEN THE ACTUAL TERMS AND CONDITIONS OF SUCH TRANSACTION DOCUMENTS SHALL PREVAIL.

The Fund will enter into an over-the-counter, total return swap (the "Leverage Instrument") with Barclays Bank PLC as counterparty (the "Leverage Instrument Counterparty"), which references the Master Fund. (See "The Leverage Instrument Counterparty" below.) The Fund will pay the Leverage Instrument Counterparty an amount equal to substantially all of the proceeds from the issuance of the Interests and will receive a return indexed to an investment in the Master Fund with a targeted leverage of 2.75 times the amount invested. The Investment Manager may in its discretion reduce such leverage. The leverage inherent in the Leverage Instruments will cause a greater volatility of returns than would a direct non-leveraged investment in the Master Fund.

As the amount of leverage increases, the costs and risk of loss also increases and, accordingly, risks associated with the leverage instruments will be increased with respect to the Fund.

The portfolio leverage provided by the Leverage Instrument is in addition to the leverage employed by the Master Fund in its investment strategy. Shareholders will therefore be exposed to generally up to 2.75 times the Net Leverage of the Master Fund (*i.e.,* 27.5 times the net asset value of the Master Fund).

The Leverage Instrument provides for an accretion of the notional amount (effectively, a finance charge) equal to the applicable 1-month USD LIBOR plus up to 1.20% per annum, compounding monthly, on the amount of leverage provided by the Leverage Instrument Counterparty. The Leverage Instrument is scheduled to terminate 3 years after its effective date, at which time, the Leverage Instrument Counterparty will pay to the Fund the difference between the value of the Fund's leveraged synthetic investment in the Master Fund and the notional amount, which initially, is the amount of leverage provided by the Leverage Instrument Counterparty. The Leverage Instrument Counterparty may also terminate the Leverage Instrument following the occurrence of certain Termination Events, as defined in and set forth in the Leverage Instrument. The Fund may terminate the Leverage Instrument at any time upon giving notice to the Leverage Instrument Counterparty, as provided in the Leverage Instrument. However, if the Fund terminates the Leverage Instrument within 18 months after its effective date it will be subject to an early termination fee.

If the Leverage Instrument is terminated, the Investment Manager may invest the proceeds received upon termination in a swap or other instrument and with a counterparty that, in the determination of the Investment Manager, would provide the Fund with economic terms and a risk profile substantially similar to the Leverage Instrument. Following termination of the Leverage Instrument and prior to entering into any such new arrangement, the Fund may invest its assets directly in the Master Fund on an unleveraged basis.

In accordance with the terms of the Leverage Instrument and in consideration of the credit exposure of the Leverage Interest Counterparty to the Master Fund investment portfolio, to the extent that the Leverage Instrument Counterparty invests in the Master Fund to hedge its obligations under the Leverage Instrument, it will be entitled to more frequent and detailed information reports and more

favorable liquidity rights than the Shareholders have with respect to their Shares. Any such agreement between the Master Fund or the Investment Manager and the Leverage Interest Counterparty will not entitle any other Shareholders to any more favorable rights with respect to their investment in the Fund.

In addition, the Leverage Instrument provides that the Leverage Instrument Counterparty may terminate the Leverage Instrument if the Master Fund breaches certain investment guidelines set forth in the Leverage Instrument  The Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

A copy of the Leverage Instrument, subject to any confidentiality requirements imposed on the Fund, will be made available to Shareholders and prospective investors upon request to the Investment Manager.

**Master Fund Leverage and Credit Hedges**

In addition to the leverage employed by the Fund through the Leverage Instrument, the Master Fund itself will borrow money to enable it to invest in securities whose market value exceeds 100% of the net asset value of the Master Fund. As the Master Fund purchases primarily highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaging Vehicle Junior Interests) with an aggregate value of as much as fifteen times the net asset value of the Master Fund. It is the intention of the Investment Manager, however, to limit Net Leverage to ten times the Net Asset Value. "Net Leverage" is defined as the total market value of the Master Fund's investments, excluding the Repackaging Vehicle Junior Interests, less the notional value of the Master Fund's credit default swap hedges, adjusted for the duration of these hedges, divided by the net asset value of the Master Fund, excluding the market value of Repackaging Vehicle Junior Interests. The Master Fund will primarily use repurchase agreements to finance its direct purchases of CDOs and other ABSs, although the Master Fund may use other forms of financing or leverage, including total return swaps and other derivative transactions. The Master Fund may also borrow money to facilitate redemptions or for other liquidity purposes.

It is anticipated that a substantial portion (initially approximately 30%) of the Master Fund's repurchase agreements will be entered into through a deposit agreement with one or more counterparties, pursuant to which the Master Fund will deposit an amount with the relevant counterparty and direct all or a portion of such funds to be invested in securities that are leveraged through the repo market. Dresdner Bank AG London Branch is the sole initial deposit agreement counterparty.

As mentioned above, the Master Fund will use credit-default swaps to hedge some of its credit exposure. A credit-default swap is a derivative contract where one party (the protection buyer) pays an annual premium to another party (the credit protection seller) in exchange for the right to receive a compensatory payment if a specified credit suffers a default or credit event. Credit default swaps will be used by the Master Fund to hedge credit exposure. A substantial portion of the Master Fund's credit default swap hedges may be general portfolio hedges that do not hedge a specific asset held by the Master Fund.

The Master Fund will also use other instruments and strategies to hedge potential market volatility. These instruments and strategies include options, futures and short positions on various financial indices or individual securities where the managers believe there is an opportunity to limit volatility in a negative market scenario.

**Leverage of the Repackaging Vehicle Junior Interests**

In addition to the leverage employed by the Master Fund in its direct investments in highly rated investment-grade assets, as measured by Net Leverage, the Master Fund will effectively be using leverage by purchasing Repackaging Vehicle Junior Interests to gain exposure to the highly rated investment-grade assets of the Repackaging Vehicle.

Traditional leverage used in repurchase agreement financing is sensitive to the market price volatility of the assets being financed. If the market price of the assets being financed deteriorates, the Master Fund may be required to post additional margin or, if sufficient margin is not available, may be required to sell a financed position. This form of financing is typically called "mark-to-market recourse financing" because the repurchase counterparty uses the mark-to-market price of the financed assets to determine whether to call for additional margin. Under the arrangements for such financing, the repurchase counterparty has recourse to the assets of the Master Fund used to secure the financing. The leverage inherent in the Repackaging Vehicle Junior Interests, by contrast, may be characterized as "non-mark-to-market" and "non-recourse", as the Repackaging Vehicle does not have the right, upon the deterioration of the market price of its assets, to require additional capital from, and generally has no recourse to the assets of, the holders of Repackaging Vehicle Junior Interests. The initial Repackaging Vehicle Junior Interest capital contribution required by a Repackaging Vehicle is determined by, among other factors, the ratings quality and diversity of the assets held by the Repackaging Vehicle. If the total par amount of assets purchased by a Repackaging Vehicle were divided by the initial capital contribution of the Repackaging Vehicle Junior Interests, the result would be a leverage ratio of approximately 60-to-1. This mathematical ratio is substantially greater than both the gross leverage and Net Leverage ratios targeted by the Master Fund for the portion of its investment portfolio that does not include the Repackaging Vehicle Junior Assets. The Investment Manager anticipates, however, that the risk-adjusted return of Repackaging Vehicle Junior Interests will generally exceed the risk-adjusted return on assets financed under repurchase agreements or other forms of financing.

**Investment Restrictions; Permitted Investments**

Pursuant to the terms of the Leverage Instrument, the Leverage Instrument Counterparty has the right to terminate the Leverage Instrument under certain conditions, including the breach by the Master Fund of investment guidelines set forth in the Leverage Instrument. The Investment Manager generally intends therefore (but is in no way obligated) to comply with such limitations, including limitations on the Master Fund's exposure to Repackaging Vehicle Junior Interests, limitations on the securities that the Master Fund may hold that are rated below AA by Standard & Poor's or Fitch or Aa2 by Moody's and limitations on the Master Fund's exposure to certain categories of structured finance securities, including CDO Securities, ABS Securities and residential mortgage-backed securities. A copy of the Leverage Instrument, including such limitations, will be made available to Shareholders and prospective investors upon request to the Investment Manager, subject to any confidentiality requirements imposed on the Fund.

Outside of the portfolio guidelines imposed by the Leverage Instrument, the Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time

any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. The Investment Manager intends, however, to adhere to the portfolio guidelines set forth in the Leverage Instrument in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

The Master Fund's Memorandum and Articles of Association generally permit investments in any and all securities, including but not limited to stocks, bonds, warrants, notes, debentures (whether subordinated, convertible or otherwise), money market funds, commercial paper, certificates of deposit, obligations of the United States or any state thereof or of foreign governments (or any instrumentality thereof), bank debt, partnership interests, whether publicly offered or pursuant to private placements, as well as futures, swaps, forward and option contracts and other derivatives, whether or not traded or on an organized exchange.

*The descriptions contained herein of specific investment strategies and methods that may be engaged in by the Master Fund should not be understood as in any way limiting the Investment Manager's investment activities. The Master Fund may engage in investment strategies and methods not described herein that the Investment Manager considers appropriate, subject to the portfolio guidelines imposed by the Leverage Instrument; provided, however, that the Shareholders will receive advance notice of any material change in the Master Fund's overall strategy or approach.*

*The Master Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objectives of the Master Fund will be achieved or that the Fund will not incur substantial losses.*

### CERTAIN RISK FACTORS

*There is a high degree of risk associated with an investment in the Fund and an investment in the Fund should only be made after consultation with independent qualified sources of investment and tax advice. References to the Fund or the Fund's investments and portfolio in the following summary of risks refer to the combined risks relating to the investments and portfolio of the Fund, the Master Fund and the Other Feeder Funds and references to the Investment Manager and its investment strategy and operations refer to Bear Stearns Asset Management Inc. as investment manager to the Fund and the Master Fund, and its roles in connection with each respectively, unless the context suggests otherwise. Among the risks involved with an investment in the Fund are the following:*

**Potential Loss of Investment**

No guarantee or representation is made that the Fund's investment program will be successful. In particular, the past results of the Investment Manager are not necessarily indicative of the future performance of the Fund. As is true of any investment, there is a risk that an investment in the Fund will be lost entirely or in part. The Fund is not a complete investment program and should represent only a portion of an investor's portfolio management strategy.

**Leverage**

The Leverage Instrument provides the Fund generally a 2.5 to 2.75-times leveraged exposure to the Master Fund. During periods of volatile market changes and/or reduced liquidity at in the Master Fund's investment portfolio, such leverage may temporarily exceed 2.75. The Master Fund itself invests on a highly leveraged basis. The more leverage is employed, the more likely a substantial change will

occur in the value of the Fund. Accordingly, any event which adversely affects the value of an investment would be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to any investments in a market that moves adversely to such investments could result in a substantial loss which would be greater than if the investments were not leveraged. In addition, trading on margin will result in interest charges to the Master Fund.

The Master Fund will primarily be using repurchase agreements to finance its direct purchases of structured finance securities (other than Repackaging Vehicle Junior Interests), although the Master Fund may use other forms of financing or leverage, including total return swaps, other derivative transactions and credit facilities. Repurchase agreements and total return swap financing entail significant financial risks, including the potential risk of loss of initial margin and additional amounts that may be required to be posted with the counterparty to the repurchase agreement or total return swap, as applicable, in connection with a particular transaction.

If the market value of securities purchased by the counterparty under a repurchase agreement (the "Purchased Securities") declines, the Master Fund will be required to deliver additional margin. If additional margin is not properly posted, the counterparty to the repurchase agreement may declare that an event of default has occurred and sell all or a portion of the securities that are subject to the repurchase transaction. In addition, the Master Fund will be responsible for any shortfall after such sale.

The Master Fund will be required to repurchase the Purchased Securities on a specified repurchase date. If the Master Fund fails to repurchase the Purchased Securities, the repurchase counterparty may declare an event of default under the repurchase agreement and sell the Purchased Securities. As a result, the Master Fund may suffer the loss of some or all of its investment. Repurchase agreements generally do not provide for a right to early termination. Therefore, if a repurchase agreement counterparty agrees to an early termination of a repurchase transaction, the Master Fund may be required to pay a transaction breakage fee and suffer a substantial loss. The repurchase agreements contemplated by the Master Fund will be for terms of one month, three months or six months. The repurchase agreement counterparty is under no obligation to enter into new repurchase agreements with the Master Fund. The inability of the Master Fund to roll a repurchase agreement would require the Master Fund to sell securities which may lead to a substantial loss.

Under a total return swap, the Master Fund will be obligated to make certain periodic payments in exchange for the total return on a referenced asset, including coupons, interest and the gain or loss on such asset over the term of the swap. The Master Fund may be required to maintain collateral with the total return swap counterparty. If the Master Fund fails to fulfill its payment obligations or fails to post any required collateral under a total return swap, the total return swap counterparty may declare an event of default and, as a result, the Master Fund may be required to pay swap breakage fees, suffer the loss of the amounts paid to the counterparty and forego the receipt from the counterparty of further total return swap payments. For additional risks relating to total return swaps, see *"—Other Investment Related Risks—OTC Derivatives"*.

The Master Fund has a targeted Net Leverage of 10 to 1 for the portion of the Master Fund's investments that are made in investments other than Repackaging Vehicle Junior Interest investments. "Net Leverage" is defined as the total market value of the Master Fund's investments, excluding Repackaging Vehicle Junior Interests, less the notional value of the Master Fund's credit default swap hedges, adjusted for the duration of these hedges, divided by the net asset value of the Master Fund, excluding the market value of Repackaging Vehicle Junior Interests. The gross leverage of the Master Fund (leverage without subtracting the notional value of the credit default swaps) measured in the same manner as Net Leverage, above, will be higher than 10 to 1. To the extent that the credit default swap hedges in the portfolio do not perform as expected, and to the extent that the Master Fund is exposed to

21

additional credit default swap counterparty credit risks, the price volatility of the Master Fund may be substantially more severe than indicated by a Net Leverage ratio of 10 to 1.

In addition to the direct financing by the Master Fund of its investments in CDOs and other assets, the investment in Repackaging Vehicle Junior Interests will expose the Master Fund to the highly leveraged investments in the collateral securing the other Repackaging Vehicle Securities and obligations. Due to the leverage inherent in the Repackaging Vehicle structure, changes in the value of the Repackaging Vehicle Junior Interests could be greater than the changes in the values of the underlying collateral, the assets constituting which are subject to, among other things, credit and liquidity risk. Investors must consider with particular care the risks of leverage in Repackaging Vehicle Junior Interests because, although the use of leverage creates an opportunity for substantial returns for the Master Fund on the Repackaging Vehicle Junior Interests, it increases substantially the likelihood that the Master Fund could lose its entire investment in Repackaging Vehicle Junior Interests if the pool of collateral held by the relevant Repackaging Vehicle is adversely affected by market developments.

**CDO Investment Related Risks**

The market value of CDOs will generally fluctuate with, among other things, the financial condition of the obligors on the underlying debt obligations or, with respect to Synthetic Securities, of the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. Prospective investors must understand that securities otherwise outside the Master Fund's investment parameters as described in this Memorandum (for example, bank loans, high-yield and mezzanine debt securities) may constitute all or a significant portion of the underlying securities held by a CDO, Synthetic Security or other investment of the Master Fund and that CDOs are therefore subject to risks particular to such securities.

CDOs are subject to credit, liquidity and interest rate risks. In particular, investment-grade CDOs will have greater liquidity risk than investment grade sovereign or corporate bonds. There is no established, liquid secondary market for many of the CDO securities the Master Fund may purchase. The lack of such an established, liquid secondary market may have an adverse effect on the market value of such CDO securities and the Master Fund's ability to sell them. Further, CDOs will be subject to certain transfer restrictions that may further restrict liquidity. Therefore, no assurance can be given that if the Master Fund were to dispose of a particular CDO held by the Master Fund, it could dispose of such investment at the previously prevailing market price.

The performance of CDOs will be adversely affected by macroeconomic factors, including (i) general economic conditions affecting capital markets and participants therein, (ii) the economic downturns and uncertainties affecting economies and capital markets worldwide, (iii) the effects of, and disruptions and uncertainties resulting from, the terrorist attacks of September 11, 2001 and the actual and potential military responses thereto and other consequences thereof and similar events, (iv) recent concern about financial performance, accounting and other issues relating to various publicly traded companies and (v) recent and proposed changes in accounting and reporting standards and bankruptcy legislation.

As used herein, the following terms have the following meanings:

"Synthetic Security" is any derivative financial instrument with respect to a debt instrument, whether in the form of a swap transaction, structured bond investment or otherwise purchased or entered into, by the Master Fund with or from a synthetic security counterparty, which investment contains similar probability of default, recovery upon default (or a specific percentage thereof) and expected loss characteristics as those of the related Reference Obligation (without taking account of such considerations

as they relate to the synthetic security counterparty), but which will contain a maturity, interest rate and other non-credit characteristics that may be different from the Reference Obligation to which the credit risk of the Synthetic Security relates.

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Reference Obligor" means the obligor on a Reference Obligation.

*Synthetic Securities.* In addition to the credit risks associated with holding senior bank loans and high-yield debt securities, with respect to Synthetic Securities, the Master Fund will usually have a contractual relationship only with the counterparty of such Synthetic Security, and not with the Reference Obligor of the Reference Obligation. The Master Fund generally will have no right to directly enforce compliance by the Reference Obligor with the terms of the Reference Obligation nor will it have any rights of setoff against the Reference Obligor or rights with respect to the Reference Obligation. The Master Fund will not directly benefit from the collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of such Reference Obligation. In addition, in the event of the insolvency of the counterparty, the Master Fund will be treated as a general creditor of such counterparty, and will not have any claim with respect to the Reference Obligation. Consequently, the Master Fund will be subject to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, concentrations of Synthetic Securities in any one counterparty subject the Securities to an additional degree of risk with respect to defaults by such counterparty as well as by the Reference Obligor.

*Structured Finance Securities.* The Master Fund may invest in trust certificates or similar securities of the type generally considered to be "repackaged securities". Structured Finance Securities may present risks similar to those of the other types of CDOs in which the Master Fund may invest and, in fact, such risks may be of greater significance in the case of Structured Finance Securities. Moreover, investing in Structured Finance Securities may entail a variety of unique risks. Among other risks, Structured Finance Securities may be subject to prepayment risks, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may depend upon any associated interest rate hedging agreement providing for the exchange of interest accruing on the security being repackaged into interest stated to be payable on the trust certificate or similar securities). In addition, the performance of a Structured Finance Security will be affected by a variety of factors, including the level and timing of payments and recoveries on, the characteristics and the adequacy of, and the ability to realize upon, any related collateral.

*Insolvency of Issuers of CDOs.* If a court in a lawsuit brought by an unpaid creditor or representative of creditors of a U.S. issuer of a CDO, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CDO and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they matured, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the issuer or to recover amounts previously paid by the issuer in satisfaction of such indebtedness. The measure of insolvency for this purpose varies. Generally, an issuer would be considered insolvent at a particular time if the sum of its debts was then greater than all of its property at a fair valuation or if the present fair saleable value of its assets was then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the issuer was insolvent after giving effect to the incurrence of the

indebtedness constituting the CDO or that, regardless of the method of valuation, a court would not determine that the issuer was insolvent upon giving effect to such incurrence. In addition, in the event of the insolvency of an issuer of a CDO, payments made on such CDO could be subject to avoidance as a preference if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CDO are voidable, whether as fraudulent conveyances or preferences, such payments can be recaptured.

The preceding description applies only to issuers of CDOs organized in the United States. Insolvency considerations will differ depending on the country in which each issuer is located or domiciled and may differ depending on whether the issuer is a non-sovereign or a sovereign entity.

*Lender Liability Considerations; Equitable Subordination.* In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders or bondholders on the basis of various evolving legal theories (commonly referred to as "lender liability"). Generally, lender liability is founded upon the premise that an institutional lender or bondholder has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or issuer or has assumed a degree of control over the borrower or issuer resulting in the creation of a fiduciary duty owed to the borrower or issuer or its other creditors or stockholders.

In addition, under common law principles that in some cases form the basis for lender liability claims, if a lender or bondholder (a) intentionally takes an action that results in the undercapitalization of an obligor to the detriment of other creditors of such obligor, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a lender or bondholder to dominate or control an obligor to the detriment of other creditors of such obligor, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors, which remedial action is called "equitable subordination". Because of the nature of CDOs, the Master Fund may be subject to claims from creditors of an obligor that debt obligations issued by such obligor that are held by the Master Fund should be equitably subordinated.

The preceding discussion is based upon principles of U.S. federal and state laws. Insofar as debt obligations issued by non-U.S. issuers are concerned, the laws of certain foreign jurisdictions may impose liability upon lenders or bondholders under factual circumstances similar to those described above, with consequences that may or may not be analogous to those described above under U.S. federal and state laws.

*Ineffectiveness of Credit Hedges.* The Master Fund may use credit default swaps to hedge a portion of the credit risk in the portfolio. The credit default swaps will generally not hedge a specific position but will hedge exposure to a group of credits that the Investment Manager believes to reflect the credit markets in general. It is possible these credit hedges will not be correlated with the portfolio as intended which will lead to a greater decline in the portfolio's value than that anticipated by the Investment Manager.

## Risks Related to an Investment in Repackaging Vehicle Junior Interests

The Repackaging Vehicle Junior Interests will represent equity interests in the relevant Repackaging Vehicle only and are not secured by any assets of such Repackaging Vehicle. Repackaging Vehicle Junior Interests will be subordinated to all other securities of the Repackaging Vehicle and all other amounts due under the priority of payments set forth in the operative documents of such Repackaging Vehicle. As such, the greatest risk of loss relating to defaults in the collateral portfolio of

the Repackaging Vehicle is borne by the Repackaging Vehicle Junior Interests. The Master Fund, therefore, as holder of the Repackaging Vehicle Junior Interests, will rank behind all of the creditors, whether secured or unsecured and known or unknown, of the Repackaging Vehicle.

Each Repackaging Vehicle will be highly leveraged. The use of leverage generally magnifies the Repackaging Vehicle's risk of loss, particularly for the Repackaging Vehicle Junior Interests.

**Other Investment Related Risks**

*Broad Discretion of Investment Manager; Potential Lack of Diversification.* There are no restrictions on the investment discretion of the Investment Manager except for those described under "The Investment Program" above. Accordingly, the Investment Manager is not restricted from investing a large portion of the assets of the Master Fund in any one sector or investment. However, the Leverage Instrument provides that the Leverage Instrument Counterparty may terminate the Leverage Instrument if the Master Fund breaches certain investment guidelines set forth in the Leverage Instrument The Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

*Evolving and New Investment Strategies.* The Investment Manager's strategies and trading techniques are continually evolving. The Investment Manager is not restricted from using the Master Fund's capital to develop new strategies, even if the Investment Manager has limited experience in the type of strategy or in the markets or instruments involved. The strategies developed by the Investment Manager may not be successful and the resources devoted to the implementation of new strategies may diminish the effectiveness of the Investment Manager's implementation of the Investment Manager's established strategies.

*Lower-Rated and Unrated Securities.* While the primary focus of the Master Fund will be on highly-rated debt securities (AA- or higher), up to 10% of the investment portfolio (excluding Repackaging Vehicle Junior Interests) may be invested in lower-rated investment grade, below investment grade or unrated securities. As the Master Fund's portfolio is leveraged, such holdings may be equal to a substantial amount of the Master Fund's Net Asset Value. In fact, if the Master Fund employs Net Leverage of ten-times its Net Asset Value, the value of such securities may equal up to 100% of investors' capital. A substantial portion of the Shareholders' investment may therefore be exposed to the credit risks and potentially greater volatility inherent in such securities.

*Directional Trading.* Certain of the positions taken by the Master Fund are designed to profit from forecasting absolute price movements in a particular instrument. Predicting future prices is inherently uncertain and the losses incurred, if the market moves against a position, will often not be hedged. The speculative aspect of attempting to predict absolute price movements is generally perceived to exceed that involved in attempting to predict relative price fluctuations.

*Hybrid and Other Strategies.* Many of the strategies executed by the Investment Manager combine elements of more than one general strategy type. Often, in the course of implementing a particular strategy an opportunistic trade representing a different trading approach will be made. For example, in seeking to exploit a relatively mispriced pair of assets, the Investment Manager may conclude that an asset is sufficiently over- or underpriced to merit taking an outright directional position.

The Investment Manager's approach combines a range of different trading techniques, implementing different strategies in different markets as well as combining different strategies, in the same or related markets.

The Investment Manager will continually develop new, and adapt and refine existing, strategies. There is no material limitation on the strategies that the Investment Manager may apply and no assurance as to which types of strategies may be applied at any one time.

*Equities.* Equity securities in which the Fund invests may involve substantial risks and may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses.

*Short Sales.* The Fund will enter into transactions, known as "short sales", in which it sells a security it does not own in anticipation of a decline in the market value of the security. Losses from short sales are potentially unlimited. In particular, a tender offer or similar transaction in respect of a company whose securities the Fund has sold short could cause the value of such securities to rise dramatically, resulting in substantial losses to the Fund. Brokers may also require the Fund to "cover" a short position at an inopportune time.

*Fixed-Income Investments.* The value of the fixed-income securities in which the Fund may invest will change as the general levels of interest rates fluctuate. When interest rates decline, the value of the Fund's fixed-income securities can be expected to rise. Conversely, when interest rates rise, the value of such securities can be expected to decline.

*Securities Options.* The Fund may engage in options trading, which is speculative and involves a high degree of risk. If the Fund purchases a put or a call option, it may lose the entire premium paid. If the Fund writes or sells a put option, it could lose the full "strike price" of the referenced security. If the Fund writes or sells a call option, its loss is potentially unlimited.

*Illiquid Securities.* Securities purchased by the Master Fund may lack a liquid trading market, which may result in the inability of the Master Fund to sell any such security or other investment or to close out a transaction involving a non-U.S. currency or the sale of an option, thereby forcing the Master Fund to incur potentially unlimited losses. In particular, no secondary market generally exists for Repackaging Vehicle Junior Interests and no such secondary market is expected to develop, and it may be difficult for the Master Fund to determine the value of the Repackaging Vehicle Junior Interests at any particular time. The Master Fund may therefore find it difficult or uneconomic to liquidate its investment in the Repackaging Vehicle Junior Interests at any particular time. In certain cases, the Master Fund will not be permitted to transfer majority ownership of Repackaging Vehicle Junior Interests other than to a single transferee without the prior written consent of another party with a controlling interest in the relevant Repackaging Vehicle. Investments in Repackaging Vehicle Junior Interests will be substantially less liquid than the remaining assets in the Master Fund.

While the Investment Manager anticipates that the Master Fund's investment portfolio will be sufficiently diversified and liquid to permit timely redemptions in most market conditions, each Shareholder should be aware that the Repackaging Vehicle Junior Interests represent a portion of the Master Fund's assets that may not be liquidated in the event of substantial redemptions. If all other assets have been liquidated, any remaining Shareholders may not be able to redeem all of their Shares and will maintain an equity holding in one or more Repackaging Vehicles for an extended period of time through the Fund's continued holding of such Repackaging Vehicle Junior Interests.

*OTC Derivatives.* The Fund may enter into swap and other over-the-counter derivative transactions involving or relating to, among other things, interest rates, currencies, or securities, and including total return swaps. A swap transaction or contract for differences is an individually negotiated, non-standardized agreement between two parties to exchange cash flows (and sometimes principal amounts) measured by different rates or prices with payments generally calculated by reference to a principal ("notional") amount or quantity. Swap contracts, contracts for differences, and other over-the-counter derivatives are not traded on exchanges; rather banks and dealers act as principals in these markets. As a result, the Fund will be subject to the risk of the inability or refusal to perform with respect to such contracts on the part of any counterparties with which the Fund trades. Over-the-counter derivatives may also expose the Fund to additional liquidity risks. The over-the-counter derivatives market is generally not regulated by any United States or non-U.S. governmental authority. Participants in these markets are not required to make continuous markets in the contracts they trade.

*Repurchase Agreement Counterparty Risk.* It is anticipated that a substantial portion (initially 30%) of the Master Fund's repurchase agreements will be entered into through a deposit agreement with one or more counterparties (each a "Deposit Agreement Counterparty"), pursuant to which the Master Fund will deposit an amount with the relevant counterparty and direct all or a portion of such funds to be invested in securities that are leveraged through the repo market. Dresdner Bank AG London Branch ("Dresdner") is the sole initial Deposit Agreement Counterparty. The performance of the Master Fund with respect to securities financed through such a deposit agreement depends on the performance by the deposit agreement counterparty of its payment obligations. If the Deposit Agreement Counterparty were to fail in its obligation to pay under the relevant deposit agreement, the Shareholders may suffer a loss of capital. If the Deposit Agreement Counterparty has financial difficulties it may be impossible for the Master Fund to recover its deposit and thus Shareholders may suffer a substantial loss of their investment. In the event of a bankruptcy or insolvency of the Deposit Agreement Counterparty, or any replacement or additional counterparty, the Master Fund could experience (i) a loss of any realized or unrealized profits on the Master Fund's positions and/or (ii) a partial or total loss of the funds paid as upfront payments for the relevant deposit agreement. The Master Fund may seek to obtain a "security interest" or similar interest in the securities held by the Deposit Agreement Counterparty with respect to the relevant deposit agreement in an effort to achieve priority in respect of the payment obligations of the Deposit Agreement Counterparty in the event of its bankruptcy or insolvency. There can be no assurance, however, that any "security interest" will be achieved, maintained or, in the event of bankruptcy or insolvency, respected. The obligation of the Dresdner to repay any amounts (including the any deposit amounts) under the initial deposit agreement is not secured. The Master Fund, therefore, is likely to have the status of a "general unsecured creditor" in the event that the Dresdner is placed in liquidation rather than in reorganization.

In the relatively recent past there have been a number of high-profile failures of financial institutions due to violations or failures of interest controls, management misfeasance or malfeasance, or exposure to failed clients and counterparties (including hedge funds). Accordingly, prospective investors should understand that the failure of the Deposit Agreement Counterparty could result in a substantial delay in the return to the Master Fund of capital invested in the relevant deposit agreement, or partial or total loss of such capital.

*Suspensions of Trading.* For all securities or commodities traded on public exchanges, each exchange typically has the right to suspend or limit trading in all securities or commodities that it lists. Such a suspension could render it impossible for the Fund to liquidate its positions and thereby expose it to losses. In addition, there is no guarantee that non-exchange markets will remain liquid enough for the Fund to close out positions.

*Futures.* Futures markets are highly volatile and a high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in

27

substantial losses to the Fund. Moreover, most commodity exchanges limit fluctuations in futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits". Such regulations could prevent the Fund from promptly liquidating unfavorable positions and thus subject the Fund to substantial losses.

*Hedging Transactions.* The Fund may utilize a variety of financial instruments, such as derivatives, options, interest rate swaps, caps and floors, futures, and forward contracts, both for investment purposes and for hedging purposes. Hedging involves special risks including the possible default by the other party to the transaction, illiquidity, and, to the extent the Investment Manager's assessment of certain market movements is incorrect, the risk that the use of hedging could result in losses greater than if hedging had not been used. Nonetheless, with respect to certain investment positions, the Fund may not be sufficiently hedged against market fluctuations, in which case an investment position could result in a loss greater than if the Fund had been sufficiently hedged with respect to such position. Moreover, it should be noted that the Fund's portfolio will always be exposed to certain risks that cannot be hedged, such as credit risk (relating both to particular securities and counterparties).

*International Investing.* Investing outside the United States may involve greater risks than investing in the United States. These risks include: (i) less publicly available information; (ii) varying levels of governmental regulation and supervision; and (iii) the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies are generally not subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies.

Foreign markets may also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions. Delays in settlement could result in periods when assets of the Master Fund are uninvested and no return is earned thereon. The inability of the Master Fund to make intended structured credit security purchases due to settlement problems or the risk of intermediary counterparty failures could cause the Master Fund to miss investment opportunities. The inability to dispose of a structured credit security due to settlement problems could result either in losses to the Master Fund due to subsequent declines in the value of such structured credit security or, if the Master Fund has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resources self-sufficiency and balance of payments position.

*Loans of Portfolio Securities.* The Fund may lend its portfolio securities. By doing so, the Fund attempts to increase income through the receipt of interest on the loan. In the event of the bankruptcy of the other party to a securities loan, the Fund could experience delays in recovering the loaned securities. To the extent that the value of the securities the Fund lent has increased, the Fund could experience a loss if such securities are not recovered.

*Possible Lack of Diversification.* There are no absolute diversification or concentration constraints on the Fund. If the Fund's portfolio becomes relatively concentrated, the value of an

investment in the Fund may be subject to greater volatility and may be more susceptible to any single economic, political, or regulatory occurrence or the fortunes of a single company or industry than would be the case if the Fund's investments were more diversified.

*Turnover.* The Fund will not be restricted in effecting transactions by any limitation with regard to its portfolio turnover rate. In light of the Fund's investment objectives and policies, the Fund's portfolio turnover rate may be substantial, which would result in significant transaction costs.

## Restrictions on Voting Rights of the Fund as Holder of Repackaging Vehicle Junior Interests

As the Fund will be deemed an affiliate of BSAM under the operative documents of the Repackaging Vehicles, the Fund will not generally be entitled to vote the Repackaging Vehicle Securities held by it in any vote under the collateral management agreement of the Repackaging Vehicle or with respect to any vote or consent on any removal of the Repackaging Vehicle Collateral Manager either for or without cause or any other amendment or modification of the indenture governing the Repackaging Vehicle Securities which increases the rights or decreases the obligations of the Repackaging Vehicle Collateral Manager, for so long as BSAM or any of its affiliates is the Repackaging Vehicle Collateral Manager. However, the Fund will be entitled to vote the Repackaging Vehicle Securities held by it with respect to all other matters.

## Certain Risks Related to the Investment Manager

*Limited Operating History.* The Fund and the Master Fund commenced operations on August 1, 2006 and therefore have a limited operating history. Past performance of the Investment Manager in managing assets similar to the Fund's assets, including the assets of the High-Grade Fund, is not necessarily indicative of future results of the Fund. There can be no assurance that the Master Fund will generate performance results equivalent to the results generated by the portfolio managers in the past (or avoid losses).

PAST RESULTS ARE NOT NECESSARILY INDICATIVE OF FUTURE PERFORMANCE. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

*Dependence on the Investment Manager and Key Personnel.* The Fund depends on the services of the Investment Manager and its personnel, particularly Ralph Cioffi, Matthew Tannin and Ray McGarrigal, and on relationships among the Investment Manager and certain key personnel of the Investment Manager, on the one hand, and members of The Bear Stearns Group, including the Prime Broker, on the other. Loss of the services of any key personnel, including those named herein, could materially adversely impact the Fund (and result in its liquidation).

*Use of "Manager Marks".* As described herein under "Net Asset Value", the Investment Manager is permitted to establish "fair value" of non-exchange listed investments. There can be no assurance that the fair value of such investments will be fully realizable upon their ultimate disposition. Because of the inherent uncertainty of the estimated values of unrealized gains and losses, the Net Asset Value as determined by the Administrator as of the last Business Day of each month (or on such other date as the Administrator may calculate Net Asset Value) may differ significantly from the actual Net Asset Value upon liquidation of such investments, and the differences could be material. The Investment Manager has a conflict of interest in making any such valuations because the valuations directly effect Net Asset Value and thus the amount of compensation received by the Investment Manager in respect of its services. Prospective investors should understand that any such Investment Manager marks are not

subject to independent review, except as may be done in connection with the audit at year-end. *See "Conflicts of Interest—Asset Valuation"*.

In addition, for the purposes of the Leverage Instrument, the value of the Leverage Instrument shall be determined by the Leverage Instrument Counterparty as calculation agent under the terms of the Leverage Instrument. The value of the Leverage Instrument will be determined in large part by the net asset value per share of the Master Fund. Generally, the net asset value per share of the Master Fund will be the amount reported by the Administrator to the Master Fund, however, the Leverage Instrument Counterparty may adjust such value based on its commercially reasonable determination under certain circumstances.

***Asset Valuation-Thinly Quoted Securities and Derivatives.*** As described under "Net Asset Value", the Investment Manager is permitted to modify valuations in its sole and absolute discretion to reflect fair value. In so doing, the Investment Manager may instead rely upon another "prudent method of valuation". For example, with respect to an over-the-counter security, the Investment Manager, if other quotes are not available, may rely upon a single broker-dealer quotation rather than the three-dealer quotes generally required in respect of assets traded on an over-the-counter market for which market quotations are readily available. It is not unusual for broker-dealers affiliated with an issuer of a structured financed security or derivative to provide "bid" and "ask" quotations for such security on a preliminary or "soft" basis. Such preliminary quotations may or may not reflect the "bid" or "ask" prices at which such broker-dealer would be willing to effect actual transactions. Broker-dealers unaffiliated with the issuer of such security or derivative, if providing quotes, may be even less likely to execute transactions (particularly sales transactions by the Fund) at or near preliminary quotes.

The Fund's portfolio may include substantial positions (in terms of number of issues and percentage of the Fund's Net Asset Value) where there is only a single broker-dealer quoting prices, which may be preliminary or "soft", and where such broker-dealer is affiliated with the issuer of such security or derivative or with the Investment Manager. It is anticipated that a number of such securities and derivatives will be executed and maintained with a Bear Stearns Entity and that such positions will be valued in reliance on quotations provided by Bear Stearns Entities in accordance with the provisions set forth under "Net Asset Value", which may be at fair value.

In the absence of actual sale transactions, it is difficult for the Investment Manager to test the reliability of preliminary quotes even when multiple broker-dealers are providing "bid" and "ask" prices. *Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio securities could dramatically affect the Fund's Net Asset Value, particularly where the Fund seeks to sell positions, if the Investment Manager's or its designee's judgments regarding appropriate valuations should prove incorrect. See "Conflicts of Interest—Asset Valuation" and "Net Asset Value".*

***Competition.*** In recent years there has been a marked increase in the number of, and flow of capital into, investment vehicles established in order to implement alternative asset investment strategies, including strategies similar to the strategy to be implemented by the Fund. While the precise effect cannot be determined, such increase may result in greater competition for investment opportunities, or may result under certain circumstances in increased price volatility or decreased liquidity with respect to certain positions. Prospective investors should understand that the Fund may compete with other investment vehicles, as well as investment and commercial banking firms, which have substantially greater resources, in terms of financial wherewithal and research staffs, than may be available to the Fund.

***Other Clients of the Investment Manager.*** The Investment Manager manages other accounts (as described herein), some of which it may have incentives to favor over the Fund. The Investment Manager

is not subject to any absolute restrictions on taking new accounts, which could increase the competition for its time and adversely impact the performance of the Fund.

*Changes in Investment Program.* The Investment Manager's investment program is dynamic and changes over time. Thus, the Investment Manager may not use the same investment program in the future that it used in the past. The specific details of the Investment Manager's investment program are proprietary; consequently, Shareholders will not be able to determine the full details of those methods, or whether those methods are being followed.

*Internal Restrictions on Fund Investments.* The Investment Manager and its affiliates are investment advisers to registered investment companies and similar non-U.S. registered entities that may, from time to time, trade in the same markets and securities as the Fund. Because the Investment Manager has, and its affiliates and their employees may have, a financial interest in the Fund, it is possible that the Fund could be restricted from buying or selling securities that are under consideration for purchase or sale or that are to be bought or sold by one of the registered investment companies or other entities, either until the securities are no longer under consideration for purchase or sale by one of the registered investment companies or other entities, or for a discrete time period, depending on the extant circumstances, after such registered investment company or other entity has completed its transaction, even where doing so would be a benefit to the Fund. If the Fund is determined to have been trading inconsistently with its internal restrictions, the Fund may have to unwind its transaction or, alternatively, disgorge its profit from the transaction. The Fund will disgorge any such profits from each Series of Shares, upon notification from compliance officers of the Investment Manager, based upon a method deemed prudent and practicable by the compliance officer, which may include *pro rata*, without regard to when a Shareholder may have subscribed for Shares.

## Certain Risks Related to Fund's Structure

*Conflicts of Interest.* The Fund is subject to certain conflicts of interest. *See "Conflicts of Interest".*

*Charges to the Fund.* The Fund is obligated to pay certain fees and expenses, including an Advisory Fee, brokerage commissions and other costs and expenses associated with the acquisition and disposition of investments, and operating costs and expenses, irrespective of profitability. There can be no assurance that the Fund will be able to earn sufficient income to offset these charges.

*Leverage Instrument Counterparty Risk.* The performance of the Fund depends on the performance by the Leverage Instrument Counterparty of its payment obligations under the Leverage Instrument. If the Leverage Instrument Counterparty were to fail in its obligation to pay under the Leverage Instrument, the Shareholders may suffer a loss of capital. Because substantially all of the Fund's assets will be invested in the Leverage Instrument, if the Leverage Instrument Counterparty has financial difficulties it may be impossible for the Fund to recover its assets and thus Shareholders may suffer a substantial or total loss of their investment.

Prospective investors should understand that the Fund has counterparty risk to the Leverage Instrument Counterparty in respect of all or most of its assets. In the event of a bankruptcy or insolvency of the Leverage Instrument Counterparty, or any replacement or additional counterparty, the Fund could experience (i) a loss of any realized or unrealized profits on the Master Fund's positions and/or (ii) a partial or total loss of the funds paid as upfront payments for the Leverage Instrument. More specifically the Leverage Instrument Counterparty, Barclays Bank PLC, is a public limited company registered in England and Wales, and it is expected that any insolvency proceeding would be administered in the United Kingdom, provided that the Leveraged Instrument Counterparty remains a "UK credit institutions"

as defined by The Credit Institutions (Reorganization and Winding Up) Regulations 2004. The Fund may seek to obtain a "security interest" or similar interest in the Master Fund shares held by the Leverage Instrument Counterparty with respect to the Leverage Instrument, either directly or through an arrangement with the U.S. Enhanced Leverage Feeder Fund, in an effort to achieve priority in respect of the payment obligations of the Leverage Instrument Counterparty in the event of its bankruptcy or insolvency. There can be no assurance that any "security interest" will be achieved, maintained or, in the event of bankruptcy or insolvency, respected. If for any reason the Fund fails to have a secured claim in the Master Fund shares held by the Leverage Instrument Counterparty with respect to the Leverage Instrument, the Fund is likely to have the status of a "general unsecured creditor" in the event that the Leverage Instrument Counterparty is placed in liquidation rather than in reorganization.

In the relatively recent past there have been a number of high-profile failures of financial institutions due to violations or failures of interest controls, management misfeasance or malfeasance, or exposure to failed clients and counterparties (including hedge funds). Accordingly, prospective investors should understand that the failure of the Leverage Instrument Counterparty could result in a substantial delay in the return to the Fund of capital invested in the Leverage Instrument, or partial or total loss of such capital.

*Incentive Fee Arrangement.* The Investment Manager could receive substantial compensation if the Fund generates increases in Net Asset Value. Prospective investors should note that (i) the fact that the Incentive Fee is payable only out of increases in Net Asset Value may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case if the Investment Manager were compensated solely based on a flat percentage of capital and (ii) the Investment Manager may receive increased compensation because the Incentive Fee will be calculated on a basis that includes unrealized appreciation as well as realized gains. If the Investment Manager receives an Incentive Fee in any year and the Fund subsequently suffers a loss in Net Asset Value, the Investment Manager is entitled to retain any and all prior Incentive Fees received by it. In addition, any redemption fee payable to the Fund by a Shareholder will increase the return, if any, on remaining Shares, and thereby also increasing the Incentive Fee (if any) payable to the Investment Manager.

*Shareholders Will Not Participate in Management.* A Shareholder has no right to participate in the management of the Fund or in the conduct of its business. There exists broad discretion to expand, revise, or contract the Fund's business without the consent of the Shareholders. Any decision to engage in a new activity could result in the exposure of the Fund's capital to additional risks which may be substantial. Under certain circumstances, however, the Shareholders may elect to remove a Director. *See "Board of Directors – Removal of a Director".*

*Lack of Transferability of Shares.* The Shares are not transferable except with the consent of the Directors. There will not be any market for the Shares.

*Limited Redemptions.* There is no public market for the transfer of Shares and Shares may not be transferred without the approval of the Directors. Redemptions are permitted only at month-end upon 40 days' prior written notice given to the Fund, subject to a redemption fee of 2% of the Net Asset Value of the Shares redeemed, and as of the last Business Day of the twelfth month-end following any subscription and of every subsequent third month-end following the first year anniversary of any subscription, on 60 days' prior written notice without being subject to any redemption fee, and the Investment Manager may suspend the determination of Net Asset Value and limit or suspend redemptions under certain circumstances, including the closure or suspension of trading on any relevant exchange or a breakdown in the means normally employed by the Fund to value assets. Further, the Fund may make distributions in kind rather than in cash.

***Possible Effect of Redemptions.*** Substantial redemptions of Shares could require the Fund to liquidate its positions more rapidly than otherwise desirable to raise the necessary cash to fund redemptions and achieve a market position appropriately reflecting a smaller asset base. These factors could adversely affect the Fund's Net Asset Value.

***Compulsory Redemption of a Shareholder's Shares.*** The Directors may compel the redemption of any Shareholder from the Fund, in whole or in part, at any time without notice, if the Directors reasonably believe that such Shareholder subscribed for Shares as a result of a misrepresentation or if such Shareholder's continued participation in the Fund would, in the reasonable judgment of the Directors, put the Fund or the other Shareholders at a material tax, legal, regulatory, or pecuniary disadvantage or at any time upon 90 days' prior written notice if such Shareholder's continued participation in the Fund would, in the reasonable judgment of the Directors, put the Fund or the other Shareholders at a material administrative disadvantage.

***Possible Indemnification Obligations.*** The Fund is generally obligated to indemnify the Administrator, the Investment Manager and possibly other parties under the various agreements entered into with such persons against any liability they or their respective affiliates may incur in connection with their relationship with the Fund.

***Contingent Liabilities.*** The Fund has the power to establish such reserves for unknown or contingent liabilities as the Directors, in consultation with the Investment Manager, may deem advisable. This could occur, for example, if some of the Fund's positions were illiquid, if there are any assets that cannot be properly valued on the Redemption Date, or if there is any pending transaction or claim by or against the Fund involving or that may affect the book value of the Shares of a redeeming Shareholder or the obligations of a redeeming Shareholder which cannot be then ascertained.

***Lack of Independent Experts Representing Investors.*** The Advisory and Incentive Fees have not been negotiated at arm's length. Further, while the Investment Manager has consulted with counsel, accountants, and other experts regarding the structure and terms of the Fund, such counsel does not represent the Fund or the Shareholders. The Fund and the Investment Manager urge each prospective investor to consult its own legal, tax, and financial advisers regarding the desirability of purchasing Shares and the suitability of an investment in the Fund.

***Institutional Risk.*** Institutions, such as brokerage firms, banks, and broker-dealers, generally have custody of the Fund's portfolio assets and may hold such assets in "street name". Bankruptcy or fraud at one of these institutions could impair the operational capabilities or the capital position of the Fund. The Fund attempts to limit its investment transactions to well-capitalized and established banks and brokerage firms in an effort to mitigate such risks.

Notwithstanding the foregoing, markets in which the Investment Manager may effect transactions (*e.g.*, credit default risk swaps) may include OTC or "interdealer" markets, and may also include unregulated private markets. The participants in such markets are typically not subject to the same level of credit evaluation and regulatory oversight as are members of the exchange-based markets. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Fund to suffer a loss. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Investment Manager has concentrated its transactions with a single or small group of counterparties. The Investment Manager is not restricted from dealing with any particular counterparty or from concentrating any or all transactions with one counterparty. The ability of the Investment Manager to transact business with any one or number of counterparties, the lack of any meaningful or independent evaluation of such