counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

**Other Risks**

*Risks Relating to Absence of, and Changes in, Statutory Regulation.* The Fund is not registered under the Company Act or under the Commodity Exchange Act. Shareholders, therefore, are not accorded the protective measures resulting from registration under such legislation. The Fund may trade on certain foreign security exchanges as well as over-the-counter markets. Such exchanges and markets are not subject to regulation by any U.S. governmental agency and, accordingly, the protections afforded by such regulation will not be available to such investments.

*Regulatory Change.* The regulation of the U.S. and non-U.S. securities and derivatives markets and of investment funds such as the Fund has undergone substantial change in recent years, and such change is expected to continue for the foreseeable future. The effect of regulatory change on the Fund, while impossible to predict, could be substantial and adverse.

*General Economic and Financial Conditions.* The success of any investment activity is influenced by general economic and financial conditions that may affect the level and volatility of equity prices, interest rates, and the extent and timing of investor participation in the markets for both equity and interest-rate-sensitive securities. Unexpected volatility, illiquidity, governmental action, currency devaluation, or other events in global markets in which the Fund directly or indirectly holds positions could impair the Fund's ability to carry out its business and could cause the Fund to incur substantial losses.

SHARES ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY ARE SUITABLE ONLY FOR PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING.

## CONFLICTS OF INTEREST

The following inherent and potential conflicts of interest exist in respect of the Fund.

**Compensation**

The Investment Management Agreement between the Fund and the Investment Manager has not been negotiated at arm's length. The Advisory Fee payable to the Investment Manager and any brokerage commissions payable to Bear, Stearns Securities Corp. and, as applicable, Bear, Stearns International Limited and/or other members of the group of companies (each such member (but specifically not including the Investment Manager), a "Bear Stearns Entity") directly or indirectly owned by BSC (collectively, the "The Bear Stearns Group") are payable without regard to the overall success of or income earned by the Fund.

**Appointment**

The Investment Manager as investment manager has an apparent conflict of interest between its fiduciary duty to the Fund as investment manager and the selection of it as the Fund's Investment Manager. Prospective investors must recognize that the Fund has been formed specifically as an investment product to be managed by the Investment Manager, and that the Investment Manager will not

appoint any other investment manager for the Fund or the Master Fund even if doing so might be in the Fund's best interests.

**Advisory Time**

The Investment Manager and its affiliates and their key personnel will devote as much of their time to the business of the Fund and the Master Fund as in their judgment is reasonably required. However, they are presently committed to and expect to be committed in the future to providing investment advisory services and securities research and brokerage services for other clients (including other pooled accounts) and engage in other business ventures in which the Fund and the Shareholders have no interest. As a result of these separate business activities, the Investment Manager may have conflicts of interest in allocating management time, services, and functions among the Fund and other business ventures or clients.

In particular, Ralph Cioffi, Matthew Tannin and certain other members of the management team are responsible for managing the sizeable investment portfolio underlying certain other funds that focus primarily on leveraged investments in structured finance securities, including the High-Grade Fund. In addition, as of the date of this Memorandum Mr. Cioffi, Mr. Tannin and other members of the management team are involved in the establishment of, and will continue to manage, a derivatives product company, the primary strategy of which is to write credit default swap protection on a portfolio of debt instruments and Rampart. BSAM, including certain members of the management team, also manages substantial investment portfolios for multiple CDOs.

**Other Clients; Allocation of Investment Opportunities**

The Investment Manager is responsible for the investment decisions made on behalf of the Fund and the Master Fund. There are no restrictions on the ability of the Investment Manager and its affiliates to manage accounts of other clients following the same or different investment objective, philosophy, and strategy as those used for the Fund. In fact, the Investment Manager and its affiliates currently manage and expect to continue to manage other portfolios that may invest pursuant to the same or different strategies as those employed by the Fund. If a determination is made that the Fund and another client of the Investment Manager and its affiliates should trade in the same securities on the same day, such securities will be allocated between the Fund and other accounts in a manner that the Investment Manager and its affiliates determine in their discretion. Circumstances may occur in which an allocation could have adverse effects on the Fund or the other client with respect to the price or size of securities positions obtainable or saleable. The results of the Fund's activities may differ significantly from the results achieved by the Investment Manager or its affiliates for any other accounts or clients for which it or its affiliates may manage or provide investment advisory services.

More specifically, the Investment Manager and its related persons may buy and sell, for their own accounts, and hold proprietary positions in, the same securities they buy and sell for, or recommend to, the Investment Manager's clients. For example, the Investment Manager may purchase equity in CDOs for which it is providing investment management services.

As these situations may involve conflicts between the interest of the Investment Manager or its related persons, on the one hand, and the interests of the Investment Manager's clients, on the other, the Investment Manager has established internal policies to ensure that the Investment Manager and its personnel do not prefer their own interests to those of the Investment Manager's clients and that clients are treated fairly.

In addition, Ralph Cioffi, the senior portfolio manager of the Investment Manager, may from time to time on behalf of BSAM engage a broker-dealer affiliate of the Investment Manager to take advantage of structural arbitrage opportunities in connection with the "unwinding" of certain structured finance transactions. Such opportunities arise when the Investment Manager recognizes that the market value of the collateral that supports the debt securities of a structured finance transaction exceeds the cost to purchase such debt securities. By purchasing such securities and selling the collateral, the Investment Manager may "unwind" the structured finance transaction and realize profit from such excess of the collateral's value. BSAM will be compensated for such arbitrage transactions on an ad hoc basis. A conflict of interest would arise where BSAM receives a fee for engaging in an unwind transaction that relates to structured finance securities held by the Master Fund. However, if BSAM would receive a fee in connection with such transaction, the Fund's portfolio managers will refer the compensation arrangement to BSAM's ethics committee for its determination of how to balance the interests of the Fund with those of BSAM in accordance with BSAM's policies regarding conflicts.

**Proprietary Trading**

The Investment Manager and its principals, affiliates, and employees may trade in the securities and derivatives markets for their own accounts and the accounts of their clients, and in doing so may take positions opposite to, or ahead of, those held by the Fund or may be competing with the Fund for positions in the marketplace. Such trading may result in competition for investment opportunities or create other conflicts of interest on behalf of one or more such persons in respect of their obligations to the Fund. Records of this trading will not be available for inspection by Shareholders.

Bear Stearns and its affiliates are engaged in a broad spectrum of activities, including financial advisory activities and has extensive activities that are independent from and may from time to time conflict with those of the Fund. Bear Stearns and its affiliates are actively engaged in transactions in the same securities and instruments in which the assets of the Fund may be invested. Subject to applicable law, Bear Stearns and/or its affiliates may purchase or sell securities of, or otherwise invest, finance or advise issuers in which the Fund has an interest. Bear Stearns and/or its affiliates may have proprietary interests in, and may advise, sponsor, manage or invest in other investment vehicles that have investment objectives similar or dissimilar to those of the Fund (including prospective investors in the Fund) and which engage in the same types of securities and instruments as the Fund. The proprietary activities or portfolio strategies of Bear Stearns and its affiliates or the activities or strategies used for accounts managed by Bear Stearns or its affiliates for other customer accounts could conflict with the transactions and strategies employed by the Fund and affect the prices and availability of the securities and instruments in which the Fund invests. Issuers of securities held by the Fund may have publicly or privately traded securities in which Bear Stearns or its affiliates are investors or make a market. The trading activities of Bear Stearns and its affiliates generally are carried out without reference to positions held directly or indirectly by the Fund and may have an effect on the value of the positions so held or may result in Bear Stearns or its affiliates having an interest in the issuer adverse to that of the Fund. The results of the Fund's activities may differ significantly from the results achieved by Bear Stearns or its affiliates for any proprietary account or from results achieved by Bear Stearns or its affiliates for any other accounts or clients for which it may manage or provide investment advisory services.

**Brokerage Placement Practices**

The Investment Manager intends to utilize Bear, Stearns Securities Corp. ("BSSC" or the "Prime Broker"), an affiliated broker, as the Master Fund's prime broker and custodian. The Master Fund's brokerage placement practices involve certain conflicts of interest. See "Brokerage Practices".

The relationships among The Bear Stearns Group and the Investment Manager create a conflict of interest in that there exists an incentive for the Investment Manager to execute transactions with or through The Bear Stearns Group and for the Investment Manager and The Bear Stearns Group to cause the Master Fund to engage in a higher volume of trading than would exist in the absence of such relationship. However, the Investment Manager intends to make all investment decisions for the Master Fund without consideration of the brokerage commissions that may be payable to The Bear Stearns Group.

From time to time, the Fund may utilize brokers that provide capital introduction services to the Fund and other funds managed by the Investment Manager and its affiliates. Such services may result in more investors, and concomitantly more assets, in the Fund, which may benefit both the Fund and its Shareholders, on the one hand, and the Investment Manager and its affiliates, on the other hand. Benefits to the Investment Manager and its affiliates are increased Management Fees and potentially higher Incentive Fees as a result of such potentially larger Fund asset size. The possibility of such benefits to the Investment Manager and its affiliates results in a conflict of interest in its selection of such brokers and may create an incentive for the Investment Manager to continue to retain any such brokers. There is no guaranty that any benefits to either the Fund and its Shareholders or to the Investment Manager and its affiliates may be realized or that capital introduction services provided by any such brokers will actually increase the Fund's assets. The Fund, and not the Investment Manager, pays brokerage fees and other fees and expenses to its brokers. However, none of such fees or expenses are specifically allocable to any capital introduction services that a broker may provide.

The Master Fund is not required to allocate either a stated dollar or stated percentage of its brokerage business to any broker for any minimum time period, and will review such relationships from time to time.

The Investment Manager may, in its discretion, appoint additional or alternative prime broker(s) and custodian(s).

**Brokerage Commissions/Soft Dollars**

Generally, the Investment Manager will direct brokerage to firms which furnish or pay for quotation and/or research, research-related services, and other products and services within the "safe harbor" provided by Section 28(e) of the Exchange Act. From time to time, however, the Investment Manager may receive research and research-related services and products through arrangements in fixed price underwritings without regard to the "safe harbor" provided by Section 28(e) of the Exchange Act, provided that the Investment Manager believes such arrangements to be in the best interests of the Fund. Such services and products are of the same type as may be acquired with soft dollars in agency trades, but are not within the safe harbor because fixed price underwritings are done on a principal basis.

The Investment Manager is expected to derive substantial direct or indirect benefit from these services, particularly to the extent the Investment Manager uses soft dollars to pay for expenses which it would otherwise be required to pay. The investment information and soft dollar benefits received from brokers may be used by the Investment Manager in servicing other accounts, and not all such information and soft dollar benefits may be used by the Investment Manager in connection with the Master Fund. The Investment Manager is not required to allocate soft dollar benefits *pro rata* or on any other equitable basis among its accounts.

In negotiating commission rates the Investment Manager will take into account the financial stability and reputation of the broker, the quality of the investment research, investment strategies, special

37

execution capabilities, clearance, settlement, custody, recordkeeping and other services provided by such broker.

**Principal Trades and Interested Party Transactions; Cross Transactions**

Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act") provides that it is unlawful for any investment adviser, directly or indirectly "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction". Transactions subject to the foregoing requirements are sometimes referred to as "principal trades".

To the extent permitted by applicable law, the Investment Manager may enter into transactions and invest in futures, securities, currencies or other instruments (including repurchase agreements and other forms of financing) on behalf of the Master Fund in which a Bear Stearns Entity, acting as principal or as agent for its customers, serves as the counterparty. The Investment Manager may also enter into cross transactions where a Bear Stearns Entity acts as agent on behalf of the Master Fund and the other party to the transaction. Cross transactions enable the Investment Manager to purchase or sell a block of securities for the Master Fund at a set price and possibly avoid an unfavorable price movement that may be created through entrance into the market with such purchase or sell order. The relevant Bear Stearns Entity may have a potentially conflicting division of responsibilities to both parties to such cross transaction.

The purchase or sale of an investment in a transaction requiring notice and consent under the "principal trade" provisions of Section 206(3) of the Advisers Act (each, a "Principal Transaction") may be presented for the review and prior approval of (i) the independent Directors or such other advisory party as established by the Directors in accordance with the Articles or (ii) the holders of a simple majority of all outstanding Participating Shares (excluding Shares held by the Investment Manager or any of its affiliates) that are not affiliated with the Investment Manager. In that connection, the Subscription Agreement of each Shareholder provides that each of the Shareholders consents and agrees that if any transaction, including any transaction effected between the Fund and the Investment Manager or its affiliates, is subject to the disclosure and consent requirements of Section 206(3) of the Advisers Act, such requirements will be satisfied with respect to the Fund and all Shareholders if disclosure is given to, and consent obtained from, the independent Directors of the Fund or such other advisory party.

On occasion, an account advised by BSAM may sell a particular security at the same time another account advised by BSAM buys the same security. In such situations, BSAM may effect cross transactions directly between such accounts, provided that such transactions have been authorized by the accounts in question, are consistent with the investment objectives and policies of such accounts (and, if applicable, with the procedures for such transactions established by the Directors of the Fund), are, in the view of the respective portfolio managers, favorable to both sides of such transactions and are otherwise executed in accordance with applicable rules and regulations. In addition, such transactions may only be undertaken if no commissions are paid to BSAM or any affiliate thereof. Notwithstanding the foregoing, however, cross transactions between managed accounts may result in the incurrence by such accounts of custodial fees, taxes or other related expenses.

Because the Investment Manager will serve as collateral manager of the Repackaging Vehicles, the purchase of the Repackaging Vehicle Junior Interests may be deemed to be a principal trade. The Investment Manager will, therefore, make appropriate disclosure to, and obtain consent from, the

members of the board of directors of the Master Fund who are not affiliated with the Investment Manager prior to the investment by the Master Fund in Repackaging Vehicle Junior Interests.

To the extent permitted by applicable law, the Fund may purchase investments that are issued, or are the subject of an underwriting or other distribution by Bear Stearns or its affiliates. The Fund may invest in the securities of issuers affiliated with Bear Stearns or in which Bear Stearns has an equity or participation interest. The purchase, holding and sale of such investments by the Fund may enhance the profitability of investments made by Bear Stearns or its affiliates. The Investment Manager has fiduciary responsibilities with respect to the Fund and will make such investment decisions in a manner which is consistent with those responsibilities.

**Investment Manager's Role as Repackaging Vehicle Collateral Manager**

In managing the assets of a Repackaging Vehicle as its collateral manager, the Investment Manager will have certain responsibilities which may potentially favor the interests of the holders of Repackaging Vehicle Securities that are senior to the Repackaging Vehicle Junior Interests or otherwise conflict with the investment objectives of the Fund. However, while it is anticipated that the investment guidelines of a Repackaging Vehicle may restrict the Collateral Manager's discretion in selecting and managing a Repackaging Vehicle's investment portfolio and limit its reinvestment period to five years, the Investment Manager anticipates that the interests of the holders of the Repackaging Vehicle Securities will generally be aligned with the interests of the Shareholders. In addition, the Investment Manager will pay over or otherwise transfer to the Master Fund any fees to which it would otherwise be entitled as Repackaging Vehicle Collateral Manager, but will be reimbursed for any of its out-of-pocket expenses incurred in the establishment of a Repackaging Vehicle and in its ongoing operations and may be indemnified for certain losses in connection with its role as Collateral Manager.

**Asset Valuation**

The fees payable to the Investment Manager are based directly on the Net Asset Value of the Fund as of various dates. There may be no public market price for a portion of the Fund's assets. The Investment Manager will generally value the Fund's assets. Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the Investment Manager. The Investment Manager will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Fund and thus the amount of the Advisory Fee and Incentive Fee that the Investment Manager receives in respect of its services. Such valuations, however, will be performed by the Investment Manager in accordance with the methodology described in this Memorandum.

**Material Non-Public Information**

By reason of the advisory, investment banking, market-making and/or other activities of the Investment Manager and its affiliates, the Investment Manager and its affiliates may acquire confidential or material non-public information or be restricted by internal policies from initiating transactions in certain securities. The Investment Manager will not be free to divulge, or to act upon, any such confidential or material non-public information and, due to these restrictions, it may not be able to initiate or recommend certain types of transactions in certain securities or instruments for the Fund's account that it otherwise might have initiated. The Fund may be frozen in an investment position that it otherwise might have liquidated or closed out.

**Borrowing Arrangements**

Certain conflicts of interest may arise should the Fund or the Master Fund enter into borrowing arrangements with any member of The Bear Stearns Group. In such situations, the Investment Manager has a conflict between its obligation to act in the best interests of the Shareholders and any interest it may have in generating fees and other revenues for itself or its affiliates. Such arrangements may create other conflicts of interest since such financing and other transactions could, in certain circumstances, negatively impact the Fund if the terms were made less favorable or if they were reduced or terminated and such member of The Bear Stearns Group may keep any profits, commissions and fees accruing in connection with such financing, In addition, in the event of adverse investment performance, the interest of such member in exercising available remedies may conflict with the interests of the Fund. For instance, in its capacity as lender or counterparty, such member may take actions, such as foreclosing on collateral, that may have a material adverse affect on the Fund. The Fund will not be entitled to, and may not receive, any special consideration or forbearance by such member in the exercise of such member's rights, as a result of the Fund's relationship with The Bear Stearns Group. If the Fund engages in repurchase agreements with a Bear Stearns Entity, the terms of any particular transaction, including any pricing rate, repurchase price or margin percentages negotiated with the relevant Bear Stearns Entity may not individually or in the aggregate be the most favorable available.

**Cash Balance Investments**

The Investment Manager may invest a portion, and reserves the right in the future to invest all or substantially all, of the Fund's short-term cash investments in money market funds advised and/or distributed by Bear Stearns or its affiliates. In such instances, each Shareholder will bear, indirectly, its proportionate share of any investment advisory, distribution and other fees and expenses paid by the Fund and Bear Stearns or its affiliates will earn additional compensation in connection with such investments. Such advisory, distribution and other fees and expenses will be in addition to any management fees, incentive allocations and other expenses payable in respect of such Shareholder's investment in the Fund.

## THE INVESTMENT MANAGER

Bear Stearns Asset Management Inc., a corporation formed under the laws of the State of New York, is the Investment Manager of the Fund and the Master Fund. The Investment Manager is generally responsible for the operation of the Fund and the Master Fund, including investment management responsibilities, but has delegated certain administrative duties to the Administrator.

The Investment Manager is registered with the SEC as an investment adviser under the Advisers Act. A copy of the Investment Manager's Form ADV, Part II is being delivered to investors in connection with the delivery of this Memorandum.

The Investment Manager is a wholly owned subsidiary of BSC. Affiliates of the Investment Manager, including Bear Stearns, are engaged, among other things, in the business of providing investment advice to pension and profit sharing plans, endowment funds, insurance companies and bank trust departments and in providing administrative services to investment companies. As of February 28, 2006, the Investment Manager and its affiliates had over $45.4 billion in third-party funds under discretionary management.

In addition to serving as Investment Manager of the Fund, BSAM will also serve as the investment manager or general partner of each of the Master Fund and the Other Feeder Funds. The

following individuals are primarily responsible for the management of the investment portfolio for each of the Fund, the Other Feeder Funds and the Master Fund:

*Ralph Cioffi, Senior Portfolio Manager* – Mr. Cioffi is a Senior Managing Director of BSAM, has been with Bear Stearns since 1985 and is a member of BSAM's Board of Directors. From 1985 through 1991, Mr. Cioffi worked in institutional fixed income sales for Bear Stearns, where he specialized in structured finance products. He served as the New York head of fixed income sales for Bear Stearns from 1989 through 1991. From 1991 through 1994, Mr. Cioffi served as global product and sales manager for high grade credit products. He was involved in the creation of the Structured Credit effort at Bear Stearns and was a principal force behind Bear Stearns' position as a leading underwriter and secondary trader of structured finance securities, specifically collateralized debt obligations and esoteric asset backed securities. Mr. Cioffi has headed the investment team that manages the Bear Stearns High Grade Structured Credit Strategies Funds since March of 2003. He holds a B.S. degree in Business Administration with distinction from Saint Michaels College, Vermont, and is a member of the international business management and administration honor society, Sigma Beta Delta.

*Ray McGarrigal, Portfolio Manager* – Mr. McGarrigal is a Managing Director and has been in the Bear Stearns Financial Analytics and Structured Transactions group for 10 years where he structured high yield CDO's and CLO's as well as mortgage related and credit derivative deals. He has worked closely with all three rating agencies and brings structuring and surveillance expertise to the management team. Mr. McGarrigal has an M.B.A. in finance from New York University and a B.S. from the State University of New York at Oneonta.

*Matthew Tannin, Chief Operating Officer* – Mr. Tannin is a Senior Managing Director of BSAM, has been with Bear Stearns since 1994 and is the Chief Operating Officer of the Bear Stearns High Grade Structured Credit Strategies Fund. Previously, he spent seven years on Bear Stearns' Collateralized Debt Obligation Structuring Desk, focusing on emerging markets, high grade and market value transactions. From June of 2001 through February of 2003, he followed the CDO market as an analyst in Bear Stearns' Asset-Backed Research Group. Mr. Tannin received a J.D. from the University of San Francisco in 1993 and was a law clerk on the California Court of Appeal. Mr. Tannin received a BA in 1983 from Bucknell University where he was a Preston Warren scholar in philosophy.

**Affiliated Investors**

The Investment Manager or its principals or affiliates will initially invest at least $10,000,000 in the U.S. Enhanced Leverage Feeder Fund. The Investment Manager, its principals and/or its affiliates may from time to time, directly or through other investment vehicles (including one or more investment vehicles formed for the benefit of Bear Stearns and its affiliates), invest in the Fund and/or make additional investments in the U.S. Enhanced Leverage Feeder Fund. The Investment Manager its principals and/or its affiliates are not required to maintain any investment in the Fund or the U.S. Enhanced Leverage Feeder Fund, and may withdraw its investment in the U.S. Enhanced Leverage Feeder Fund at any time without notice to Shareholders.

**The Fund and the Master Fund Investment Management Agreements**

The Investment Manager entered into a discretionary investment management agreement with the Fund (the "Investment Management Agreement"). The Investment Management Agreement may be terminated by the Investment Manager or the Fund at any time upon 60 days' prior written notice to the other party. The Fund may terminate the Investment Management Agreement without any notice at any time for cause, which is defined as fraud, bad faith, gross negligence or willful misconduct of the Investment Manager with respect to its performance or non-performance of its duties or obligations under

the Investment Management Agreement. It is not intended that the Master Fund will appoint an investment manager that is not affiliated with The Bear Stearns Group. The Investment Management Agreement provides that the Investment Manager may assign or delegate to one or more affiliates of the Investment Manager some or all of the Investment Manager's rights and duties under the Investment Management Agreement.

The Investment Management Agreement contains broad indemnification provisions that require the Fund to indemnify the Investment Manager and its affiliates, directors, managers, shareholders, officers, controlling persons, employees, sub-advisers (and their respective affiliates, directors, managers, shareholders, partners, members, officers, controlling persons, employees, and agents) and agents (including any individual who serves at the Investment Manager's request as director, officer, partner, trustee, or the like of another entity, including the Fund) and/or the legal representatives and controlling persons of any of the foregoing (each of the foregoing being an "Indemnified Party"), to the fullest extent permitted by applicable law against any liabilities, claims, and expenses, including amounts paid in satisfaction of judgments, in compromise, or as fines and penalties, and counsel fees and expenses reasonably incurred by such Indemnified Party in connection with the defense or disposition of any action, suit, or other proceeding, whether civil or criminal, before any court or administrative or investigative body, in which such Indemnified Party may be or may have been involved as a party or otherwise or with which such Indemnified Party may be or may have been threatened, while acting in any capacity described above or thereafter by reason of such Indemnified Party having acted in any such capacity, except with respect to any matter as to which such persons shall have been adjudicated by the highest court or tribunal that has jurisdiction over such matters to have acted in bad faith in determining that such person's action was in the best interest of the Fund and furthermore, in the case of any criminal proceeding, so long as such person had no reasonable cause to believe that the conduct was unlawful; *provided, however,* that (i) no indemnification shall be provided to any person for losses or expenses incurred as a result of such person's fraud, bad faith, gross negligence or willful misconduct and (ii) with respect to any action, suit, or other proceeding voluntarily prosecuted by any Indemnified Party as plaintiff, indemnification shall be mandatory only if the prosecution of such action, suit, or other proceeding by such Indemnified Party was authorized by the Board of Directors. Further, the Investment Manager shall have no liability to the Fund for losses or expenses incurred so long as such losses or expenses did not arise by reason of the Investment Manager's fraud, bad faith, gross negligence or willful misconduct. The indemnification and exculpation provisions in the Investment Management Agreement shall not be construed as a waiver of any rights of the Fund or any investor under U.S. securities laws.

The Fund, in the discretion of the Board of Directors, shall make advance payments in connection with the expenses of defending any action with respect to which indemnification might be sought hereunder if the Fund receives a written affirmation of the Indemnified Party's good faith belief that the standard of conduct necessary for indemnification has been met and a written undertaking to reimburse the Fund unless it is subsequently determined that such Indemnified Party is entitled to such indemnification and if the Fund determines that the facts then known to it would not preclude indemnification. In addition, at least one of the following conditions must be met: (i) the Indemnified Party shall provide reasonable collateral for such Indemnified Party's undertaking; (ii) the Fund shall be insured against losses arising by reason of any lawful advances; or (iii) an independent legal counsel, in written opinion, at the expense of the Indemnified Party, shall determine, based on a review of readily available facts (as opposed to a full trial-type inquiry), that there is reason to believe that the Indemnified Party ultimately will be found entitled to indemnification.

The Investment Manager entered into a comparable investment management agreement with the Master Fund.

## THE MASTER FUND

**Master Fund Directors**

The directors of the Master Fund have ultimate authority over the Master Fund's operations, although the directors have delegated authority to make investment decisions to the Investment Manager and have delegated responsibility for administration of the Master Fund to the Administrator. The Master Fund's board of directors is comprised of five directors, of whom three are affiliated, and two unaffiliated, with the Investment Manager.

The individuals who serve as the directors of the Fund will also serve as directors of the Master Fund. See *"The Board of Directors"* for more information regarding the directors of the Master Fund.

**Capitalization of the Master Fund**

The Master Fund's authorized share capital is U.S. $3,000 divided into 1,000 ordinary shares (the "Ordinary Master Fund Shares") of U.S. $0.001 par value each, all of which have been issued to, and will be divided equally among and held on an ongoing basis by the Fund and Other Feeder Funds; and 2,999,000 participating shares, U.S. $0.001 par value each (the "Participating Master Fund Shares" or "Master Fund Shares"). All Master Fund Shares of the Master Fund, when duly issued, will be fully paid and nonassessable. No capital of the Master Fund is under option or agreed, conditionally or unconditionally, to be put under option to any person. The board of directors of the Master Fund may issue the Master Fund Shares in separate series.

The Ordinary Master Fund Shares have the entire voting power of the Master Fund, but do not participate in the Master Fund's profits and are not redeemable, and on a winding up are entitled only to return of their par value, and then only after the payment of the par value of the Participating Master Fund Shares. Each Ordinary Master Fund Share is entitled to one vote. Except with respect to the material adverse variation or abrogation of rights attached to any separate Class of Participating Master Fund Shares, the holders of Participating Master Fund Shares do not have any right to vote. Participating Master Fund Shares are participating and redeemable. The holders of Participating Master Fund Shares are entitled to receive, to the exclusion of the Ordinary Master Fund Shares, any dividends which may be declared by the board of directors of the Master Fund or any committee of the board of directors of the Master Fund.

No certificates will be issued for the Master Fund Shares. Investors' shareholdings will be recorded in the Master Fund's books and records.

## BOARD OF DIRECTORS

**The Board of Directors; Delegation**

The Fund has a board of directors (the "Board of Directors") which reviews and assesses the investment policy and performance of the Fund and generally supervises the conduct of the affairs of the Fund. The Directors may elect one or more additional persons to serve as Directors of the Fund or to fill vacancies. The Directors have ultimate authority over the Fund's operations, although the Directors have delegated authority to make investment decisions to the Investment Manager and have delegated responsibility for administration of the Fund to the Administrator. The Board of Directors is comprised of five directors, of whom three are affiliated, and two unaffiliated, with the Investment Manager. The unaffiliated directors may (and the initial unaffiliated directors do) serve as directors for other funds advised by the Investment Manager or its affiliates.

The following individuals serve as the Directors and also serve as the directors of the Master Fund:

***Barry J. Cohen*** – Mr. Cohen is a Senior Managing Director and Director of Alternative Investments (Hedge Funds) for BSAM and is a member of the board of directors of Bear, Stearns & Co. Inc. Mr. Cohen joined Bear Stearns in 1987 as head of its Risk Arbitrage Department, which is one of the largest risk arbitrage operations in the world, and later headed the Bear Stearns Global Equity Arbitrage Funds. Prior to joining Bear Stearns in 1987, Mr. Cohen was a risk arbitrageur at First Boston Corporation, a partner in Bedford Partners, a risk arbitrage hedge fund and a mergers and acquisitions lawyer at Davis Polk & Wardwell. Mr. Cohen holds a B.A. in Applied Mathematics from Harvard College and received J.D. and M.B.A. degrees from Harvard Law and Harvard Business Schools, respectively.

***David G. Sandelovsky*** – Mr. Sandelovsky is a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM. Mr. Sandelovsky joined BSAM in 2004 as the COO of its hedge fund business. Prior to joining BSAM, Mr. Sandelovsky served as a Managing Director at Deutsche Asset Management where he was Head of Trading and Risk for Single Manager Strategies in the Absolute Return Strategies division. Previously, Mr. Sandelovsky was a managing director and partner at Bankers Trust Company where he ran Foreign Exchange Trading and Sales in New York and served as a member of the Global Trading and Sales Management Committee. Mr. Sandelovsky holds a B.S. from The Wharton School, University of Pennsylvania.

***Gerald Cummins*** – Mr. Cummins is a Managing Director of BSAM responsible for hedge fund middle office support and firm-wide operations risk. Mr. Cummins joined Bear Stearns in 1980 as part of its management training program and joined BSAM in 1984 to provide operations support for a newly developed options overwrite products. He is currently a member of the BSAM Pricing, Risk and Best Execution Committees. Mr. Cummins received his B.A. in Mathematics from Fordham University.

***Scott P. Lennon*** – Mr. Lennon is a Senior Vice President of Walkers SPV Limited ("Walkers SPV"), a Cayman Islands licensed trust company and mutual fund administrator. He heads the Fund Services Group at Walkers SPV. Prior to joining Walkers SPV in November 2003, Mr. Lennon worked at State Street Cayman Trust Company Ltd, which acquired the Global Securities Services business of Deutsche Bank (Cayman Islands) in February 2003. At Deutsche Bank, Mr. Lennon was the Head of Investment Funds from April 2001 to February 2003. Mr. Lennon holds a Bachelor of Commerce from Carleton University in Ottawa, Canada, and a Graduate Diploma in Public Accounting from McGill University, Montreal, Canada. Mr. Lennon is a member of the Institute of Chartered Accounts of Ontario and the American Institute of Certified Public Accountants, and he is a Chartered Financial Analyst charterholder. In addition, Mr. Lennon is a member of the CFA Institute and a member of the board of directors of the Cayman Islands Society of Financial Analysts.

***Michelle M. Wilson-Clarke*** – Ms. Wilson-Clarke is a Vice President of Fund Services at Walkers SPV. Prior to joining Walkers SPV, Ms. Wilson-Clarke was a Vice President and Relationship Analyst at Wellington Management Company, LLP in Boston Massachusetts. In addition, Ms. Wilson-Clarke has a broad range of experience in capital markets, fund compliance and fund risk analysis. Ms. Wilson-Clarke received a B.S. in Mathematics and Computer Science from Howard University in Washington D.C., an M.B.A. in Finance from the Sloan School of Management at the Massachusetts Institute of Technology, and a M.S. in Mathematics.

The foregoing individuals also serve as directors in respect of the Master Fund.

**Certain Provisions of the Fund's Articles of Association Relating to Directors**

A Director is not required to hold any Participating Shares of the Fund by way of qualification. The remuneration of Directors shall be determined by the Fund's Board of Directors and any Director who serves on any committee or devotes special attention to the business of the Fund or performs services which, in the opinion of the Directors, are outside the scope of the ordinary duties of a Director may be paid such extra remuneration as the Directors may determine; *provided, however,* any Directors who also are directors, officers or employees of the Investment Manager shall not receive any remuneration from the Fund other than as part of the fees described under "Fees and Expenses" herein and in the following sentence. Directors may be reimbursed by the Fund for reasonable travel, hotel and other out-of-pocket expenses properly incurred by them in attending and returning from meetings of Directors or general meetings of the Fund or otherwise in connection with the business of the Fund.

A Director may hold any other office under the Fund (other than the office of the auditor) in conjunction with his office of Director, or may act in a professional capacity to the Fund on such terms as the Board of Directors may determine. No Director shall be disqualified, by his office, from contracting with the Fund, nor shall any such contract or any contract or arrangement entered into by the Fund in which any Director shall be in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Fund for any profit realized by any such contract or arrangement by reason of such Director holding that office if he shall declare the nature of his interest. If a Director has a material interest in the business to be conducted at any meeting, that Director will disclose such conflict to the other Directors. Persons who are directors, officers or employees of the Investment Manager may not contract with the Fund except as described herein.

A Director, notwithstanding his interest, may be counted in the quorum present at any meeting at which he or any other Director is appointed to hold any office or place of profit under the Fund and at which the terms of any such appointment are arranged, and he may vote on any such appointment or arrangement.

The maximum and minimum number of Directors to be appointed may be fixed from time to time by a participating shareholder resolution; *provided, however* that during the pendency of a Removal Petition, the maximum and minimum number of Directors may not be altered. Unless otherwise fixed, the minimum number of Directors is one and the maximum number of Directors is unlimited.

No Director of the Fund has any interest, direct or indirect, in any assets which have been or are proposed to be acquired or disposed of by, or leased to or by, the Fund since the date of incorporation of the Fund.

The Memorandum and the Articles of Association of the Master Fund contain provisions substantially identical to the foregoing provisions.

**Indemnification of Directors**

The Articles of Association of the Fund contain provisions indemnifying and exempting the members of the Board of Directors of the Fund, and its officers and agents, from liability in the discharge of their duties.

The Articles of Association of the Fund provide that no Director shall be liable (i) for the acts, receipts, neglects, defaults or omissions of any other director or officer or agent of the Fund, or (ii) for any loss on account of defect of title to any property of the Fund, or (iii) on account of the insufficiency of any security in or upon which any money of the Fund shall be invested, or (iv) for any loss incurred

through any bank, broker or similar person, or (v) for any loss occasioned by any negligence, default, error of judgment or oversight on his part, or (vi) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Director's office or in relation thereto, in each case, unless the same shall happen through such Director's own bad faith, gross negligence or willful misconduct.

Every Director and officer of the Fund, and the personal representatives of the same shall, in the absence of such indemnified person's bad faith, gross negligence or willful misconduct, be indemnified and secured harmless out of the assets and funds of the Fund to the fullest extent permitted by applicable law, against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Director or officer in or about the conduct of the Fund's business or affairs or in the execution or discharge of such Director's or officer's duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Director or officer in defending (whether successfully or otherwise) any civil proceedings concerning the Fund or its affairs in any court whether in the Cayman Islands or elsewhere.

Notwithstanding the foregoing, the Fund will not indemnify any of its officers or Directors for any act or omission constituting gross negligence or willful misconduct.

The Memorandum and the Articles of Association of the Master Fund contain provisions substantially identical to the foregoing provisions.

**Removal of a Director**

Shareholders not affiliated with the Investment Manager may vote to remove and replace a Director upon the affirmative vote of Shareholders owning a simple majority of all outstanding Participating Shares (as defined below) in accordance with the following procedures, as more fully set forth in the Fund's Articles of Association. A Shareholder may obtain a copy of the Fund's Articles of Association by contacting the Investment Manager.

A petition (a "Removal Petition") to submit to Participating Shareholders a proposal to remove and/or replace one or more Directors at a meeting of Participating Shareholders may be submitted to the Board of Directors by any Participating Shareholder that is not an affiliate of the Investment Manager (a "Nonaffiliated Participating Shareholder"). The Board of Directors have the power and duty to determine whether a Removal Petition was properly made in accordance with the provisions of the Fund's Articles of Association. If a Removal Petition was not properly made in accordance with such provisions, the Board of Directors will notify the Nonaffiliated Participating Shareholder in writing of any procedural or eligibility deficiencies and instruct the Nonaffiliated Participating Shareholder on how to cure such deficiencies, and such Removal Petition will be disregarded. If the Removal Petition is properly made in accordance with the provisions of the Articles of Association, the Board of Directors will mail the Removal Petition to all Nonaffiliated Participating Shareholders and the trustee and the enforcer of the Star Trust within 15 days after receipt of the Removal Petition together with written instructions specifying that a special meeting of Participating Shareholders will be called to vote on the removal and/or replacement, as applicable, of the specified Director(s) if the Removal Petition is signed by Nonaffiliated Participating Shareholders owning at least 10% of the paid up Participating Share capital of the Fund (excluding for the purposes of such calculation Participating Shares held by any Participating Shareholders that are employees or affiliates of the Investment Manager ("Affiliated Participating Shareholders")) and returned to the Fund within 60 days after the date of such mailing.

To be properly made, a Removal Petition must be received in writing by the Board of Directors at the principal place of business of the Fund, request that the Board of Directors mail the Removal Petition to all Nonaffiliated Participating Shareholders, and must set forth:

(1) as to any proposed successor director (A) the name and business address of the proposed successor director, (B) if such director is not a natural person, the beneficial ownership of the proposed successor director, including on a look-through basis each person that beneficially owns 10% or more of any person that is a direct or indirect owner of the proposed successor director, and (C) any other information concerning the proposed successor director that must be disclosed as to nominees in proxy solicitations pursuant to Regulation 14A under the Exchange Act; and

(2) as to the Nonaffiliated Participating Shareholder making the Removal Petition (A) such Nonaffiliated Participating Shareholder's name and address, as they appear on the Fund's books, (B) the Net Asset Value of such Nonaffiliated Participating Shareholder's Shares as of the most recent date of determination, (C) a description of all arrangements or understandings between such Nonaffiliated Participating Shareholder and each proposed successor director, if any, and any other person or persons (including their names) pursuant to which the any successor director(s) are to be proposed by such Nonaffiliated Participating Shareholder, and (D) a representation that at least one Shareholder from the group of Shareholders that will sign the Removal Petition (or a qualified representative of at least one such Shareholder) intends to appear in person at the special meeting of Shareholders to remove the relevant director(s) and to present the proposed successor director(s), if any, named in its Removal Petition.

In addition, to be properly made, the Removal Petition must be accompanied by the written consent of the proposed successor director(s), if any, to serve if so appointed.

The Removal Petition may not set forth any proposal regarding the Fund other than the removal and/or the replacement of one or more Directors of the Fund. The Removal Petition shall be improper if it contains any false or misleading statements. The Board of Directors may, in its sole and absolute discretion, deem a Removal Petition improper if another proposal to remove and/or replace any Directors was previously submitted by the same Participating Shareholder (or an affiliate or immediate family member of such Participating Shareholder) (the "Previous Removal Petition") and the Board of Directors mailed the Previous Removal Petition to Nonaffiliated Participating Shareholders and such Previous Removal Petition was either signed by or received the approval of: (x) Nonaffiliated Participating Shareholders holding less than 3% of the total paid up Participating Share capital of the Fund (excluding for the purposes of such calculation Participating Shares held by any Affiliated Participating Shareholders) at such time if proposed once within the preceding 5 calendar years; (y) Nonaffiliated Participating Shareholders holding less than 6% of the total paid up Participating Share capital of the Fund (excluding for the purposes of such calculation Participating Shares held by any Affiliated Participating Shareholders) at the time of its last submission to Nonaffiliated Participating Shareholders if proposed twice within the preceding 5 calendar years; or (z) Nonaffiliated Participating Shareholders holding less than 10% of the total paid up Participating Share capital of the Fund (excluding for the purposes of such calculation Participating Shares held by any Affiliated Participating Shareholders) at the time of its last submission if proposed three times or more within the preceding 5 calendar years.

Upon receipt of the Removal Petition, signed by Nonaffiliated Participating Shareholders holding at least 10% of the paid up Participating Share capital of the Fund (excluding for the purposes of such calculation Participating Shares held by any Affiliated Participating Shareholders) and returned to the Fund within 60 days after the date on which the Removal Petition was mailed, the Board of Directors will, by written notice to each Nonaffiliated Participating Shareholder of record within 15 days after receiving such Removal Petition call a special meeting of Participating Shareholders to vote on the

removal and/or replacement of the relevant Director(s). Such meeting will be held at least 30 but not more than 60 days after the mailing of such notice, and such notice will specify the date, a reasonable place (which will include, for avoidance of doubt, the principal place of business of the Fund), and time for such meeting, as well as its purpose.

Except as otherwise required by the Fund's Articles of Association, neither the Fund nor any Director will have any obligation to forward any communication received by a Shareholder to any other Shareholder or to call a meeting of Shareholders. Nothing in the Fund's Articles of Association shall in any way limit or restrict the ability of the Fund or any Director to solicit votes or consents in opposition of any Removal Petition. If the Fund or any Director so solicits votes or consents in opposition of any Removal Petition, the Fund will, upon the written request of a Shareholder, be obligated to mail to all Nonaffiliated Participating Shareholders a reasonable number of additional soliciting materials provided by such Shareholder, *provided that* no such additional soliciting materials contain any false or misleading statements. Notwithstanding any other provisions of the Fund's Articles of Association, if at least one Shareholder from the group of Shareholders that signed the Removal Petition (or a qualified representative of at least one such Shareholder) does not appear in person at the special meeting of Shareholders to present the successor director(s), if any, such successor director(s) will be disregarded, notwithstanding that proxies in respect of such vote may have been received by the Fund. (Stating the immediately preceding sentence differently, if at least one Shareholder from the group of Shareholders that signed the Removal Petition (or a qualified representative of at least one such Shareholder) appears in person at the special meeting of Shareholders to present the successor director(s), if any, such successor director(s) will not be disregarded.) For these purposes, to be considered a qualified representative of a Shareholder, a person must be authorized by a written instrument executed by such Shareholder or an electronic transmission delivered by such Shareholder to act for such Shareholder as proxy at the meeting of Shareholders and such person must produce such written instrument or electronic transmission, or a reliable reproduction of the written instrument or electronic transmission, at the special meeting of Shareholders. By submitting a Removal Petition to the Board of Directors, the Nonaffiliated Participating Shareholder will be deemed to consent to the Fund's mailing of the Removal Petition to all Nonaffiliated Participating Shareholders for all purposes, including without limitation for purposes of Regulation S-P under the U.S. Securities Laws and other applicable privacy laws.

The Memorandum and the Articles of Association of the Master Fund contain provisions substantially identical to the foregoing provisions.

**Other Provisions Relating to the Directors**

A Director may vote on a proposal, arrangement or contract in which he is materially interested as provided for in the Articles. A Director may be a director or other officer or employee of any company that provides services to the Fund or in which the Fund may be interested and, unless otherwise agreed, no such Director will be accountable to the Fund for any remuneration or other benefits received thereby.

The Memorandum and the Articles of Association of the Master Fund contain provisions substantially identical to the foregoing provisions.

**Transactions between the Fund and the Investment Manager or its Affiliates**

Members of the boards of directors of the Fund and the Master Fund who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Fund or the Master Fund will have the responsibility for approving any transactions between the Fund or the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. The Investment Manager and its affiliates are not required to obtain approval for any transaction unless such approval is required by law.

## THE ADMINISTRATOR

PFPC Inc. (Delaware), a Massachusetts corporation, serves as the Fund's administrator (the "Administrator") pursuant to an administrative services agreement (the "Administration Agreement") between the Fund and the Administrator.

Pursuant to the Administration Agreement, the Administrator serves as administrator, registrar and transfer agent and provides all day-to-day administrative services to the Fund, including accounting and clerical functions, processing the issuance, transfer, and redemption of Shares, maintaining all appropriate Shareholder registers and ledgers, distributing annual reports and account statements to Shareholders, responding to inquiries received from Shareholders, prospective investors, and others, preparing and maintaining all financial and accounting books and records, maintaining the Fund's principal administrative records, disbursing payment of expenses of the Fund, responding to inquiries from the general public, and notifying the Investment Manager of redemption requests. The Administration Agreement may be terminated after the initial two year term, among other circumstances, at any time without penalty by either of the parties upon not less than 60 days' written notice to the other party.

Pursuant to the Administration Agreement, the Administrator is liable only for any damages arising out of its failure to perform its duties under the Administration Agreement to the extent such damages arise out of the Administrator's willful misfeasance, bad faith, negligence or reckless disregard of such duties or a material breach by the Administrator of the Administration Agreement. The Fund agrees to indemnify and hold harmless the Administrator and its affiliates from all taxes, charges, expenses, assessments, claims and other liabilities, including, without limitation, reasonable attorneys' fees and disbursements (any such liability, a "Loss"), arising directly or indirectly from any action, or omission to act, in accordance with the Administration Agreement; provided that neither the Administrator, nor any of its affiliates, shall be indemnified against any Loss (or any expenses incident to such Loss) caused by the Administrator's or its affiliates' own willful misfeasance, bad faith, negligence or reckless disregard in the performance of the Administrator's activities under the Administration Agreement or a material breach by the Administrator of the Administration Agreement.

The Administrator has entered into a comparable administrative services agreement with each of the Master Fund and the Other Feeder Funds.

## THE LEVERAGE INSTRUMENT COUNTERPARTY

Barclays Bank PLC is a public limited company registered in England and ales under number 1026167. The liability of the members of Barclays ank PLC is limited. It has its registered head office at 1 Churchill Place, London, E14 5HP. Barclays Bank PLC was incorporated on 7 August 1925 under the Colonial Bank Act 1925 and on 4 October 1971 was registered as a company limited by shares under the Companies Act 1948 to 1967. Pursuant to The Barclays Bank Act 1984, on 1 January 1985, Barclays Bank was re-registered as a public limited company and its name was changed from "Barclays Bank International Limited" to "Barclays Bank PLC."

Barclays Bank PLC and its subsidiary undertakings (taken together, the "Group") is a major global financial services provider engaged in retail and commercial banking, credit cards, investment

banking, wealth management and investment management services. The whole of the issued ordinary share capital of Barclays Bank PLC is beneficially owned by Barclays PLC, which is the ultimate holding company of the Group and one of the largest financial services companies in the world by market capitalisation.

The short term unsecured obligations of Barclays Bank PLC are rated A-1+ by Standard & Poor's, P-1 by Moody's and F1+ by Fitch Ratings Limited and the long-term obligations of Barclays Bank PLC are rated AA by Standard & Poor's, Aa1 by Moody's and AA+ by Fitch Ratings Limited.

The Leverage Instrument Counterparty shall not in any way be responsible or liable to investors for (i) the accuracy or completeness of any of the representations, warranties or covenants (express or implied) made by BSAM, the Fund or any of its affiliates or their agents in connection with the Fund or the Leverage Instrument, or (ii) the performance of any of the obligations of, BSAM, the Fund or any of their affiliates or their agents, in each case, in connection with the Fund or the Leverage Instrument. Furthermore, the Leverage Instrument Counterparty makes no representations, warranties or covenants, express or implied, nor shall the Leverage Instrument Counterparty be responsible or liable, with respect to the management, or any acts or omissions, of BSAM, the Fund or any other person in connection with the management of assets and funds under management with respect to the Fund, or with respect to the structuring or terms of the Leverage Instrument.

The Leverage Instrument Counterparty's interests under the terms of the Leverage Instrument may be in conflict with the interests of the Shareholders. If an Event of Default or a Termination Event occurs, as defined under the Leverage Instrument, the Leverage Instrument Counterparty's interests in terminating the Leverage Instrument might conflict with the interests of the Shareholders, and the Leverage Instrument Counterparty will likely terminate the Leverage Instrument without regard to the interests of investors. Shareholders shall have no direct or indirect right of action or recourse, in connection with, or arising out of, the Leverage Instrument or against the Leverage Instrument Counterparty for any matters related to the Fund or otherwise.

The Leverage Instrument Counterparty is not responsible for the preparation of this Memorandum or the activities of the Fund or the Master Fund and therefore accepts no responsibility for any information contained in this Memorandum other than the information set out in this section entitled "Leverage Instrument Counterparty".

The Leverage Instrument Counterparty is structuring, negotiating and executing the Leverage Instrument as principal, for and on its own behalf. The Leverage Instrument Counterparty will not be acting as advisor, fiduciary or in any capacity for or on the Fund's behalf with respect to any matter involving the Leverage Instrument or otherwise. The Leverage Instrument Counterparty will not initially or at any time during the term of the Leverage Instrument provide any investment advice to the Fund.

The Leverage Instrument Counterparty has not and will not recommend the Leverage Instrument as suitable or appropriate for the Fund with respect to the Fund's investment and trading strategies. The Leverage Instrument Counterparty has not provided the Fund with any tax or other financial advice involving the Leverage Instrument or otherwise.

## BROKERAGE PRACTICES

**The Prime Broker**

The Master Fund has appointed Bear, Stearns Securities Corp. ("BSSC") as the Master Fund's prime broker and custodian (in such capacities, respectively, the "Prime Broker" and "Custodian")

pursuant to a Prime Broker and Custodian agreement (the "Prime Brokerage Agreement"). BSSC is a wholly-owned subsidiary of Bear Stearns, an indirect wholly-owned subsidiary of BSC and an affiliate of the Investment Manager.

BSSC and, as applicable, other members of The Bear Stearns Group will provide certain clearing (including prime brokerage), margin financing and stock lending services with respect to the Master Fund's securities and cash carried on the books of BSSC. BSSC or an affiliate entity, as applicable, may earn interest on debit balances in the Fund's accounts resulting from margin loans to the Fund. Such services and facilities will be provided pursuant to a series of mutually acceptable agreements (the "Customer Documents") and may include an Institutional Account Agreement with The Bear Stearns Group containing provisions in compliance with the laws, rules and regulations of the United States Securities and Exchange Commission and other exchanges and dealer associations by which The Bear Stearns Group is regulated (collectively, the "U.S. Rules"). For the avoidance of doubt, the Institutional Account Agreement shall apply to the Master Fund's securities and cash carried on the books of BSSC but shall not apply to any assets where beneficial title is transferred to a Bear Stearns Entity (including, but not limited to, transactions under a Master Repurchase Agreement) or to assets transferred to a Bear Stearns Entity to serve as collateral in connection with principal transactions (including, but not limited to, activities covered by master agreements such as ISDA agreements, etc.). The Fund is not committed to continue its prime brokerage relationship with BSSC for any minimum period and may in the future use more than one prime broker. BSSC or an affiliated entity or unit thereof (including Bear Stearns) may also execute orders to the extent permitted by applicable regulations and receive commissions, fees and other compensation in connection therewith.

BSSC, as Prime Broker and/or Custodian, may appoint sub-custodians, including other Bear Stearns Entities, of the Master Fund's cash and securities. BSSC will exercise reasonable skill, care and diligence in the selection of any such sub-custodian(s), will be responsible to the Master Fund for the duration of the sub-custody agreement(s) for satisfying itself as to the ongoing suitability of such sub-custodian to provide custodian services to the Master Fund, will maintain what it considers to be an appropriate level of supervision over such sub-custodian and will make appropriate inquiries periodically to confirm that the obligations of such sub-custodian(s) continue to be competently discharged.

The Master Fund may also enter into principal transactions with one or more Bear Stearns Entities. As security for the payment and performance of all liabilities and obligations of the Master Fund to BSSC and to each other Bear Stearns Entity with which the Master Fund engages in transactions, all assets of the Master Fund held by or through BSSC and any other Bear Stearns Entity will be charged with and subject to a lien in their favor and will therefore constitute collateral security for the Master Fund's liabilities and obligations to BSSC and to each other Bear Stearns Entity.

The Master Fund will have rights against BSSC for the return of all Master Fund assets held by it as Prime Broker and/or Custodian of the Master Fund, net of any obligations of the Master Fund to BSSC or any other Bear Stearns Entity, except for assets held by a Bear Stearns Entity as margin. In accordance with the U.S. Rules, all fully-paid and "excess margin" securities and net cash balances not required for the settlement of transactions (collectively, "Segregated Assets") may not be used by BSSC or by any other Bear Stearns Entity for its own purposes, but such Segregated Assets remain subject to the charge and lien to secure the Master Fund's liabilities and obligations to BSSC and to any other Bear Stearns Entities. (In accordance with U.S. Rules, the term "excess margin" means margin securities in excess of 140% of the amount of the margin indebtedness.)

Master Fund assets that are held by BSSC as Prime Broker and/or Custodian will be carried in the name of the Master Fund and beneficial ownership in the name of the Master Fund will be recorded on the books of BSSC. In accordance with applicable U.S. Rules, the Master Fund's assets that are not

Segregated Assets may be borrowed, lent or otherwise used by BSSC and other Bear Stearns Entities as may hold such assets for their own purposes. Master Fund assets held by a Bear Stearns Entity as collateral for principal transactions between the Master Fund and such Bear Stearns Entity are not treated as Segregated Assets.

To the extent of applicable U.S. Rules, securities and cash held in customers' accounts will not be available to the non-customer creditors of BSSC or of any other Bear Stearns Entity, but all securities and cash held in customers' accounts at BSSC would be distributed *pro rata* among customers if there were to be an insolvency of BSSC, there were not sufficient customer assets to pay all customers in full and if BSSC's insurance were insufficient to cover any shortfall in customer assets.

Certain of the Master Fund's assets may be held at Bear, Stearns International Limited ("BSIL"). Any of the Master Fund's investments or cash recorded on the books of BSIL as belonging to the Master Fund will be held in accordance with applicable rules and regulations of the Financial Services Authority. If permitted thereunder, all such investments of the Master Fund may be borrowed, lent or otherwise used by BSIL for its own purposes and the Master Fund will have the right against BSIL for the return of equivalent assets. The Master Fund would rank as an unsecured creditor in relation thereto and, in the event of the insolvency of BSIL, the Master Fund may not be able to recover equivalent assets in full.

Neither BSSC nor any other Bear Stearns Entity will be liable for any loss to the Master Fund resulting from any act or omission in relation to the services provided under the terms of the Customer Documents unless such loss results directly from the negligence, bad faith, willful misfeasance of BSSC or other Bear Stearns Entity, but in no event is BSSC or any other Bear Stearns Entity liable for consequential or other types of special damages. Neither BSSC nor any other Bear Stearns entity will be liable for losses to the Master Fund caused by the insolvency, acts or omissions of any sub-custodian or other third party by whom or in whose control any of the Master Fund's investments or cash may be held (subject to the obligations regarding the selection and ongoing suitability of such sub-custodian or third party as set out above). BSSC accepts the same level of responsibility for nominee companies controlled by it as for its own acts. The Master Fund has agreed to indemnify BSSC and the other Bear Stearns Entities against any loss suffered by, and any claims made against, them to the extent set forth in the Customer Documents.

Neither BSSC nor any other Bear Stearns Entity will have any involvement in the management of the Master Fund or any decision-making discretion relating to the Master Fund's investments. Neither BSSC nor any other Bear Stearns Entity has any responsibility for monitoring whether investments by any investment manager or advisor are in compliance with any internal policies, investment goals or limitations of the Master Fund, and neither BSSC nor any other Bear Stearns Entity will be responsible for any losses suffered by the Master Fund.

BSSC is registered with and regulated by the Securities and Exchange Commission in the United States. BSIL is regulated by the Financial Services Authority in the United Kingdom. BSC has a credit rating of A-1 by Standard & Poor's and P1 by Moody's for its short-term debt, a credit rating of A by Standard & Poor's for its long term debt and a credit rating of A2 by Moody's for its long term debt. BSSC is separately rated A-1 for short term debt and single A+ for long term debt by Standard & Poor's.

The Bear Stearns Entities and the Master Fund each reserve the right to change the arrangements described above by agreement between them, and the Bear Stearns Entities have certain rights to modify such arrangements on notice to the Master Fund. The Master Fund may, in its discretion, terminate the arrangements described above in accordance with the Customer Documents. BSSC and each other Bear Stearns Entity reserve the right not to clear transactions and not to provide any of the services (including prime brokerage) described above if the provision of such services or the clearing of transactions presents

a risk unacceptable to them and reserve the right to terminate the arrangements in accordance with the provisions of the Customer Documents.

BSSC and the other Bear Stearns Entities are service providers and are not responsible for the preparation of this document or the activities of the Master Fund and therefore accept no responsibility for the accuracy of any information contained in this document.

The Investment Manager may, in its discretion, appoint additional or alternative prime broker(s) and custodian(s).

## DESCRIPTION OF THE SHARES

**Capitalization**

The Fund's authorized share capital is U.S. $3,000, divided into 1,000 ordinary shares (the "Ordinary Shares") of U.S. $0.001 par value each, all of which have been issued to, and will be held on an ongoing basis by a service provider to the Fund, or by another entity, to be held in trust or pursuant to some other arrangement; and 2,999,000 participating shares, U.S. $0.001 par value each (the "Participating Shares" or "Shares"). All Shares of the Fund, when duly issued, will be fully paid and nonassessable. No capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option to any person. A separate Series of Shares will be issued for each successive issuance of Shares. Each Share of a Series will be equal to every other Share of the same Series with respect to earnings, assets, dividends, and voting privileges. All Shares will be issued in book entry form. No certificates will be issued for the Shares. The Directors in their sole discretion may authorize additional Tranches of Shares with different fees, liquidity and voting rights. There are no preemptive or other subscription rights.

The Ordinary Shares have the entire voting power of the Fund but do not participate in the Fund's profits and are not redeemable, and on a winding up are entitled only to return of their par value, and then only after the payment of the par value of the Participating Shares. Each Ordinary Share is entitled to one vote per Ordinary Share. The Ordinary Shares are held in the Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. Star Trust (the "Star Trust"), a Cayman Islands STAR Trust established for the sole purpose of holding the Ordinary Shares and exercising the rights attaching thereto. Walkers SPV Limited is the trustee of the Star Trust, and ATC Trustees (Cayman) Limited (the "Enforcer") is the enforcer of the Star Trust. In its role as enforcer, the Enforcer is responsible for enforcing the purpose of the Star Trust, by bringing legal proceedings against the trustee for failing to follow the purposes of the Star Trust.

Except with respect to the material adverse variation or abrogation of rights attached to any separate Tranche of Participating Shares, the holders of Participating Shares do not have any right to vote. Participating Shares are participating and redeemable. The holders of Participating Shares are entitled to receive, to the exclusion of the Ordinary Shares, any dividends which may be declared by the Board of Directors or any committee of the Board of Directors or the Fund.

In order to allocate properly the Incentive Fee as well as other fees and expenses with respect to Shares sold at different times, each Tranche of Shares will be offered in different Series. For every Subscription Date on which Shares of a particular Tranche are purchased, a new Series of Shares will be issued for such Tranche. Each new Series of Shares will be issued at an initial Net Asset Value per Share of U.S. $1,000. At the end of each calendar year, each Series of each Tranche (other than the first Series issued (the "Initial Series")) will be redesignated and converted into the Initial Series of that Tranche (after payment to the Investment Manager of any applicable Incentive Fee and Advisory Fee); *provided,*