*however*, that no redesignation and conversion shall occur with respect to a Series unless at the end of such calendar year an Incentive Fee is due in respect of such Series and the Initial Series. Such redesignation and conversion will be effected at the then prevailing Net Asset Value per Share of the Initial Series.

## ELIGIBILITY TO PURCHASE SHARES

The Shares are offered only to (1) non-"United States persons" and (2) U.S. investors which are tax-exempt investors, "accredited investors" under SEC Regulation D, and "qualified purchasers" under Section 2(a)(51) of the Company Act. The terms "accredited investor" and "qualified purchaser" are defined in the Subscription Agreement for U.S. Tax-Exempt Investors, which is available from the Administrator upon request.

"United States" means the United States, its states, territories, and possessions, and any enclave of the United States government, its agencies, or instrumentalities, and the following persons are not considered to be "United States persons:" (1) a natural person who is not a resident of the United States; (2) a partnership, corporation, or other entity, other than an entity organized principally for passive investment, organized under the laws of a non-U.S. jurisdiction and that has its principal place of business in a non-U.S. jurisdiction; (3) an estate or trust, the income of which is not subject to U.S. federal income tax regardless of source, provided that no executor or administrator of such an estate or trustee of such a trust, as the case may be, is a "United States person;" (4) an entity, organized under the laws of a foreign jurisdiction and that has its principal place of business in a foreign jurisdiction, provided that: such entity was not formed by a United States person principally for the purpose of investing in securities not registered under the Securities Act (unless it was organized or incorporated and is owned exclusively by "accredited investors", as defined in SEC rules, who are not natural persons, estates, or trusts); and (5) a pension plan for the employees, officers, or principals of an entity organized and with its principal place of business outside the United States, provided that such plan is established and administered in accordance with the laws of a country other than the United States and customary practices and documentation of such country.

## FEES AND EXPENSES

*The following is a summary of the Fund's fees and expenses:*

### Organizational and Initial Offering Costs

The Master Fund will pay the expenses of organizing the Fund, the Master Fund and the U.S. Enhanced Leverage Feeder Fund and the initial offering of Shares and interests of the U.S. Enhanced Leverage Feeder Fund. Such expenses are being amortized on a straight-line basis over a period of not less than 60 months, beginning as of the commencement of operations of the Master Fund unless the Master Fund Directors decide that some other amortization method shall be applied. The Fund will bear, as an investor in the Master Fund, its *pro rata* share of all such organizational expenses. The Master Fund Directors believe that such amortization is more equitable than requiring the initial investors of the Fund and the U.S. Enhanced Leverage Feeder Fund to bear all such organizational expenses as would otherwise be required under GAAP. If such divergence from GAAP would be cause for qualification in any opinion given to the Fund by its auditors, the Master Fund Directors will not permit such amortization, but may agree to other arrangements to similar equitable effect. If such arrangements are not feasible, the initial investors in the Fund will likely bear a greater portion, if not all, of such organizational expenses.

**Advisory Fee**

The Fund will pay to the Investment Manager an advisory fee (the "Advisory Fee") equal to 1/12 of 2.0% of the month-end Net Asset Value (pro rated for periods of less than one month) of each Series of Shares in the Fund prior to any accrual for or payment of any Advisory Fee, Incentive Fee or redemption effected on such date (approximately a 2.0% annual rate). The Advisory Fee is payable in arrears as of the last Business Day of each calendar quarter or upon the redemption of Shares. The Investment Manager will be entitled to the Advisory Fee regardless of the performance of the Fund. The Fund may issue Tranches of Shares with respect to which the Advisory Fee is reduced or waived, and may permit certain Shareholders to participate in the Fund on different financial terms than other Shareholders.

**Incentive Fee**

Unless otherwise specified in respect of a particular Tranche of Shares, as of the end of each calendar year, upon a redemption of Shares (in respect of the Shares being redeemed), and upon commencement of winding-up of the Fund (each, a "Performance Period"), the Investment Manager is entitled to receive a fee (the "Incentive Fee"), calculated separately with respect to each outstanding Series, equal to 20% of Net New Income in respect of each Series of Shares determined as of the end of each calendar year (and as of the date of any redemption of Shares of such Series). "Net New Income" in respect of a Series of Shares as of a particular date is the amount, if any, by which Cumulative Net Income in respect of such Series of Shares determined as of such date exceeds the High Water Mark in respect of such Series of Shares. For purposes of the foregoing, "Cumulative Net Income" in respect of a Series of Shares as of a particular date is the amount, if any, by which (1) aggregate realized and unrealized gains, and aggregate items of operating income, credited to such Series of Shares during the entire life of the Fund to and including such date exceeds (2) aggregate realized and unrealized losses, and aggregate items of operating expenses, charged against such Series of Shares during the entire life of the Fund to and including such date (without charging any of the Investment Manager's Incentive Fee against such Series of Shares). "High Water Mark" in respect of a Series of Shares as of a specified date means (1) zero, until after the first calculation of a positive Incentive Fee in respect of such Series of Shares pursuant to the foregoing provisions and, thereafter, (2) the highest amount of Cumulative Net Income previously calculated in respect of such Series of Shares in accordance with the foregoing provisions, in either instance, subject to reduction in the event of a redemption, as follows: if a redemption is made from a particular Series at a time when there is a loss carryforward for such Series (i.e., Cumulative Net Income is below the High Water Mark), then the High Water Mark shall be reduced, as of the date on which such redemption is made and for every Performance Period thereafter until a positive Incentive Fee is calculated in respect of such Series, by an amount equal to (a) the excess of such High Water Mark over the current Cumulative Net Income multiplied by (b) a fraction, the numerator of which is equal to the amount of the redemption, and the denominator of which is equal to the Net Asset Value of the Series immediately before giving effect to the redemption.

If the Investment Manager receives an Incentive Fee in respect of any Series, and a net loss is subsequently incurred by such Series, the Investment Manager will be entitled to retain all Incentive fees previously paid to it in respect of such Series. No subsequent Incentive fee is due to the Investment Manager in respect of such Series for such Performance Period or any subsequent Performance Period, until such net loss has been made up (taking into account interim redemptions and distributions).

Incentive Fees will be calculated in the event of redemption of Shares, with respect to the redeemed Shares, as if the date of the redemption were the last day of a calendar year. In addition, upon commencement of winding-up of the Fund, Incentive Fees will be calculated as if the commencement of winding-up were the last day of a calendar year.

Notwithstanding the foregoing, to the extent the Fund is invested in the Master Fund, the Incentive Fee will be paid by the Master Fund and not the Fund.

**Operational Costs**

The Fund will bear its operational expenses, including (without limitation) research expenses; legal fees; expenses of the continuous offering of Shares, including the cost of producing and distributing offering memoranda and other marketing materials; printing and mailing costs; filing fees and expenses; accounting, audit, and tax preparation expenses; computer software, licensing, programming and operating expenses; data processing costs; the fees of the Fund's Board of Directors; the out-of-pocket expenses of the Directors and any consultant fees; tax, litigation, and extraordinary expenses, if any; interest expenses (including interest due to repurchase agreements and borrowing by the Fund); insurance expenses, custody fees, bank charges, brokerage commissions (including options trades); spreads and mark-ups on securities, swaps and forwards, short dividends, currency hedging costs, if any, and other investment and operating expenses. In addition, the Fund will bear the costs associated with the Leverage Instrument, including the accrual of a financing charge of 1-month USD LIBOR plus up to 1.20% per annum, compounding monthly.

The Fund will also bear, as an investor in the Master Fund, its *pro rata* share of the Master Fund's operational expenses, including, without limitation, interest expenses (including interest due to repurchase agreements and borrowing by the Master Fund); insurance expenses, custody fees, bank charges, brokerage commissions (including options trades); spreads and mark-ups on securities, swaps and forwards, short dividends, currency hedging costs, and other investment and operating expenses, the fees and out-of-pocket expenses of the Administrator and the Master Fund's board of directors. The Investment Manager and the Administrator will each bear the costs of providing their respective services to the Fund and the Master Fund, including their general overhead, salary, and office expenses.

**Administration Fee**

The Fund will pay its *pro rata* share of an annual fee payable to the Administrator on a monthly basis at the Master Fund level. The Administrator will perform accounting, investor servicing and tax services to the Master Fund and the Fund. The Administrator's fee for accounting will generally equal 0.10% per annum of the Master Fund's Net Asset Value, subject to certain adjustments made on the basis of the leverage in the Master Fund and subject to such minimum fees as may be agreed between the Master Fund and the Administrator. The Administrator's fees for investor servicing and tax services will be based on the total number of investors in the Fund and the Other Feeder Funds, subject to such minimum fees as may be agreed between the Master Fund and the Administrator. The Administrator's fees will be calculated and accrued monthly based on the Master Fund's month-end Net Asset Value and is payable monthly in arrears on the last Business Day of each month.

**Selling Commissions**

Bear Stearns and certain other members of The Bear Stearns Group, to the extent they act as Placement Agents to the Fund, will be compensated by the Investment Manager with payments based upon a percentage of the Advisory Fee and/or Incentive Fee. Certain non-affiliated Placement Agents may be paid up to 3% of an investor's subscription price for Shares. Such commission may be waived or reduced by any such Placement Agent in respect of particular investors.

**Reduced Fee Tranches; Rebates**

The Fund may issue Tranches of Shares with respect to which the Advisory Fee and/or the Incentive Fee is reduced or waived, and may permit certain Shareholders to participate in the Fund on different financial terms than other Shareholders. The Fund may also in its discretion rebate part or all of the Advisory Fee or Incentive Fee in the case of certain Shareholders. Such different financial terms or rebate will have no adverse effect on any other Shareholder. No such terms or rebate shall entitle any other Shareholder to such terms or rebate (other than, with respect to differing financial terms, Shareholders of the same Tranche). Investments in the Fund by certain Bear Stearns Entities, and their respective employees and other related persons may not be subject to all or a portion of the Advisory Fees or any Incentive Fee.

## REDEMPTIONS

**Redemptions**

Subject to the conditions and limitations described herein, (i) a Shareholder may, upon not less than 40 days' prior written notice to the Fund, request that the Fund redeem all or part of such Shareholder's Shares as of the last Business Day of any calendar month subject to a redemption fee of 2% of the amount redeemed unless such redemption fee is reduced or waived by the Directors in their sole discretion and (ii) upon not less than 60 days' prior written notice to the Fund, a Shareholder may request that the Fund redeem all or part of such Shareholder's Shares attributable to a subscription as of the last Business Day of the twelfth month-end following such subscription and of every subsequent third month-end following the first year anniversary of such subscription without being subject to any redemption fee (each such date, a "Redemption Date").

For example, with respect to a subscription made as of August 1, 2006, the Shareholder may first redeem all or part of its Shares attributable to such subscription without being subject to a redemption fee as of July 31, 2007 (*i.e.*, the twelfth month-end following such subscription, and thereafter, as of the last Business Day of each October, January, April and July, so long as sufficient funds remain in its investment that are attributable to such subscription.

Shareholders that, on the initial closing date of the Fund, exchanged shares in Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (the "Offshore High-Grade Fund") for Shares ("Exchange Shares"), will be credited with the time they were invested in the Offshore High-Grade Fund for the purposes of determining the application of the redemption fee described above. With respect to any Shareholder that subscribed for shares in the Offshore High-Grade Fund at different times and continues at the time of exchange to be subject to different lock-up periods (i.e., the period during which no redemption may be made without being subject to a redemption fee) applicable to such subscriptions, such lock-up periods will apply to such Shareholder's Exchange Shares on a *pro rata* basis.

Notwithstanding the foregoing, in respect of Exchange Shares acquired in exchange for shares of the Offshore High-Grade Fund purchased prior to September 1, 2004, a Shareholder may (i) upon not less than 40 days' prior written notice to the Fund, request that the Fund redeem all or part of any such Exchange Shares as of the last Business Day of any calendar month subject to a redemption fee of 1% of the amount redeemed, unless such redemption fee is reduced or waived by the Directors in their sole discretion, and (ii) upon not less than 60 days' prior written notice to the Fund, request that the Fund redeem all or part of such Exchange Shares as of the last Business Day of each calendar quarter without being subject to a redemption fee.

Partial redemptions may not reduce a Shareholder's investment to less than the minimum investment of $1,000,000, unless such minimum is reduced or waived by the Directors in their sole discretion.

If a Shareholder subscribes for Shares at different times, such Shares will be treated as a separate Series for the purpose of determining any applicable redemption fee, and redemptions will be deemed to be made from the Series of Shares subscribed for on the earliest date (as adjusted for changes in the Net Asset Value). The redemption fees described above are payable to the Fund and are intended generally to cover anticipated expenses relating to the liquidation of Master Fund assets required to fund the relevant redemptions, including "breakage costs". The Directors may reduce or waive such redemption fees for any redeeming Shareholder to the extent that they determine in their sole discretion that the Fund will not incur such expenses or that the Fund will not otherwise be materially disadvantaged by such reduction or waiver. The Directors, however, will in no event be obligated to reduce or waive such redemption fees, including when there are no such expenses.

The Fund may permit redemptions on such shorter notice or on any date other than a Redemption Date (such redemptions to be made on the basis of estimated Net Asset Value per Share) in its sole and absolute discretion.

If, for any calendar quarter, the aggregate amount of requests for redemption from the Fund, together with withdrawal requests from the Other Feeder Funds, exceeds in value 25% of the net asset value of the Master Fund determined as of the beginning of such calendar quarter and as adjusted for subscriptions during such calendar quarter, the Investment Manager (in such capacity and as general partner, manager or sponsor of the Other Feeder Funds) may elect to limit such redemptions and withdrawals to an aggregate value of not more than 25% of the net asset value of the Master Fund, allocating such redemptions and withdrawals *pro rata* according to the value of the Shares owned by each Shareholder requesting a redemption of Shares and the value of the capital accounts/units of each investor requesting a withdrawal from the Other Feeder Funds at such time. Any unhonored portion of a redemption request will remain invested in the Fund, and will be deferred to the next Redemption Date subject to the same limitation.

Redemption requests must be submitted in writing, delivered by messenger, mail, or facsimile. Redemption requests may not be submitted by electronic mail.

All distributions may be made in cash or other property, or any combination thereof, as may be determined by the Fund (or by the liquidator, in the case of a distribution made in connection with the winding up of the Fund). Subject to its assessment of the activity and condition of the relevant market and general financial and economic conditions, the Fund (or the liquidator) shall use its reasonable efforts to cause the Fund to make distributions in the form of cash.

Redemption proceeds (based on unaudited data) will generally be paid within 30 days of the relevant Redemption Date. However, upon a redemption in full of a Shareholder's Shares (and after the application of all charges and credits properly allocable to such Shareholder's Shares), such Shareholder will be entitled to receive 90% of such redemption proceeds within 30 days of the relevant Redemption Date, and the balance (based on unaudited data) without interest will be paid within 60 days of such Redemption Date. Any amount subject to the foregoing "hold-back" will not remain subject to the profit/loss of the Fund following the Redemption Date. The Fund may waive the foregoing hold-back provisions in its sole and absolute discretion and permit the full redemption of any Shareholder's Shares to be made generally within 30 days of the effective date of redemption. Upon certain circumstances, the Fund may limit or suspend redemptions and/or delay payment of redemption proceeds to redeeming Shareholders.

Redemptions will be made on the basis of estimated Net Asset Value. The Fund will have no obligation to attempt to make adjustments to estimated payments to reflect final audited numbers. If, after payment of redemption proceeds, the Fund determines that adjustment to the Net Asset Value as of any Redemption Date is necessary, the redeeming Shareholder (if the Net Asset Value is adjusted upwards) or the remaining Shareholders (if the Net Asset Value is adjusted downwards) will bear the risk of such adjustment. The redeeming Shareholder will neither receive proceeds from, nor will it be required to reimburse, the Fund in such circumstances.

Generally, no interest will be paid by the Fund on redemption amounts pending distribution to Shareholders. However, a Shareholder may be credited with interest in respect of payments deferred to the extent that doing so would, in the sole discretion of the Directors, be equitable.

In its discretion, the Fund may hold back a portion of the redemption proceeds payable to a Shareholder in respect of redeemed Shares (whether such redemption is voluntary or compulsory) to satisfy estimated or accrued expenses, contingencies or liabilities. The amount held back is in the Fund's discretion.

**Compulsory Redemptions**

The Directors may compel the redemption of any Shareholder from the Fund, in whole or in part, at any time without notice, if the Directors reasonably believe that such Shareholder acquired Shares as a result of a misrepresentation or if such Shareholder's continued participation in the Fund would, in the reasonable judgment of the Directors, put the Fund or the other Shareholders at a material tax, legal, regulatory, or pecuniary disadvantage including, by way of example and not limitation: (i) causing the Fund to be required to be registered or regulated under the Company Act; (ii) causing the assets of the Fund to be deemed to be "plan assets" for purposes of ERISA or Section 4975 of the Code; (iii) causing the Fund to be registered under the Exchange Act, or the offering of its Shares registered under the Securities Act; (iv) causing the Investment Manager to be required to be registered with the CFTC as a "commodity pool operator" and become a member of the NFA (if the Investment Manager is not then so registered and/or such a member); (v) causing a violation under any law or any contractual provision to which the Fund or its property or the Investment Manager is subject; or (vi) causing the Fund to be in violation of (in the reasonable judgment of the Directors), to potentially violate or otherwise cause concerns under, the anti-money laundering program and related responsibilities of the Fund or the Investment Manager. In addition to the foregoing, the Directors may compel the redemption of any Shareholder from the Fund, in whole or in part, at any time upon 90 days' prior written notice if such Shareholder's continued participation in the Fund would, in the reasonable judgment of the Directors, put the Fund or the other Shareholders at a material administrative disadvantage; *provided that* the Directors may not so compel the redemption of any Shareholder from the Fund, during the pendency of a Removal Petition.

**Suspension of Redemptions**

The Directors may suspend the determination of Net Asset Value, limit or suspend redemptions and/or delay payment of redemption proceeds: (a) when any securities exchange, board of trade, or organized inter-dealer market on which a significant portion on the Fund's assets is regularly quoted or traded is closed (other than for holidays) or trading thereon has been restricted or suspended; (b) whenever, as a result of events, conditions, or circumstances beyond the control or responsibility of the Fund, disposal of the assets of the Fund or other transactions in the ordinary course of the Fund's business involving the sale, transfer, delivery, or withdrawal of securities or funds is not reasonably practicable; (c) if it is not reasonably practicable to determine the Net Asset Value of any Series of Shares on an accurate and timely basis; or (d) during any period when the Fund has insufficient liquid assets to

make payment to those Shareholders that have requested redemptions. Any such suspension shall take effect at such time as the Directors shall declare, and thereafter there shall be no determination of the Net Asset Value of any Series of Shares of the Fund or any redemptions or payment of redemption proceeds until the Directors declare the suspension at the end, except that such suspension shall terminate in any event on the first business day on which (i) the condition giving rise to the suspension will have ceased to exist and (ii) no other condition under which suspension is authorized will exist. In the event redemptions are limited rather than suspended, redemption payments will be made *pro rata* with respect to each Shareholder requesting to redeem.

The determination of the Directors shall be conclusive. Notice of any limitation or suspension will be given to any Shareholder who has submitted a redemption request and to whom full payment of the redemption proceeds has not yet been remitted. If a redemption request is not withdrawn by a Shareholder following notification of a suspension, the redemption will be completed as of the next month-end following the end of the suspension.

The Memorandum and the Articles of Association of the Master Fund contain provisions substantially identical to the foregoing provisions.

**Transfers**

Because the offering of Shares is not registered under the Securities Act, each purchaser must represent and warrant in the Subscription Agreement that the purchaser is purchasing its Shares for investment and not with a view to the transfer, or disposition of all or a portion of such Shares.

A Shareholder may not transfer, or otherwise dispose of, by gift or otherwise, all or any portion of such Shareholder's Shares without giving prior written notice to the Fund and receiving the Fund's prior written consent, which the Fund may withhold in its sole and absolute discretion (and which it does not, in general, intend to give). If a proposed transfer or disposition arises by reason of the death of a Shareholder, the notice may be given by the duly authorized representative of the estate of the Shareholder. The notice must be supported by proof of legal authority acceptable to the Fund. The Fund reserves the right to redeem mandatorily the Shares held by any person becoming entitled to Shares by operation of law.

**Distributions**

The Fund may make distributions in the discretion of the Directors, after consultation with the Investment Manager. However, the Directors do not intend to make any distributions.

## NET ASSET VALUE

The Administrator will determine each Series' net asset value ("Net Asset Value") and the net asset value per Share ("Net Asset Value per Share") of each Series as of the close of business on the last business day of each month or such other date as it determines. The net asset value of the Fund will generally equal the total assets minus the total liabilities of the Fund, in each case determined in accordance with GAAP (except in respect of the amortization of organizational costs) and the valuation principles set forth in the Fund's Articles of Association.

The initial Net Asset Value of a Series is equal to the aggregate subscription price paid by all Shareholders of such Series in subscribing for such Shares. Subsequently, the "Net Asset Value per Share" is determined at the end of any period first by allocating any realized or unrealized increase or decrease in the Net Asset Value of the Fund for the period among the Series *pro rata* in accordance with

the Net Asset Value of each Series at the beginning of the period, and then dividing the Net Asset Value of each Series by the number of outstanding Shares therein. All Shares within a Series will have the same Net Asset Value per Share.

The Net Asset Value per Share of each Series shall be the Net Asset Value of such Series divided by the number of Shares outstanding in such Series. The valuation of positions held by the Master Fund (or the Fund) will be made by the Investment Manager and reported to the Administrator.

The Fund's assets shall be valued in accordance with the following principles, unless GAAP requires otherwise:

- Assets listed or traded on a stock exchange or over-the-counter market (other than derivatives, as referred to below) for which market quotations are readily available will be valued at the official close of business price on the principal exchange or market for such investment, provided that the value of any investment listed on a stock exchange or over-the-counter market but acquired or traded at a premium or at a discount outside or off the relevant stock exchange or on an over-the-counter market, and securities which are not listed on a recognized securities exchange, may be valued at the mean of their "bid" and "ask" prices as quoted by each of three (or, if three are not reasonably available, two) recognized broker/dealers for such assets as at the date of valuation of the investment. If for specific assets the official close of business prices do not, in the opinion of the Investment Manager or its designee, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the Investment Manager or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date.

- If the assets are listed or traded on several stock exchanges or over-the-counter markets, the official close of business price on the stock exchange or over-the-counter market which, in the opinion of the Investment Manager or its designee, constitutes the main market for such assets will be used.

- Cash and other liquid assets will be valued at their face value with interest accrued, where applicable.

- Exchange traded derivative instruments will be valued at the settlement price for such instruments on such market; if such price is not available such value shall be the probable realization value estimated with care and in good faith by the Investment Manager or its designee. Over-the-counter derivative instruments will be valued on each valuation date at the settlement price independently confirmed by the Investment Manager or its designee with the counterparty or by commercial pricing models which may be obtained from an affiliate of the Investment Manager. Open forward foreign exchange contracts shall be valued with reference to the prevailing forward foreign exchange rates, which the Investment Manager or its designee, deems appropriate in the circumstances. Closed-out forward foreign exchange contracts that have not yet reached the maturity date will have locked-in a fixed currency gain or loss. This fixed currency amount shall be revalued at the same spot exchange rates used for other assets.

- Short-term money market instruments and bank deposits shall be valued at cost plus accrued interest to the date of valuation.

- If, as of the date of determination, the exchange or market herein designated for the valuation of any given asset is not open for business, the valuation of such asset shall be determined as of the last preceding date on which such exchange or market was open for business. If a security or commodity interest could not be liquidated on the valuation date, due to the operation of daily limits or other rules of the exchange or market designated for the valuation thereof, the settlement price on the first subsequent day on which the security or commodity interest could be liquidated shall be the basis for

determining the value thereof for that day, or such other value as the Investment Manager or its designee may deem fair and reasonable.

- There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

The foregoing valuations may be modified by the Investment Manager or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the Investment Manager. Without limiting the generality of the foregoing, the valuation of an asset by the Investment Manager or its designee may reflect the amounts invested by the Fund in such asset, notwithstanding that such amounts may not represent the market value of such asset. The Investment Manager or its designee may also follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Shareholders. The Investment Manager is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Fund as a whole, such valuation is not open to challenge by current or previous investors. All good faith determinations of value by the Investment Manager or its designee shall be final and conclusive as to all Shareholders.

So long as the Fund gains exposure to the Master Fund through the Leverage Instrument, the Investment Manager will value the Leverage Instrument as though it represented a direct leveraged investment in the Master Fund. For the purposes of the Leverage Instrument, the Leverage Instrument will be valued by the Leverage Instrument Counterparty as calculation agent under the terms of the Leverage Instrument. The value of the Leverage Instrument will be determined in large part by the net asset value per share of the Master Fund. Generally, the net asset value per share of the Master Fund will be the amount reported by the administrator to the Master Fund, however, the Leverage Instrument Counterparty may adjust such value based on its commercially reasonable determination under certain circumstances.

Organizational expenses are being amortized over 60 months, notwithstanding GAAP. Any opinion given to the Fund by its auditors may be qualified with respect to the divergence of this amortization schedule from GAAP.

The Directors or the Investment Manager may establish reserves for future liabilities, including legal fees, and indemnification expenses. Any such reserve would reduce Net Asset Value for all purposes, including calculation of redemption proceeds.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio securities could dramatically affect each Series' Net Asset Value and the Incentive Fee if the Investment Manager's judgments regarding appropriate valuations should prove incorrect.

All matters concerning valuation, as well as accounting procedures, not expressly provided for in the Articles of Association may be determined by the Investment Manager, whose determination (subject to the overall supervision of the Directors) is final and conclusive as to all Shareholders.

*As a significant portion of the Fund's portfolio is likely to be executed through and maintained with a Bear Stearns Entity, prospective investors should understand that Bear Stearns Entities may value a substantial portion of such portfolio, which valuation will be made in accordance with the foregoing provisions. See "Conflicts of Interest".*

## New Issues

The Fund may from time to time invest in "new issues" (*i.e.*, equity securities which are issued in an initial public offering). The Board of Governors of the NASD, Inc. (the "NASD") has published the Restrictions on the Purchase and Sale of Initial Equity Public Offerings rule (the "New Issues Rule"), which implements in part the requirement that NASD members (principally broker-dealers and investment bankers) make a bona fide public distribution at the public offering price of securities of an initial public offering (a "new issue"). The New Issues Rule restricts NASD members and their associated persons from, among other things, selling with limited exception any new issue securities to any NASD member, to any associated person of an NASD member, to any senior officer of a registered investment advisory firm, bank, savings and loan institution or insurance company, or to certain other restricted persons (collectively, "Restricted Persons"). The New Issues Rule prohibits NASD members from selling securities in a new issue to the Fund if Restricted Persons would be allocated in aggregate more than 10% of profits or losses relating to those new issues.

The Fund currently does not intend to allocate directly any profits or losses relating to new issues to Shareholders who are Restricted Persons. The Fund reserves the right, however, (but is not obligated) to change this allocation policy in the future without seeking the consent of any Shareholders, in order to permit the allocation of new issues to all Shareholders more broadly, including Restricted Persons, to the extent permitted by the New Issues Rule, as it may be amended from time to time.

To the extent a Shareholder is a collective investment vehicle, as long as such Shareholder complies with the de minimis exemption under the New Issues Rule (*i.e.*, 10% or less of new issues profits and losses are allocated to Restricted Person investors in such Shareholder), such Shareholder will be treated as unrestricted for new issues allocation purposes.

To enable the Fund to participate in new issues, the Shares will be divided into two tranches of Shares, Tranche A Shares (the "Tranche A Shares") and Tranche B Shares (the "Tranche B Shares") (unless otherwise indicated herein, a reference to Shares encompasses both the Tranche A Shares and the Tranche B Shares). The Tranche A Shares may be purchased by investors who are not designated by the Fund as Restricted Persons and Tranche B Shares may be purchased by any eligible investors whether or not they are designated by the Fund as Restricted Persons. Profits and losses attributable to new issue securities purchased by the Fund are allocated only to the Tranche A Shares. The Tranche A Shares and Tranche B Shares will be treated identically for all other purposes. To avoid any violation of the New Issues Rule, investors subscribing for Shares must provide information demonstrating whether or not they are Restricted Persons. Failure to provide such information will result in the investor receiving Tranche B Shares.

## TAXATION AND EXCHANGE CONTROL

*The following summary of the principal United States and Cayman Islands tax consequences applicable to the Fund and its investors is based upon interpretations of existing laws in effect on the date of this Memorandum. No assurance can be given that courts or fiscal authorities responsible for the administration of such laws will agree with the interpretations or that changes in such laws will not occur.*

63

**United States Federal Income Taxation**

*       *       *       `

Any discussion of U.S. federal tax issues set forth in this Memorandum was written in connection with the promotion and marketing by the Fund, BSAM and the Placement Agents of the transactions described in this Memorandum. Such discussion was not intended or written to be legal or tax advice to any person and was not intended or written to be used, and it cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax advisor.

*       *       *

*Tax Characterization and Treatment of the Leverage Instrument.* The Fund will enter into the Leverage Instrument with the Leverage Instrument Counterparty. The Leverage Instrument references a partnership interest in the Master Fund. The Leverage Instrument Counterparty and the Fund have agreed (in the absence of an administrative determination, judicial ruling or other authoritative guidance to the contrary) to treat, to the extent that the Leverage Instrument Counterparty hedges all or some of its risk under the Leverage Instrument by investing in shares of the Master Fund, the Fund as the owner of such shares and to treat the Leverage Instrument as a debt instrument for all tax purposes. The Leverage Instrument Counterparty, however, is not obligated to hedge its risk under the Leverage Instrument by investing in shares of the Master Fund at any time other than the effective date of the Leverage Instrument and thereafter may continue to hedge its risk or not continue to hedge its risk in its sole discretion. To the extent that the Leverage Instrument Counterparty does not continue to hedge its risk under the Leverage Instrument by remaining invested in shares of the Master Fund, the Fund will not be treated as the owner of such shares and the Leverage Instrument will not be treated as a debt instrument. In addition, even where the Leverage Instrument Counterparty does hedge its risk under the Leverage Instrument by investing in shares of the Master Fund, notwithstanding the parties' agreement to treat the Leverage Instrument as evidencing ownership of an interest in the Master Fund, alternative characterizations of the Leverage Instrument are possible, including characterization as some type of financial interest for tax purposes. The following discussion assumes that the Fund will be treated as the owner of a partnership interest in the Master Fund and the Leverage Instrument will be treated as a debt instrument for all tax purposes.

THE LEVERAGE INSTRUMENT COUNTERPARTY EXPRESSES NO VIEW AS TO ANY TAX POSITION TAKEN BY THE FUND. THE LEVERAGE INSTRUMENT COUNTERPARTY, AS A MATTER OF POLICY, DOES NOT PROVIDE TAX, ACCOUNTING OR LEGAL ADVICE TO ITS CUSTOMERS, AND HAS ADVISED THE FUND THAT IT MUST MAKE ITS OWN DETERMINATIONS CONCERNING THE TAX, ACCOUNTING AND LEGAL EFFECTS ON THE FUND AND ITS INVESTORS OF ENTERING INTO THE LEVERAGE INSTRUMENT.

*The Fund and the Master Fund.* The Fund will be treated as a corporation and the Master Fund will elect to be treated as a partnership for U.S. federal income tax purposes. The Master Fund will not be treated as a publicly traded partnership, provided that at least 90% of the Master Fund's gross income consists of interest, dividends, payments with respect to securities loans, gains from the sale or disposition of stock or securities or foreign currencies or other income (including gains from options, futures or forward contracts) derived with respect to the Master Fund's business of investing in stock, securities or currencies.

The Fund and the Master Fund generally will not be subject to taxation by the United States on income or gain realized by them from their trading and investment activities provided that neither the Fund nor the Master Fund is engaged in, or is deemed to be engaged in, directly or indirectly, a U.S. trade

64

or business to which such income or gain is treated as effectively connected. Neither the Fund nor the Master Fund should be considered to be so engaged, so long as (i) neither the Fund nor the Master Fund is considered a dealer in stock or securities and does not regularly offer to enter into, assume, offset, assign, or terminate positions in derivatives with customers, (ii) the Fund's and the Master Fund's U.S. business activities (if any) consist solely of trading in stock, securities, and derivatives for their own account and (iii) an entity in which the Fund or the Master Fund invests that is a disregarded entity or is treated as a partnership for U.S. federal income tax purposes is not engaged or deemed to be engaged in a U.S. trade or business. The Fund and the Master Fund each intends to conduct its affairs in a manner that meets such requirements. If the Fund were engaged in a U.S. trade or business in any year, the Fund would be required to file a U.S. federal income tax return for such year and pay tax on its income and gain that is effectively connected with such trade or business at U.S. corporate tax rates, and, in addition, a branch profits tax equal to 30% of the dividend equivalent amount for the taxable year.

Even assuming the Fund and the Master Fund meet such requirements, the Fund will generally be subject to 30% U.S. withholding tax on any source dividend income and any other U.S. source fixed or determinable annual or periodic gains, profits or income. There is no withholding tax on U.S. source interest income if such interest income either (i) falls within the "portfolio interest" exception to withholding tax or (ii) is received on U.S. bank deposits, certificates of deposit or discount obligations with maturities (from original issue) of 183 days or less. In general, "portfolio interest" is interest (other than certain contingent interest) on an obligation issued after July 18, 1984 that: (i) if in bearer form, is issued under arrangements reasonably designed to ensure that such obligation will be sold only to non-U.S. persons, is payable only outside the United States, and bears a legend on its face that any U.S. person which holds such obligation is subject to certain limitations under the U.S. income tax laws; and (ii) if in registered form the U.S. person responsible for paying interest received a statement either from the beneficial owner of such obligation or from certain qualifying agents of such beneficial owner that such owner is not a U.S. person. The Fund intends to provide the Master Fund with IRS Form W-8BEN to claim that it is a foreign corporation . The Master Fund intends to provide IRS Form W-8IMY together with the Fund's IRS Form W-8BEN and the U.S. Enhanced Leverage Feeder Fund's IRS Form W-9 and all other required supporting documentation to U.S. persons paying such interest for purposes of qualifying for the portfolio interest exemption from U.S. withholding tax and for purposes of limiting any other applicable withholding to the extent of the Fund's ownership of the Master Fund.

*U.S. Tax-Exempt Investors.* Income or gain realized on an investment in the Fund by a U.S. tax-exempt investor should not be taxable under the Code, as "unrelated business taxable income", provided the tax-exempt investor does not incur "acquisition indebtedness" (within the meaning of Section 514(c) of the Code) in connection with its purchase of Shares.

Any U.S. tax-exempt investor that transfers cash to the Fund in exchange for Shares may be required to file Form 926 (Return by a U.S. Transferor of Property to a Foreign Corporation) with the IRS if (1) immediately after the transfer, such investor holds, directly or indirectly, at least 10% of the total voting power or the total value of the Fund, or (2) the amount of cash transferred by such investor (or its affiliates) during the 12-month period ending on the date of the transfer exceeds $100,000. Failure to file Form 926 properly under the circumstances described above may result in a penalty equal to 10% of the value of the cash transferred (not to exceed $100,000 unless such failure is intentional).

In addition, any U.S. tax-exempt investor generally owning 10% or more of the total value of the shares of a foreign corporation will be required to file annually Form 5471 (Information Return of U.S. Persons with Respect to Certain Foreign Corporations) with the IRS. Such information return requires certain disclosures concerning the filing shareholder, other shareholders, and the corporation. The Fund has not committed itself to provide the information concerning the Fund or its Shareholders necessary to

complete such return. Failure to file such information with the IRS may subject such U.S. tax-exempt investor to penalties (generally not to exceed $50,000).

***Non-U.S. Investors.*** Gains realized by an investor that is not a U.S. person (a non-resident alien individual, foreign partnership, foreign corporation, foreign trust, or foreign estate) upon the sale, exchange, or complete redemption of Shares held as a capital asset generally should not be subject to U.S. federal income tax, provided that the gain is not effectively connected with the conduct of a trade or business in the United States. However, in the case of a non-resident alien individual, any such gain will be subject to the 30% (or lower treaty rate if applicable) United States tax if (i) such individual is present in the United States for 183 days or more during the taxable year and (ii) such gain is derived from United States sources.

Generally, the source of gain upon the sale, exchange, or complete redemption of Shares is determined by the place of residence of the investor. For purposes of determining the source of such gain, residency is defined in a manner that may result in an individual who is otherwise a non-resident with respect to the United States being treated as a United States resident. Each prospective non-U.S. investor who anticipates being present in the United States for 183 days or more (in any taxable year) or otherwise has a substantial connection to the United States should consult his or her tax adviser with respect to the possible application of this rule and the possible impact of such presence or such individual's status as a non-resident for U.S. tax purposes generally.

Gains realized by a non-U.S. investor engaged in a trade or business within the United States will be subject to U.S. federal income tax upon the sale, exchange, or redemption of Shares if such gain is effectively connected with such United States trade or business.

## Cayman Islands Taxation

There are at present no corporation, income, capital gains, profits, or other taxes in the Cayman Islands that would apply to the profits of the Fund or the Master Fund, nor are there gift, estate, or inheritance taxes in the Cayman Islands. The Fund and the Master Fund have applied for and expect to receive from the Governor in Council of the Cayman Islands an undertaking that for a period of 20 years from the date of the undertaking (i) no law which is thereafter enacted in the Cayman Islands imposing any tax to be levied on the profits, income, gains, or appreciations shall apply to it or its operations; and (ii) no such tax nor any tax in the nature of estate duty or inheritance tax will be payable on or in respect of its shares, debentures, or other obligations or by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision) of the Cayman Islands.

## Other Jurisdictions

Interest, dividend and other income realized by the Fund and the Master Fund from sources other than the United States and the Cayman Islands, and capital gains realized on the sale of securities of non-U.S. and non-Cayman Islands issuers, may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced and/or in which the issuer is located. It is impossible to predict the rate of foreign tax the Fund or the Master Fund will pay since the amount of the assets to be invested in various countries and the ability of the Fund or Master Fund to reduce such taxes are not known.

**Future Changes in Applicable Law**

The foregoing description of U.S. and Cayman Islands income tax consequences of investing in the Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund to income taxes or subject Shareholders to increased income taxes.

THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE SHAREHOLDERS. PROSPECTIVE SHAREHOLDERS SHOULD CONSULT LEGAL AND TAX ADVISERS IN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE AND DOMICILE TO DETERMINE THE POSSIBLE TAX OR OTHER CONSEQUENCES OF PURCHASING, HOLDING AND REDEEMING SHARES UNDER THE LAWS OF THEIR RESPECTIVE JURISDICTIONS.

**INVESTMENTS BY EMPLOYEE BENEFIT PLANS**

**In General**

The following section sets forth certain consequences under ERISA and the Code that a fiduciary of an "employee benefit plan" as defined in, and subject to Part 4 of Title I of ERISA or of a "plan" as defined in and subject to Section 4975 of the Code who has investment discretion should consider before deciding to invest the plan's assets in the Fund (such "employee benefit plans" and "plans" being referred to herein as "Plans", and such fiduciaries with investment discretion being referred to herein as "Plan Fiduciaries"). The following summary is not intended to be complete, but only to address certain questions under ERISA and the Code that are likely to be raised by the Plan Fiduciary's own counsel.

*          *          *

Any discussion of U.S. federal tax issues set forth in this Memorandum was written in connection with the promotion and marketing by the Fund, BSAM and the Placement Agents of the transactions described in this Memorandum. Such discussion was not intended or written to be legal or tax advice to any person and was not intended or written to be used, and it cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax advisor.

*          *          *

In general, the terms "employee benefit plan" as defined in ERISA and "plan" as defined in Section 4975 of the Code together refer to any plan or account of various types that provides retirement benefits or welfare benefits to an individual or to an employer's employees and their beneficiaries. Such plans and accounts include, but are not limited to, corporate pension and profit-sharing plans, "simplified employee pension plans", Keogh plans for self-employed individuals (including partners), individual retirement accounts described in Section 408 of the Code, and medical benefit plans.

67

Each Plan Fiduciary must give appropriate consideration to the facts and circumstances that are relevant to an investment in the Fund, including the role an investment in the Fund plays in the Plan's investment portfolio. Each Plan Fiduciary, before deciding to invest in the Fund, must be satisfied that investment in the Fund is a prudent investment for the Plan, that the investments of the Plan, including the investment in the Fund, are diversified so as to minimize the risks of large losses, and that an investment in the Fund complies with the governing documents of the Plan and related trust.

EACH PLAN FIDUCIARY CONSIDERING ACQUIRING SHARES MUST CONSULT ITS OWN LEGAL AND TAX ADVISERS BEFORE DOING SO.

### Restrictions on Investments by Benefit Plan Investors

ERISA and a regulation issued thereunder contain rules for determining when an investment by a Plan in an entity will result in the underlying assets of the entity being assets of the Plan for purposes of ERISA and Section 4975 of the Code (*i.e.*, "plan assets"). Those rules provide that assets of an entity will not be plan assets of a Plan that purchases an interest therein if the investment by all "benefit plan investors" is not "significant" or certain other exceptions apply. The term "benefit plan investors" includes all Plans (*i.e.*, all "employee benefit plans" as defined in, and subject to Part 4 of Title I of, ERISA and all "plans" as defined in and subject to Section 4975 of the Code), and all entities that hold "plan assets" (each, a "Plan Assets Entity") due to investments made in such entities by already described benefit plan investors. ERISA provides that a Plan Assets Entity is considered to hold plan assets only to the extent of the percentage of the Plan Assets Entity's equity interests held by benefit plan investors. Investments by benefit plan investors will be deemed not significant if benefit plan investors own, in the aggregate, less than 25% of the total value of each class of equity interests of the entity (determined by not including the investments of persons with discretionary authority or control over the assets of such entity, of any person who provides investment advice for a fee (direct or indirect) with respect to such assets, and "affiliates" (as defined in the regulations issued under ERISA) of such persons; *provided, however,* that under no circumstances are investments by benefit plan investors excluded from such calculation).

In order to avoid causing the assets of the Fund to be "plan assets", the Directors intend to restrict the aggregate investment by benefit plan investors to under 25% of the total value of each class of equity interests of the Fund (not including the investments of the Investment Manager, any Director of the Fund or the Master Fund, any person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Fund, and any entity (other than a benefit plan investor) that is directly or indirectly through one or more intermediaries controlling, controlled by, or under common control with any of such entities (including an entity for which the Investment Manager is the sponsor, investment adviser or provides investment advice), and each of the principals, officers, and employees of any of the foregoing entities who has the power to exercise a controlling influence over the management or policies of such entity or of the Fund). Furthermore, because the 25% test is ongoing, it not only restricts additional investments by benefit plan investors, but can also cause the Fund to require that existing benefit plan investors redeem their Shares from the Fund if other investors redeem. If rejection of subscriptions or such mandatory redemptions are necessary, as determined by the Directors, to avoid causing the assets of the Fund to be "plan assets", the Fund will effect such rejections or redemptions in such manner as the Fund, in its sole discretion, determines.

### Ineligible Purchasers

In general, Shares may not be purchased with the assets of a Plan if the Investment Manager, BSIL, the Prime Broker, the Administrator, any Director of the Fund or the Master Fund, the Leverage Instrument Counterparty, Stone Tower Debt Advisors LLC, Dresdner Bank AG London Branch, any

Placement Agent, any of their respective affiliates or any of their respective employees either: (i) has investment discretion with respect to the investment of such plan assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such plan assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such plan assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

In addition, unless an exemption from the prohibited transaction rules of ERISA and Section 4975 of the Code applies, it may be a prohibited transaction for a Plan or Plan Assets Entity to purchase Shares from, or redeem Shares of, the Fund if the Fund or Master Fund is a "party in interest" as defined in Section 3(14) of ERISA or a "disqualified person" as defined in Section 4975(e)(2) of the Code with respect to the Plan or one or more Plans holding an interest in the Plan Assets Entity. A party in interest and a disqualified person include a company of which 50% or more of the voting power or value of the company is owned directly or indirectly by a fiduciary or service provider with respect to a Plan. Because Barclays Bank PLC will be the sole investor in the Master Fund, if Barclays Bank PLC or one of its affiliates were to be a fiduciary or service provider to certain Plans, there is a risk that the Fund and Master Fund may be a party in interest and a disqualified person with respect to a Plan for which Barclays Bank PLC or one of its affiliates is a fiduciary or service provider. Therefore, in order to avoid engaging in any direct or indirect prohibited transaction, during any time that Barclays Bank PLC owns 50% or more of the Master Fund, a benefit plan investor may not purchase Shares or redeem Shares unless either: one of the following prohibited transaction exemptions applies and will continue to apply while the benefit plan investor owns Shares: (i) Prohibited Transaction Class Exemption ("PTCE") 84-14 applicable to certain transactions involving qualified professional asset managers, (ii) PTCE 96-23 applicable to certain transactions involving in-house asset managers, (iii) PTCE 90-1 applicable to certain transactions involving insurance company pooled separate accounts, (iv) PTCE 91-38 applicable to certain transactions involving bank collective investment funds, (v) PTCE 95-60 applicable to certain transactions involving insurance company general accounts, or (vi) the service provider exemption provided by Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code; or the benefit plan investor has determined that it has no relationship, and will not have a relationship, during the time it holds Shares, to Barclays Bank PLC or any of its affiliates that would cause the Fund to be a "party in interest" or "disqualified person" with respect to such benefit plan investor.

Except as otherwise set forth, the foregoing statements regarding the consequences under ERISA and the Code of an investment in the Fund are based on the provisions of the Code and ERISA as currently in effect, and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial, or legislative changes will not occur that may make the foregoing statements incorrect or incomplete.

ACCEPTANCE OF SUBSCRIPTIONS ON BEHALF OF PLANS IS IN NO RESPECT A REPRESENTATION BY THE DIRECTORS OR ANY OTHER PARTY RELATED TO THE FUND THAT THIS INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN OR THAT THIS INVESTMENT IS APPROPRIATE FOR ANY PARTICULAR PLAN. THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND IN LIGHT OF THE CIRCUMSTANCES OF THE PARTICULAR PLAN.

## SUBSCRIPTION PROCEDURE

Shares are offered for sale through Placement Agents on a continuous basis as of the opening of business of the first Business Day of each calendar month. The minimum initial subscription amount for each new investor in the Fund is $1,000,000. The minimum additional subscription amount is $500,000. The Directors (or their delegates) may accept or reject subscriptions and may waive the minimum subscription amounts in their sole discretion (provided that the minimum initial subscription amount be not less than $50,000).

In order to subscribe for Shares, a prospective investor must submit a fully completed and executed Subscription Agreement to the Investment Manager at least five Business Days prior to the Subscription Date (or such shorter period permitted by the Investment Manager). The subscriber must also make arrangements with the Investment Manager for the transmission of its subscription funds, which must be received by the Fund prior to 5:00 p.m. (New York time) (or such shorter period acceptable to the Investment Manager) two Business Days prior to the relevant Subscription Date (or such shorter period acceptable to the Investment Manager). After both the Subscription Agreement and subscription amount are received, the Investment Manager will promptly notify the subscriber whether the subscription will be accepted or rejected. Subscription Agreements should be sent to the Fund, c/o Bear Stearns Asset Management Inc., 383 Madison Avenue, New York, New York 10179, United States.

All subscriptions are irrevocable. The Fund may accept a subscription only in part and will promptly notify any affected subscriber.

As part of the subscription process, prospective investors must furnish the Administrator and the Investment Manager with all representations and documentation required pursuant to their anti-money laundering policies and applicable anti-money laundering laws and regulations and agree to provide any information deemed necessary by the Investment Manager in its sole discretion to comply with its anti-money laundering program and related responsibilities from time to time.

PROSPECTIVE SUBSCRIBERS MUST CAREFULLY CONSIDER THE INFORMATION REQUIRED IN THE SUBSCRIPTION AGREEMENT AND THE PROPOSED AMOUNT OF THEIR INVESTMENT IN LIGHT OF THE AMOUNT OF THEIR OTHER SPECULATIVE INVESTMENTS. AN INVESTMENT IN THE FUND IS SUITABLE ONLY FOR A LIMITED PORTION OF THE RISK SEGMENT OF AN INVESTOR'S PORTFOLIO.

## PLAN OF DISTRIBUTION

The Fund's assets are managed by the Investment Manager. The Fund does not offer any feature designed to assure a return of capital to investors.

Bear, Stearns & Co. Inc., certain of its affiliates and certain non-affiliated selling agents will serve as placement agents with respect to Shares (collectively, "Placement Agents"), subject to prior sale, when, as and if delivered, and subject to certain other conditions. The Investment Manager is authorized to appoint any broker-dealer of securities which is registered as such with the SEC and is a member as such with the NASD to make offers or sales of Shares. The Fund does not currently intend, but reserves the right to list the Shares on a foreign exchange. Additionally, the Investment Manager may appoint, under certain circumstances, any foreign bank, dealer, institution, or individual which is ineligible for or not subject to SEC registration or NASD membership to make offers or sales of Shares outside the United States and its possessions or territories.

## PRIVACY STATEMENT

This privacy statement is issued by the Fund, the Investment Manager, and their affiliates. The Fund and the Investment Manager consider privacy to be fundamental to investor relationships and adhere to the policies and practices described below to protect current and former investors' nonpublic personal information.

The Fund and the Investment Manager do not disclose nonpublic personal information about investors or former investors to third parties other than as described herein. The Fund and the Investment Manager never sell investor lists or individual investor information. Internal policies are in place to protect confidentiality, while allowing investor needs to be served. Only individuals who need to do so in carrying out their job responsibilities may access investor information. The Fund and the Investment Manager maintain physical, electronic, and procedural safeguards that comply with federal standards to protect confidentiality. These safeguards extend to all forms of interaction with the Fund and the Investment Manager, including the Internet.

In the normal course of business, investors give the Administrator, the Fund and the Investment Manager nonpublic personal information on subscription documents and other forms, on websites, and through transactions with affiliates of the Investment Manager. The Fund, the Administrator and the Investment Manager collect information about investors (such as name, address, birth date, social security number, educational and professional background, assets, and income) and the investors' transactions with the Fund, the Administrator and the Investment Manager and its affiliates (such as investments, performances, and account balances). To enable the Fund, the Administrator and the Investment Manager to serve investors, information may be shared with affiliates and third parties that perform various services for the Fund, the Administrator and the Investment Manager, such as transfer agents, lawyers, custodians, administrators, and broker-dealers. This shared information includes identification information (*e.g.*, name and address), transaction and experience information (*e.g.*, account balance), and other information necessary to accomplish transactions. This information may be shared with affiliates, with companies with which the Fund and the Investment Manager have marketing agreements, or with other parties only as permissible by law. Any organization receiving client information may only use it for the purpose designated by the Investment Manager or its affiliates. In addition, the Administrator and the Fund may pass on client information to the Investment Manager.

## MISCELLANEOUS

### Side Letter Arrangements

The Fund and the Other Feeder Funds may from time to time enter into agreements with certain investors which provide for terms of investment that are more favorable to such investors than the terms described in this Memorandum (collectively, "Side Letters"). Such terms may include (i) the waiver, reduction or rebate of Advisory Fees and/or Incentive Fees or profit shares, (ii) preferential transfer or liquidity rights, including additional redemption dates and waived or reduced redemption notice periods, redemption fees or holdback periods for redemption proceeds, (iii) the commitment to permit future investments in the Fund by such investors when the Fund is otherwise closed to new or additional investments and (iv) undertakings designed to protect an investor from violating an applicable statute or administrative regulation. The Fund may also agree to provide certain investors with supplemental information and reports; *provided, however,* that any such supplemental information and reports will also be offered to all other Shareholders (who may or may not choose to receive such supplemental information and reports). In any such case, the supplemental information or reports provided for in the Side Letter may affect the decision of its recipient to request a redemption of its Shares. Other than with respect to supplemental information and reports, Side Letters will not generally entitle other investors to the same preferential terms of investment and the Fund may not disclose to other investors the existence

71

or terms of any such Side Letters. The Fund will enter into Side Letters only if and to the extent they are consistent, and implemented in accordance, with the governing documents of the Fund and the fiduciary duties owed by the Fund to its investors.

## Reports to Shareholders

Within 30 days of the end of each calendar month, the Fund will prepare an account statement containing information relating to the Net Asset Value and the Net Asset Value per Share for each Series of Shares as of the end of such month. In addition, an annual report containing audited financial statements will be prepared and distributed to Shareholders as soon as practicable after the close of the Fund's fiscal year. Copies of these reports will be mailed to Shareholders at their registered addresses.

## Available Documents

The Fund's and the Master Fund's Memoranda and Articles of Association and the Fund's and the Master Fund's agreements with the Administrator and the Investment Manager are available for inspection and review by Shareholders, prospective investors, and their authorized representatives during normal business hours at the office of the Administrator. Such documents will also be sent to Shareholders and prospective investors at cost upon request. The Fund will afford prospective investors the opportunity to obtain any additional information necessary to verify the accuracy of any representations or information set forth in this Memorandum, to the extent that the Fund possesses such information or can acquire it without unreasonable effort or expense. Such review is limited only by the proprietary and confidential nature of the trading strategies utilized by the Investment Manager and by the confidentiality of personal information relating to other investors.

Because the Fund will invest a substantial amount of its assets in Repackaging Vehicle Junior Interests, and an investment in the Fund involves certain of the risks of investing in Repackaging Vehicle Junior Interests, the offering documents for Repackaging Vehicle Securities and/or any operative documents of the Repackaging Vehicles referred to in the Repackaging Vehicle offering documents, subject to any confidentiality requirements imposed on the Fund, will be sent to Shareholders and prospective investors without charge upon request to the Investment Manager at Bear Stearns Asset Management Inc., 383 Madison Avenue, New York, New York 10179, Attention: Alternative Fund Services; telephone: 212-272-1630; facsimile: 917-849-3018.

## Principal Office; Location of Records

The registered office of the Fund and the Master Fund, and the location where certain of their corporate books and records are kept, is at the offices of Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

## Cayman Islands Mutual Funds Regulation

The Fund falls within the definition of a "mutual fund" in terms of the Mutual Funds Law (2005 Revision) of the Cayman Islands (the "Law") and accordingly will be regulated in terms of that Law. However, the Fund is not required to be licensed or to employ a licensed mutual fund administrator because the minimum interest purchasable by a prospective investor in the Fund equals or exceeds $50,000 or its equivalent in another currency. Accordingly, the obligations of the Fund are: (i) to register the Fund with the Cayman Islands Monetary Authority (the "Authority") in the Cayman Islands appointed in terms of the Law; (ii) to file with the Authority prescribed details of this Memorandum and any changes to it; (iii) to file annually with the Authority accounts audited by an approved auditor; and (iv) to pay a prescribed registration fee.

As a regulated mutual fund the Fund will be subject to the supervision of the Authority and the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the

Authority within such time as the Authority specifies. In addition, the Authority may ask the Directors to give the Authority such information or such explanation in respect of the Fund as the Authority may reasonably require to enable it to carry out its duty under the Law.

The Directors must give the Authority access to or provide at any reasonable time all records relating to the Fund and the Authority may copy or take an extract of a record it is given access to. Failure to comply with these requests by the Authority may result in substantial fines being imposed on the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Authority is prohibited by the Law from disclosing any information relating to the affairs of a mutual fund other than disclosure required for the effective regulation of a mutual fund or when required to by law or by the court.

The Authority may take certain actions if it is satisfied in respect of a regulated mutual fund that:

- it is, or is likely to become, unable to meet its obligations as they fall due;
- it is carrying on, or is attempting to carry on business, or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors;
- its direction or management has not been carried on in a fit and proper manner; or
- a person holding a position as a director, manager, or officer is not a fit and proper person to hold the respective position.

The powers of the Authority include, among other things, the power to require the substitution of the Fund's Directors, to appoint a person to advise the Fund on the proper conduct of its affairs, or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Authority, including the ability to apply to a court for approval of other actions.

Notwithstanding the foregoing, investors must appreciate that the Monetary Authority has not passed upon the contents of this Memorandum or the merits of investing in the Shares.

If the Master Fund falls within the definition of a "mutual fund" in terms of the Law, the foregoing disclosure will be deemed to have been delivered to the Fund by this reference.

The description set forth under this section entitled "Cayman Islands Mutual Fund Regulation" applies equally to the Master Fund.

**EU Council Directive 2003/48/EC**

Dividends and other distributions of income made by the Fund, together with payment of the proceeds of sale and/or Redemption of Shares ("Payments"), should not be subject to any reporting requirements that may arise as a result of the Cayman Islands legislation (the "Cayman EUSD Legislation") which will implement measures similar to the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "EUSD"). For the purpose of the Cayman EUSD Legislation, the Fund will be deemed to be a non-UCITS fund and therefore Payments by the Fund will be deemed to be "out of scope".

If an investor is based in the European Union or certain states which have equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have equivalent measures to the EUSD, then the provisions of the EUSD may apply. In such circumstances the investor may become the paying agent for EUSD purposes and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities under EUSD or withhold tax at applicable rates from any redemption proceeds.

73

**Money Laundering Prevention**

As part of the Fund's responsibility for the prevention of money laundering, the Fund, the Administrator, the Investment Manager, and their affiliates, subsidiaries, or associates may require a detailed verification of the applicant's identity and the source of the payment required under Cayman Islands Money Laundering Regulations (2005 Revision). Depending on the circumstances of each application, a detailed verification might not be required where:

(a)    the applicant is a recognized financial institution that is regulated by a recognized regulatory authority and carries on business in a country listed in Schedule 3 of the Cayman Islands Money Laundering Regulations (2005 Revision);

(b)    the application is made through a recognized intermediary that is regulated by a recognized regulatory authority and carries on business in a country recognized in Schedule 3 of the Money Laundering Regulations (2005 Revision). In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

(c)    the applicant makes the payment for his investment from an account held in the applicant's name at a recognized financial institution.

These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations.

An individual will be required by the Administrator to produce a copy of a passport or identification card. Corporate applicants will be required by the Administrator to produce a certified copy of the certificate of incorporation (and any certificate of change of name), Memorandum and Articles of Association (or other document evidencing the existence of the legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce, and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities that subscribe to the Fund must demonstrate organizational documents that verify the existence of the entity and that verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund, the Administrator, and the Investment Manager reserve the right to request such information as is necessary to verify the identity of an applicant or a transferee of Shares.

In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator will refuse to accept the application and the subscription monies relating thereto. In such event, any funds received will be returned without interest to the account from which the funds were originally sent. The Administrator may also refuse to accept any application and monies relating thereto or to make any redemption or distribution payments to a Shareholder if the Administrator suspects or is advised that it might result in the breach or violation of any applicable anti-money laundering or other laws or regulations.

If, as a result of any information or other matter which comes to his attention, any person resident in the Cayman Islands (including the Fund, its Directors, and the Administrator) knows or suspects that another person is engaged in money laundering, such person is required to report such information or other matter pursuant to the Proceeds of Criminal Conduct Law (2005 Revision) of the Cayman Islands and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

Each prospective investor and Shareholder must also provide any information requested by the Investment Manager to comply with its obligations under U.S. anti-money laundering rules and regulations.

74

The description set forth under this section entitled "Money Laundering Prevention" applies equally to the Master Fund.

**Inquiries**

Inquiries regarding the Fund and the Shares should be directed to the Investment Manager.

NY1 5860694v.20