**THE COMMONWEALTH OF MASSACHUSETTS**
**OFFICE OF THE SECRETARY OF THE COMMONWEALTH**
**SECURITIES DIVISION**
**ONE ASHBURTON PLACE**
**BOSTON, MASSACHUSETTS 02108**

IN THE MATTER OF:

BEAR STEARNS ASSET
MANAGEMENT, INC

    Respondent

ADMINISTRATIVE
COMPLAINT

Docket No. E-2007-0064

## ADMINISTRATIVE COMPLAINT

### I. PRELIMINARY STATEMENT

The Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth (respectively "Enforcement Section" or "Division") files this Administrative Complaint ("Complaint") in order to commence an adjudicatory proceeding against the above-named Respondent for violating the Massachusetts Uniform Securities Act, M.G.L. c. 110A ("Act") and relevant regulations, 950 C.M.R. 10.00 *et. seq.* ("Regulations"). The Enforcement Section seeks an Order of the Division: 1) requiring Respondent to permanently cease and desist from violating the Act and Regulations; 2) censuring Respondent; 3) requiring Respondent to pay an administrative fine in an amount and upon such terms as the Director or Hearing Officer may determine; and 4) taking such further action as may be deemed just and appropriate by the Director or Hearing Officer for the protection of investors.

## II.   SUMMARY

The collapse and bankruptcy of the Bear Stearns High-Grade Structured Credit Strategies Fund ("High Grade Fund") and the Enhanced Leverage Fund ("Enhanced Leverage Fund") (collectively, "Funds" or "BSAM Funds") during June and July 2007 has cost investors and creditors billions of dollars. The implosion of these funds has shaken the assumptions underlying the markets for structured and mortgage-backed securities around the world. The combination of illiquid structured debt securities, national mortgage market turmoil, exotic credit derivative contracts, fair value pricing, aggressive and even "enhanced" leverage, and the supercharged race for competitive returns ultimately overwhelmed the portfolio and risk managers at Bear Stearns Asset Management ("BSAM").

Investment advisers have a fiduciary duty to manage conflicts of interest. Advisers therefore generally maintain internal controls, compliance managers, and a board of directors to police conflicts of interest and safeguard their client investors. Investors in the BSAM Funds were exposed to more conflicts of interest than investors in most other hedge funds. The BSAM Funds invested in "special purpose vehicles" structured by the managers of the Funds themselves, bought and sold securities from those special purpose vehicles and bought and sold securities from the affiliated broker-dealer Bear, Stearns & Co ("BSC").

In recognition of those conflicts of interest, the High Grade Fund's disclosures provided very specific and detailed assurances for investors wary of the risks created by those conflicts of interest. BSAM's own Offering Memoranda for the Funds laid out a procedural road map for the management of conflicts between BSAM and BSC and conflicts between BSAM and other investment vehicles advised by BSAM. BSAM assured its High Grade Fund investors that when

2

the Fund was buying from or selling to an affiliated broker-dealer, special purpose vehicle or other related parties, the Fund's operating procedure required disclosure, consent, and approval before the deal could be settled. Unbeknownst to investors, the very controls and procedures established to safeguard their interests did not survive the daily ordeals of trading and managing and leveraging. Investors who sought to take advantage of the inimitable risk management reputation of Bear Stearns found themselves in a highly complex hedge fund investment program that relied on overworked junior personnel to manage a conflict reporting process required by federal law. The staff whose job it was to report conflicts like principal transactions and related party deals to the Fund's directors were not told when, why or what they were responsible for sending to the directors. The result of this poor conflict management was that hundreds of transactions did not obtain the approvals required by Federal law and promised in the offering documents. Of the transactions that required prior approval by the Unaffiliated Directors, 78.95% were missing such approval in 2006, 58.66% in 2005, 29.73% in 2004 and 18% in 2003.

Responding to this state of affairs during the summer or early fall of 2006, Bear Stearns imposed a freeze on all transactions between the High Grade Fund and Bear Stearns. This moratorium on trading with Bear Stearns was meant to block further problems with conflicts of interest from arising at BSAM and especially the High Grade Fund. However, this moratorium was regarded by traders in the Funds as detrimental to investors' interests and the liquidity of the fund. The moratorium extended, with few exceptions, from the summer or fall of 2006 until May or June of 2007. Such a long freeze on deals between the affiliated Bear entities reveals the depth and gravity of the breakdown. The process of disclosing principal transactions, seeking consent, and obtaining approval had been, from 2005 until midway through 2006, a low-priority task for junior assistants. If the work of managing conflicts of interest and complying with the

3

representations made to High Grade investors had been tackled with the seriousness and care it deserved, the moratorium on trading with Bear Stearns may never have been necessary.

The High Grade Fund's board of directors went through several changes from 2004 – 2006. The original unaffiliated directors were located in Dublin, Ireland. In 2006, BSAM replaced the Dublin based directors with two new directors from the firm Walkers Fund Services in the Cayman Islands. The Walkers directors assumed responsibility for the oversight of principal trades after deficiencies in the disclosure, consent and approval mechanism became obvious and distressing to BSAM Compliance. The Walkers directors, however, do not appear to have been entirely independent from BSAM as Walkers was already engaged with BSAM in other legal and business relationships. By consistently choosing unaffiliated directors who were domiciled outside the United States, BSAM effectively shielded those unaffiliated directors from accountability for the essential duties they were to perform for investors in the Funds. While the Securities Division issued subpoenas and scheduled interviews for the two Walkers directors during the course of its investigation, the directors never appeared to respond to questions on the record because they claimed that the Securities Division lacked jurisdiction in the Cayman Islands.

## III. JURISDICTION & AUTHORITY

1.    The Massachusetts Securities Division is a division of the Office of the Secretary of the Commonwealth with jurisdiction over matters relating to securities, as provided for by the Act. The Act authorizes the Division to regulate: 1) offers and/or sales of securities; 2) those individuals and entities offering and/or selling securities; and 3) those

4

individuals and entities transacting business as investment advisers within the Commonwealth.

2. This proceeding is brought in accordance with the Act and its Regulations.

3. The Division allows this action pursuant to the enforcement authority conferred upon it by section 407A of the Act and M.G.L. c. 30A, wherein the Division has the authority to conduct an adjudicatory proceeding to enforce the provisions of the Act and all Regulations and rules promulgated thereunder.

4. The Enforcement Section specifically reserves the right to amend this Complaint and/or bring additional administrative complaints to reflect information developed during the current and ongoing investigation.

## IV.    RELEVANT TIME PERIOD

5. Except as otherwise expressly stated, the conduct described herein occurred during the approximate period of September 1, 2003, through the present.

## V.    RESPONDENT

6. Bear Stearns Asset Management, Inc. ("BSAM") is a SEC registered investment adviser with Central Registration Depository ("CRD") number 113359 and a principal place of business at 237 Park Avenue, New York, NY. BSAM has notice filed as an investment adviser in Massachusetts since February 1998. BSAM is directly owned by the Bear Stearns Companies, Inc.

## VI.  OTHER RELATED PERSONS OR ENTITIES

7. Bear, Stearns & Co. Inc. ("BSC") is a registered broker-dealer with CRD number 79 and a principal place of business at 383 Madison Avenue, New York, NY. BSC is a subsidiary of the Bear Stearns Companies Inc.

5

8.   The High Grade Structured Credit Strategies Fund ("High Grade Fund") is a hedge fund managed by BSAM. The High Grade Fund had investors domiciled in Massachusetts during the relevant time period.

9.   The High Grade Structured Credit Strategies Enhanced Leverage Fund ("Enhanced Leverage Fund") is a hedge fund managed by BSAM. The Enhanced Leverage Fund had investors domiciled in Massachusetts during the relevant time period.

10.  The High Grade Fund and the Enhanced Leverage Fund shall be referred to collectively as the "Funds."

11.  Ralph Cioffi ("Cioffi") joined BSAM in 1985 and serves as a Senior Managing Director, Adviser, and Director at Bear Stearns Asset Management Inc. Cioffi is also a registered representative of BSC with CRD number 707240 and serves as Co-Chief Executive Officer, Director and Member of Operating Committee at Everquest Financial Ltd (a holding company jointly managed by BSAM and Stone Tower). Mr. Cioffi established the High Grade Structured Credit Strategies Fund in March 2003 and has managed it since.

12.  Matthew Tannin ("Tannin") is the chief operating officer of the Bear Stearns High Grade Funds and a senior managing director at BSAM. Tannin has been with Bear Stearns since 1994. In 2003 Tannin, Cioffi and Joanmarie Pusateri started the Bear Stearns High-Grade Structured Credit Strategies Fund. Tannin is a registered representative of BSC with CRD number 2482756.

13.  Joanmarie Pusateri ("Pusateri") has been a registered representative of BSC since June 20, 1986 with CRD number 1258315. Pusateri is also vice president of Bear Stearns

Asset Management Inc. and worked with Cioffi and Tannin to launch the High Grade Fund in 2003.

14.   Jessica Borenkind ("Borenkind") was a sales assistant for Bear Stearns & Co. with CRD number 4655812. Her employment started April 1, 2002 and she left BSC's employ by "mutual agreement" on November 20, 2006. Borenkind worked at BSAM on the High Grade Fund from the Spring of 2005 until her termination on November 20, 2006.

15.   Richard Bierbaum ("Bierbaum") was a Trading Assistant for Bear Stearns & Co. with CRD number 5010470. Bierbaum took and passed his S7 and S66 exams in 2005 and 2006 respectively. Bierbaum was registered with BSC from October 20, 2003 to November 17, 2006 and his termination on the CRD is listed as "voluntary." Bierbaum worked at BSAM on the High Grade Fund from approximately June 2005 until his termination on November 17, 2006.

16.   Barbara Keller ("Keller") was the Secretary and Chief Compliance Officer of BSAM during the time period of October 10, 2005 through March 31, 2007, her CRD number is 1960836.

17.   PFPC International Ltd. ("PFPC"), located in Dublin, Ireland provides fund accounting, administration, transfer agency and shareholder recordkeeping services for non-U.S.-domiciled funds, partnerships and other commingled investment products, operating out of Ireland and Luxembourg. Pursuant to an administrative services agreement, PFPC serves as administrator, registrar and transfer agent and provides day-to-day administrative services to the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., including accounting and clerical functions. Additionally, two PFPC employees acted as Unaffiliated Directors to the High Grade Fund.

7

18.    Joan Kehoe ("Kehoe") was an Executive Vice-President of PFPC Worldwide and was employed with PFPC since 1993. Kehoe was one of the unaffiliated directors that authorized via signature Principal Transactions.

19.    Tara Murphy ("Murphy") was the head of Compliance for PFPC International. Murphy was one of the unaffiliated directors that authorized via signature Principal Transactions.

20.    Walkers is a licensed Cayman Islands trust company and mutual fund Administrator providing specialist offshore fund services to investment fund structures. Walkers provides services such as provision of directors, acting as trustee, general or administrative partner for a limited partnership and consultation on setting up and structuring offshore investment vehicles.

21.    Scott Lennon ("Lennon") is a Senior Vice President at Walkers. Lennon joined Walkers from State Street Cayman Trust Company Ltd. He was the former Head of Investment Fund Services at Deutsche Bank (Cayman) Ltd., and prior to that he was a Manager in the investment funds group at KPMG in the Cayman Islands. Lennon was one of the unaffiliated directors that was to approve principal transactions for BSAM.

22.    Michelle Wilson-Clarke ("Wilson-Clarke") is currently Senior Vice President of Walkers Fund Services Limited. Prior to joining Walkers Fund Services Limited, Michelle was Vice President and Relationship Analyst at Wellington Management Company, LLP in Boston, Massachusetts. Wilson-Clarke was one of the unaffiliated directors that authorized via signature Principal Transactions.

8

230

## VII. STATEMENT OF FACTS

### A. The Offer and Sale of Securities

23. From the third quarter of 2003 until 2007, Bear Stearns Asset Management ("BSAM" or the "General Partner") solicited investors for the Bear Stearns High-Grade Structured Credit Strategies Limited Partnership ("High-Grade Fund," the "Partnership" or "BSHG") using a Confidential Private Placement Memorandum ("PPM") and oral presentations.

24. During the same period, BSAM was the investment manager to Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "Master Fund"), an exempted company incorporated under the laws of the Cayman Islands.

25. From the third quarter 2006 until 2007, BSAM solicited investors for the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Limited Partnership ("Enhanced Leverage Fund") using a PPM and oral presentations.

26. From the third quarter 2006 until 2007, BSAM was the investment manager to Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd., an exempted company incorporated under the laws of the Cayman Islands.

### 1. The Strategy

27. According to the High Grade Fund's 2004 PPM, the primary objective of the High-Grade Fund was to achieve high current income and capital appreciation relative to the London Interbank Overnight Rate (LIBOR).

28. The High Grade Fund's PPMs in use between 2004 and present state that the Partnership would gain exposure on a recourse and non-recourse leveraged basis to investment-grade structured finance securities through the Master Fund's purchase of the equity and other

9

securities issued by structured vehicles that invest, on a leveraged or unleveraged basis, in investment-grade structured finance securities including collateralized debt obligations ("CDOs").[1]

29. The PPMs state that the Partnership will make investments in asset-backed securities (ABS), synthetic ABS, mortgage-backed securities (MBSs), and various derivatives, including credit-default swaps, interest rate swaps, options, futures, currencies and both listed and over-the-counter forward contracts.[2]

30. The PPMs state that the Partnership would generally operate up to a Net Leverage of its investments of 10 to 1.

31. The Master Fund relied primarily on repurchase agreements to finance its direct purchases of CDOs and ABSs although it may have also used total return swaps and other derivative transactions.

32. Repurchase agreements or "repos" are a principal means of financing securities lending transactions in the capital markets.[3]

---

[1] Structured finance securities are the securities of special purpose vehicles ("SPVs") formed to purchase pools of assets like mortgage loans and other debt obligations. The assets held by an SPV are financed through the issuance of different tranches of securities, from senior to mezzanine to equity level tranches. Each tranche has a specific right to the interest and principal payments from the underlying pool of assets held by the SPV. As the tranches move from senior to equity level, the rate of return increases as does the degree of risk of the security. Structured vehicles are also referred to as "Repacking Vehicles" in the PPMs.

[2] A credit-default swap is a derivative contract where one party pays an annual premium to another party in exchange for the right to receive a payment if a specified credit instrument suffers a default or other credit event.

[3] A repo represents a transfer of a financial instrument by one party to another party for payment, with a simultaneous agreement by the second party to retransfer securities to the first party on demand or on a date certain against payment which reflects a rate of interest or "haircut." S. Rep. No. 98-65, at 44 (1983). The repo market is built upon transactions that are highly interrelated. The ability of the repo market to serve its functions in the money market depends upon a high level of certainty about the ability of the various repo participants to close out repo transactions in the event of the insolvency of the other party to the transaction. Id. at 49. As explained throughout the PPM, Leverage used in repurchase agreement financing is sensitive to the price volatility of the assets being financed through repo. When the market price of assets financed through repo deteriorates, the borrower in the repo deal may be required to post additional margin or to sell a financed position. This method of financing is often called

10

33. According to the PPM dated October 31, 2004, the Master Fund's Board of Directors would initially include four directors, two from BSAM, Barry J. Cohen and Michael Guarasci, Sr., and two from PFPC, Joan Kehoe and Tara Murphy. Joan Kehoe and Tara Murphy were defined in the PPM as unaffiliated directors.

34. The PPM states that the Master Fund Directors have ultimate authority over the Master Fund's operations.

### 2. Conflicts of Interest

35. Investment advisers owe a fiduciary duty to their clients.

36. When an investment adviser engages in transactions with its clients, the adviser creates conflicts of interest. Such interested transactions raise the possibility that the investment adviser might engage in transactions at terms that unfairly advantage the investment adviser at the expense of the client or that the client would not otherwise undertake absent the adviser's financial interest in the transaction.

37. As an investment adviser registered under the Adviser's Act, BSAM is required to comply with Section 206(3) of the Investment Advisers Act of 1940 ("Adviser's Act").

38. Section 206 of the Adviser's Act deals with fraudulent practices.

39. Section 206(3) of the Adviser's Act reads in relevant part:

> **Section 206 -- Prohibited Transactions by Investment Advisers**
> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> ... acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, *without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining*

---

"mark-to-market recourse financing" because the counterparty to the borrower in repo uses the mark-to-market price of the financed securities to determine whether to demand additional margin.

11

*the consent of the client to such transaction.* The prohibitions of this paragraph
(3) shall not apply to any transaction with a customer of a broker or dealer if such
broker or dealer is not acting as an investment adviser in relation to such
transaction; *[emphasis added]*

40. The PPM, under a subsection called "Principal Trades and Related Party Transactions;
Cross Transactions," explains that "prior approval of the independent Master Fund
Directors...or the Consent of the Partnership" are required when the Investment Manager
engages in the purchase or sale of an investment...under the "principal trade" provisions
of Section 206(3) of the Advisers Act.

41. The PPM also explains that BSAM or its affiliates may or may not be a collateral
manager or other service provider to certain of the Repackaging Vehicles held within the
Partnership's investment program.

42. The 2004 PPM states in relevant part:

> Because the Investment Manager will serve as collateral manager of the
> Repackaging Vehicles, the purchase of the Repackaging Vehicle Junior Interests
> may be deemed to be a principal trade. The Investment manager will therefore,
> make appropriate disclosure to, and obtain consent from, the members of the
> board of directors of the Master Fund who are not affiliated with the Investment
> Manager prior to the investment by the Master Fund in Repackaging Vehicle
> Junior Interests.

43. The 2004 PPM also makes those "unaffiliated" directors of the Master Fund responsible
for "approving any transactions between the Master Fund and the Investment Manager or
its affiliates involving significant conflicts of interest (including principal trades)." These
procedures shall hereinafter be referred to as "PTL Procedures" or "Procedures for
Related Party Transactions." "PTL" shall refer to Principal Trade Letters.

44. Transactions requiring approval from the Unaffiliated Directors of the High Grade Fund
(including Principal Transactions, transactions involving the Repackaging Vehicles and

12

transactions involving significant conflicts of interest) shall be referred hereinafter as "Related Party Transactions."

45.    None of the offering documents, presentation materials, or other risk disclosures for the High Grade Fund ever defined which transactions beyond the technical reach of 206(3) principal trades were captured by the phrase "involving significant conflicts of interest."

46.    BSAM has acknowledged to the Division that it cannot provide the definition of transactions "involving significant conflicts of interest" that it used to interpret and comply with its own PPM.

47.    Throughout the period from the launch of the High Grade Fund to its bankruptcy filing, Bear Stearns Securities Corp. provided Prime Brokerage services to the Master Fund.

**B.    Faulty Implementation of the Investor Protections Required by the Private Placement Memorandum**

   **1.    Staff with responsibility for handling PTLs did not understand why PTLs were necessary or even when the approvals were due**

48.    The management of the High Grade Fund, BSAM and BSAM Compliance failed to effectively communicate the importance of completing PTLs for Related Party Transactions to the people responsible for executing those tasks. The result is that significant numbers of Related Party Transactions were not approved in violation of the Adviser's Act and the PPM.

49.    In October 2003, BSAM, Cioffi, Tannin and Pusateri created the High Grade Fund.

50.    At the time the High Grade Fund was created, Pusateri's responsibilities included all administrative and operational tasks.

13

51. Pusateri explained that Tannin assigned her the responsibility for obtaining PTLs on transactions between the High Grade Fund and BSC from the time of High Grade Fund inception in 2003.

52. Pusateri understood that submitting PTLs was a necessary administrative procedure but did not understand that a failure to do it on time and accurately was a violation of Federal Law and the PPM.

53. According to Pusateri, all PTLs needed to be approved by directors prior to settlement date for any Related Party Transactions and PTLs were only required for transactions between the High Grade Fund and BSC.

54. When Pusateri was informed of a transaction, she would determine whether the transaction involved BSC as a counterparty, and if it did, she would "put the details of a trade on a form letter that was already addressed to the administrator and [she] would send it out on trade date to the administrator for their approval and ask them to e-mail it back to [her] before settlement date."

55. According to Pusateri, Tannin provided her with the above referenced form letter.

56. On information and belief, the information provided to the Unaffiliated Directors was insufficient to determine whether the Related Party Transactions should be approved.

57. Pusateri did not know whether PTLs were required for transactions between the High Grade Fund and Klio, a structured finance vehicle managed by Cioffi, Tannin or BSAM.

58. Pusateri did not know whether transactions between the High Grade Fund and the Repackaging Vehicles required consent by the Unaffiliated Directors, even though the PPM stated that such consent was required for those transactions.

14

59.    On information and belief, BSAM did not require that PTLs be sent to the unaffiliated directors for transactions between the High Grade Fund and Repackaging Vehicles managed by Cioffi, Tannin or other BSAM personnel until 2005 or early 2006.

60.    According to Pusateri, Tara Murphy and Joan Kehoe were the people at the administrator, PFPC, to whom she sent PTL letters for consent and approval.

61.    Pusateri did not know whether the people at PFPC served as unaffiliated directors to the High Grade Fund and when asked what role PFPC played for the High Grade Fund, Pusateri replied, "I'm not sure. I don't know." Additionally, Pusateri did not know whether PFPC still reviews and consents to PTLs for the High Grade Fund.

62.    According to Pusateri, she did not know why the High Grade Fund was required to "Obtain" a PTL prior to engaging in transactions with BSC.[4]

63.    Between the approximate dates of October 2003 and some time in 2004, Pusateri was the only person responsible for ensuring the High Grade Fund complied with the PTL Procedures.

64.    According to Pusateri, at some point during calendar year 2004, she had a meeting with a BSAM Compliance officer where they discussed approximately 10 or 20 missing PTLs. Following the meeting, Pusateri took steps to address and troubleshoot the issues leading to the missing PTLs.

65.    According to Pusateri, BSAM Compliance personnel informed her that it was a priority to obtain PTL consents, but they never mentioned that the failure to obtain PTLs would

---

[4] "Obtaining" a PTL shall mean the successful completion of the process that starts with the High Grade Fund putting on a trade with BSC or another Related Party, demands several intermediate administrative tasks like inputting the requisite securities data onto the PTL, and finishes with a director communicating approval back to the High Grade Fund by email or other means.

15

be a violation of the Adviser's Act and is inconsistent with the offering documents of the High Grade Fund.

66.   According to Pusateri, neither Tannin nor Cioffi explained to her that both the Adviser's Act and the PPM's representations would be violated if PTL consents were not obtained.

### 2.   BSAM did not effectively train or monitor people hired to obtain PTLs

67.   Pusateri's failure to understand which transactions required PTLs and why they were required caused confusion among her delegates as to why PTLs were necessary, their relative priority and how to effectively obtain approvals for them.

68.   In approximately April 2005, Pusateri hired Jessica Borenkind to assist with trade settlement, repo transactions and complying with PTL Procedures.

69.   Prior to working for the High Grade Fund, Borenkind had no experience in compliance functions or obtaining PTL consents.

70.   Borenkind had many other duties at the High Grade Fund, including answering phones for Ralph Cioffi, making copies, and handling "a lot of stuff with documentation."

71.   Pusateri acted as Borenkind's supervisor and delegated to her responsibility for obtaining PTLs.

72.   According to Pusateri, she taught Borenkind how to obtain PTLs.

73.   According to Borenkind, after the booking of a trade where BSC was counterparty to the High Grade Fund, Borenkind would input the trade date, settlement date, security description, and CUSIP into a "pre-written letter that all I have to do is copy....and then send it off to this e-mail address that I had. And I usually did it at the end of the day."

74.   When Borenkind was sending PTLs for approval, she sent them to Tara Murphy of PFPC in Dublin, Ireland.

16

75. When asked about Murphy's role, Borenkind did not know who Murphy was.

76. Borenkind has never spoken with Murphy.

77. According to Borenkind, Murphy never followed up a PTL e-mail with request for additional information.

78. According to Borenkind, Murphy never rejected a PTL as incomplete, late, or otherwise deficient.

79. When asked if Pusateri explained the purpose of submitting the PTLs to Tara Murphy, Borenkind responded, "I don't know."

80. On information and belief, Pusateri did not inform Borenkind of the importance of obtaining PTLs or that the failure to obtain PTLs was a violation of Federal Law and the PPM.

81. Pusateri gave Borenkind the authority to send PTLs that indicated they were from Pusateri, without Pusateri's review.

82. Although she was ultimately responsible for obtaining PTLs, Pusateri on at least one occasion informed Borenkind that she did not need to be cc:ed on emails requiring approval of PTLs.

83. According to Borenkind, when she failed to obtain PTLs, BSAM compliance would email her spreadsheets listing PTLs sent, PTLs received back with approvals, PTLs without any approvals, and PTLs which should have been sent but never were.

84. BSAM Compliance typically only sent PTL Spreadsheets once per month.

85. The majority of the transactions reflected on the PTL Spreadsheets had settled prior to the PTL Spreadsheet being sent. Each transaction listed on the PTL Spreadsheets as missing represented a violation of the Adviser's Act and the PPM.

86. Upon receiving the PTL Spreadsheet, Borenkind would send an email to the Unaffiliated Directors seeking approval for all of those transactions missing approvals ("PTL Remediation Emails").

87. According to Borenkind, the PTL Remediation Emails were her idea and not suggested by anyone in BSAM Compliance.

88. Obtaining approval on PTLs after settlement date does not satisfy the requirements of §206(3) of the Adviser's Act.

89. Despite being notified of Related Party Transactions after settlement, the Unaffiliated Directors nevertheless approved of the transactions.

90. By approving of Related Party Transactions after the transactions settled, the Unaffiliated Directors exhibited a lack of understanding of why they had the role of approving the transactions and what elements were necessary to approve of a PTL.

91. According to Bierbaum's testimony, his initial duties at the High Grade Fund when he was hired in June 2005, included "trading assistant/junior trader role/analyst role, was sort of a jack-of-all-trades in a junior function, if you will, within the fund." Bierbaum reported to Manny Villar, Ardavan Mobasheri and Ralph Cioffi.

92. Bierbaum's testimony indicates that in the fall of 2005 Cioffi instructed Bierbaum to assume some of Borenkind's responsibilities including obtaining PTLs for certain transactions, in addition to his initial duties.

> Basically, Ralph sat me down and said, hey, can you take over, you know, can you do a couple of these things for Jess and can you cover for her while she's out. So, at that point, I think what I took over from her was immediately, PTL letters, which are principal trade letters.

93. Thus Bierbaum took over the task of obtaining PTLs for certain securities.

18

94. Prior to working for the High Grade Fund, Bierbaum had no experience obtaining PTLs.

95. Pusateri acted as Bierbaum's supervisor for the tasks Cioffi delegated to him relating to obtaining PTLs.

96. Although Pusateri claims to have taught Bierbaum how to obtain PTLs, he obtained most of his PTL training from Borenkind.

97. Borenkind initially trained Bierbaum on the PTL process according to testimony provided by Bierbaum.

98. Bierbaum, through his testimony, explained how the High Grade Fund approached the disclosure, consent and approval process with principal transactions.

> Well, again, in sort of the daily triage of the work dynamic, at first, I didn't believe it to be very important…Sometimes, I'll just wait for Compliance, our contact was Marisol Farley, to send us a list of trades that Compliance had or knew, you know, had record of us doing with BSC. Us, I mean High-Grade Fund. And then sending that directly to the outside director and getting approval and then having it sent back, as opposed to doing it on a continually rolling basis.

99. After receiving the monthly PTL Spreadsheet from Marisol Farley, Borenkind would "sort it from the ones I was responsible for and the ones Chip was responsible for" and then send out a single letter with all of the missing principal trades highlighted in the PTL Spreadsheet.

### 3. Related Party Transactions: High Grade Deals with KLIO and CIRC

100. "CIRC" is a non-recourse term funding structure that invests primarily in highly-rated securities. The High Grade Fund's deposit (investment) placed with Dresdner Bank earns a leveraged return linked to the performance of a portfolio of securities less costs to finance the portfolio.

19

101. Klio Funding ("Klio") is a structured finance vehicle managed by the investment managers of the High Grade Fund that invests in a portfolio of investment grade ABS, MBS, and CDO securities.

102. According to Borenkind she was required to send PTLs when the High-Grade Fund engaged in a transaction with CIRC.

103. According to Borenkind, she could not remember any occasions where she had to send a PTL when the counterparty for the transactions was someone other than BSC or CIRC.

104. According to Bierbaum, when he began obtaining PTLs for the High Grade Fund, he was not instructed to obtain PTLs for transactions involving interests in the Repackaging Vehicles.

105. According to Pusateri, some time in 2005 or early 2006, she became aware of the requirement to obtain PTLs for transactions between the High Grade Fund and the Repackaging Vehicles as a result of an e-mail sent by Tannin to Borenkind and cc:ed to Pusateri.

106. On information and belief, some time in 2005 or early 2006, Tannin sent an e-mail to Jessica Borenkind indicating that she was required to obtain PTLs for transactions between the High Grade Fund and the Repackaging Vehicles.

107. On information and belief, BSAM failed to obtain approval for significant numbers of Related Party Transactions between the High Grade Fund and the Repackaging Vehicles. This was in violation of the Adviser's Act and the PPM.

108. At the end of 2005, Bierbaum was placed on a two month probation because he was unable to effectively complete the tasks given to him by Villar and Mobiasheri.

109. When he was interviewed by BSAM human resources in connection with the probation, he expressed to the person he met with that he was overloaded with work and was unable to complete all of it.

110. Despite informing BSAM of his inability to complete all of his duties in the end of 2005, Birnbaum was not relieved of any of his duties by BSAM management until mid-2006.

111. According to Pusateri, she became aware of Borenkind and Bierbaum's failure to obtain approvals on PTLs when Cioffi informed her of problems with PTLs in approximately the fourth quarter of 2005.

**C.    Breakdown in Process for Obtaining PTLs**

112. Because BSAM senior management, High Grade Fund management and BSAM Compliance failed to correct the problems with PTLs that were identified by January 2005, the failures in obtaining consents on PTLs continued unabated well into 2006.

113. On January 23, 2006, Joan Kehoe sent a letter to "the Directors" of the High Grade Fund at Walkers SPV Limited in the Cayman Islands, resigning her role as a Director of the High Grade Fund ("Resignation Letter"). (See Exhibit A)

114. On information and belief, BSAM did not receive copies of the Resignation Letter until May 16, 2006.

115. On January 24, 2006, as a result of receiving copies of the PTL Remediation Emails sent to the unaffiliated directors by Birnbaum, Marisol Farley sent the following email to Birnbaum:

> Chip,
> In order for Tara's approvals to be valid you must attach the principal trade letter to the email in addition to the trade detail spreadsheet you normally send. (See Exhibit B)

21

116.   By sending the aforementioned email, BSAM Compliance was tacitly approving the process whereby Birnbaum and Borenkind were obtaining PTL consents after the completion of principal transactions.

117.   At the beginning of 2006, Compliance notified Bierbaum that there were problems related to PTLs "not being done on a timely enough basis."

118.   At some point during the first quarter of 2006, Marisol Farley convened a meeting with Borenkind and Bierbaum where, according to Bierbaum, "she outlined the specific rule in the Investment Advisers Act that required these letters to be sent. She explained, all right, we've got to send these letters, you know, prior to settlement."

119.   While early in 2006 there was more Compliance staff attention devoted to obtaining PTLs, Bierbaum's actual routine did not change much:

> I made a concerted effort to get them out more frequently than previously, but again, I was working for a hedge fund. The most important things, at least certainly to me were, okay, what do we need to do to make sure that the fund is going to operate and make money, you know, number one. So, anything sort of related to that, getting trades booked, making sure that accounting was solid and the whole nine yards, that was number one. So, in terms of absolute priorities, I wouldn't say that it changed at all. I would say it just brought more attention to it.

120.   Bierbaum looked for guidance in "the general behavior of my supervisors."

121.   Through his testimony, Bierbaum explained how "there were certain things that they wanted done now and, you know, nobody – PTLs weren't one of them."

122.   Between January 2006 and June 2006, Borenkind and Bierbaum continued to be unable to obtain consent on PTLs in a timely manner.

123.   Bierbaum has explained through his testimony that with PTLs, "there was no real discussion as far as I can remember about the timing, at least for the CDS that I was involved in. That was initially. That changed."

22

124.   The failure to obtain approvals for Related Party Transactions prior to completion of such a transaction constitutes a violation of §206(3) of the Adviser's Act and the PPM.

125.   Between January 2006 and June 2006, even after late and missing PTLs had been identified as an ongoing problem, Borenkind and Bierbaum were still permitted to send PTL Remediation Emails for transactions that were already in violation of the Adviser's Act and the PPM.

126.   Between January 2006 and June 2006, the Unaffiliated Directors of the High Grade Fund continued to approve of late PTLs.

127.   In the late spring or early summer of 2006, BSAM Compliance began to understand the implications of the High Grade Fund's continued failure to obtain timely PTL consents and elevated their concerns related to those issues.

128.   According to Bierbaum, before the problems with missing PTLs and late PTLs were elevated, handling PTL issues was viewed as "less important" relative to other trading and booking tasks.

129.   During the summer of 2006, the Chief Compliance Officer for BSAM convened meetings to determine the scope of the PTL failures, revamp the management of principal trades, and institute new procedures for requesting and otherwise obtaining consent on PTLs ("PTL Meetings").

130.   Obtaining timely PTL approvals was elevated as a key priority for the High Grade Fund during the PTL Meetings.

131.   Following what she described as a "scare meeting" convened by Keller during summer 2006, Borenkind learned that even one missing PTL could have serious legal repercussions.

132.  In connection with the PTL Meetings, BSAM Compliance worked with Borenkind and Bierbaum to determine the number and scope of missing PTLs.

133.  On information and belief, that process only sought to identify violations of §206(3) of the Adviser's Act and not violations of the PPM related to transactions with the Repackaging Vehicles and those "involving significant conflicts of interest."

134.  According to a working draft of a chart of principal transactions prepared by BSAM Compliance in 2006, between the creation of the fund and some time in 2006, the High Grade Fund engaged in more than 2,300 principal transactions that required approval from the Unaffiliated Directors of the High Grade Fund prior to completion of the transactions. (See Exhibit C)

135.  Of the more than 2,300 transactions that required prior approval, 1,108 or 47% of the total were not approved prior to trade settlement as required by §206(3) of the Adviser's Act and the PPM.

136.  Of the transactions that required prior approval by the Unaffiliated Directors, 78.95% were missing such approval in 2006, 58.66% in 2005, 29.73% in 2004 and 18% in 2003.

137.  Once the scope of missing PTLs was identified, Borenkind and Bierbaum sent additional PTL Remediation Emails to the Unaffiliated Directors.

138.  On July 19, 2006, Borenkind sent an email to Tara Murphy requesting approval for 88 principal transactions that had occurred between January and July 2006. (See Exhibit D)

139.  On July 19, 2006, Borenkind sent an email to Tara Murphy requesting approval for 53 principal transactions that had occurred between January and July 2006.

140.  The failure to obtain timely consent for the above referenced principal transactions constitutes a total of 133 violations of §206(3) of the Adviser's Act and the PPM.

24

**D.** **BSAM's Response to the PTL Breakdown**

**1.  BSAM Institutes New Procedures to Ensure PTLs are Approved**

141. On August 9, 2006, Cioffi sent an email to Pusateri regarding the breakdown in obtaining PTL consents:

> Subject: RE: they create all this frenzy and now they are gone. This was supposed to be resolved when I was in Calif 3 weeks ago
>
> I Ill that but they have to get organized first. WE are organized other than the fact that two people did not do their jobs on PTLs and BSAM did not have a process to catch the late PTL's. There is this whole uproar over PTL's and they want to make it into a big story about how we are not organized. *[sic]*

142. Prior to the PTL Meetings, letters requesting approval of securities often failed to include basic identifying information about the transactions including trade dates, notional amounts and settlement dates. Such transactions did not contain independent bids and were frequently late. The transactions were approved despite material insufficiencies including lack of price information, bids, or previous marks.

143. Before the PTL Meetings, BSAM sent at least thirty-five emails requesting approval for unidentifiable types of securities. The letters amounted to at least 150 securities.

144. Of the unidentifiable securities many were missing material such as names of the securities and dates. Through about seven request letters over 100 of these securities were seeking approval of securities that were late. The approvals were still granted despite the deficiencies.

145. According to Pusateri, Borenkind and Bierbaum ceased being responsible for obtaining consents on PTLs once the scope of the PTL problems was identified.

146. During the summer of 2006, Alexander Reynolds was hired to take over the work of sending PTLs and getting them approved by the PFPC or Walker directors.

25

147. According to Borenkind, "Alex was hired to relieve me of some of my duties."

148. Even after the PTL Breakdown, Pusateri did not require that Reynolds cc: her on emails to the Unaffiliated Directors.

149. One of the new compliance procedures instituted by Keller was the creation of a new PTL form ("New PTL Form").

150. The New PTL Form classified transactions into several different categories, and the different categories required the request for approval to include specific price and other information for the unaffiliated directors.

151. More than 165 out of 261 transactions submitted to the unaffiliated directors using the New PTL Form were deficient because they were late or because they did not meet the requirements of the New PTL Form. All of those transactions that were deficient when submitted were nevertheless approved by Lennon and Wilson-Clarke.

152. New PTL Forms that were incomplete cannot be deemed to be approved, even if consented to by the unaffiliated directors, when they are missing information classified as essential by the Chief Compliance Officer of BSAM.

153. Beginning in March 2007 several PTL emails contained severe deficiencies. Of the 87 letters sent only 34 were completed correctly and 21 were late. Six of the letters did not contain letters of authorization for the transactions and of these, three were for approximately 100 securities. All of these PTLs were approved.

154. After March of 2007, four of the letters did not contain letters of authorization for the repurchasing agreement transactions. Of these four, three were for at least 80 securities.

155. Approval by Unaffiliated Directors of New PTL Forms that were missing required data demonstrates the Unaffiliated Directors' negligence, lack of independence and failure to

26

248

seriously or professionally carry out their duties to the investors in the funds. All of these PTLs were approved.

### 2.  BSC places a moratorium on transacting with BSAM

156.  As a result of the collapse in BSAM's obtaining approvals for Related Party Transactions, BSC placed a moratorium on BSAM's ability to transact with BSC.

157.  Neither BSC nor BSAM stopped the High Grade Fund from engaging in Related Party Transactions with other entities managed or owned by BSAM.

158.  On September 7, 2006, Reynolds sent the following email to Pusateri:

> ... our administrator gave us approval on the SAMI deal that we did with Bear. However, after we received approval the head of Bear Stearns compliance squashed it ..... until further notice.. no trading with Bear again.

159.  Once the moratorium took affect, the portfolio managers of the High Grade Fund began to express concerns with the liquidity of the High Grade Fund.

160.  On September 17, 2006, Tannin sent an email to Cioffi:

> Subject: Liquidity game plan
>
> ...I think we need to have a very specific idea of how we would raise 100mm in liquidity over a sixty day period. While I do not "expect" this – I think it is possible...
>
> **...We also need to now factor in bear principal trade issues in terms of liquidity.**
>
> And just to complete the thought we also need to look at where we plan to finance our positions as we ramp up the levered fund. *[emphasis added]*

161.  On September 18, 2006, Tannin sent the following email to Pusateri, Cioffi and McGarrigal:

> Subject: Repo now
> Here are my thoughts on what we have to do with our repo situation.

27

I think we are under a clear mandate to eliminate the repo with Bear as quickly as possible.

Changing prime brokers is a possibility - but one that is not immediate - and one that comes with difficulties.

Here is the idea I had for the time being.

We need a certain amount of unencumbered assets to satisfy our working capital requirements. These assets need to be "repoable" away from Bear.

So step one would be to make sure that our working capital unencumbered assets satisfy this requirement.

If theses assets are repoable at other dealers then Joan could use these assets to raise the cash she needs on a daily basis. The more accurately Joan could predict her settlement date cash needs the more accurately we could repo the unencumbered assets. I suppose we could err on the side of having some "extra" cash in our account.

Where do the "surprise" needs for cash come from? I think the answer is our volatility book. I need to understand this better.

What are your thoughts?

162.    On September 19, 2006, McGarrigal wrote to Cioffi, Tannin and Pusateri:

Do we have an official mandate to terminate our relationship with Bear? This hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOS. Bear is among the best (reducing liquidity) and further eliminates a source for assets. Bear is #1 in MBS and in the top 5 of CDO issuers. All bad for our investors. I think we should work hard to put in place all necessary compliance procedures to allow to continue operating as we have to date.

163.    According to Pusateri, she regarded BSC to be a repo counterparty of last resort.

164.    On November 9, 2006, in response to a series of emails discussing the Funds' liquidity

needs, Pusateri wrote to Cioffi:

I think our only option is to finance the Rampart shares. I don't like to argue with you but I was told that we are definitely not allowed any repos with Bear (PTL or not)

28

165.  On information and belief, the moratorium on trading with BSC lasted from September 2006 until May or June 2007.

166.  Despite the emails expressing serious concern over the effect of a moratorium on transactions with BSC, neither the moratorium nor the problems with obtaining consents on Related Party Transactions were communicated in the High Grade Fund's August 2006 PPM.

### 3. New unaffiliated directors are appointed but fail to appropriately review Related Party Transactions.

167.  In January 2006, Master Fund director Joan Kehoe submitted a resignation letter removing herself from the board of the High Grade Fund.

168.  The reassessment of PTL procedures and controls that took place during the summer of 2006 led BSAM to seek new directors from Walkers.

169.  In the summer of 2006, PFPC's Murphy was removed from the board of directors and BSAM hired Walkers senior vice presidents Scott Lennon and Michelle Wilson-Clarke to be directors of the Master Fund under the revised August 2006 PPM.

170.  Lennon and Wilson-Clarke are characterized as "unaffiliated" directors by the August 2006 PPM.

171.  The August 2006 PPM for the High Grade Fund changes the requirements for the directors with authority to approve of principal transactions, from being merely unaffiliated directors to "independent" directors.

172.  According to the 2006 PPM, no directors of the Master Fund are defined as "independent."

29

173. Accordingly, based on the language of the August 2006 PPM, no directors had authority to approve of principal transactions beginning in August 2006.

174. The terms of the August 2006 PPM required that Lennon and Wilson-Clarke, as the "unaffiliated directors," review and approve "any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act."

175. Directors Lennon and Wilson-Clarke were also charged with the responsibility for "approving any transactions between the Master Fund and the Investment Manager or its affiliates *involving significant conflicts of interest* (emphasis added)" and approving of transactions with repackaging vehicles

176. Walkers serves as legal counsel and has an attorney-client relationship with at least 16 hedge funds that BSAM advises, including Bear Stearns Systematic Equity Partners, Bear Stearns Global Alpha Fund, Bear Stearns Health Care Value, Bear Stearns Active Country – International Plus, Bear Stearns Offshore Fund of Hedge Funds, Bear Stearns Asset Backed Securities Master Fund, Bear Stearns Emerging Markets Macro Fund, Bear Stearns Europe Long/Short Fund, Bear Stearns Structured Risk Partners Master Fund, Hedge Select (Offshore), Global Growth, the High Grade Fund, and the Enhanced Leverage Master Ltd.

177. According to an October 15, 2007 letter to the Division, BSAM has retained Walkers Fund Services, Ltd. for at least nine of its hedge funds, including its Equity Focus Fund, the Institutional Leveraged Loan Master Fund, the High Grade Fund, the Enhanced Leverage Fund, the Europe Long/Short Fund, the Structured Risk Partners Fund, and Hedge Select (Offshore).

30

178.   Walkers Fund Services does not appear to be independent or unaffiliated with BSAM in light of its multifaceted legal and business relations with BSAM and funds advised by BSAM.

179.   On information and belief, many transactions between the High Grade Fund and the Repackaging Vehicles were never submitted to the Walkers directors for approval nor were approved.

180.   On information and belief, many transactions between the Enhanced Leverage Fund and the Repackaging Vehicles were never submitted to the Walkers directors for approval nor were approved.

181.   The Walkers directors approved more than 165 Related Party Transactions whose applications (PTLs) were incomplete or were submitted after the transactions were completed.

182.   Pusateri was not aware of a principal transaction ever being rejected by the unaffiliated directors.

183.   According to Pusateri, Borenkind, and Bierbaum there was no procedure in place in case a principal transaction was rejected.

184.   The Securities Division faxed subpoenas to Scott Lennon and Michelle Wilson-Clarke on September 18, 2007.

185.   Cayman Island attorneys for Lennon and Wilson-Clarke responded to the Division on September 27, 2007, acknowledging that Lennon and Wilson-Clarke had received the subpoenas and expressed particular concern with respect to possible questions by the Division that would implicate specific confidentiality laws of the Cayman Islands.

31

186. The Securities Division communicated clearly to Cayman Islands counsel for Lennon and Wilson-Clarke that the Division had no intention of asking questions related to areas specifically articulated as problematic by Lennon and Wilson-Clarke's counsel.

187. Although Lennon and Wilson-Clarke were scheduled to provide testimony at the Securities Division's office in Boston on October 10 and 11, the Division offered extensions on the condition they would agree to attend and provide testimony.

188. On October 26, 2007, local counsel for Lennon and Wilon-Clarke communicated to the Division that Lennon and Wilson-Clarke would not comply with the subpoenas sent to them by the Division.

189. The Securities Division has not interviewed Lennon or Wilson-Clarke.

190. On information and belief, BSAM chose "Unaffiliated Directors" domiciled outside the United States because they would not be accountable to investors or regulators.

191. Like PFPC before them, Lennon and Wilson-Clarke did not consistently carry out the oversight role on behalf of the Limited Partners as it was assigned to them by the terms of the August 2006 PPM.

192. Given the volume of High Grade Fund principal trades that were never approved, the Walkers directors do not appear to have reviewed, consented to and approved of all the PTLs and other related party deals as the PPM required for the protection of the Limited Partners.

E. **Despite the Problems with Related Party Transactions, BSAM Launches Two New Entities**

  1. **BSAM launched the Enhanced Leverage Fund alongside High Grade Fund while its operational and staffing problems continued to build.**

32

193.   Despite all of the internal compliance problems at BSAM, BSAM launched an entirely

new hedge fund that had additional leverage and additional risk, without changing its

original disclosures to investors in its offering document.

194.   On September 17, 2006, Cioffi responded to Tannin's aforementioned (in paragraph

161) "liquidity game plan" email:

> As far as liquidity we have the repo on the Rampart equity and if my numbers are
> correct after rampart we will have over $200M of liquidity. SO unless we go into
> a full unwind of the short term liquidity is not an issue. What we need to figure
> out is how to get the majority of our LPs into the enhanced fund. That will take
> some time but once we do that we have an easy liquidity source and that's
> Barclays.[5]

195.   On September 17, 2006 Tannin responded to Cioffi's "liquidity game plan" email:

> I've been working on that too.
> There are three ways to roll our investors into Barclays: (although perhaps you
> can think of more).
> 1. Force them (I'm not really serious)
> 2. A sell out and sell in. This is sticky because it forces us to raise liquidity in HG
> – and over time we would increase the more illiquid investments.
> 3. We do an in-kind exchange. The issue here is that we have to get a "real" mark
> on all the assets. I will speak to Jerry again about this.

196.   On September 17, 2006, Cioffi responded to Tannin's second "liquidity game plan"
email:

> What I was thinking was to build up 6 mos. of returns then send a letter to all the
> remaining investors and tell them we are closing the HGS fund and ask everyone
> to convert to EHGS. We'd have to handle it like we did thru an exchange of assets
> I would not want to have to sell everything. This is the riskiest way to go because
> you know some LPs will not convert but I feel comfortable that we can get almost
> all of them to.

197.   On August 1, 2006, the High Grade Fund was split into two funds where 36.74% of the

fund became the Enhanced Leverage Fund. The creation of the new fund was

---
[5] Barclays extended a credit line to the Enhanced Leverage Fund.

33

accomplished by a subscription in kind: 36.74% of each asset in High Grade was

redeemed from High Grade and used to launch the Enhanced Leverage Fund.

198. On information and belief, BSAM did not obtain consents on PTLs for transactions

related to the transfer of securities from the High Grade Fund to the Enhanced Leverage

Fund.

### 2. BSAM initiates the process of creating a publicly traded CDO RAMPART

199. Rampart is a CDO of CDOs, created and managed by the investment managers of the

High Grade Fund and other BSAM employees. Rampart's securities consist of two

tranches: a single, highly-rated senior note and an equity tranche.  Securities underlying

the structure include mezzanine and equity/first-loss tranches of other CDOs.  Rampart

was intended to first be offered as a private subscription and then later, in May or June

2007, it was to have an IPO with publicly traded shares.

200. When Rampart was still in its planning stages, Tannin and McGarrigal expressed their

serious reservations about the project to Cioffi.

201. In an email to McGarrigal and Cioffi on September 5, 2006 relating to the creation of

Rampart, Tannin described his concerns about the transaction to Cioffi and McGarrigal:

> We are in essence, repackaging our Klio position – and diluting our investors
> exposure to Klio – and making it more difficult to run Klio as efficiently.
>
> The two main benefits to investors are – the potential for this to price and trade
> above book value – and the greater liquidity provided by the public markets. I
> think both of these are real questions – not that they won't happen – but there is
> very very little hard data to go on to make the case – so we are putting a lot of
> very big eggs in one basket – including our "signature egg" Klio – which will
> become absorbed into a repack within rampart…
>
> …Our hedge fund would be completely exposed to public market volatility. If we
> were to have a problem in just one position that affected a distribution we face
> unknown price action. (See Exhibit E)

202. Despite the reservations of Tannin and McGarrigal, Cioffi decided to go forward with Rampart/ Everquest.

203. According to a letter intended to be sent to investors regarding the Fourth Quarter 2006 (4Q Letter), on September 28, 2006, "the Bear Stearns Hedge Funds transferred to [Rampart] equity in 10 CDOs, including Parapet CDO, for a purchase price of $548.8 million. In consideration, [Rampart] issued 16 million shares, at $25 per share, and paid $148.8 million in cash."

204. According to the 4Q Letter, 63% of Rampart assets are directly managed Rampart's investment managers through CDOs sponsored by them.

205. Because Rampart was a CDO managed by BSAM personnel, BSAM is a direct investor in Rampart and Rampart's Subscription Agreement disclosed several conflicts of interest related to transactions between Rampart and the Funds, transactions between Rampart and the Funds were Related Party Transactions and subject to the notice and consent requirements of the PPM.

206. On information and belief, the unaffiliated directors of the Funds were not informed of and did not consent to the transactions between the Funds and Rampart that funded Rampart.

207. In addition to being required to obtain consent from the unaffiliated directors of the Funds, Rampart's independent directors were required to provide various other consents. In connection with those consents, BSAM retained Princeton Advisory to provide a Reasonableness Assessment. (See Exhibits F, G, H and I)

35

208. On October 4, 2006, Tannin signed a letter on behalf of the High Grade Fund and the Enhanced Leverage Fund to Bear Stearns Securities Corp. stating among other things that "we have made all the required disclosures and obtained all required consent to make the Transfers from all persons whose consent is required."

209. Between March 30 and April 21, 2007, BSAM personnel sent several emails relating to a transfer of credit default swaps from the Funds to Rampart. (See Exhibits J, K and L)

210. On information and belief, on May 3 and May 8, 2007, the Funds transferred between $20 million and $40 million worth of credit default swaps to Rampart. Although there was no prior written agreement between the Funds and Rampart in connection with this transaction, the prices used for the transaction reflected the value of the securities on September 28, 2006 when the funding transaction for Rampart occurred.

211. On information and belief, the value of the credit default swaps was included in the statements of net asset value provided to investors in the Funds.

212. On information and belief, the purported intent of BSAM to novate the credit default swaps to Rampart at cost was not disclosed to investors in the Funds.

213. The 4Q Letter described the novations as follows:

> Prior to an since our formation, our manager BSAM has hedge exposures to certain tranches of ABS held by some of our CDOs, particularly RMBS with a high degree of exposure to sub-prime residential mortgage loans. These hedging transactions were not initially transferred to us pending our entry into relevant International Swaps and Derivatives Association, or ISDA, master agreements or other appropriate documentations with the third-party counterparties to the swaps. On May 8, 2007, the BSHG Funds transferred to us their interests in credit default swaps that reference 48 tranches of ABS securities held by our CDOs with a notional amount of approximately $201 million. The fair value of the hedges novated on May 8, 2007, net of consideration paid, was 16.6 million.

36

258

214. On information and belief, the credit default swaps were novated to Rampart at the cost to the Funds of carrying the securities rather than the market value of the securities as of the date of the novation.

215. On information and belief, the net decrease in value to the Funds as a result of the May 3 novation of credit default swaps to Rampart (including payments by Rampart and the Funds' ownership stake in Rampart) was $6,199,587. (See Exhibit M)

216. On information and belief, the net decrease in value to the Funds as a result of the May 8 novation of credit default swaps to Rampart (including payments by Rampart and the Funds' ownership stake in Rampart) was $10,911,290.

217. On information and belief, neither Lennon nor Wilson-Clarke approved of the May 8 or May 3, 2007 novations between the Funds and Rampart.

218. Everquest filed a registration statement with the Securities and Exchange Commission on May 9, 2007, one day after the May 8 novations were completed.

### 3. BSAM commissioned a report to study the impact of the PTL breakdown

219. In the summer of 2006 BSAM commissioned Cornerstone Research to analyze and create a report studying the impact of the PTL breakdown. Cornerstone Research ("Cornerstone") provides expert testimony and economic and financial analysis for law firms and financial institutions engaged in complex commercial litigation and regulatory proceedings.

220. Analysis of comparable price data was the focus of the Cornerstone review of BSAM's principal trades.

221. Cornerstone's report of May 2007 identified a total of 2,968 principal transactions.

37

259

222.   In May 2007, Cornerstone Research prepared a presentation entitled "Bear-Stearns Asset Management Review of Principal Trades" (the "Cornerstone Report").

223.   The Cornerstone Report concluded "Based on our analysis, we expect that the prices for the full set of Principal Transactions would fall overwhelmingly within the range of market prices." It continued, "In sum, it would not be surprising to see a few prices in the Principal Transactions outside of the narrowly-defined range of BSC Comparable prices."

224.   The Cornerstone Report did not analyze any transactions between BSAM funds and KLIO.

225.   The sample of trades analyzed in the Cornerstone Report is a fraction of the universe of Principal Transactions missing Unaffiliated Director consent. The number of BSC Comparables for these transactions is even smaller, for single BSC Comparables 37.9% of trades and multiple BSC Comparables only about 2.81% of trades were analyzed.

226.   There is no information in the Cornerstone Report analyzing how transactions with BSC compare with the universe of publicly-available prices. The Cornerstone Report failed to include quantitative information on how much trading has cost, or how high or low the trading costs were compared to the benchmarks outlined in the report. The Cornerstone Report did not give a sense of where the cost of the principal trades fit into the range of prices paid by third parties in same-day trades, or how high or low the trading costs were compared to the benchmarks.

227.   The Division compared some PTL Remediation Emails with the Cornerstone Research spreadsheet that contained the high grade hedge fund trades used as a sample for analysis (the "Cornerstone Spreadsheet") in the Cornerstone Report.

38

228. The Division analyzed how many of the 117 trades in the July 13, 2006 PTL Remediation Emails (the "July emails") were represented in the Cornerstone Spreadsheet.

229. Only 27 of the 117 principal transactions for which approval was requested in the July emails were captured in the Cornerstone Spreadsheet and therefore analyzed in creating the Cornerstone Report.

**F.    Collapse of the Fund**

230. On May 26, 2007, Tannin sent an email to Cioffi and McGarrigal with the subject "The building of the plan." This email detailed Tannin's concerns about the viability of the fund and ways to sell it. (See Exhibit N)

231. At least by May 26, 2007, Cioffi, Tannin and McGarrigal had serious concerns as to the viability and liquidity of the High Grade Fund.

232. On May 31, 2007, Tannin wrote an email to Cioffi, relating to communications with investors, saying, "The issue is – do we give them the -6.5 april or the larger down april?" (See Exhibit O)

233. Cioffi responded, "Ah that's correct I think that one deserves a phone call."

234. In July, an undated, unsigned letter addressed to "Client of Bear Stearns & Co, Inc." was sent to investors in the High Grade Fund and Enhanced Leverage Fund:

> Dear Client of Bear, Stearns & Co. Inc,
>
> Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade Structured Credit Strategies Enhanced Leveraged Funds managed by Bear Stearns Asset Management...
>
> A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the funds This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.

As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations.

As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value.

The Funds' reported performance, in part, reflects the unprecedented declines in the valuations of a number of highly-rated (AA and AAA) securities.

Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June.

The preliminary estimates show there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007. In light of these returns, we will seek an orderly wind-down of the Funds over time.

235.    Many of the High Grade Fund's investors are located in the United States.

236.    Between 15 and 20 High Grade Fund investors are individual Massachusetts investors, family trusts, or partnerships.

237.    Although BSAM managed the two hedge funds from its offices in New York from 2003-2007, it petitioned the Cayman Islands Grand Court for an "orderly liquidation" of the remaining assets held by the funds.

238.    The High Grade Fund and the Enhanced Leverage Fund filed for bankruptcy through Chapter 15 of the Bankruptcy Code with United States Bankruptcy Court for the Southern District of New York on July 31, 2007.

40

## VIII.    CONCLUSIONS OF LAW

### Violations of § 101

239.    Paragraphs 1 through 240 are incorporated herein

240.    Section 101 of the Act states in relevant part:

> **Chapter 110A: Section 101. Sales and Purchases.**
>
> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud,
>
> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
>
> (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

241.    By failing to obtain consent from the Unaffiliated Directors of the High Grade Fund for each Related Party Transaction as required by the offering materials, BSAM made an untrue statement of material fact and therefore violated §101 of the Act.

242.    By continuing to offer and sell interests in the High Grade Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the High Grade Fund knew or should have known that the Procedures for Related Party Transactions were not being followed as required by the offering materials, BSAM made an untrue statement of material fact and therefore violated §101 of the Act.

243.    By issuing, offering and selling interests in the Enhanced Leverage Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the Enhanced Leverage Fund knew or should have known that the

41

263

Procedures for Related Party Transactions were not being followed for the High Grade Fund as required by the offering materials, BSAM made an untrue statement of material fact and therefore violated §101 of the Act.

244. By failing to obtain consent from the Unaffiliated Directors of the High Grade Fund for each Related Party Transaction as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §101 of the Act.

245. By continuing to offer and sell interests in the High Grade Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the High Grade Fund knew or should have known that the Procedures for Related Party Transactions were not being followed as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §101 of the Act.

246. By issuing, offering and selling interests in the Enhanced Leverage Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the Enhanced Leverage Fund knew or should have known that the Procedures for Related Party Transactions were not being followed for the High Grade Fund as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §101 of the Act.

**Violations of §102**

247. Section 102 of the Act states in relevant part:

42

Chapter 110A: Section 102. Advisory Activities.

It is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise

(1) to employ any device, scheme, or artifice to defraud the other person, or

(2) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

248.    By violating §206(3) of the Adviser's Act on hundreds of occasions, BSAM engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

249.    BSAM receives consideration from the High Grade Fund or the investors in the High Grade Fund primarily for advising the High Grade Fund or the investors in the High Grade Fund as to the value of securities or their purchase or sale.

250.    BSAM receives consideration from the Enhanced Leverage Fund or the investors in the Enhanced Leverage Fund primarily for advising the Enhanced Leverage Fund or the investors in the Enhanced Leverage Fund as to the value of securities or their purchase or sale.

251.    By failing to obtain consent from the Unaffiliated Directors of the High Grade Fund for each Related Party Transaction as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §102 of the Act.

252.    By continuing to offer and sell interests in the High Grade Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the High Grade Fund knew or should have known that the Procedures for Related Party

43

Transactions were not being followed as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §102 of the Act.

253.   By issuing, offering and selling interests in the Enhanced Leverage Fund using offering materials that contained the Procedures for Related Party Transactions after senior management of the Enhanced Leverage Fund knew or should have known that the Procedures for Related Party Transactions were not being followed for the High Grade Fund as required by the offering materials, BSAM engaged in an act, practice, or course of business that operated as a fraud or deceit upon any person and therefore violated §102 of the Act.

## IX. PUBLIC INTEREST

254.   For any and all of the reasons set forth above, it is in the public interest and will protect Massachusetts investors to issue an Order of the Division: 1) requiring Respondent to permanently cease and desist from violating the Act and Regulations; 2) censuring Respondent; 3) requiring Respondent to pay an administrative fine in an amount and upon such terms as the Director or Hearing Officer may determine; and 4) taking such further action as may be deemed just and appropriate by the Director or Hearing Officer for the protection of investors.

## X. STATUTORY BASIS FOR RELIEF

255.   Section 407A(a) of the Act states:

> If the secretary determines, after notice and an opportunity for hearing, that any person has engaged in or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule or order issued there under, he may order such person to cease and desist from such unlawful act or practice and may take such affirmative action, including the

44

imposition of an administrative fine, the issuance of an order for an accounting, disgorgement, or rescission or any other such relief as in his judgment may be necessary to carry out the purposes of [the Act].

## XI.    RELIEF REQUESTED

256.    Wherefore, the Enforcement Section of the Division requests that the Director or Hearing

Officer take the following action: find as fact the allegations set forth in paragraphs 1 to

240 of the Complaint and issue an Order of the Division: 1) requiring Respondent to

permanently cease and desist from violating the Act and Regulations; 2) censuring

Respondent; 3) requiring Respondent to pay an administrative fine in an amount and

upon such terms as the Director or Hearing Officer may determine; and 4) taking such

further action as may be deemed just and appropriate by the Director or Hearing Officer

for the protection of investors.

ENFORCEMENT SECTION
MASSACHUSETTS SECURITIES DIVISION

By: _____
Michael Regan, Staff Attorney
Nathaniel Orenstein, Staff Attorney
Patrick Ahearn, Chief of Enforcement

Massachusetts Securities Division
One Ashburton Place, Room 1701
Boston, Massachusetts 02108
(617) 727-3548

November 14, 2007

45