**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
In re:                                                            :
                                                                 :        Chapter 15 Case No. 07-12383 (BRL)
BEAR STEARNS HIGH-GRADE STRUCTURED               :
CREDIT STRATEGIES MASTER FUND, LTD.              :
(IN PROVISIONAL LIQUIDATION)                     :        Civil Case No. 07-8730 (RWS)
                                                                 :
Debtor in a Foreign Proceeding and Appellant.    :
-------------------------------------------------------------x
In re:                                                            :
                                                                 :        Chapter 15 Case No. 07-12384 (BRL)
BEAR STEARNS HIGH-GRADE STRUCTURED               :
CREDIT STRATEGIES ENHANCED LEVERAGE              :
MASTER FUND, LTD.                                :        Civil Case No. 07-8746 (RWS)
(IN PROVISIONAL LIQUIDATION)                     :
                                                                 :
Debtor in a Foreign Proceeding and Appellant.    :
-------------------------------------------------------------x

<u>**APPELLANTS' REPLY TO BRIEFS OF AMICI**</u>

AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel for Joint Official Liquidators

January 4, 2008

**TABLE OF CONTENTS**

<u>Page</u>

I.  PRELIMINARY STATEMENT..................................................................................1

II.  ARGUMENT..........................................................................................................3

    A.  Chapter 15 Reflects Congress' Intent to Enhance the United States'
        Longstanding Tradition of Comity in the Insolvency Arena ...................3

    B.  As the Statute Makes Plain, Comity is the Overarching Principle of
        Chapter 15 and Cannot Be Divorced from the Recognition Process......................8

    C.  Amici's Argument that the Liquidations Underway in the Cayman Islands
        Should Be Denied Recognition of Any Kind Is Unsupported by the Law
        and Facts of this Case ...................................................................12

        1.  Amici's narrow reading of the terms "COMI" and "establishment"
            are unsupported and contrary to established law ......................12

            a)  The COMI Presumption.................................................12
            b)  Establishment..............................................................18

        2.  The FTI amici's arguments are based on unsupported allegations
            that are irrelevant to this appeal ..............................................20

III.  CONCLUSION..................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir. 2001) .................................4

*Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir. 1985) ...........................4

*Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999) ........................4

*Hilton v. Guyot*, 159 U.S. 113 (1895) ....................................................................1, 3

*Maxwell Commun. Corp. plc by Homan v. Societe Generale
(In re Maxwell Commun. Corp. plc)*, 93 F.3d 1036 (2d Cir. 1996) ...........................3, 4, 8

*In re SPhinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006) ..................................................13

*The M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) ............................................1

*In re Tri-Continental Exchange Ltd.*, 349 B.R. 627 (Bankr. E.D. Cal. 2006) ........10, 12, 13

*Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709 (2d Cir. 1987) ............4

## FOREIGN CASES

*Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.* Case C-341/04 (Grand
    Chamber), 2006 WL 1142304 (ECJ May 2, 2006) ..................................13, 13 n.15, 14

*Klempka v. ISA Daisytek SA*, 2003 WL 22936778 ..............................................15, 15 n.17

*In re Mawcon Ltd.*, [1969] 1 W.L.R. 78 ..............................................................................18

*In re Parmalat Capital Finance*, [2006] CILR 480 ............................................................23

*In re Philadelphia Alternative Asset Fund.*, Cause No. 440 of 2005 at 2-3
    (Cayman Grand Court, J. Henderson Feb 22, 2006) ...........................................17 n.21

## STATUTES

11 U.S.C. § 101(23) .........................................................................................................7 n.7

11 U.S.C. § 1501(a) ........................................................................................................8 n.8

11 U.S.C. § 1502(2) ..........................................................................................................19

11 U.S.C. § 1502(2), (5)....................................................................7

11 U.S.C. § 1508............................................................................6 n.6

11 U.S.C. § 1509(b)(3)................................................................9 n.9

11 U.S.C. § 1511(a)..........................................................................11

11 U.S.C. § 1515(b)(1)-(2).................................................................7

11 U.S.C. § 1516................................................................................9

11 U.S.C. § 1516(a) ....................................................................7 n.7, 9

11 U.S.C. § 1516(b)............................................................................9

11 U.S.C. § 1516(c)............................................................................9

11 U.S.C. § 1517................................................................................7

11 U.S.C. § 1517(c) ..................................................................9, 15 n.18

11 U.S.C. § 1517(d)..........................................................................10

11 U.S.C. § 1519..............................................................................10

11 U.S.C. § 1521-22..........................................................................10

26 U.S.C. § 6331(h), *as amended by* Pub. L. No. 105-34 ....................20 n.24

H.R. Rep. No. 109-31, *as reprinted in* 2005 U.S.C.C.A.N. 88.................6, 8, 9 n.9, 11

## OTHER AUTHORITIES

Thomas P. Lemke et al., *Hedge Funds and Other Private Funds: Regulation and Compliance,* §§ 2:10-12, (2007-2008 Edition)...................................21 n.25

National Bankruptcy Review Commission, *Bankruptcy: The Next Twenty Years,* 361 (1997)...............................................................................5

United Nations Commission on International Trade Law (UNCITRAL) – UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment ...............................................................................5, 16

## LAW REVIEWS AND ARTICLES

Timothy T. Brock, *How the Assault on Offshore Havens in Bear Stearns Undermines New Chapter 15: Part I*, XXVI No. 10 ABI Journal 34 (2007) .............. 1 2

Hon. Samuel L. Bufford, *Center of Main Interests, International Solvency Case Venue, and Equality of Arms: The Eurofood Decision of the European Court of Justice*, 27 Nw. J. Int'l L. & Bus. 351 (2007) ........................................ 5, 14, 14 n.1 6

Hon. Samuel L. Bufford, *International Insolvency Case Venue in the European Union: the Parmalat and Daisytek Controversies*, 12 Colum. J. Eur. L. 426 (2006) ............................................................................................ 15 n.1 7

N. Desai, *How Insolvent Multinational Businesses Should Adjust to Congress's Creation: Chapter 15*, 7 Hous. Bus. & Tax L.J. 138 (2006) .......................................... 4

Paul Lee, *Ancillary Proceedings Under Section 304 and Proposed Chapter 15 of the Bankruptcy Code*, 76 Am. Bankr. L.J. 115 (2002) .................................................. 5

Burton Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-by-Section Analysis*, A US-EU Experience (George Affaki ed., Bruyland & FEC 2007) ................................................................................. 5

George Shuster, *The Trust Indenture Act and International Debt Restructuring*, 14 Am. Bankr. Inst. L. Rev. 431 (2006) ................................................................. 10 n.12

Jay Lawrence Westbrook, *Chapter 15 and Discharge*, 13 Am. Bankr. Inst. L. Rev. 503 (2005) .......................................................................................................... 4

Jay Lawrence Westbrook, *Chapter 15 At Last*, 79 Am. Bankr. Inst. L.J. 713 (2005) ................................................................................................................ 5

Jay Lawrence Westbrook, *Book Review: Multinational Financial Distress: The Last Hurrah of Territorialism*, Tex. Int'l L.J. 321 (2006) ................................ 5, 10 n.11

Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 Brook. J. Int'l. L. 1019 (2007) .......................................................................... 14, 20

# I.  PRELIMINARY STATEMENT

Time and again, the United States Supreme Court has recognized that, as a nation, "[w]e cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts." *The M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972).  For that reason, U.S. courts have long afforded respect to foreign judicial proceedings involving commercial disputes.  *See Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895).  This fundamental principle of judicial comity is of enormous relevance in the global economy of the 21st century.  Today more than ever, multinational corporations operate in a worldwide arena that demands a heightened level of international judicial cooperation.  Nowhere is this cooperation more critical than in the field of insolvency, where the failure of courts to respect foreign insolvency proceedings can lead to administrative chaos, uncertainty and expense – consequences antithetical to the efficient resolution of bankruptcy cases.

Congress affirmed the principle of comity in insolvency matters when it enacted 11 U.S.C. § 304[1] in 1978, making the United States a world leader in promoting cooperation in cross-border insolvency cases.  Congress took this a step further in 2005, when it enacted chapter 15 of the Bankruptcy Code.  Comity is the overarching principle of chapter 15, which was designed to foster respect and reciprocity among bankruptcy courts worldwide.  The Westbrook amici, who include persons involved in implementing Chapter 15 in the first place, should be among the last to seek to undermine these principles.[2]

---

[1] All statutory references are to title 11 of the U.S. Code (the "Bankruptcy Code").

[2] We refer to the brief of the Westbrook amici as "West. Br." and to the brief of the Elected Representatives (the "FTI amici") as "FTI Br."  The FTI amici join in the Westbrook amici's legal and theoretical arguments.  *See* FTI Br. at 3.  Accordingly, we refer simply to "amici" when responding to these joint arguments.

Driven by their own idiosyncratic agendas, the amici have adopted a reading of chapter 15 that is completely at odds with, and irrelevant to, its legislative purpose. The Westbrook amici wish to foster a domestic "debate [concerning] the desirability *vel non* of increased regulation or oversight of subprime lending and [] certain kinds of investments." West. Br. 31. The FTI amici are concerned with liquidation proceedings involving a fund that is not at issue here. The position of both sets of amici reflects an unwarranted bias against both the Cayman Islands judicial system and the practice (sanctioned by U.S. law) of registering hedge funds in the Cayman Islands. Indeed, both sets of amici use highly charged rhetoric and make sweeping and unsupported allegations about the Cayman Islands judicial system and the winding-up proceedings at issue here to distract this Court from the legal issues on appeal – namely, the proper interpretation of the terms "COMI" (center of main interests) and "establishment" in the context of chapter 15.

To further their agendas, amici urge this Court to withhold comity from the duly-initiated winding-up proceedings in the Cayman Islands, in the mistaken belief that denial of recognition will move the proceedings from the Cayman Islands to the United States, so that the liquidation of the Foreign Debtors[3] can "take place in American courts, supervised by American judges, and under the observation of American investors and our financial media." *Id.* But denial of recognition will not have any such effect; to the contrary, the Foreign Proceedings will continue in the Cayman Islands with or without U.S. recognition.

In the end, amici's overblown arguments collapse of their own weight. Their positions are antithetical to the text and purpose of chapter 15 and find no support in any binding authority.

---

[3] All capitalized terms not defined in this brief are defined in the opening brief ("AOB") filed by appellants Joint Official Liquidators (the "JOLs" or "appellants").

This Court should reject amici's efforts to use chapter 15 to further their own political and strategic ends at the expense of Congress' efforts to pave the way for international comity, predictability, and fairness in insolvency proceedings.

## II.    ARGUMENT

We start by addressing the Westbrook amici's arguments, which are adopted by the FTI amici. We then address the separate points made by the FTI amici.

### A.    Chapter 15 Reflects Congress' Intent to Enhance the United States' Longstanding Tradition of Comity in the Insolvency Arena.

As set forth in the appellants' opening brief, the principle of comity has played a progressively important role in the history of insolvency legislation in the United States. Because the Westbrook amici suggest that chapter 15 signals a legislative retrenchment from the principle, we revisit the historical backdrop, which plainly refutes this conclusion.

As early as 1895, comity was an entrenched concept in American jurisprudence. As the Supreme Court explained in a seminal decision that year,

> [Comity] is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other[,] [but is rather] the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. at 163-64. Congress has likewise recognized the principle of comity as an integral facet of the law of nations to which this nation subscribes. Acknowledging the symbiotic relationship between international comity and domestic legislation that touches foreign matters, the Second Circuit has stressed: "Because Congress legislates against a backdrop that includes those international norms that guide comity analysis, absent a contrary legislative direction the doctrine may properly be used to interpret any statute." *Maxwell Commun. Corp. plc by Homan v. Société Generale (In re Maxwell Commun. Corp. plc)*, 93 F.3d 1036, 1048 (2d

Cir. 1996). In general, comity should be accorded to foreign proceedings if they do not violate

the laws or public policy of the United States, and if the foreign court abides by fundamental

standards of procedural fairness. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240,

246 (2d Cir. 1999); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985);

*Bank of New York v. Treco (In re Treco)*, 240 F.3d 148, 157 (2d Cir. 2001).

As the Second Circuit has repeatedly observed, "Comity is especially important in the

context of the Bankruptcy Code[.]" *Maxwell*, 93 F.3d at, 1048. "[D]eference to foreign

insolvency proceedings will, in many cases, facilitate 'equitable, orderly, and systematic'

distribution of the debtor's assets." *Id.* (quoting *Cunard*, 773 F.2d at 458); *see also Victrix*

*Steamship Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("American

courts have long recognized the particular need to extend comity to foreign bankruptcy

proceedings.").

Congress explicitly recognized the importance of the principles of international comity in

cross-border insolvencies when it enacted § 304 in 1978. *See Maxwell*, 93 F.3d at 1048 (citing

legislative history of § 304). As Professor Westbrook himself has noted, "Section 304 was a

breakthrough when it was adopted in 1978, putting the United States among the most advanced

countries in the world in providing deference toward foreign proceedings and active cooperation

with those proceedings." Jay Lawrence Westbrook, *Chapter 15 and Discharge*, 13 Am. Bankr.

Inst. L. Rev. 503, 503-04 (2005).[4] Despite Congress' "cooperative push," however, other

countries were, in Professor Westbrook's words, "painfully slow" to follow suit. N. Desai, *How*

*Insolvent Multinational Businesses Should Adjust to Congress's Creation: Chapter 15*, 7 Hous.

---

[4] As set forth in the opening brief (AOB 18-19), U.S. courts regularly granted comity to Cayman
Islands proceedings under former section 304, and have continued to do so under chapter 15.

Bus. & Tax L.J. 138, 144 (2006) (quoting Jay Lawrence Westbrook, *Chapter 15 At Last*, 79 Am. Bankr. L.J. 713, 719 (2005) ("*At Last*")).

So far, it seems, appellants and amici are in agreement. Judging from Professor Westbrook's articles, it appears that amici would also agree that Congress' purpose in adopting the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law") was to promote international cooperation. "The number one reason for adopting [the Model Law] was to demonstrate the United States' commitment to the Model Law and to cooperation and universalism generally, in the hope that our example would encourage other countries to follow." Jay Lawrence Westbrook, *At Last*, at 726; *accord*, Paul Lee, *Ancillary Proceedings Under Section 304 and Proposed Chapter 15 of the Bankruptcy Code*, 76 Am. Bankr. L.J. 115, 177 (2002) (citing National Bankruptcy Review Commission, Bankruptcy: The Next Twenty Years, at 361 (1997); *see also* Burton Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-by-Section Analysis*, A US-EU Experience (George Affaki ed., Bruyland & FEC 2007) at 32-33, ¶ 5 (Addendum Tab 23).

Amici do not dispute that one of the main changes wrought by chapter 15 was inclusion of a mandatory recognition provision, "provid[ing] for recognition based purely on the existence of a foreign proceeding." Jay Lawrence Westbrook, *Book Review: Multinational Financial Distress: The Last Hurrah of Territorialism*, 41 Tex. Int'l L.J. 321, n.40 (2006) ("*Last Hurrah*"); *see also, e.g.,* Lee, *supra*, 76 Am. Bankr. L.J. at 185; Hon. Samuel L. Bufford, *Center of Main Interests, International Solvency Case Venue, and Equality of Arms: The Eurofood Decision of the European Court of Justice*, 27 Nw. J. Int'l L. & Bus. 351 (2007) ("*Center of Main Interests*") (discussing mandatory recognition in context of the EU's version of the Model Law).

5

Yet amici now insist that chapter 15, and its recognition provision in particular, mark a *retreat* from comity, in "stark contrast" to former § 304. *See* West. Br. 3-4. According to amici, chapter 15's recognition provision "raises the eligibility bar" to debtors seeking comity for foreign proceedings in U.S. courts. *See* West. Br. 12. To support this reading, amici inexplicably rely on paragraph 113 of the legislative commentary to section 1517, which states that, "'the decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code. The requirements of this section … *are all that must be fulfilled* to attain recognition.'" *See* West. Br. 16 (quoting House Report (H.R. Rep. No. 109-31, as reprinted in 2005 U.S.C.C.A.N. 88) at 175 (emphasis added)).[5]

But this language does not by any reckoning support the notion that Congress raised the bar on comity – to the contrary, it demonstrates that Congress viewed the new regime as one that would alleviate the burden on foreign applicants and expedite the process of facilitating ancillary proceedings in U.S. courts. *See* Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (the "Guide") ¶ 28 (Model Law's recognition system was designed "to provide expedited and direct access for foreign representatives to the courts of the enacting State" and to "avoid[] the need to rely on cumbersome and time-consuming letters rogatory or other forms of diplomatic or consular communications that might otherwise have to be used").[6] Indeed, appellants cited paragraph 113 in their opening brief for this very reason. *See* AOB 20.

---

[5] The Westbrook amici trumpet their credentials as scholars of chapter 15, and as participants in the drafting process. But to the extent the ideas presented in their brief part company with the decisions made by Congress, their expertise is irrelevant.

[6] Section 1508 directs courts to "consider [the chapter's] international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."

Amici also try to bolster their narrow reading of recognition by arguing that, unlike the subjective factors listed in former section 304, which invited courts to render a discretionary "verdict" on the nature of the foreign proceeding, chapter 15's recognition statute is objective, "rigid," and "inflexible." *See* West. Br. 3, 15. They point to the straightforward requirements of sections 1515 and 1517, which include the presentation of certain documents attesting to the commencement of the foreign proceeding and the appointment of foreign representatives, *i.e.*, persons or bodies authorized to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as the debtor's representative. *See* 11 U.S.C. § 1515(b)(1)-(2) (cited by reference in section 1517). No one questions that the Foreign Representatives have met these requirements here.

Section 1517 also requires that a foreign proceeding[7] be categorized as a "foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502." A foreign main proceeding is one that is brought in the courts of the country where the debtor has its COMI, section 1502(4), while a foreign nonmain proceeding is one that is brought in another country, where the debtor has an "establishment," defined as "any place of operations where the debtor carries out a nontransitory economic activity," 11 U.S.C. § 1502(2), (5). This step is the crux of the instant dispute. The terms "COMI" and "establishment" are defined in extremely general terms and there is very little U.S. caselaw regarding the scope of COMI, and none (prior to the order on appeal) regarding the scope of establishment under chapter 15.

---

[7] The Bankruptcy Code defines "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country … under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization, or liquidation." 11 U.S.C. § 101(23). Amici do not argue that the Foreign Proceeding fails to meet this definition. In any event, chapter 15 provides that "a foreign proceeding is [presumed to be] a foreign proceeding" when (as here) the certificate issued by the Foreign Court so indicates. 11 U.S.C. § 1516(a).

Notwithstanding their insistence on an "objective" reading of the statute, amici seek to take advantage of the uncertainty surrounding these terms by injecting subjective criteria – *e.g.*, their own strongly colored views of the Foreign Debtors' business, the offshore registration of hedge funds and the Cayman Islands legal system – into the analysis of COMI and establishment, in place of the time-honored principle of comity and the virtually uninterrupted tradition in the United States of according respect for Cayman Islands judicial proceedings. Amici's strategy does not withstand scrutiny. In the absence of Congressional direction to the contrary, "the doctrine [of comity] may properly be used to interpret any statute," "because Congress legislates against a backdrop that includes those international norms that guide comity analysis." *Maxwell*, 93 F.3d at 1048. This maxim applies with special force in the case of a statute that cites comity as its overarching principle.

### B.    As the Statute Makes Plain, Comity is the Overarching Principle of Chapter 15 and Cannot Be Divorced from the Recognition Process.

According to the House Report, comity is set at the fore of chapter 15's statement of purpose to "make clear that it is the central concept to be addressed." House Report at 172.[8] It thus stands to reason that comity is the lens through which to view the statute as a whole as well as each of its individual provisions – including the recognition provision, which amici would

---

[8] Section 1501(a) provides that the chapter "incorporate[s] the Model Law ... to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of":

(1) cooperation between ... United States [courts], United States trustees, trustees, examiners, debtors, and debtors in possession; and [] the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; [¶] (2) greater legal certainty for trade and investment; [¶] (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; [¶] (4) protection and maximization of the value of the debtor's assets; and [¶] (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

isolate and interpret without reference to comity at all. *See* West. Br. 3, 14 ("Appellants and Judge Drain are wrong in viewing chapter 15 eligibility through the lens of comity").

There is nothing in the statute to indicate that the statutory purposes set forth in section 1501 – including comity and cooperation – are to be set aside when reading the recognition provisions, sections 1515-1517.[9] To the contrary, these provisions, read together, unquestionably support a comity-based interpretation. Section 1517(c) provides that the recognition decision "shall be decided upon at the earliest possible time," based on the minimal documentary showing required under section 1515. Section 1516 establishes three presumptions in favor of approving an application for recognition. First, the court may presume that "the foreign proceeding is a foreign proceeding and the person or body is a foreign representative" if the certificate from the foreign court so indicates. 11 U.S.C. § 1516(a). Next, it may presume that the section 1515 documents presented by the foreign representative are authentic, "whether or not they have been legalized." *Id.* § 1516(b). Finally, it may presume, in the absence of evidence to the contrary, that the debtor's place of registration is its COMI. *Id.* §1516(c). Regardless of the strength of the third presumption, which appellants and amici dispute,[10] the procedure established by sections 1515-1517 is clearly designed to facilitate recognition, whether

---

[9] Amici quote selectively from section 1509(b)(3) to support their theory that "comity comes into play *after* recognition" (West. Br. 17), but review of this provision in context demonstrates the fallacy of amici's argument. Section 1509 concerns the respect owed to a foreign representative (as opposed to a foreign proceeding) by *non*-bankruptcy courts, in which a foreign representative may seek relief after the bankruptcy court grants recognition to a foreign proceeding under section 1517. 11 U.S.C. § 1509(b)(3); *see* House Report, 100-111 ("If recognition is granted, the foreign representative will have full capacity under [U.S.] law (subsection (b)(1)), may request such relief in a state or Federal court *other than the bankruptcy court* (subsection (b)(2), and shall be granted comity or cooperation by such *non*-bankruptcy court (subsection (b)(3) and (c).)" (emphasis added)). Section 1509 does not address the recognition process, much less suggest (as amici would have it) that the process is not informed by comity.

[10] *See* discussion below, pages 12-14.

as a main or a nonmain proceeding, thereby promoting the overriding objective of comity. Indeed, as noted above, the procedure is often referred to as "mandatory" recognition.

While some scholars have criticized this "mandatory" recognition process on the grounds it gives the debtor too much freedom to choose a forum, this criticism ignores the limits and safeguards built into chapter 15.[11] First, the public policy exception set forth in section 1506 (sometimes called the "anti-comity" provision)[12] permits courts to refuse to take actions "manifestly contrary to the public policy of the United States."[13] And section 1517 itself provides for subsequent revocation or modification of recognition if "the grounds for granting it were fully or partially lacking or have ceased to exist." 11 U.S.C. § 1517(d). Accordingly, the reviewing court is free to deny recognition on traditional comity grounds or to withdraw recognition if the evidence that accrues during the foreign representative's investigation leads the court to conclude that the foreign proceeding is not an appropriate candidate for recognition. Further, far from tying the bankruptcy court's hands, the decision to grant recognition triggers a process that, as amici themselves observe (West. Br. 3, 15), gives the court great discretion and flexibility in handling the case to ensure proper administration and protection of creditors. 11 U.S.C. §§ 1519, 1521-22; *see In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 638 (Bankr. E.D. Cal. 2006).

---

[11] *See* Westbrook, *Last Hurrah, supra*, 41 Tex. Int'l l. J. at n.40 (assuring critics that section 1517(d) operates as a safeguard against any abuse of chapter 15's "automatic" recognition system: "Sections 1515-17 ... do provide for recognition based purely on the existence of a foreign proceeding, but section 1517(d) specifically provides for revocation or modification of recognition in appropriate circumstances.").

[12] *See, e.g.*, George Shuster, *The Trust Indenture Act and International Debt Restructuring*, 14 Am. Bankr. Inst. L. Rev. 431, 455 (2006).

[13] Notwithstanding the animus displayed by both sets of amici against the Cayman Islands judicial system, they do not suggest – nor could they – that the public policy exception has any application here. Nor did the Bankruptcy Court call on or make any mention of section 1506.

If, however, recognition is denied at the outset (for reasons unrelated to the public policy exception), based on conclusions drawn from the handful of facts the foreign representative has had time to accrue, the purpose of the statute is defeated. The recognition process can hardly be completed, as the statute requires, "at the earliest possible time" if an expansive evidentiary record is required – far beyond the documents specified in section 1515 – even when (as here) a petition is uncontested. There is certainly no statutory basis for requiring an expanded evidentiary record as a prerequisite to obtaining nonmain recognition when the court decides the foreign proceeding does not qualify as a main proceeding.

Contrary to amici's belief, non-recognition will not simply remove the liquidation proceeding to the United States where they think it belongs. *See* West. Br. 31. Instead, the Foreign Proceedings will continue in the Cayman Islands with or without U.S. cooperation. The JOLs are not obliged to commence a substantive bankruptcy proceeding in the United States, and may simply elect to relinquish U.S.-based judicial assistance if chapter 15's efficient and economical form of relief is unavailable.

Further, it is unclear that the Foreign Representatives *can* commence a chapter 11 proceeding here in the absence of chapter 15 recognition, as the Bankruptcy Court invited them to do, because section 1511 permits a foreign representative to file for relief under sections 301 and 303 only "[u]pon recognition." 11 U.S.C. § 1511(a); *see* House Report at 106 ("An order granting recognition is required as a prerequisite to the use of §§ 301 and 303 by a foreign representative."). One experienced bankruptcy practitioner predicts that the Bankruptcy Court's decision will "create[] an insurmountable hurdle for certain rejected foreign representatives," and opines that, in the absence of "foreign non-main recognition and the ability to file ancillary proceedings in the United States, offshore entities will be forced to file multiple full bankruptcy

11

cases in multiple countries.  Such inefficiency will shrink the assets ultimately available for

distribution, violating at least two of chapter 15's express purposes." Timothy T. Brock, *How the*

*Assault on Offshore Havens in Bear Stearns Undermines New Chapter 15: Part I*, XXVI No. 10

ABI Journal 34, 78-79 (2007) (citing section 1501(a)(3) and (4)).[14]

> **C.**     **Amici's Argument that the Liquidations Underway in the Cayman Islands
> Should Be Denied Recognition of Any Kind Is Unsupported by the Law and
> Facts of this Case.**

> > **1.**     **Amici's narrow reading of the terms "COMI" and "establishment"
> > are unsupported and contrary to established law.**

> > > **a)**     **The COMI Presumption**

Amici's characterization of the COMI presumption as "weak" (West. Br. 27) is nothing

more than a rhetorical flourish. Amici repeatedly invoke the California Bankruptcy Court's

opinion *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, but *Tri-Continental* does not help

them. The *Tri-Continental* court granted a petition for main recognition of liquidation

proceedings filed in the Caribbean island where the debtor had its registered office, overruling a

creditor's objection that COMI was in the United States, where debtor had perpetrated an

insurance scam and where most of its creditors resided. *Id.* at 629, 631.  The court recognized

the potential for detriment to U.S. creditors, but declined to impose any restrictions on the

foreign representatives, who have "the matter … well in hand," and can be expected to "be

punctilious in their performance of duty." *Id.* at 639-40.  Amici point out that the debtor in *Tri-*

*Continental* had substantial contacts in the Caribbean, including 20 employees and its lead

---

[14] The Bankruptcy Court appears to believe that the foreign representatives may file for relief
under section 303(b)(4), which does not include a recognition requirement, but noted that "the
failure to repeal section 303(b)(4) … may have been a drafting error in view of the newly
enacted § 1511(b), which likewise addresses the commencement of a case under section 301 and
§ 303. The inconsistencies of the two statutes have not been conformed[.]" Opin. p. 17, n.15.
This theory has never been tested.

underwriter, but while the court noted these contacts (id. at 630), it did not set any kind of floor for main recognition, and the decision cannot be read to require the presence of any particular contacts to establish COMI.

Amici also make much of the court's statement in *Tri-Continental* that the burden of proof is on the foreign representative to show that its place of registration is its COMI when an opposing party argues that COMI is elsewhere. *See* West. Br. 18-19, *see Tri-Continental*, 349 B.R. at 635. The burden of proof is not in dispute, however. What *is* disputed is the amount of evidence necessary to rebut successfully the COMI presumption, a question the *Tri-Continental* court did not address or answer, any more than it determined that the COMI presumption should be viewed as "weak." The only other U.S. case to address the COMI presumption is *SPhinX*, which unquestionably viewed the presumption as a strong one. *See In re SPhinX, Ltd.*, 351 B.R. 103, 119-22 (Bankr. S.D.N.Y. 2006) (stating that, but for petitioners' improper motive in seeking recognition, the court would have recognized the Cayman Islands proceeding as a foreign main proceeding, although debtor's sole contact was registration of its business there).

Amici also cite to European cases as support for Judge Lifland's decision, but these cases do not help them either. Contrary to amici's representation, the lead European case dealing with the COMI presumption – the European Court of Justice's (ECJ's) decision in *Eurofood*[15] – supports a strong reading of the COMI presumption. Indeed, Professor Westbrook recently criticized *Eurofood* on this very ground, observing that its "emphasis on the jurisdiction of incorporation might threaten to award the COMI prize to that jurisdiction in almost every case."

---

[15] *Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.)* Case C-341/04 (Grand Chamber), 2006 WL 1142304, ¶ 34-35 (ECJ May 2, 2006) ("*Eurofood*").

Westbrook, *Locating the Eye of the Financial Storm*, 32 Brook. J. Int'l. L. 1019, 1028 (2007) (cited throughout Judge Lifland's opinion).

Amici dispute appellants' reading of *Eurofood* as a case in which the place of registration was determinative of COMI. Instead, amici assert, the ECJ granted main recognition to Ireland because that was the place the debtors "conducted their business operations." *See* West Br. 23-25; *see also* AOB 24, 26-27. Amici's description of the case is surprising not only because it is inaccurate, but because it contradicts Professor Westbrook's own assessment in the article on which Judge Lifland relied. There, Professor Westbrook correctly observed that, "Eurofood was a subsidiary of the spectacularly fallen Parmalat group. It was incorporated in Ireland and was apparently a shell used by Bank of America in structuring financing transactions for the Parmalat group, *having no actual employees, business, or operations*." *Locating the Eye, supra*, at 1028 (emphasis added) (citing Bufford, *Center of Main Interests, supra*, 27 Nw. J. Int'l L. & Bus. 351).[16] Although Eurofood was operated out of Italy, the ECJ ruled that its COMI was in Ireland, the place of registration, reasoning that the interests of legal certainty and foreseeability require courts to apply criteria that are "objective and ascertainable by third parties." *Eurofood*, 2006 WL 1142304, ¶ 34. In short, far from supporting Judge Lifland's decision or amici's interpretation of the COMI presumption as a weak one, *Eurofood* supports a strong reading of the COMI presumption in keeping with the Model Law's (and chapter 15's) emphasis on creditor expectations.

---

[16] Like Professor Westbrook, appellants drew on the factual background provided in Judge Bufford's article, since the *Eurofood* case itself recites few of the relevant facts. As Judge Bufford explains, Eurofood, a subsidiary of the Italian company Parmalat, was registered in Dublin to take advantage of tax haven benefits available to non-resident businesses. It had no employees, and its sole asset was the corporate guarantee of its Italian parent. *See* Bufford, *Center of Main Interests, supra*, at 364, 368.

The importance of creditor expectations was likewise stressed in the *Daisytek* cases, where insolvency proceedings were initially filed in England on behalf of the company's 16 subsidiaries, three of which were located in Germany and France. The English court concluded that the COMI of all 16 subsidiaries was in England, based largely on its determination that creditors would anticipate insolvency proceedings to take place there. *See* AOB 24 (citing *In re Daisytek-ISA Ltd.*, [2003] All ER (D) 312). Amici fault appellants for quoting the English court's opinion, apparently because it was challenged in France (West. Br. 25-26), but there is nothing "ironic[]" or improper about appellants' use of the English opinion. Indeed, the English court's reasoning and conclusions were ultimately upheld by the French court of appeal.[17]

In addition to misrepresenting the caselaw, amici misstate the facts of this case in an effort to dissuade this Court from ruling that creditors' expectations weigh in favor of granting recognition to the Cayman Islands proceedings.[18] Ignoring the make-up of the Foreign Debtors' investors and creditors, amici assert that "[n]o evidence has been offered to suggest that any investor or creditor of the funds knew or had reason to know of their Cayman Islands

---

[17] Amici also suggest that the French court of appeals affirmed the English decision based on a finding that the French subsidiary was operated from England. (West. Br. 26 n.57.) But the French court did not decide the COMI question; instead, it deferred to the English court based on an EU regulation that requires EU member states to recognize opening insolvency proceedings. *See Klempka v. ISA Daisytek SA*, 2003 WL 22936778, [2004] I.L.Pr.6 (C d'A 2003) (Fr.), pp. 4-6. For a detailed discussion of the *Daisytek* cases, *see* Hon. Samuel L. Bufford, *International Insolvency Case Venue in the European Union: the Parmalat and Daisytek Controversies*, 12 Colum. J. Eur. L. 429 (2006).

[18] Amici argue that appellants have somehow "ambushed" the Court by including on appeal the handful of facts presented to the Bankruptcy Court in connection with their stay application. (West. Br. 9.) But amici's professed outrage ignores the nature of the recognition process, which is intended to take place "at the earliest possible time," § 1517(c), based on the minimal documentary showing required under § 1515, before the foreign representatives have had time to conduct a thorough investigation. In this case, the Foreign Representatives presented the facts to the Bankruptcy Court as they became available. Amici's criticism of appellants is also misplaced in light of their own cavalier inclusion of "facts" in their briefs that have no support in the record and that consist mainly of unsupported allegations and attributions of improper motive.

incorporation[.]" West. Br. 7; *see* FTI Br. 13. Nonsense. The absence of creditor and/or investor objections to the proceeding or to the chapter 15 petitions alone speaks volumes – like the dog without a bark in *The Hound of the Baskervilles*. Amici conjure up nefarious reasons for the lack of objection (West. Br. 30), but their allegations are entirely without support and are belied by the undisputed facts in this case.

The Foreign Debtors are two master funds, Enhanced Fund and High-Grade Fund (the "Master Funds"), in which various feeder funds (the "Feeder Funds") invested.[19] First, there is no question that Enhanced Fund's *sole* investor – the English bank, Barclays, one of the largest financial institutions in the world – knew that it was investing in a Cayman Islands hedge fund. As Barclays states in its recently filed complaint against BSAM, it "subscribed to shares from that Cayman Islands entity through a process that was devised solely for Barclays and that relied upon the fact that Barclays … was a non-United States entity." *See* Barclays Complaint, ¶ 54; *see also* ¶¶ 3, 20. Further, all three of the investors in High Grade Fund were affiliates of that Fund and were thus well aware it was a Cayman Islands entity. And all of the approximately 14 creditors of the two Master Funds are sophisticated institutional investors like Merrill Lynch, which presumably conducts careful investigations into all of their investments and counter-party relationships as a matter of course. It defies belief to suggest that these creditors were not acutely aware of the structure and place of registration of the two Master Funds.[20]

---

[19] Diagrams depicting the structure of the master and feeder funds are in the Addendum to the AOB (Tabs 9 and 10). When the AOB was filed, the identity of Enhanced Fund's sole investor was confidential. Since then, that investor – Barclays Bank PLC ("Barclays") – has disclosed its identity in a complaint filed against Bear Stearns Asset Management ("BSAM") and other entities. *See* Exhibit A annexed hereto.

[20] The Feeder Fund investors were also clearly informed that they were investing in Cayman Islands entities, as demonstrated by the FTI amici's own exhibit – the Confidential Offering Memorandum (the "Offering Memorandum") BSAM sent to potential investors in the Enhanced

The FTI amici endorse the view that creditor expectations are critical to determining COMI, stating that:

> A party engaged in commerce with another naturally assumes that the [COMI] for the counterparty is the jurisdiction where the business is done or, at least, that the counter-party is established in that jurisdiction. If the transaction goes awry, there is no expectation that an insolvent counterparty will then abandon the jurisdiction of its COMI or establishment and retreat to another corner of the Earth in order that claims may be adjudicated under a legal system strange to the initial transaction.

*See* FTI Br. 10. In keeping with this view, it is entirely appropriate to grant main recognition to proceedings that are underway in the place where the Foreign Debtors are registered, and where creditors and investors were most likely to anticipate liquidation taking place.[21]

Here, additional facts, set forth in the opening brief, amply support the presence of COMI in the Cayman Islands: to wit, two of their four investors are located in the Cayman Islands; both of their independent directors resided there and reviewed relevant transactions there; their pre-filing attorneys were located and performed services there and their pre-filing auditors performed work there.[22] In addition, the Foreign Debtors invested in collateralized debt

---

Leverage Feeder Fund. FTI Br. Exhibit A Part 3A (the cover of the Offering Memorandum plainly states that the Feeder Fund was "A Cayman Islands Exempted Company"); *see also id.* Exhibit A Part 3D at 72 (discussing the Feeder Fund's regulation under Cayman Islands law). Potential investors were required to warrant in their subscription agreement that they had read the Offering Memorandum "outlining, among other things, the organization and investment objectives and policies of, and the risks, conflicts of interest, and expenses of an investment in the Fund." FTI Br. Exhibit A Part 4.

[21] In fact, Cayman Islands law requires that businesses registered there be wound up there. *See, e.g., In re Philadelphia Alternative Asset Fund.*, Cause No. 440 of 2005 at 2-3 (Cayman Grand Court, J. Henderson Feb 22, 2006) ("[The Cayman Islands] is the fund's domicile. The established rule is that any winding up must take place here although, if there are assets in a foreign jurisdiction, ancillary proceedings abroad may be necessary.") (Addendum Tab 17).

[22] And, as the Offering Memorandum further demonstrates, these investors were well aware that the directors of the Master Fund would have ultimate decision-making authority over the Master Fund's operations. FTI Br. Exhibit A Part C at 43 ("The directors of the Master Fund have ultimate authority over the Master Fund's operations although the directors have delegated

obligations constituted under Cayman Islands law; they were exempt from U.S. income tax, but subject to Cayman Islands tax laws; and they were (and are) governed by Cayman Islands law. *See* AOB 12-15, 34-35. Finally, upon the appointment of the Foreign Representatives as Joint Provisional Liquidators ("JPLs"), the Foreign Debtors came under the exclusive and absolute control of the Cayman Islands-based JPLs. *See* AOB 8-9 (citing Cayman law), 35; *see also In re Mawcon Ltd.* [1969] 1 W.L.R. 78, 82 (the appointment of JPLs supersedes the authority of the debtor company's directors).

Where, as here, the COMI presumption is met in the first instance, and the Foreign Representatives have presented evidence that initiation of an insolvency proceeding in the place of registration is fully in keeping with creditors' expectations and is supported by substantial additional contacts with that forum, the COMI presumption should be honored.

### b)    Establishment

Even if this Court decides that the Cayman Islands is not the Foreign Debtors' COMI, there is no reason to affirm the Bankruptcy Court's denial of nonmain recognition, which was based on its erroneously narrow view of establishment.

Amici argue that the bar to obtaining nonmain recognition is even higher than the bar to obtaining main recognition, because there is no presumption in favor of establishment. *See* West. Br. 27. This makes no sense. As set forth above, pages 8-10, chapter 15's recognition provision must be read in keeping with the statute's overarching purpose of furthering comity and

---

authority to make investment decisions to the Investment Manager and have delegated responsibility for administration to the Administrator"); *see id.* at 48 ("Members of the boards of directors of the [Feeder Fund] and the Master Fund who are not affiliated with the Investment Manager ... will have the responsibility for approving any transaction between the Fund or the Master Fund and the Investment manager or its affiliates involving significant conflicts of interest (including principal trades).").

18

cooperation.  In the absence of a finding that recognition would be "manifestly contrary to the public policy of the United States," section 1516, the U.S. bankruptcy court should afford recognition when the basic requirements of the statute are met.  There is nothing in the statute to suggest that a prolonged evidentiary inquiry is necessary to support nonmain recognition of a proceeding, especially where, as here, the COMI presumption is met in the first instance.  Nor does any case so hold.

"Establishment" is defined by chapter 15 as "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  By contrast, the definition of "establishment" under the European version of the Model Law requires there to be economic activity with "human means and goods."  EU Reg. Insolv. Proceedings, Art. 2(h).  In excluding this language, Congress set a lower threshold for an establishment than its European counterparts, no doubt to cover businesses that operate via wire and cyberspace rather than via personal contact with goods or human services.  A reasonable interpretation of the U.S. standard would extend nonmain recognition to any place where debtors have a registered office, when that office is not recognized as its COMI.  Surely registration of a business in a given country, which entails a corresponding obligation to proceed under that country's laws, including its insolvency laws, establishes a nontransitory economic presence there.[23]

Here, as set forth above and in the opening brief, the Foreign Debtors were not only registered in the Cayman Islands, but also had substantial other "nontransitory economic

---

[23] Contrary to the suggestion of the Bankruptcy Court and amici, nothing in Cayman Islands law prevents an exempted company from carrying on nontransitory economic activities in the Cayman Islands. *See* AOB 36-37 (citing Companies Law (2007 Revision) § 193, providing, *inter alia*, that "nothing in [this section] shall be construed so as to prevent the exempted company effecting and concluding contracts in the Islands and exercising in the Islands all of its powers necessary for the carrying on of its business outside the Islands").

activities" there.  Honing in on selected facts and ignoring the rest, amici reductively characterize the Foreign Debtors' economic activities as "certain auditing activities" and "the preparation of incorporation papers."  These activities cannot suffice, they claim, because "establishment" must mean "a business office or a place for the provision of goods and services[.]"  *See* West. Br. 28. But amici's definition of establishment ignores the nature of hedge funds, which are financial undertakings that require no bricks-and-mortar office, provide no goods or personal services, and often (as in this case) have no employees.

Amici – and Professor Westbrook in particular – make no secret of their negative view of offshore hedge funds.  *See Locating the Eye, supra,* at 1029-31.  But this view is not shared by Congress, which is well aware of the practice of offshore registration and has passed no laws to discourage it.[24]  If amici want to "debate the desirability *vel non* of increased regulation or oversight of subprime lending and [] certain kinds of investments" (West. Br. 31), the place to do it is within the legislative arena.  Regulation and oversight are not within the purview of chapter 15, which simply creates a procedural vehicle for recognizing and cooperating with foreign insolvency proceedings.

2. **The FTI amici's arguments are based on unsupported allegations that are irrelevant to this appeal.**

Barclays, the only investor in Enhanced Fund, contracted with two Feeder Funds, one of which is the "Overseas Feeder Fund" represented by the FTI amici.  *See* Barclays Complaint,

---

[24] To the contrary, Congress has passed laws favoring offshore hedge funds.  For example, the Taxpayers Relief Act, enacted in 1997, permits hedge funds to move certain administrative functions to the United States without losing their off-shore tax benefits.  26 U.S.C. § 6331(h), *as amended by* Pub. L. No. 105-34.  Nothing in chapter 15 suggests that such funds should be singled out for discriminatory treatment in the case of insolvency.

¶¶ 32-56 (describing structure of master and feeder funds).[25] The FTI amici and the parties they claim to represent did not themselves invest – in any way, shape, or form – in either of the Master Funds, and thus lacked standing to participate in the liquidation of the Master Funds or in the chapter 15 recognition proceeding initiated by the Foreign Representatives. The FTI amici have elected to participate in the latter as amici, but they have no stake in either of the Master Funds proceedings. They are concerned with, and complain at length about, liquidation proceedings involving the Overseas Feeder Fund (*e.g.*, FTI Br. 5-9), but those proceedings are entirely unrelated to the matters that gave rise to this appeal. Accordingly, their remarks about the Overseas Feeder Fund liquidation proceedings are entirely irrelevant to the issues before this Court.[26]

To the extent the FTI amici direct their attention to the Foreign Proceedings, *i.e.*, the Master Funds liquidation proceedings, their arguments consist of inflammatory rhetoric and unsupported allegations that the Foreign Proceedings will somehow interfere with the rights of the Overseas Feeder Fund investors to investigate alleged wrongdoing by their own counterparties and their agents – who are the only parties from whom these investors can obtain relief, and who are the defendants in a number of lawsuits filed and pending in the United States, including the suit filed by Barclays.

---

[25] A master fund buys securities directly. A corresponding feeder fund invests in the master fund's shares. A single master fund may have multiple feeder funds, each tailored for a certain category of clients. The master-feeder structure is designed to benefit shareholders by allowing costs incurred by the master fund to be shared among all feeder portfolios, resulting in cost savings. *See, e.g.*, Thomas P. Lemke et al., *Hedge Funds and other Private Funds: Regulation and Compliance*, §§ 2:10-12, (2007-2008 Edition).

[26] The FTI amici's involvement with the Overseas Feeder Fund itself is minimal, because they were elected to the Fund's Board of Directors only after that Board was rendered legally defunct by the initiation of liquidation proceedings. *See* FTI Br. 6.

The FTI amici assert they "need affirmation that the liquidation of the Master Funds will not be a sham." *See* FTI Br. 8. But they present no evidence to support the implicit allegation that the Foreign Proceedings are not being conducted properly. Nor do they cite any evidence to support their claim that the Master Funds' liquidation will interfere with, let alone preclude, any regulatory or criminal investigation. As noted above, their own counterparty, Barclays, has just filed a complaint and is doing its own investigation into alleged wrongdoing by BSAM and other parties (which do not include the Master Funds). Investigations by the Securities Exchange Commission, the Department of Justice, and the state securities authorities in Massachusetts are also underway against Bear Stearns, BSAM, principals of BSAM, and other entities (but not including the Master Funds). There is nothing to suggest that the JOLs have been anything but cooperative with the SEC, the DOJ, the Massachusetts state authorities, or anyone else conducting investigations.[27]

The JOLs themselves, along with their U.S. counsel, Akin Gump, are investigating potential causes of action relating to the Master Funds and have been sharing their work and findings with the formal committees of creditors established on behalf of each of the Master Funds. The creditors' committees include the Master Funds' largest creditors, who have a direct interest in seeing that the investigations are conducted properly. These investigations (in addition to the failure of any creditor to object to the Foreign Proceedings or the chapter 15

---

[27] Whatever the merits of lawsuits filed against BSAM and other entities, which have yet to be tested in litigation, they are entirely irrelevant to this Court's assessment and application of COMI and establishment.

petitions) belie the FTI amici's bald assertions that there is "no visible creditor support" for the proceedings in the Cayman Islands. *See* FTI Br. 8, 13.[28]

The FTI amici argue that there is a conflict of interest between the Master Funds and the Feeder Funds that will prevent the JOLs from carrying out their legal duties (*id.*), but this argument too is utterly baseless. First, there is no conflict between the Master Funds and the Feeder Funds. The Overseas Feeder Fund invested in Enhanced Fund through its counterparty, Barclays, and thus had no direct investment relationship with that Master Fund. As noted above, the claims with which the FTI amici are concerned are directed against Barclays and agents of the Overseas Feeder Fund, and not against the Master Funds. Further, there is nothing improper about the JOLs' involvement in both sets of liquidation proceedings. It is established practice under Cayman Islands law (which applies the English Insolvency Rules 1986 and largely follows English case law as persuasive authority, see AOB 9-10) to appoint a single set of liquidators to wind up related entities. *In re Parmalat Capital Finance*, [2006] CILR 480, annexed hereto as Exhibit B. The JOLs are officers of the Cayman Islands Court. They are independent of the directors and the investment manager of the company and its creditors and are required by Cayman Islands law to deal impartially with all creditors. *See* AOB 7-8 (citing Cayman Islands law). There is no ground for amici's speculation that the JOLs are not acting in accordance with their fiduciary duties.

In sum, the FTI amici's brief consists entirely of intemperate and unsupported accusations that contribute nothing to the analysis of issues before this Court. It is unclear what the FTI amici hope to achieve, because the outcome of this appeal will have no effect on matters

---

[28] The FTI amici also claim that the JOLs are "unable" to investigate or lack the financial means to conduct investigations. FTI Br. 13. Not so. The Master Funds have substantial assets (approximately $50 million each), which will more than allow them to fund the investigation.

concerning the Overseas Feeder Fund. To the extent that the FTI amici want the U.S. courts to be involved in the Master Funds liquidation proceedings, it is in their interest to urge that the Foreign Proceedings be recognized by the Bankruptcy Court. As noted above, the Foreign Proceedings will continue with or without recognition. The sole issue before this Court is whether the Foreign Proceedings are entitled to recognition (main or nonmain) and whether the Foreign Representatives are entitled to the assistance of the U.S. courts in winding up the estates of the Foreign Debtors.

### III.    CONCLUSION

For the foregoing reasons and the reasons stated in the opening brief, the Decision denying recognition of the Foreign Proceedings should be reversed and the Foreign Proceedings should be recognized as foreign main proceedings or, in the alternative, foreign nonmain proceedings.

Dated:    January 4, 2008
          New York, New York

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  _/s/ Fred S. Hodara_

      AKIN GUMP STRAUSS HAUER & FELD LLP
      Fred S. Hodara (FH-7947)
      Lisa G. Beckerman (LB-9655)
      Abid Qureshi (AQ-4882)
      Brian D. Geldert (BG-4146)
      590 Madison Avenue
      New York, New York  10022-2524
      (212) 872-1000 (Telephone)
      (212) 872-1002 (Facsimile)

      L. Rachel Helyar
      2029 Century Park East, Suite 2400
      Los Angeles, California 90067
      (310) 229-1000 (Telephone)
      (310) 229-1001 (Facsimile)

      Counsel for the Joint Official Liquidators

24

## CERTIFICATE OF SERVICE

The undersigned certifies that he is an attorney admitted to practice before this Court and that on January 4, 2008 he caused a true and correct copy of the Appellants' Reply to Briefs of Amici in Case Nos. 07-CV-8730 (RWS) and 07-8746 (RWS) pending before the District Court for the Southern District of New York to be served via first class mail on:

KAYE SCHOLER LLP
Attorneys for Merrill Lynch, Pierce, Fenner &
Smith, Inc., Merrill Lynch International and
Merrill Lynch Capital Services, Inc.
425 Park Avenue
New York, New York 10022
Attention:    Madlyn Gleich Primoff, Esq.
              Jeffrey A. Fuisz, Esq.
              David M. Eskew, Esq.

Professor Jay L. Westbrook
University of Texas, School of Law
727 East Dean Keeton Street
Austin, Texas 78705-3224


Daniel M. Glosband
GOODWIN PROCTOR LLP
Exchange Place
Boston, Massachusetts 02109

Professor Kenneth N. Klee
UCLA School of Law
405 Hilgard Avenue
Law Building 1242
Los Angeles, California 90095-1476

REED SMITH, LLP
599 Lexington Avenue
New York, New York 10022
Attention: Lance Gotthoffer, Esq.


          _/s/ Fred S. Hodara_____
              Fred S. Hodara