# Exhibit A

JUDGE PRESKA
Lawrence Byrne
James R. Warnot, Jr.
Lance Croffoot-Suede
Ruth E. Harlow
Brenda D. DiLuigi
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Tel: (212) 903-9000
Fax: (212) 903-9100

Attorneys for Plaintiff, Barclays Bank PLC

**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BARCLAYS BANK PLC,

                                      Plaintiff,

               v.

BEAR STEARNS ASSET MANAGEMENT INC.,
RALPH CIOFFI, MATTHEW TANNIN, BEAR,
STEARNS & CO. INC., and THE BEAR
STEARNS COMPANIES INC.,

                                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 ___ 11400

Case No. _____

<u>JURY TRIAL DEMANDED</u>

## COMPLAINT

Plaintiff, Barclays Bank PLC ("Barclays"), brings this action against Bear Stearns Asset

Management Inc. ("BSAM"), Ralph Cioffi, Matthew Tannin, Bear, Stearns & Co. Inc. ("Bear

Stearns"), and The Bear Stearns Companies Inc. ("Bear Stearns Companies").

### SUMMARY OF THE ACTION

1.    This action arises from one of the most high-profile and shocking hedge fund failures in

the last decade: In a matter of days in June 2007, Bear Stearns' and BSAM's reputation as one

of the premier credit investment franchises on Wall Street collapsed along with two Bear Stearns hedge funds, formerly with approximately $20 billion in assets.

2.      In late June 2007, *The Wall Street Journal, BusinessWeek* and others reported that the Securities and Exchange Commission opened an inquiry into the months-after-the-fact revisions to investment results announced by one of the funds and that fund's pricing practices. In early October, *The Wall Street Journal* reported that both funds are the subject of a criminal investigation by federal prosecutors in the Eastern District of New York. More recently, *The Wall Street Journal* reported that Ralph Cioffi also is under investigation for insider trading with one of the funds, as described below.

3.      Barclays is the sole participating shareholder in – and thus has the sole direct exposure to – the master fund of the BSAM structure now under SEC and U.S. Attorney scrutiny, the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Fund").

4.      Defendant BSAM established the structure at issue and is the investment manager for the Enhanced Fund. Defendants Cioffi, the Senior Portfolio Manager who led BSAM's High-Grade Structured Credit Strategies group, and Matthew Tannin, that group's Chief Operating Officer, were responsible for BSAM's creation and operation of the structure, its management of the Enhanced Fund, and its communications with Barclays. (Collectively, the three "BSAM Defendants.")

5.      It is now clear that the BSAM Defendants have long known that the Enhanced Fund and its underlying assets were worth far less than their stated values in the early months of 2007 – values that BSAM itself had determined in most instances – and were at great risk for further losses. The BSAM Defendants concealed the fund's falling net asset value ("NAV") from

2

Barclays and investors in related feeder funds for as long as possible, instead of revealing the drop in value in, and the increased risk to, the Enhanced Fund, and instead of taking immediate and effective corrective action to correct the problems with the Enhanced Fund. This cover-up and failure to respond in accordance with BSAM's fiduciary duties to Barclays only caused greater losses and a more spectacular collapse of the Enhanced Fund.

6.     Barclays entered into its transaction involving the Enhanced Fund, as set forth in detail below, only after extensive, one-on-one negotiations in which the BSAM Defendants held themselves out as having a proprietary, extraordinarily sensitive and effective risk management system and as having special access to pricing (or "marking") information and marking expertise that they would employ for the benefit of Barclays. Moreover, the BSAM Defendants promised to operate the Enhanced Fund with full transparency on performance and on pricing to Barclays. In addition, the BSAM Defendants and Barclays negotiated detailed investment restrictions, including by asset class and rating requirements, with which BSAM agreed to comply for the benefit of Barclays. In all these respects, the BSAM Defendants entered intentionally into a relationship in which Barclays placed trust and confidence in them. The BSAM Defendants made unique commitments to Barclays (that the BSAM Defendants did not make to feeder fund investors or to any other entity in the structure), upon which they knew that Barclays would rely.

7.     Barclays now knows that from March 2006 into at least mid-June 2007, BSAM and Tannin deceived Barclays through a series of misrepresentations *first*, to secure Barclays' provision of its initial leverage for and financial stake in the "enhanced" fund structure; *second*, to secure a significant increase in Barclays' economic commitment to the structure in March 2007; and *third*, to deceive Barclays and keep it in the structure with ongoing positive reports about the Enhanced Fund's performance, even into mid-June 2007, until Barclays' losses had

3

snow-balled. BSAM and Tannin thus repeatedly and fraudulently misled Barclays and utterly failed to provide the total transparency regarding the Enhanced Fund that the BSAM Defendants promised to Barclays. BSAM and Tannin's deceptive acts were performed with Cioffi's knowledge, and pursuant to his approval and direction.

8.      According to *The Wall Street Journal* and *BusinessWeek*, the SEC and U.S. Attorney's Office are investigating whether Cioffi engaged in insider trading in February or March 2007 when he withdrew millions of dollars that he had invested personally from the Enhanced Fund. These withdrawals occurred at the same time that Cioffi was publicly "making optimistic forecasts about the portfolio's prospects" and that BSAM and Tannin were attempting to secure Barclays' significant additional commitment to the Enhanced Fund structure.

9.      As described in detail below, the BSAM Defendants failed to employ their purported and promised superior risk management system and the claimed expert pricing and hedging techniques to protect Barclays' exposure as leverage counterparty and sole participating shareholder in the Enhanced Fund. They also failed to exercise the duties of care they particularly owed to Barclays in their actions as the Enhanced Fund's investment manager; and they failed in their specific fiduciary duties to deal candidly and fairly with Barclays.

10.     The BSAM Defendants and defendant Bear Stearns compounded the troubles of the Enhanced Fund by using it for Bear Stearns' and BSAM's selfish purposes, to the further detriment of Barclays and in further breach of the fiduciary duties uniquely owed to Barclays.

11.     Indeed, Bear Stearns' and BSAM's transactions with the Enhanced Fund and the second collapsed fund, the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "High-Grade Fund"), have been the subject of an investigation by the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the "Massachusetts Securities

4

Division"). As reported by *The Wall Street Journal* in mid-October 2007, the Massachusetts
Securities Division was examining whether Bear Stearns entities improperly traded with the
funds without required disclosure and approval by the funds' independent directors and whether,
as a result, "troubled securities positions were offloaded onto investors in the two funds, among
other things."

12.    On November 14, 2007, the Massachusetts Securities Division filed an administrative
complaint, Docket No. E-2007-0064 (the "Massachusetts Complaint"), against BSAM alleging
violations of the Massachusetts Uniform Securities Act based on BSAM's failure to obtain
approval by unaffiliated directors for numerous related party transactions with Bear Stearns
and/or other entities controlled or managed by BSAM, and its failure to disclose to investors in
the High-Grade Fund and the Enhanced Fund that, in doing so, BSAM violated Section 206(3) of
the Investment Adviser's Act of 1940, as well as certain provisions of the offering materials for
the funds. The Massachusetts Complaint alleges that hundreds of so-called "principal
transactions" were processed without prior approval by unaffiliated directors. According to the
complaint, 78.95% of principal transactions in 2006 were not approved by unaffiliated directors.

13.    Bear Stearns and BSAM used the Enhanced Fund as a place to unload excessively risky
or troubled assets that could not be sold to other investors at the prices paid by the Enhanced
Fund. For example, at the very end of May 2007, BSAM caused the Enhanced Fund to buy large
portions (with a price totaling almost $500 million) of the six riskiest classes of securities in a
deal that BSAM managed. BSAM did so despite the fact that the investment restrictions it had
promised Barclays did not permit those securities to be held in the fund.

14.    In addition, Bear Stearns, BSAM and Cioffi hatched a plan to make more money for
themselves and further to use the Enhanced Fund as a repository for risky, poor-quality

5

investments by creating a new investment vehicle called Everquest Financial Ltd. ("Everquest") – co-led by Cioffi and through which he stood to benefit personally. Their plan, as formulated, was intended to culminate in an initial public offering ("IPO") of Everquest shares underwritten by Bear Stearns.

15.     That plan collapsed along with the two BSAM funds in June 2007, amid outrage that Bear Stearns would take troubled assets from the two funds, package them as Everquest, and then try to foist investment in those shaky assets onto the public in an IPO. As a result of the defendants' actions, the Enhanced Fund still owned shares in Everquest into July 2007 and Barclays has been harmed by the faulty underlying Everquest investments. The Everquest shares were not a permitted investment under the investment restrictions negotiated with Barclays, and ownership of Everquest shares was never disclosed as such on BSAM's reports to Barclays of the Enhanced Fund's portfolio.

16.     Because the BSAM Defendants have withheld information to which Barclays is entitled, and Barclays does not have full and accurate information about the current assets and NAV of the Enhanced Fund, Barclays cannot determine its precise damages from defendants' misconduct. Those losses, however, are clearly in excess of the jurisdictional threshold of this Court. Indeed, on July 31, 2007, the Enhanced Fund started a liquidation proceeding and filed a petition in bankruptcy court. The liquidators report that the Enhanced Fund is likely insolvent. If that is correct, and Barclays recovers nothing from the liquidation process, it will have lost all of its leverage provided to and fees owed from the BSAM transaction.

17.     The chief executive of The Bear Stearns Companies Inc. ("Bear Stearns Companies") (the parent of BSAM and Bear Stearns), James Cayne, has admitted that Bear Stearns Companies' carefully-honed reputation for sound risk management and prudent investing has

6

suffered a "body blow of massive proportion." According to *The New York Times*, others within Bear Stearns Companies have described the failed funds situation as "a fiasco" that is "without parallel in its 84-year history."

18.     As a direct result of the collapse of the funds, leaders of Bear Stearns Companies at the end of June 2007 ousted the chairman and chief executive of BSAM, Richard Marin, and brought in a replacement from Lehman Brothers. Defendant Cioffi was removed from the helm of the Enhanced Fund in June. The Bear Stearns Companies' management led the response to the crisis in the two fund structures. The parent company also took on even more direct supervision of BSAM's risk management activities, with BSAM risk-management personnel coming under the day-to-day supervision of Michael Alix, the parent company's chief risk officer.

19.     In a further bid to salvage BSAM's and the broader company's reputations, Bear Stearns Companies also jumped in with an infusion of approximately $1.6 billion in financing for the High-Grade Fund. It is now known that as of June 2007 the High-Grade Fund was performing better and had higher quality assets under management than the Enhanced Fund, which was contrary to BSAM's commitments to Barclays.

20.     No Bear Stearns Companies' financial support was offered to rescue the Enhanced Fund, in which Barclays owns the sole direct economic stake. Bear Stearns Companies' then co-President, Warren Spector, made clear during the June 2007 crisis that the parent company and BSAM would attempt to "save the less leveraged fund that had better quality assets and let the other fund collapse," as reported by *The Wall Street Journal*.

21.     This decision to sacrifice the Enhanced Fund led to further asset destruction in the Enhanced Fund, through even more urgent counterparty deals and fire-sales of the underlying

7

portfolio assets, as described below. Bear Stearns Companies, Bear Stearns, and BSAM tried to salvage their tattered reputations while letting Barclays' losses continue to mount. The defendants instead could have avoided such fire-sales and kept their commitments to Barclays.

22.     By the beginning of August 2007, Spector was forced to resign as Bear Stearns Companies' co-President because of his fault in the unraveling of the Enhanced Fund and in Bear Stearns Companies' escalating crisis. *The New York Times* explained that Spector's position became "untenable" – during the critical time period, "[n]ot only did [BSAM's] asset management business report to him but he also had direct responsibility over the risk controls that were in place there." Those controls had proven wholly insufficient, and then further actions by Bear Stearns Companies in June 2007 exacerbated the damage to the Enhanced Fund structure.

23.     As a result of the wrongdoing pled in this Complaint, Barclays sues BSAM and Tannin for fraud and misrepresentation; Cioffi for conspiring with those defendants to commit fraud; BSAM, Cioffi and Tannin for breach of their fiduciary duties and duties of care owed specifically to Barclays in their management of the Enhanced Fund and operation of the structure; BSAM for promissory estoppel; Bear Stearns for its conspirator role along with the BSAM Defendants in misusing the Enhanced Fund to serve interests other than Barclays'; and Bear Stearns Companies for its actions in conspiring with and aiding BSAM's breach of its duties to Barclays, especially during the June 2007 crisis, and its role in helping the Enhanced Fund fail in a manner that caused further losses uniquely to Barclays.

## PARTIES

24.     Plaintiff, Barclays Bank PLC, is a public limited company validly existing under the laws of England and Wales. Its principal place of business is 1 Churchill Place, London E14 5HP, England.

25.     Defendant Bear Stearns Asset Management Inc. is a corporation organized under the laws of the State of New York. Its principal place of business is 383 Madison Avenue, New York, New York 10179.

26.     Defendant Ralph Cioffi was, at times relevant to this action, a Senior Managing Director at Bear Stearns Asset Management Inc., a member of BSAM's Board of Directors, the Senior Portfolio Manager for the funds at issue in this case, and was until sometime in June 2007 responsible for, inter alia, the composition of and risk management in those funds. Cioffi is a resident of the State of New Jersey.

27.     Defendant Matthew Tannin is a Senior Managing Director of Bear Stearns Asset Management Inc. At least until mid-June 2007, Tannin was the Chief Operating Officer of the Enhanced Fund and the other BSAM-managed funds relevant to this action. Tannin is a resident of the State of New York.

28.     Defendant Bear, Stearns & Co. Inc. is a corporation organized under the laws of the State of Delaware. It is an investment banking, securities trading, and brokerage firm. Its principal place of business is 383 Madison Avenue, New York, New York 10179.

29.     Defendant The Bear Stearns Companies Inc. is a corporation organized under the laws of the State of Delaware, and is the parent of wholly-owned subsidiaries BSAM and Bear, Stearns & Co. Inc. Its principal place of business is at 383 Madison Avenue, New York, New York 10179.

9

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332. This action is between a citizen of the United Kingdom, as Plaintiff, and citizens of New York, Delaware and New Jersey, as Defendants, and the amount in controversy exceeds $75,000.

31.     Venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BEAR STEARNS' AND BSAM'S EXPERIENCE IN

## THE STRUCTURED CREDIT MARKETS

32.     The Bear Stearns Companies together constitute a global investment bank, securities trading and financial services firm.  Its subsidiaries have focused particularly on bond trading, with significant market share in the securitization of mortgage loans and in the trading of the resulting securities.

33.     BSAM is the asset management arm of Bear Stearns Companies and is an SEC-registered investment advisor.  Until the events detailed in this Complaint, BSAM purported to be a market leader in the area of structured credit services and an expert in managing structured credit assets.

34.     A key feature of BSAM's strategy has been its claimed leadership in risk management – which BSAM has described as the "cornerstone" of its business practice – namely, careful portfolio construction, ongoing surveillance and valuing of portfolio assets, and conservative hedging strategies to manage the credit risk in those assets.  In the past, BSAM had a widespread reputation for this purported risk management expertise and for its (again, purported) uniquely-effective proprietary methods of portfolio management.

10

35.     Defendant Cioffi, in particular, was by 2006 deemed an expert with a "stellar reputation" in structuring and managing structured finance products, particularly collateralized debt obligations (CDOs) and other types of asset-backed securities.

36.     In March 2003, BSAM and Cioffi formed the High-Grade Fund as an investment fund that could be "compared to a specialty finance company" because it would bring together a very large number of structured credit assets and produce returns for investors based on the payments the fund received from those assets.

37.     The risks associated with structured credit assets vary according to asset class, credit rating, and other factors. As explained to Barclays, the High-Grade Fund's strategy – and a core feature of BSAM's overall structured credit business model – was to select and monitor its portfolio assets in a highly informed and careful way that would manage and hedge against any significant risks associated with fluctuations in particular segments of the credit market, including in asset-backed securities based on sub-prime mortgages.

38.     By August 2006, the High-Grade Fund had reportedly enjoyed a return in excess of 36%. As of January 2007, it reportedly had experienced no decline in 40 months and earned a cumulative return of 50%. Barclays has recently learned that, despite its positive public reports, the High-Grade Fund was experiencing serious liquidity problems by at least September 2006 (and possibly earlier), and BSAM, Cioffi and Tannin concealed those troubles, as will be described below.

39.     In 2006, BSAM, Cioffi and Tannin decided to form a second, spin-off master-feeder fund structure, and did so by capitalizing on the High-Grade Fund's reported track record and success in attracting investors. This fund structure, according to the BSAM Defendants' statements to Barclays discussed in more detail below, would employ the same purported BSAM expertise and

11

proprietary analytics, and be managed in a similar fashion to the High-Grade Fund, but would utilize greater leverage.

### BARCLAYS' LEVERAGE INSTRUMENT AND HEDGE TRANSACTION

40.     Thus, in 2006 BSAM created the Enhanced Fund.  Bear Stearns' or BSAM's clients seeking exposure to that master fund portfolio's investments were able to purchase interests in two new BSAM "feeder funds," the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (collectively, the "Feeder Funds").

41.     The "enhanced leverage" for investors in the Feeder Funds came in significant part from a "total return swap" for which Barclays served as the counterparty.  The negotiations and representations between BSAM and Barclays that led Barclays, at BSAM's request, to provide the leverage for the Feeder Funds and simultaneously to hedge its risks by owning shares in the Enhanced Fund are described in more detail in the next section of the Complaint.

42.     Barclays was positioned between the Feeder Funds and the master fund in the "enhanced leverage" structure.  A structural diagram is attached to and incorporated in this Complaint as Exhibit A.

43.     The overall transaction is a financing transaction that resembles a loan from Barclays to the structure, with the Enhanced Fund portfolio providing security for the leverage.

44.     Barclays entered into a total return swap with each Feeder Fund, memorialized in Confirmation Nos. BL15089 and BL15090.  The swaps were constructed so that Barclays would return to each Feeder Fund the total net asset value (plus any cash) achieved by a reference portfolio based on the Enhanced Fund *as if* both the Feeder Fund's investor assets and the notional (*i.e.*, committed) dollar amount from Barclays had been invested in the Enhanced Fund,

12

minus (a) the notional amount and (b) accreted interest and spread (Barclays' fee for the leverage) that would be retained by Barclays as a payment from each Feeder Fund. On the closing and effective date of the transaction, August 1, 2006, the notional or leverage amount for the two Feeder Funds from Barclays was $50,000,000.

45.    For Feeder Fund investors, the anticipated benefit of the total return swap was that if the Enhanced Fund assets increased in value, the Feeder Fund investors would receive back from their counterparty Barclays at the end of the transaction their initial investment *plus* the total return on the Enhanced Fund assets as augmented by Barclays' leverage amount (and minus their fee to Barclays).

46.    The Confirmations provide that when the swaps and hedge are in place, the notional amount is treated for U.S. federal income tax purposes as "a loan from Party A [Barclays] to Party B [each Feeder Fund]." This status of the whole transaction as a loan for U.S. tax purposes was particularly important to BSAM.

47.    The swaps were for a three-year period, but could be terminated by Barclays early based on various termination events in the confirmation agreements and in an annexed and incorporated list of Additional Termination Events.

48.    Each swap Confirmation further provided that on its initial effective date Barclays must own shares in the Enhanced Fund equal, in their aggregate value, to the Initial Reference Portfolio Value. The Initial Reference Portfolio Value consisted of (i) the initial aggregate investment in the swap from the Feeder Fund plus (ii) the initial notional amount committed by Barclays.

49.    To establish the new "enhanced leverage" fund structure, BSAM offered its investors in the High-Grade Fund's feeder funds the option of moving to the Enhanced Fund structure.

13

Assets were transferred from the High-Grade Fund to the Enhanced Fund in proportion to the indirect interest therein of the investors who decided to move to the Enhanced Fund structure.

50.     Barclays acquired its initial shares in the Enhanced Fund because the Feeder Funds were deemed to have contributed the initial portfolio to the Enhanced Fund on Barclays' behalf through the above process. Barclays also acquired shares through its own subscription, equal to its notional amount.

51.     By owning shares in the Enhanced Fund (the reference fund under the swaps), Barclays hedged its obligations to the Feeder Funds under the total return swaps. This hedge was a critical feature of the overall transaction for Barclays because it permitted Barclays to obtain the same rate of return that it would owe Feeder Fund investors if the Enhanced Fund increased in value.

52.     The Confirmations provided that after the initial effective date, Barclays was not required to maintain any hedge through shares in the Enhanced Fund. However, Barclays negotiated the whole transaction with BSAM – and in particular, negotiated the Investment Guidelines and the Reporting Requirements – with the obvious and stated intention, acknowledged by BSAM, that Barclays would continue to hedge its swap obligations with ownership of shares in the Enhanced Fund throughout the life of the transaction. This continuing hedge was also important to BSAM, so that the entire transaction could be viewed as a loan.

53.     After closing the transaction and establishing the structure, BSAM served as investment manager for the Enhanced Fund, investment manager for the overseas Feeder Fund, and general partner for the U.S. Feeder Fund. BSAM's compensation for all of these investment management roles came through advisory fees and incentive or profit-sharing payments from the Feeder Funds and their investors (and not from Barclays). BSAM's compensation turned on

14

various formulas related to the NAVs of the Feeder Funds, and thus, in turn, the NAV of the Enhanced Fund. A growing NAV in the Enhanced Fund would lead to greater compensation.

54.     The Enhanced Fund is a Cayman Islands entity. Barclays subscribed to shares from that Cayman Islands entity through a process that was devised solely for Barclays and that relied upon the fact that Barclays, as subscriber, was a non-United States entity. Moreover, the Enhanced Fund, in the context of the subscription, specifically acknowledged that Barclays was subscribing to shares to the extent necessary to hedge and for the purpose of hedging the total return swaps.

55.     Barclays could not profit from an increase in the value of the Enhanced Fund. Any increase in the Enhanced Fund (also the swap reference fund) would be correspondingly owed to the Feeder Fund investors. Barclays' fee for the entire transaction came from the floating interest rate option (USD-LIBOR-LIBO) plus a spread specified in the Confirmations. Thus, for Barclays, the transaction was the functional equivalent of a loan.

56.     As will become clear below, Barclays' hedge through ownership of shares (contemplated by both Barclays and BSAM to exist throughout the transaction) is distinguished from the also-critical hedging activities by BSAM, Cioffi and Tannin, as investment managers, within the Enhanced Fund portfolio itself.

### BSAM'S INITIAL REPRESENTATIONS AND COMMITMENTS TO BARCLAYS

57.     Barclays' participation in the two Feeder Fund swaps and the corresponding hedge came about after months of negotiations with BSAM. Those negotiations began when, in or about early March 2006, BSAM proposed to Barclays that Barclays provide the leverage instruments for the planned new "enhanced leverage" Feeder Funds.

15

58.     Defendant Tannin of BSAM invited Ram Rao and Edward Ware of Barclays to visit with him at BSAM's offices in the Bear Stearns Companies' building and have lunch.

59.     At that lunch meeting on or about March 6, 2006, Tannin described the planned new fund and the need for a leverage counterparty.

60.     Tannin emphasized to Rao and Ware that BSAM's specialties were risk management for this kind of structured credit investment fund and the assessment of the value in particular structured credit assets. Tannin gave Rao and Ware information about the High-Grade Fund and about BSAM's overall approach to structured credit investment, and later forwarded to them detailed written reports and spreadsheets on the High-Grade Fund. Tannin claimed that BSAM and "Bear Stearns" generally were the best in the field.

61.     Tannin told Rao and Ware at the initial meeting – and throughout the negotiation of the transaction – that BSAM wanted Barclays to have comfort in entering into a leverage counterparty role, and stressed that what was to become the Enhanced Fund would be constructed and operated with full transparency to Barclays. According to Tannin, BSAM would provide Barclays with ongoing access to all of BSAM's portfolio content and pricing information.

62.     On or about March 22, 2006, Rao, Ware, Richard Ho, Carlo Panzeri, and Frank Gerhard from Barclays met with Tannin and other members of BSAM's risk management and operations staff for a due diligence meeting at BSAM. Ho, Panzeri and Gerhard came from London, where they are based, to New York for this meeting. The Barclays employees also spoke with Cioffi at the meeting. Other due diligence calls with BSAM, from its New York City offices, and further exchange of information from BSAM to Barclays occurred in the months after this meeting.

63.     During Barclays' initial investigation of the proposed structure, BSAM gave Barclays a PowerPoint presentation on "Bear Stearns High-Grade Structured Credit Strategies" and on

16

BSAM's claimed capabilities in managing structured credit funds. Tannin and BSAM explained that the Enhanced Fund would be managed with the same team and the same, then-existing methods of "investment process" discussed in the PowerPoint slides – including the same proprietary analytics and portfolio system.

64.     In the PowerPoint presentation, and in statements made to Barclays at the March 22 due diligence meeting, and in other conversations before Barclays entered into the total return swaps and related hedge, BSAM emphasized its proprietary "Surveillance, Portfolio Evaluation, Analysis and Risk System" for structured credits and their underlying portfolios.

65.     According to BSAM, that system aggregated information from multiple vendors and applied analytics, including Bear Stearns BondStudio and proprietary models, to keep BSAM informed about each asset's performance and stability. In BSAM's system, BSAM told Barclays in the PowerPoint and in other communications, "Alerts and Collateral Management reports are generated every day based upon updated data from the data providers." BSAM further stated to Barclays that this proprietary system allowed its credit portfolio managers "to quickly identify and sell any suspect assets before credit deterioration begins or ratings downgrades occur."

66.     In addition, BSAM represented in the PowerPoint and in other statements to Barclays that its investment process "prioritize[d] clean, new issue quality assets" and "filter[ed] out assets based upon collateral quality test performance, concentration limitations, payment frequency, maturity as well as weighted average life, and ratings."

67.     Tannin told Ware and others from Barclays in the 2006 negotiations that the Enhanced Leverage fund planned to apply Barclays' additional leverage to even higher quality assets, by increasing the proportion of the highest rated assets in the Enhanced Fund's portfolio, than were held by the High-Grade Fund.

68.     Tannin told Ware early on in the negotiations, and on several occasions before Barclays

entered into the transaction, that BSAM's then-existing investment system allowed it, in

Tannin's words, to avoid "freaked-out repo counterparty risk." (In general, a repurchase or

"repo" agreement is the sale of securities coupled with an agreement by the initial holder to

repurchase them at a later date. It is in many ways similar to a secured loan with the securities as

collateral to protect against default, except that in a repo arrangement legal title to the securities

actually passes to the lender. Thus, under certain margin call or default circumstances, the lender

can liquidate the assets. Repo agreements with Barclays and other banks were used by BSAM as

an additional source of leverage within its structured credit portfolios.)

69.     BSAM's presentation to Barclays also emphasized that BSAM used credit derivatives

and "long protection" positions to hedge the underlying portfolio. BSAM represented to

Barclays during the initial negotiations that its vast access to information and analytics allowed it

to be particularly adept at hedging. BSAM further represented that its portfolio in the Enhanced

Fund, like its existing High-Grade Fund, would not be subject to the risk of uni-directional bets

that might cause sudden large movements in the value of the portfolio.

70.     In a March 28, 2006, e-mail to Rao and Ware, Tannin further explained BSAM's

portfolio approach and the protections it specifically would provide Barclays in the Enhanced

Fund. He explained that the BSAM team uses two forms of leverage:

> We have "internal" leverage assets and "external" leverage assets. Internal
> leverage assets are structurings or repackagings that we do where we take the high
> quality assets and fund them from within a structure. This gives us pure cash flow
> leverage which does not have first order mark-to-market volatility. We also use
> more traditional repo and TRS [total-return-swap] leverage.
>
> . . . We plan to use the leverage provided by you guys to increase the proportion
> of EXTERNAL leverage assets. We plan to do this because this will give you
> guys the comfort that you need that **we will always be able to maintain a level of**

18

**liquidity that will allow us to "dial" up and down the leverage based upon market price volatility when necessary.**

(Emphasis added.)

71.     The "increase[d] proportion" of externally leveraged assets would, according to Tannin

and BSAM, be the highest quality assets.

72.     Again on April 6, 2006, Tannin emphasized BSAM's transparent information flows and

its ability to manage risk in the Enhanced Fund in an e-mail to Rao and Ware at Barclays:

> We are more than happy to discuss with you credit and portfolio limits for the underlying portfolios as well. This way if there is measurable CREDIT deterioration we can factor this in and reduce the leverage.
>
> **I don't want to sound like a broken record but the value of this transaction lies in the transparency of credit information on high underlying credit quality assets.** We have a lot of it and you can have it as often as you want. We'll even chew it up for you and give you customized reports. Look at the stability of the ratings in these portfolios[.]

(Emphasis added.)

73.     Based on BSAM's stated extant expertise, capabilities, and practices, Barclays decided to

proceed toward becoming the leverage counterparty and to negotiate further details of the

planned transaction.

74.     Barclays also continued to rely on the above representations and commitments from

BSAM and Tannin in later closing the deal, in increasing Barclays' contribution to the structure

in March 2007, and in participating in the structure into July 2007.

75.     Before entering into the transaction, Barclays not only questioned BSAM and engaged in

due diligence, but also investigated BSAM and its stated capabilities through third party inquiries

and sources.

76.     In addition, Barclays' ultimate participation in the deal was contingent (among other

things) upon its obtaining commitments from BSAM about its operation of the Enhanced Fund

as investment manager that were customized to Barclays. These commitments by BSAM to Barclays were explicitly agreed to be greater than BSAM's commitments to the Feeder Funds' investors, and greater than BSAM's general obligations to the Enhanced Fund itself. Thus, BSAM and Barclays continued their one-on-one discussions and negotiations also to develop these additional commitments to Barclays, as the sole participating shareholder in the Enhanced Fund and swap counterparty.

77.      As a result, during the months between March and August 1, 2006, Barclays and BSAM negotiated specific investment limitations ("Investment Guidelines") and reporting commitments ("Reporting Requirements"), to which BSAM agreed for Barclays' benefit. BSAM did this to induce Barclays to enter into the swaps and their corresponding hedge and specifically to protect Barclays with regard to BSAM's activities as investment manager of the Enhanced Fund.

78.      Tannin was Barclays' primary contact at BSAM. He consulted with Cioffi and Raymond McGarrigal, another Senior Managing Director, during the negotiations. Cioffi himself, however, negotiated the leverage transaction's pricing with Barclays.

79.      Cioffi was Tannin's supervisor, and was aware of Tannin's actions, and oversaw Tannin's activities that are alleged in this Complaint.

80.      Richard Ho in London had primary responsibility for the transaction at Barclays; and which became part of Barclays' London business. Barclays' Rao and Ware, in New York, were at times the immediate points of contact with Tannin and BSAM. Carlo Panzeri, in London, reviewed and assisted in the negotiation of the investment limitations and reporting commitments for Barclays.

81.      Tannin, on behalf of BSAM, agreed to the final version of the Investment Guidelines on or about July 31, 2006, the day before the closing of the deal.

82.     Each specification in the five-page Investment Guidelines, which were annexed to the
Confirmations and are attached hereto as Exhibit B, was a representation, commitment, and
agreement by BSAM, as investment manager, that it "will operate the [Enhanced] Fund in
accordance with" that specification.

83.     These specially-negotiated terms of the Investment Guidelines were representations,
commitments and agreements regarding non-discretionary requirements that BSAM made
specifically to Barclays. These specifically-negotiated terms were in addition to and separate
from any representations made to the Feeder Fund investors or any representations made to the
Enhanced Fund itself. They specifically pertained to BSAM's role in managing and operating
the Enhanced Fund while Barclays served as the leverage counterparty and hedged its risk
through shares in that fund.

84.     Barclays relied on all of the representations, commitments and agreements by BSAM in
Exhibit B in deciding to undertake the swaps and their hedge, in committing additional funds
after the initial closing, and in continuing to participate in the transaction into July 2007. BSAM
and Tannin knew that Barclays was relying on those representations, agreements and
commitments, and intended that Barclays do so.

85.     In addition, each specification of the Reporting Requirements, which were annexed to the
Confirmations and are attached hereto as Exhibit C, was a representation, commitment, and
agreement by BSAM, as investment manager, that it "will provide Barclays" with (or will cause
the Enhanced Fund's administrator to provide Barclays with) the listed reports and notices.

86.     The specially-negotiated terms of the Reporting Requirements were representations,
commitments and agreements regarding non-discretionary requirements that BSAM made
specifically to Barclays. These specifically-negotiated terms were in addition to and separate

21

from any representations made to the Feeder Fund investors or any representations made to the Enhanced Fund itself. They specifically pertained to BSAM's role in managing and operating the Enhanced Fund while Barclays served as the leverage counterparty and hedged its risk through shares in that fund.

87.    Tannin and BSAM also confirmed BSAM's agreement to the Reporting Requirements to Ware and others at Barclays shortly before the deal closed on August 1, 2006. Indeed, Tannin represented to Panzeri and others during conversations in mid-2006 that the Reporting Requirements for the Enhanced Fund closely reflected BSAM's then-existing, internal reporting with respect to its original High-Grade Fund and thus would simply continue BSAM's current practices. Again, BSAM agreed to these reporting requirements to provide Barclays with personal protections greater than it provided to others.

88.    Barclays relied on all of the representations, commitments and agreements by BSAM in Exhibit C in deciding to undertake the swaps and their hedge, in contributing additional funds after the initial closing, and in continuing to participate in the transaction into July 2007. BSAM and Tannin knew that Barclays was relying on those representations, commitments and agreements, and intended that Barclays do so.

89.    High quality assets, limitations on permitted investments, and adherence to portfolio diversification requirements for the Enhanced Fund were critical to Barclays in establishing the basis for its participation in the transaction. The permitted investments and their concentration limitations were specifically defined in the Investment Guidelines. In addition, Barclays' negotiations focused on ensuring that especially hard-to-price assets would be excluded from the portfolio.

90.     For example, under the Barclays-specific Investment Guidelines that BSAM represented

and agreed it would follow, "Instruments where there is no official public price available are

only eligible if the Reference Fund Administrator is able to obtain independent pricings of the

instrument on a regular basis from financial counterparties."

91.     Based on BSAM's stated expertise and then-existing access to effective proprietary

analysis, Barclays was relying on BSAM continuously to "mark" the portfolio assets

appropriately and accurately, and to do so with transparency to Barclays. (Under the Reporting

Requirements, Barclays was entitled to "[w]eekly pricing sheets detailing the sources of the

marks of the various underlying products.") The required ability of the Reference Fund

Administrator, a third-party institution, under the Investment Guidelines to price assets

independently on a daily or at least regular basis was negotiated to provide additional assurance

that on assets in the portfolio were not being over-valued.

92.     CDOs are issued by special purpose entities organized to buy debt collateral. The special

purpose entities bundle together and structure a portfolio of collateral – various debt assets – and

then issue tranches (or groups of securities organized by class) of "CDOs" that in the higher

tranches are rated by the major credit rating agencies but in the junior tranches are unrated

"equity." CDOs often include mortgage assets in their collateral.

93.     Under the Barclays-specific Investment Guidelines, CDOs were a permitted investment,

defined to include not only plain CDOs, but also Synthetic CDOs, High Grade and High Yield

CDOs. But CDOs were not defined to include CDO-squared investments, which are CDOs in

which the underlying instruments are in turn other CDOs. CDOs, as described and limited in the

Investment Guidelines, were restricted to an upper limit of 60% of the portfolio assets.

94.     The Investment Guidelines required that from 75% to 100% of the total portfolio assets had to carry a AAA to AA- rating. Below BBB- or not-rated assets could comprise at most 3.5% of the total assets. A single issue rated below A- or unrated could not amount to more than 0.1% of total assets or more than 2% of NAV.

95.     Tannin described these "AA/AAA assets" as having "very very low volatility" in a May 1, 2006, e-mail to Ware, Rao, and Panzeri at Barclays.

96.     In that same e-mail, Tannin described to Barclays that the new "enhanced" structure would "continue to operate [as did the High-Grade Fund] in the best parts of the capital structure"; "concentrate the ultimate exposure in the highest rated floating rate kinds of assets" and "[g]enerate a prudent return for our investors which allows our portfolio managers and structuring team to concentrate on the areas in the market where there is the greatest liquidity and greatest value."

97.     As above, Barclays relied on each of the representations, commitments and agreements described in paragraphs 89-96 in deciding to proceed initially and in continuing to participate in the transaction, without terminating, into July 2007. BSAM and Tannin knew that Barclays was relying on those representations, commitments and agreements, and intended that Barclays do so.

98.     Transparency in the portfolio's operations and in the pricing of its assets also was critical to Barclays. The Reporting Requirements specified timely, detailed reporting of various types to Barclays on a daily, weekly, and monthly basis.

99.     BSAM agreed in the Reporting Requirements, for example, to provide to Barclays "[r]eports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis"; "[f]ull investment positions reports on a weekly basis" and "[n]otice as soon as

24

reasonably possible of any change in circumstances, which might cause the final monthly NAV of the [Enhanced Fund] to show a loss in value equal to or more than 10%[.]"

100.    BSAM further agreed that the Enhanced Fund's administrator would provide Barclays with estimated monthly NAV values "no later than twelve Business Days following the end of each calendar month."

101.    The Confirmations provided that the fund administrator was obligated to report final NAVs to Barclays on the fifteenth day following a relevant "dealing date." This dealing date under the initial Confirmations was the first day of each month; by the end of March, 2007, the dealing dates had been amended to be the third and fifteenth days of each month, with the final NAV expected on the fifteenth day following the first dealing date (*i.e.*, the third day) of the month.

102.    Again, Barclays relied on each of these representations, agreements and commitments in deciding to proceed initially and in continuing to participate in the transaction.  BSAM and Tannin knew and intended that Barclays would do so.

103.    Barclays' information at closing supported BSAM's portrayal of itself as extremely proficient and data-rich in structured credit markets; as having proprietary models and systems that did and would continue to assess accurately portfolio value, and thus protect Barclays' financial exposure; as committed to transparency in pricing and about its operations; and as being able – indeed, obliged – to warn Barclays should any significant increased risk arise, with time for corrective action.

INITIAL REPRESENTATIONS AND PROMISES TO BARCLAYS PROVED UNTRUE

104.    In fact, Tannin and BSAM falsely represented to Barclays that BSAM would adhere to the Investment Guidelines and Reporting Requirements, and falsely represented BSAM's risk

25

management practices and ability to avoid harm from deterioration in the value of the portfolio assets. The falsity of the representations about – and BSAM's failure to meet its commitments regarding – timely and accurate pricing and reporting, effective hedging strategies, control over risk, portfolio limits, and other central aspects of BSAM's initial portrait of the Enhanced Fund for Barclays were revealed only in June 2007. Those misrepresentations caused losses to Barclays.

105.    In its operation of the structure and management of the Enhanced Fund, BSAM – as its many explicit commitments to Barclays' interests and requirements made clear – stood in a special fiduciary relationship to Barclays. Yet, after the transaction closed, BSAM, Cioffi and Tannin did not make good on the commitments, agreements, and duties they had undertaken for the benefit of Barclays. Instead, BSAM and its individual managers operated the fund deceptively, for their own or their conspirators' gain, in bad faith, and in a grossly negligent manner, contrary to the duties that they owed Barclays. Those actions caused losses to Barclays.

106.    BSAM's and Tannin's pre-closing misrepresentations were made, in part, because by June 2006, BSAM had already started soliciting investors for the new Feeder Funds, including with the representation that Barclays would serve as the leverage instrument counterparty. As the summer of 2006 progressed, BSAM became very highly motivated to get its "enhanced" structure underway after months of negotiations. BSAM and its managers stood to gain in their compensation and prestige from this expansion of BSAM's "marquee" structured credit strategies practice. Indeed, as described below, BSAM, Cioffi and Tannin decided that they would use the Enhanced Fund to conceal from investors worsening liquidity problems within the High-Grade Fund. They also did not want to be proven wrong in their already-disseminated statement to prospective investors that Barclays would serve as the leverage counterparty.

107.    Against this backdrop, Tannin and BSAM misled Barclays and made commitments that BSAM would not honor. Tannin and BSAM intentionally deceived Barclays, or at a minimum made factual representations with recklessness, in order to bring their planned "enhanced" fund to fruition.

108.    As time went on, Tannin and BSAM intentionally, or at a minimum recklessly, deceived Barclays in an ever-expanding way in order to obtain a further infusion of Barclays' financial support for the structure, hide self-dealing, conceal performance problems, and keep Barclays in the structure. Moreover, BSAM likewise failed in its fiduciary duties to Barclays and acted contrary to its detailed commitments to Barclays in the operation and management of the Enhanced Fund.

109.    The BSAM Defendants managed the Enhanced Fund and breached their fiduciary duties specific to Barclays from their offices in New York City.

110.    Barclays has suffered losses as a result of its reasonable reliance on BSAM's and Tannin's representations, and on Barclays' expectation that BSAM would fulfill BSAM's fiduciary duties and its other duties of care specific to Barclays. BSAM's numerous misrepresentations and breaches, and BSAM and Bear Stearns' self-interested use of the Enhanced Fund, further described below, eventually led to very large and swift uncontrolled losses in the Enhanced Fund, without BSAM providing the required warnings to Barclays that BSAM had committed to provide. Barclays now knows that, contrary to BSAM's representations to Barclays about their effective, risk-controlling practices, BSAM's proprietary systems and portfolio management were grossly ineffective.

111.    The initial misrepresentations to Barclays first were followed by reporting failures. After the total return swaps closed on August 1, 2006, and Barclays simultaneously subscribed to

27

shares, BSAM did not immediately institute reporting that complied with its agreement and representations, commitments and agreements. Barclays repeatedly pushed BSAM to do so. BSAM, Tannin and Robert Ervin, another BSAM employee, continually affirmed to Barclays during the next months that BSAM remained committed to meeting all the Reporting Requirements and to providing "whatever," in the words of Tannin to Ware and others, Barclays needed with regard to portfolio information.

112.    Carlo Panzeri and Angus McIsaac of Barclays' risk-management department in London began a long process of attempting to get adequate reports, repeatedly following up with BSAM to work toward the proper reporting and to obtain what Barclays had been promised from BSAM.

113.    Panzeri and McIsaac gradually extracted more reporting from BSAM, after an initial "ramping up" period, but continued to push for more adequate compliance with the Reporting Requirements as 2007 began.

## A "LIQUIDITY SOURCE" TO CONCEAL THE HIGH-GRADE FUND'S TROUBLES

114.    As discussed above, to secure Barclays' initial investment and later participation in the Enhanced Fund structure, the BSAM Defendants touted their supposedly unique and successful portfolio risk management capabilities, in particular with the High-Grade Fund. Despite the positive reports BSAM gave to Barclays regarding the High-Grade Fund, Barclays recently has learned that the High-Grade Fund was experiencing serious liquidity problems in at least September 2006, and possibly earlier.

115.    In fact, the High-Grade Fund's liquidity problems motivated the BSAM Defendants to deceive Barclays into investing and continuing to participate in the Enhanced Fund structure.

28

116.    For example, on September 17, 2006, Tannin apparently sent Cioffi an e-mail regarding a

potential "liquidity game plan" for the High-Grade Fund, stating "I think we need to have a very

specific idea of how we would raise 100mm in liquidity over a sixty day period. . . ."

117.    In response to Tannin's e-mail, Cioffi sent an e-mail to Tannin on the same day, stating

that "What we need to figure out is how to get the majority of our [limited partners] into the

enhanced fund. That will take some time but once we do that **we have an easy liquidity source**

**and that's Barclays.**" (Emphasis added.)

118.    The High-Grade Fund's liquidity problems were apparently so severe by September 2006

that Cioffi had considered closing the High-Grade Fund altogether and moving all of the High-

Grade Fund investors into the Enhanced Fund structure. Again on September 17, 2006, Cioffi

wrote a further "liquidity game plan" e-mail to Tannin:

> What I was thinking was to build up 6 [months] of returns then send a letter to all
> the remaining investors and tell them we are closing the [High-Grade Fund] and
> ask everyone to convert to [the Enhanced Fund]. We'd have to handle it like we
> did thru an exchange of assets[.] I would not want to have to sell everything. This
> is the riskiest way to go because you know some [limited partners] will not
> convert but I feel comfortable that we can get almost all of them to.

119.    Apparently because BSAM, Tannin and Cioffi viewed Barclays as an "easy liquidity

source," it was important for these defendants to deceive Barclays to commit initially and remain

invested in the Enhanced Fund structure so that they would have a way of concealing the High-

Grade Fund's troubles from its own investors (*i.e.*, by "getting" those investors to convert to

investments in the Enhanced Fund Structure), thereby preserving the defendants' own

reputations in the process. Barclays was never told of that strategy before making its initial and

later commitments to the Enhanced Fund structure. In fact, Barclays did not learn of it until well

after both funds collapsed. Instead, Barclays invested and continued to participate in the

29

structure based on BSAM's and Tannin's multiple representations, including those about the High-Grade Fund's strong financial position.

## "OUR HEDGES ARE WORKING BEAUTIFULLY"

120. BSAM's and Tannin's deception expanded further in February and March 2007, when Tannin (and BSAM) attempted to convince Barclays to increase its financial commitment to the structure. As explained below, the initial deceptions and these early 2007 deceptions were followed by more deceptions of Barclays, all of which were exposed only with the revelations in mid-June and later.

121. From in or about January 2007 until early June 2007, Tannin and others at BSAM offered – usually unsolicited – statements to Barclays about the Enhanced Fund's performance that repeatedly represented to Barclays that the Enhanced Fund, and in particular its portfolio hedging strategies, were performing well. Tannin and BSAM never described any reason for concern during this period. Instead, they continually represented that the fund was doing "great." They represented that BSAM's methods were successfully capitalizing on, and not falling prey to, the volatility in the sub-prime mortgage market.

122. On or about January 22, 2007, Tannin met Ram Rao and Edward Ware of Barclays for a long-delayed closing dinner in New York. Tannin told Rao and Ware that the new Enhanced Fund was performing well. He used the word "great" and offered no caveats. Tannin also raised the possibility of exploring additional business opportunities with Barclays.

123. Ware talked by phone with Tannin on many occasions and "great" was consistently the synopsis of the Enhanced Fund's performance, in each conversation from the date of execution through the spring of 2007.

30

124.    On or about February 19, 2007, McIsaac in London requested that Tannin send Barclays

the latest Excel spreadsheet and "factsheet" for the Enhanced Fund. Neither McIsaac nor anyone

else at Barclays received the requested information.

125.    Instead, Tannin responded by e-mail to McIsaac on the same date with this representation

about the Enhanced Fund's performance: **"You will be happy to know that we are having our**

**best month ever this February. Our hedges are working beautifully.** We were up 1.6% in

January and are up 2% so far in February." (Emphasis added.)

126.    On or about February 27, 2007, McIsaac again asked Tannin for reports on the Enhanced

Fund portfolio. Tannin, in an email response that same day to McIsaac and Ware, provided a

position report, a portfolio list, and this summary of the fund's most recent performance:

> Here is the relevant information for Enhanced Leverage.
>
> **As you can see, despite the sell off in the sub-prime mortgage market -- our**
> **fund continues to do well, quite well, in fact.**
>
> Here are a few points I think you should be aware of:
>
> 1. Our hedges are working just as we discussed. Our hedges are lower quality
> than our assets - so in this market **we've experienced a significant mark to**
> **market gain so far this month.**
>
> 2. Our term financed positions are not as sensitive to this market volatility - just
> as we've discussed
>
> 3. We have been in touch with all of our repo counterparties - and they are
> uniformly very happy with all of our positions.
>
> In short, we are very pleased with our performance - but even more important
> than that we are pleased that our ideas about how to structure our risk and limit
> our volatility are once again proving to have been prudent.

(Emphasis added.)

31

127.    The first page of the attached portfolio report that Tannin sent to Barclays on February 27 to provide Barclays with "information for the Enhanced Fund" showed BSAM's calculation of a 5.5% "gross return" and a 4.3% "net return" for the month (through February 23).

128.    Up through and including the February 27 e-mail, Tannin and BSAM explicitly reassured Barclays about the Enhanced Fund's positive, "best month ever." This was at a time, February 2007, of extreme volatility and dropping prices in ABX indices that track the performance of bundles of asset-backed debt securities, particularly those tied to sub-prime debt.

129.    Tannin and BSAM, with these February 2007 statements, thereby added to BSAM's representations, made since the inception of Barclays' involvement, about BSAM's stellar abilities to control risk and to use portfolio hedges and other strategies to produce positive results, even when related structured credit markets were performing badly.

130.    Tannin and BSAM deceived Barclays about the Enhanced Fund's purported February performance to secure Barclays' increased financial commitment to the Enhanced Fund structure just days later.

<u>BARCLAYS INCREASES ITS COMMITMENT IN MARCH, AT BSAM'S REQUEST</u>

131.    On or about February 26, BSAM requested that Barclays provide an additional, significant financial commitment to the structure on March 1, 2007. Relying on all of the positive information and all of the representations it had received from Tannin and BSAM, Barclays did so on March 1.

132.    BSAM requested another, equally sizable commitment to be executed on March 15, 2007. When BSAM requested from Barclays the additional March 15 commitment on March 8, Tannin represented, unsolicited, that **"Despite dramatic volatility in the structured finance**

32

**market our Fund has been extremely stable.** We are seeing the beginning of new asset opportunities and would like to take down additional cash." (Emphasis added.)

133.    Barclays made this second additional commitment in March to its swaps and the corresponding hedge of shares in the Enhanced Fund. It did so in reliance on BSAM's report of extreme stability and BSAM's representation that it had identified positive new asset opportunities, as well as the earlier representations from BSAM outlined above.

134.    On or about March 27, 2007, Rao and Ware of Barclays attended a business dinner in New York with Cioffi, Tannin, and Raymond McGarrigal of BSAM. There, Cioffi, Tannin, and McGarrigal expressly reported to Rao and Ware that their strategies for the Enhanced Fund continued to perform well, and that they were starting to see desired differentiation between the results for the leveraged Enhanced Fund and the High-Grade Fund.

135.    From the end of March, 2007, through mid-May, the Barclays' risk management staff in London received periodic reports of the month-to-date from Tannin and BSAM that showed small declines in the overall value of the Enhanced Fund portfolio, ranging from -1.4% to -2.5%. Those small declines did not raise a concern for Barclays regarding its commitment to the structure and position in the Enhanced Fund, because of the backdrop of Tannin's and BSAM's statements about their successful hedging and other risk management strategies. The decline in the ABX indices that had occurred earlier in 2007 had turned around by April. Based on BSAM's representations, Barclays believed the Enhanced Fund had apparently weathered well a volatile period.

136.    In addition, BSAM consistently and repeatedly reported to Barclays a total NAV of close to or over a billion dollars for the Enhanced Fund, which meant that the fund would have to suffer massive losses before Barclays' priority (first-out) stake of less than half that amount

33

would be at risk. For all Barclays was being told, the Enhanced Fund portfolio was performing very well, BSAM had a firm grip on risk, and BSAM was paving the way for even more success.

137.    As it turns out, the Enhanced Fund was not performing as well as Tannin and BSAM had represented; and BSAM's marks for assets were exaggerated and unreliable. Furthermore, the BSAM Defendants were using and wanted to continue to use Barclays' capital for their own purposes (*e.g.*, purchasing multiple tranches of new CDOs for which BSAM had accumulated the underlying assets) and for Bear Stearns' similar underwriting goals, without Barclays realizing that they were doing so to its detriment.

138.    Likewise, as described above, in the midst of the Enhanced Fund's plummeting performance in February and March 2007, Cioffi reportedly withdrew millions of dollars of his own money from the Enhanced Fund, while publicly making "optimistic forecasts about the portfolio's prospects."

139.    Cioffi, and the other BSAM Defendants, therefore, had to keep the deception going. Tannin and BSAM misrepresented the Enhanced Fund's February performance to secure Barclays' significantly increased financial exposure, and misrepresented the Enhanced Fund's March, April and May performances to keep Barclays in the structure, to hide self-dealing, and (by at the latest April) to hide BSAM's sharply failing investment structure from Barclays, Feeder Fund investors, and the public. For these reasons, among others, Tannin and BSAM intentionally, or at a minimum recklessly, misrepresented the Enhanced Fund's performance in their statements and reports to Barclays about February, March, April, and May results, alleged above.

140.    The BSAM Defendants were trying to buy time to stabilize the Enhanced Fund and to use it for their own and Bear Stearns' self-dealing purposes, as discussed further below. In addition,

the BSAM Defendants' professional reputations and their financial rewards depended on the Enhanced Fund's success. Risk management of portfolio assets such as those in the Enhanced Fund was supposedly their specialty, and the Enhanced Fund was supposedly their most advanced, innovative investment fund. For all these reasons, among others, BSAM and Tannin deceived Barclays.

### BSAM'S DELAYS OF THE FUND ADMINISTRATOR'S MONTHLY REPORTS

141.    During this same period, there was another facet to BSAM's hiding from Barclays the true performance facts and unstable nature of the portfolio in the Enhanced Fund, as well as BSAM's breach of its fiduciary duties to Barclays.

142.    From December 2006 through July 2007, the fund administrator's required monthly or semi-monthly NAVs for the Enhanced Fund each were long delayed or never came at all. (Semi-monthly NAVs were required under the Confirmations, as amended, between December 2006 and March 2007.) Under the Investment Guidelines, the Reporting Requirements and the Confirmations, the Enhanced Fund administrator PFPC Inc. ("PFPC") was to deliver NAVs to Barclays based on independent pricing shortly after each relevant dealing date. PFPC, however, did take its direction from BSAM, and eventually explained to Barclays that the delays were the fault of BSAM, as outlined below.

143.    The Confirmations call for the NAVs from the fund administrator to issue at least on a monthly basis and by the fifteenth day following a relevant "dealing date." The operative dealing date at the beginning of the transaction was the first of the month, then became the first and fifteenth of the month, and after a Confirmation amendment in late March 2007 was the third of each month.

35

144.    The report from PFPC for the month of December (triggered by the dealing date on January 1), however, was not released until late February, long after the fifteen-day deadline. That report showed a 1.60% increase in the fund for the month of December. PFPC later revised that result to show a 1.76% increase.

145.    Simran Sethi of Barclays in London regularly followed up by e-mail and by phone with PFPC and BSAM for the administrator's NAV reports. PFPC initially reported that the delay in the December report was due to year-end processing issues; but the delay in December was repeated in the subsequent months.

146.    When Sethi spoke with Tannin in early 2007 about the lack of timely reports from the fund administrator, Tannin said that Barclays should rely on the numbers that BSAM was directly providing to Barclays for periods when the administrator report was not available.

147.    Sethi and Barclays, however, sought reports from the administrator as well. They did this because the administrator was supposed to be obtaining **independent** pricing of the portfolio instruments, under the terms of the Investment Guidelines, and because administrator NAVs were required under the Confirmations.

148.    On or about April 2, 2007, for example, after many previous calls and emails about the delayed administrator reporting, Sethi wrote her contacts at PFPC and copied Tannin:

> I would really appreciate if you could reply to my mail below [dated March 29]. Even the February NAVs are overdue now and we are still waiting for January NAVs.
>
> Could you please let us k[n]ow the reason for delay each month and what we can do to resolve this ASAP.

149.    Neil Rosen of PFPC responded that the January NAV was still being calculated and that the delay resulted from "waiting for pricing on one of the underlying securities."

36

150.    Sethi followed up with numerous emails and calls to PFPC and Tannin to try to resolve the slow reporting by proposing that PFPC set a cut-off date and use an estimate or the previous month's valuation for one or two missing prices by that date. Tannin's approval was necessary for PFPC to proceed in that way.

151.    Tannin repeatedly communicated that he was happy to work out a more timely arrangement, and that Sethi had a "great idea;" but when Sethi subsequently followed up with either Tannin or PFPC, she could not get a resolution. Barclays now realizes that Sethi was being given the runaround by Tannin and BSAM, given the discrepancies in the February through May reporting of the portfolio's performance, and that the source of the misinformation was BSAM.

152.    Sethi continued to push for the appropriate, timely fund administrator reporting. On May 8, 2007, a managing director and vice president of PFPC, Ellen Corson, addressed the situation in an e-mail to Sethi:

> Currently, the Bear Stearn [sic] (BS) fund that you are requesting information on holds an investment that due to its complexity is taking a very long time to obtain a valuation. Each month, BS requires PFPC to wait until the value for the particular investment has been calculated and approved. Unfortunately, the process to value that particular investment has been delayed greatly...PFPC is not involved in the valuation of the investment and are instructed to wait for the price from the advisor. In addition, BS has not instructed PFPC to value the BS fund with an estimate price. Also, due to the nature of this investment, BS is very much aware of the issues surrounding the valuation. The delays you are expecting [sic] are not the result of PFPC service issues.
>
> As of today, PFPC is waiting for approval from BS for February's final numbers. In addition, final valuations for the investment in question has not been finalized for March and April.
>
> I have previously requested that BS reach out to their Barclay's [sic] contact and explain to them the issues. . . .

37

153.    On or about May 9, 2007, Sethi and Panzeri of Barclays called Tannin and did not reach him. Sethi followed up with an e-mail to Tannin that asked "what this 'investment' is which takes more than three months to value."

154.    Sethi followed up with Corson at PFPC to ask her which asset supposedly caused the delay in pricing each month. Corson responded that she was not sure.

155.    Tannin never identified a specific asset that was delaying the administrator's pricing in response to Barclays' inquiries.

156.    Instead, more than a week later, on or about May 17, 2007, Tannin responded by claiming that "**We do not have ANY assets that take 3 months to value**. The volitility [sic] in the market created a problem with the dealers getting us marks. We can give PFPC our estimated NAV promptly – within 5 business days of the end of the month. I believe they are happy to pass this on to you." (Emphasis added.) Tannin thus contradicted PFPC's stated reason for the delay and made a new representation about BSAM's supposed ability to timely value its assets. In any event, timely NAVs from PFPC were never forthcoming.

157.    In addition, it was only through further discussions with PFPC on or about June 1 that Sethi and others at Barclays discovered that the Enhanced Fund administrator apparently had been relying on BSAM for pricing on a major portion of the assets in the Enhanced Fund. They also discovered that PFPC had not been independently pricing a major portion of the assets, as required by the Investment Guidelines, or even spot-checking them for purposes of calculating the fund administrator's NAV reports.

158.    Immediately after that discovery, Sethi called Mark Mannion, another managing director at PFPC, and stressed that the administrator's job was to provide independent pricing. She stressed that even for estimates that might come before final numbers from PFPC, PFPC should

38

do random checks of those estimates, and that for final NAV pricing there had to be much less of a time lag than currently was occurring.

159.    Tannin and BSAM, in breach of BSAM's and Tannin's duties to disclose and fiduciary duties to Barclays, deliberately or at least recklessly delayed the fund administrator's reporting and directed the administrator's inadequate conduct. They did so to hide from Barclays the Enhanced Fund portfolio's actual performance and the BSAM Defendants' and Bear Stearns' other improper actions, as alleged herein.

### BSAM'S FEBRUARY CLAIM OF UP 5.5% REDUCED TO BELOW ZERO

160.    The fund administrator on May 10, 2007, finally released its NAV for February. That report showed that the Enhanced Fund's return in February had actually been -.30% — far less than the report of a 5.5% gross or 4.3% net increase that Tannin and BSAM had conveyed to Barclays on February 27.

161.    As set forth above, February had been the month in which Tannin's and BSAM's deception paved the way for Barclays to increase significantly its commitment to the structure in March.

### ADDITIONAL FALSE STATEMENTS OF SUCCESSFUL HEDGING
### AND POSITIVE RETURNS

162.    By at least late May 2007, Tannin apparently had serious doubts about the Enhanced Fund's viability and was considering possible ways to "sell" the Enhanced Fund and the High-Grade Fund, including to a third party investment company, Cerberus, before the funds were completely "wiped out."

39

163.    Despite concerns that the Enhanced Fund was on the verge of failure, BSAM and Tannin continued to conceal the Enhanced Fund's true performance through false reports of successful hedging and positive returns on the portfolio.

164.    At or about the beginning of June 2007, Tannin called Barclays' Ware to tell him about an imminent publication in *Hedge Fund Alert*. Tannin told Ware that an article was about to come out that said that BSAM had "gated" (*i.e.*, suspended) investor redemptions from the Feeder Funds.

165.    Tannin represented to Ware that this statement about gating was untrue. He stated that BSAM was considering gating, but had not done so. (On June 22, 2007, however, Bear Stearns Companies' Chief Financial Officer, Samuel Molinaro, said in an analyst conference call that he believed that investor redemptions were suspended sometime in May.)

166.    In or about early June, Panzeri and Ware spoke further with Tannin. Tannin told Panzeri and Ware that BSAM was working to reduce an over-concentration of CDOs in the portfolio, to curtail exposure to CDO-squared securities specifically, and to divert investment to structured credits with physical underlying assets.

167.    Panzeri emphasized to Tannin that BSAM had to take all steps necessary to bring the portfolio within the Investment Guidelines and had to make sure that Barclays was getting timely NAVs.

168.    Tannin also claimed in early June, again, that the portfolio's hedges were working. He told Panzeri and Ware that there had been a slight lag in response, but now the portfolio had bounced, the hedges were catching up, and the Enhanced Fund was performing well. As later became clear, Tannin and BSAM were still intentionally, or at a minimum recklessly, misstating the portfolio's status as of June 2007 to Barclays for all of the same reasons outlined above.

40

169.    On June 7, PFPC released the final April NAV to Barclays. The administrator's report revealed a drop of more than 11% in the Enhanced Fund. This was more than four times greater a loss than BSAM's worst report of the fund's performance to date—*i.e.*, the -2.5% figure that BSAM provided to Barclays in late April. On June 7, PFPC also released revised March results of -3.6%.

170.    BSAM had failed to abide by its representations and commitments, leaving Barclays to learn from PFPC long after the fact about a drop in the NAV of more than 10%. Under the Reporting Requirements, BSAM was required to notify Barclays as soon as it reasonably could of "any change in circumstances, which **might** cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%." (Emphasis added.) Instead, BSAM and Tannin engaged in deliberate deception to hide the Enhanced Fund's falling NAV for as long as possible.

171.    Barclays had the ability under the swap agreements and its hedge to terminate the transaction and wholly withdraw from the structure based on written notice given at least two business days before a dealing date, if a termination event as listed in the Confirmations occurred. A material change in the risk profile of the fund without Barclays' consent or a breach of the Investment Guidelines (with no agreed-upon plan to cure) are among the many possible termination events.

172.    It is inconceivable that BSAM did not know long before **June 7** of a "change in circumstances" that might – and actually did – significantly affect **April**'s results, especially given BSAM's supposed daily surveillance of the portfolio and its apparent ongoing interactions with the administrator with regard to pricing. Yet Barclays heard of this 11.3% drop only through PFPC's June 7 correspondence to Barclays.

41

173.    In addition, Robert Ervin of BSAM, on or about June 8, came back to Angus McIsaac of Barclays with a claimed new, positive report. BSAM reported in that June 8 transmittal that the returns on the portfolio in May were up 2.7%. (Subsequent disclosures by BSAM and PFPC – in mid-July – showed that the Enhanced Fund, in reality, had lost more than 38% of its value in May.)

174.    On or about **June 14**, an even more positive report came from Ervin of BSAM in an email to McIsaac of Barclays, with Tannin copied. Ervin, couching results for the first time as "internal estimates," sent Barclays a **BSAM spreadsheet that showed gains through June 12 of almost 6%.** It also showed a total NAV of more than $950,000,000.

175.    On or about June 14, however, BSAM was also hosting a meeting of "repo" agreement counterparties with claims on certain portfolio assets to try to negotiate grace. It is inconceivable that when Ervin sent the report of a gain of 6% for June, BSAM, Cioffi and Tannin and their staff did not realize the Enhanced Fund portfolio was going even more sharply down instead of up and that the fund was in imminent danger of adverse actions by repo counterparties.

176.    BSAM, through Ervin, on June 8 and 14 engaged in deliberate deception of Barclays, or at a minimum extreme recklessness and breach of the BSAM Defendants' fiduciary duties to Barclays, by telling Barclays that the Enhanced Fund was up for May and again up almost 6% through June 12.

177.    In reality, the portfolio's asset values were plummeting. As noted above, PFPC disclosed, in a notice dated July 17, 2007, that the Enhanced Fund fell by more than 38% in May. BSAM in mid-July admitted to Feeder Fund investors that their investment had been wiped out completely by the end of June. The value of Barclays' investment, at a minimum, had been severely diminished by the end of June, according to BSAM's revelation in mid-July.

178.    By misrepresenting the supposed ongoing success of BSAM's hedging and portfolio risk management, by misrepresenting the portfolio's performance numbers and asset values, and by misrepresenting BSAM's portfolio restrictions and characteristics (as specifically promised to Barclays), among other things, BSAM and Tannin caused losses to Barclays. Tannin and BSAM did so intentionally, or at least recklessly, to keep Barclays in the structure, to hide their troubles, and to continue to try to buy time, for all the reasons alleged herein, until time ran out with the repo lenders.

179.    Likewise, BSAM, Cioffi and Tannin – by undertaking excessive, directional portfolio risk, by erroneously marking asset values, by failing to fill the portfolio with high quality assets (and instead causing the Enhanced Fund to become a dumping ground for especially risky assets, including numerous CDO-squared securities and other toxic assets, many acquired through transactions in which a Bear Stearns Companies' entity played an additional role), by acting contrary to the agreed-upon portfolio limitations, and by failing timely to inform Barclays of the true performance of the portfolio, among other things – breached their special fiduciary duties to and were grossly negligent in causing losses to Barclays.

### BEAR STEARNS' AND BSAM'S SELF-INTERESTED USE OF THE FUND

180.    This extraordinary fraud and breach of the investment manager's fiduciary duties personal to Barclays was not the result of BSAM's, Cioffi's and Tannin's actions alone.

181.    It is now apparent that Bear Stearns and BSAM agreed to work together to use the Enhanced Fund for their own purposes, rather than as a structure that would protect or advance the interests of Barclays and, indirectly, the investors in the Feeder Funds. Later, Bear Stearns Companies, too, became involved to the detriment of Barclays by, among other things, taking actions to benefit the High-Grade Fund and to harm the Enhanced Fund as it struggled to cope

43

with the June 2007 crisis, contrary to BSAM's specific fiduciary obligations and duties owed to Barclays.

182.    As discussed above, the Massachusetts Securities Division has been investigating numerous securities trades by Bear Stearns entities with the funds, including "whether troubled securities positions were offloaded onto [the funds'] investors," and has recently filed an administrative complaint based on the hundreds of transactions that BSAM caused the High-Grade Fund and/or Enhanced Fund to undertake with Bear Stearns and other entities that BSAM controlled or managed, in violation of federal and state laws, including anti-fraud laws.

183.    Indeed, Bear Stearns and BSAM used the Enhanced Fund as a place to dump certain risky Bear Stearns assets, to Barclays' detriment. For example, it has now come to light that on or after the last day of February 2007, the Enhanced Fund bought all the securities in several tranches of a CDO-squared deal (with a combined price of approximately $140 million) – investments not permitted under the Investment Guidelines promised to Barclays – that was underwritten by Bear Stearns.

184.    Similarly, in other self-dealing in May 2007, Bear Stearns sold large portions of two tranches of another offering that it was underwriting into the Enhanced Fund. This was during the period when BSAM and PFPC now say the previously-claimed value of the Enhanced Fund was quickly unraveling.

185.    As Bear Stearns Companies' public statements and actions in June 2007 have indicated, and a comparison of the two portfolios reveals, during the months prior to June 2007 BSAM was funneling higher quality assets to the High-Grade Fund and accepting excessively risky or troubled assets at inflated prices in the Enhanced Fund. BSAM was collecting inappropriate risks and overstated marks in the Enhanced Fund despite BSAM's professed surveillance

strategies that applied equally to both funds and despite its fiduciary duties to Barclays. Moreover, BSAM had promised Barclays that it would place higher quality assets in the Enhanced Fund, not the other way around.

186.    In addition, BSAM even more blatantly caused the Enhanced Fund to buy **all** the securities in **all** the tranches of an April 18, 2007, Tahoma CDO-squared offering (with a combined price of approximately $150 million) that BSAM was managing. This means that no independent third-party market participant priced these securities or ascertained their fair market value; instead, BSAM caused the Enhanced Fund to purchase them at non-arms-length prices.

187.    Moreover, given that BSAM was purchasing all of the offering for the Enhanced Fund, BSAM instead could have caused the Enhanced Fund to buy the underlying assets or similar assets directly, and avoided the more risky, superfluous (and impermissible under the Investment Guidelines) CDOs-within-a-CDO structure. In addition, in the CDO markets, it is highly unusual for a CDO structure manager to retain in its own investment funds all of an offering for which it accumulated the assets and for which it will serve as the CDO manager.

188.    BSAM was accumulating illiquid assets in the Enhanced Fund that were sold into that fund in non-arms-length arrangements, in order to help BSAM succeed in other roles. In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the Enhanced Fund structure. BSAM also was violating its specific representations, commitments and agreements to Barclays.

189.    Likewise, as late as **May 24, 2007**, when it turns out that the value of the Enhanced Fund was plunging, BSAM caused the Enhanced Fund to buy large portions of the securities (with a combined price of almost $500 million) from **the six riskiest tranches** (omitting only the A1A tranche) of another CDO-squared offering, BSAG 2007-1A, for which BSAM served as

45

manager. BSAM caused the Enhanced Fund to purchase the majority of each of those six tranches, and then had the High-Grade Fund purchase the remainder of each tranche.

190.    Again, no independent third-party market participant priced these securities or ascertained their fair market value; instead, BSAM caused the Enhanced Fund to purchase them at non-arms-length prices. Moreover, BSAM instead could have caused the Enhanced Fund and the High-Grade Fund to buy the underlying assets or similar assets directly, and avoided the superfluous, impermissible CDO-squared structure.

191.    BSAM was causing the Enhanced Fund to invest almost $500 million on impermissible, very risky assets at a time – late May 2007 – when it knew that the Enhanced Fund was already in serious trouble.

192.    All of these 2007 purchases of multiple tranches indicate that the Enhanced Fund was being used by BSAM to purchase assets that could not otherwise find a market at the prices BSAM was willing to cause the Enhanced Fund to pay. The later transactions, furthermore, extracted cash from the Enhanced Fund to benefit the defendants just before the fund completely failed, to the unique detriment of Barclays.

193.    These securities went into the Enhanced Fund portfolio because that BSAM-controlled fund provided the "best" opportunity for BSAM and its underwriting partners on these deals to gain a high price for their offerings and take cash from the fund, as well as an opportunity for BSAM and the underwriters to attempt to maintain their reputations as successful deal makers in structured credit. Now these securities and prices have been exposed as "toxic" for Barclays and its financial stake in the Enhanced Fund structure.

194.    Bear Stearns', Cioffi's, and BSAM's harmful self-dealing and conflicts of interest are also apparent in their Everquest Financial Ltd. machinations. Those defendants tried to conceal

their harmful conduct in the Enhanced Fund by transferring some of the fund's highest-risk assets – CDOs of CDOs that contained the lowest rated tranches and unrated "equity" – out of the fund and into another new BSAM-led entity, Everquest. These defendants then planned to have Everquest sell shares that would transfer a significant part of the risk in these dangerous investments onto third-party public investors through a $100 million IPO of Everquest in mid-2007 (though Barclays, in the Enhanced Fund, would still be saddled with shares in Everquest as of the date of the IPO).

195.    At all relevant times, Everquest was jointly run by BSAM and Stone Tower LLC. Cioffi, in addition to his roles at BSAM with regard to the Enhanced Fund, was the co-chief executive of Everquest.

196.    On May 9, 2007, Everquest filed a Form S-1 with the Securities and Exchange Commission ("SEC") for its planned IPO. Everquest's filing disclosed that a significant portion of the assets (valued by Everquest and BSAM at $548.8 million) in its approximately $720 million portfolio had been purchased in 2006 from the High-Grade Fund and the Enhanced Fund. In return, the funds received 16 million shares of Everquest (valued by Everquest and BSAM at $25 per share) and $148.8 million in cash. As of the date of the S-1, that filing discloses that the funds retained their 16 million shares in Everquest.

197.    The largest transfer from the BSAM Enhanced and High-Grade Funds to Everquest involved the lower (*i.e.*, riskier) tranches of Parapet, a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from vehicles managed by BSAM.

198.    The Everquest S-1 listed Cioffi as the "beneficial owner" of Everquest shares. In addition, Everquest disclosed that, upon the IPO, BSAM and Stone Tower would each receive

47

new share grants representing 2.5% of Everquest's outstanding shares for the managers and/or employees, which include Cioffi. Therefore, Cioffi stood to benefit personally from the IPO.

199.    BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the Enhanced Fund structure. Likewise, Bear Stearns would benefit from an Everquest IPO through its underwriting fees.

200.    Shares in Everquest are not a permitted investment under the Investment Guidelines, and indeed such shares have never appeared on the portfolio reports for the Enhanced Fund given to Barclays by BSAM, despite the disclosure of share ownership to the SEC in the Form S-1. In addition, as a large unrated investment in a single issue, the Enhanced Fund's apparent ownership stake in Everquest far exceeded allocation limitations set by the Investment Guidelines.

201.    Everquest's S-1 filing – like BSAM's direct reports to Barclays on the Enhanced Fund from the same period – omitted critical disclosures that would have had a significant adverse effect on the amount Bear Stearns, Cioffi, and BSAM could realize from an IPO. Neither Everquest's filing nor BSAM's reports on the Enhanced Fund to Barclays through May 2007 disclosed, for example, that the Enhanced Fund had suffered significant losses in April 2007 as the Everquest and other similarly shaky assets lost value.

202.    BSAM, Everquest and its planned IPO disregarded Barclays' interests, and the Everquest plan instead was designed to generate fees or other income for BSAM, Cioffi, and the Bear Stearns entities.

203.    Indeed, even Bear Stearns Companies' or Bear Stearns' managing directors viewed Everquest with great skepticism by mid-June 2007. During a "town hall" meeting for Bear

Stearns' managing directors on or about June 22, one of those managing directors reported that the overall sense among the managing directors at the meeting was extreme skepticism regarding Everquest's construct and purpose. According to this managing director, the managing directors expressed the belief that BSAM was improperly trying to offload poor quality CDOs through the Everquest IPO. The June 22 meeting attendees also openly questioned whether the BSAM portfolios in general were "dumping grounds" for toxic assets, including many Bear Stearns-related assets.

204.    Others at the "town hall" opined that BSAM and its funds would have been fine if BSAM had been able "to offload its risk to the public" through the Everquest IPO.

205.    However, on or about June 25, 2007, amid an onslaught of negative press reports surrounding the deteriorating High-Grade and Enhanced Funds and the terrible quality of the assets that had been dumped into Everquest, Everquest withdrew its planned offering. Therefore, no Everquest shares left the Enhanced Fund; and the fund remained indirectly invested in the worst tranches of the Parapet CDO of CDOs and other troubled assets into at least July 2007, to Barclays' detriment.

206.    Indeed, press reports described the now-aborted Everquest IPO as "an unprecedented attempt by a Wall Street house to dump its mortgage bets." *See* Matthew Goldstein, *Bear Stearns Subprime IPO: Everquest Financial is Going Public with Risky Mortgage Bets Purchased from Its Underwriter's Hedge Funds,* www.BusinessWeek.com, May 11, 2007; *see also* Carolyn Sargent, *Behind Bear's Big Fall*, www.absolutereturn.net, September 2007 ("Bear allowed [Cioffi] . . . to stuff his funds with Bear-originated collateralized debt obligations that he allegedly helped form. Bear even helped Cioffi set up a company to purchase shaky securities from the funds when the market began to crack."); Alistair Barr, *Everquest IPO Tied to Troubled*

49

*Bear Hedge Fund: Cioffi's Fund Transferred Risky Mortgage Derivatives to Firm He Helps Run*,
www.MarketWatch.com, June 15, 2007 (one CDO expert quoted as saying, "If the stories are
correct about the problems at the fund, it sounds like they off-loaded the riskiest positions to
Everquest[.]")

207.    Cioffi, Tannin and BSAM breached their unique fiduciary duties to Barclays through all
of the above self-dealing and self-interested behavior that harmed Barclays. Bear Stearns
conspired with those BSAM Defendants to do so, and stood to gain from its related
underwritings, including of Everquest.

208.    In addition, as described above, Cioffi is under investigation by federal prosecutors for
insider trading with the Enhanced Fund in order to save millions of dollars of his own personal
investment in the fund. Cioffi's actions occurred at the same time BSAM and Tannin were
deceiving Barclays into increasing its financial commitment and/or remaining invested in the
Enhanced Fund structure, and months before BSAM's public revelations regarding the fund's
true financial condition.

209.    Tannin and BSAM also intentionally deceived Barclays throughout early 2007 and into
the meltdown in June to cover their harmful behavior, to allow BSAM and Bear Stearns time to
accomplish the Everquest IPO, and to otherwise use the Enhanced Fund as a vehicle for holding
troubled Bear Stearns- or BSAM-affiliated assets at exaggerated prices.

210.    BSAM's structured credit funds, until their enormous mid-2007 troubles, and BSAM's
purported expertise in structured credit comprised the heart of BSAM's name on "the Street."
To keep from losing what they had built, Cioffi, Tannin and BSAM attempted to juggle their
furtherance of broader Bear Stearns, BSAM and selfish purposes with the goal of somehow

50

turning the funds around and maintaining their reputations. To do that, the BSAM Defendants kept their portfolio and performance errors hidden from Barclays for as long as possible.

211. The nature of the actions alleged above indicates that other individuals, yet to be specifically identified, at Bear Stearns, BSAM and/or Everquest also were likely involved in knowingly assisting and implementing the BSAM Defendants' breach of their fiduciary duties to and deception of Barclays, and perpetuating Bear Stearns' improper self-dealing to Barclays' detriment.

212. In the months since the July 2007 revelation, BSAM and certain of the other defendants have been sued in numerous lawsuits and/or arbitrations involving investments in the Enhanced Fund and/or High-Grade Fund structures, alleging, among other things, concealment of the funds' problems from investors, failure to disclose related-party trades, and the failure to disclose risks associated with illiquid securities held in the funds. Likewise, investigations by federal and state enforcement authorities surrounding the funds' collapse reportedly have increased significantly in number and continue to expand in scope as details come to light regarding the events leading up to the funds' troubles. As discussed above, one such investigation by state officials has already resulted in a complaint against BSAM alleging violations of federal and state law, including anti-fraud statutes.

<u>FURTHER BREACHES AND MISREPRESENTATIONS,</u>

<u>AND BEAR STEARNS COMPANIES' SACRIFICE OF BARCLAYS' STAKE</u>

213. By on or about June 14, 2007, counterparties in transactions involving the underlying portfolio assets had realized that there was reason for concern about the future of the High-Grade Fund and the Enhanced Fund and demanded meetings with BSAM.

214. Barclays itself was concerned about whether BSAM would take all appropriate steps to stabilize the Enhanced Fund, would try to avoid rushed asset sales, and would ensure that any necessary asset disposition be orderly. Barclays was also concerned about whether it would be provided with full information at every step, and whether every action would be taken to protect Barclays in accordance with BSAM's special duties to it.

215. On or about June 15 and June 16, Richard Ho of Barclays spoke with Tannin about those concerns. On or about June 17, Barclays received its last portfolio spreadsheet of the Enhanced Fund's assets from BSAM, dated June 15. This portfolio report (as revealed by subsequent disclosures by BSAM and PFPC) vastly overstated the asset values in the Enhanced fund. Thus, BSAM's intentional deception continued.

216. From June 17 onward, John Mahon and Mark Manski of Barclays took the lead for Barclays in trying to get additional information and cooperation from BSAM. These and other Barclays' executives repeatedly attempted to reach Richard Marin, then still the chief executive of BSAM, but did not succeed in talking with him until on or about June 20. Mahon eventually spoke with Marin approximately six times, up to the beginning of July. Mahon and Manski also spoke or attended meetings in New York with The Blackstone Group, which had been retained by BSAM to assist it in the crisis, and with other BSAM representatives, every day from June 18 through at least June 22, 2007.

217. On June 18, BSAM and Blackstone still were representing to Barclays that the equity in the Enhanced Fund would be sufficient to make Barclays whole. By June 25, however, Marin told Mahon that there might be only $150 million value left in the Enhanced Fund, between assets and the Everquest shares. By June 26, Marin revealed that yet more probable losses had occurred, saying that the $150 million had been book value, not actual value.

52

218.    Despite all of the affirmative efforts by Barclays to obtain information, and despite BSAM's obligations under its prior commitments to Barclays, Barclays never succeeded in obtaining even basic confirmation of what was occurring during this June 2007 period with the Enhanced Fund. Marin and others would profess to Barclays BSAM's willingness to provide ongoing information, and made specific promises to Barclays that it would do so, but vital information was never forthcoming.

219.    For example, Mahon asked Marin for a list of the Enhanced Fund's unencumbered assets. Marin promised to provide that list, but never did.

220.    In addition, at one point Marin admitted to Mahon that BSAM did not know how to value various CDO equity positions in the Enhanced Fund portfolio.

221.    As the crisis continued, Mahon also asked for specific information on the initial deals that BSAM had made with counterparties and for the marks on assets that had been included in those deals. Again, Barclays never received that information.

222.    Finally, on June 22 Mahon sent a letter to BSAM, again asking for up-to-date information about the NAV of the Enhanced Fund, unencumbered assets, deals that had already been concluded, and any "issues hampering reaching agreements with other counterparties." BSAM did not respond to Mahon's letter or provide any of the requested information, save for isolated bits of information about remaining assets and a few counterparty transactions conveyed on July 19, 2007.

223.    From June 15 onward, Barclays indicated its willingness to help BSAM navigate and weather the crisis. Mahon and others told BSAM that Barclays had a team of people that could immediately go to BSAM to assist it in stabilizing the Enhanced Fund (and thereby protect Barclays' stake in the structure).

53

224.    From June 15 onward, Ho, Mahon and Manski emphasized to BSAM that it should do everything possible to avoid asset sales and to avoid counterparty banks breaking ranks to sell their assets hurriedly, which would cause a downward spiral. BSAM did not do so.

225.    Moreover, in mid-June, Bear Stearns Companies stepped in to make the major decisions about what would be done to stabilize, or not, the High-Grade Fund and/or the Enhanced Fund.

226.    Bear Stearns Companies and BSAM did not adequately, competently, or in good faith manage events in mid-June to stabilize the position of all the repo counterparties with regard to the Enhanced Fund, to Barclays' special detriment.

227.    Bear Stearns Companies and BSAM mismanaged the relationship with Merrill Lynch, one of the repo counterparties, who ultimately broke away and began to sell assets on the open market, despite the Bear Stearns entities and Merrill being only a small amount apart in their negotiations to avoid such an outcome. The Bear Stearns entities knew this would likely trigger many further assets sales by repo counterparties.

228.    In addition, Bear Stearns Companies announced that it would make $3.2 billion in financing available to the High-Grade Fund. It later reduced that number to $1.6 billion. Yet, at the same time, Bear Stearns Companies publicly made clear that it would allow the Enhanced Fund to fail. These decisions were made by the executive committee or other senior management of Bear Stearns Companies, and dictated to BSAM.

229.    After the Merrill actions, which could have been avoided by the defendants, and the Bear Stearns Companies' announcement that it was turning its back on the Enhanced Fund, Barclays' financial stake effectively was left to the mercy of a fire-sale market. Indeed, there was a rush to the door by the repo counterparties in selling assets quickly rather than negotiating for price.

230.    For example, a Cantor Fitzgerald trader trying to unload repo agreement assets told a trader from another firm that Cantor simply wanted bids, and did not care what they were.

231.    The actions by Bear Stearns Companies and BSAM in allowing the Enhanced Fund to fail and allowing asset sales in a manner that destabilized the structure and did not preserve value for Barclays breached BSAM's fiduciary duties that were specific to Barclays. Bear Stearns Companies knowingly aided in that breach.

232.    The nature of the actions alleged above indicates that other individuals, yet to be specifically identified, at Bear Stearns Companies and/or BSAM also were likely involved in knowingly assisting and implementing the breach of BSAM's fiduciary duties during this period, and perpetuating Bear Stearns Companies' harm to Barclays.

233.    BSAM said in late June that a final NAV for May would not be released until July 16, 2007, one month late.

234.    Despite the Investment Guidelines and other continuing promises to Barclays, BSAM refused to provide any other written reports or portfolio status information to Barclays prior to July 16.

235.    On July 17 (even one more day later than planned), BSAM released a May NAV for the Feeder Funds and an estimated June NAV for those funds, and in doing so, revealed the devastating news that that there is "effectively no value left" for the Feeder Fund investors. The release did not explain, however, how hundreds of millions of dollars in reported asset value could have vanished so quickly.

236.    In a letter dated July 17, but sent by email to Simran Sethi of Barclays late on the night of July 18, PFPC reported to Barclays that the Enhanced Fund had declined 38.27% in May. PFPC did not provide a report to Barclays for June.

237.    On or about July 23, Barclays hand delivered to BSAM the appropriate notice to terminate the swaps and redeem its hedge of shares in the Enhanced Fund simultaneously on the next dealing date, August 3, 2007.

238.    On or about July 25, Sethi called Corson of PFPC to obtain an update on the NAV of the Enhanced Fund for June month end.  Corson, however, did not provide any information, but instead told Sethi to speak with Jerry Cummins, a director of the Enhanced Fund and a managing director at BSAM.

239.    On July 31, 2007, the Enhanced Fund applied to the Grand Court of the Cayman Islands for the appointment of joint provisional liquidators and commenced an insolvency proceeding.

240.    After their appointment, those joint provisional liquidators then appeared *ex parte* on July 31 in the U.S. Bankruptcy Court in the Southern District of New York to seek various forms of temporary relief for the fund.

241.    The July 31 papers filed by the Enhanced Fund's joint provisional liquidators in the U.S. Bankruptcy Court recounted that "[t]he Foreign Petition states that Enhanced Fund is insolvent and unable to pay its debts as they come due."

242.    On August 2, 2007, BSAM, on behalf of the Enhanced Fund, faxed to Barclays a letter stating that the Enhanced Fund Board of Directors purportedly declared a suspension of the redemption of shares in the Enhanced Fund on July 25, 2007, and informed Barclays of the Cayman Islands' appointment of the joint provisional liquidators.

243.    Based on Marin's last representations, information from counterparties and other non-BSAM sources, the mid-July information released by BSAM and PFPC, and ongoing reports regarding assets and liabilities from the liquidators, either all or almost all the value in the

Enhanced Fund portfolio is gone. Thus, all or almost all of Barclays' financial commitment to the structure has disappeared.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Fraud and Deceit—as to Defendants BSAM and Tannin)

244.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

245.    As detailed above, defendants BSAM and Tannin made material misrepresentations of fact and/or omitted to disclose material facts in connection with Barclays' participation in the swaps and their hedge, its commitment of additional funds to the structure, and its continued participation in the transaction into July 2007.

246.    Defendants BSAM and Tannin knew that their statements were false and misleading, or at a minimum were reckless in not knowing whether the statements were true, when the statements were made, and those defendants made the statements with the intent and expectation that Barclays would rely on them.

247.    In the pre-closing period, BSAM and Tannin made numerous representations about their future planned actions that they knew at the time did not reflect their true intentions (in addition to their numerous misstatements of fact). They reiterated these same representations about future planned actions after the transaction commenced, again knowing that the statements did not reflect their true intentions. BSAM and Tannin did so initially to convince Barclays to close the transaction, and thus enable the whole structure and the Feeder Funds to begin operation. BSAM and Tannin did so subsequently to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible.

248.    Based on their purported expertise, specialized knowledge and relationship with Barclays in connection with the swaps and hedge, defendants BSAM and Tannin owed a duty to Barclays to disclose material facts about the transaction, including in particular about the Enhanced Fund. BSAM, among other things, owed Barclays a duty to disclose the true facts regarding the nature and performance of the investment portfolio at issue, and a duty to disclose defendants' self-dealing and attendant misuse of the structure. Such information was not readily available to Barclays, and defendants BSAM and Tannin knew that Barclays was acting in reliance on mistaken information.

249.    Defendants BSAM and Tannin also had a duty to correct and/or update information for Barclays.

250.    Barclays reasonably relied on each of the pre-closing representations of defendants BSAM and Tannin, which, in fact, were misrepresentations. Without those material representations, Barclays would not have entered into the transaction.

251.    Barclays also reasonably relied on each of the representations (which, in fact, were misrepresentations) of defendants BSAM and Tannin as Barclays increased its financial commitment to the structure and continued its participation in the transaction. Without those material representations, Barclays would instead have terminated its participation or would have required that immediate and comprehensive steps be taken by BSAM to protect Barclays' financial commitment.

252.    BSAM's and Tannin's fraudulent conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

253.    As a direct, proximate and foreseeable result of BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial. As a result of BSAM's and Tannin's

conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

### SECOND CAUSE OF ACTION

(Negligent Misrepresentation—as to Defendants BSAM and Tannin)

254.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

255.    At the time BSAM or Tannin made the material misrepresentations to secure Barclays' initial participation in the transaction or to increase its financial commitment to the structure, described above, defendants BSAM and Tannin knew, or at a minimum were negligent in not knowing, that those statements were false and misleading. At a minimum, BSAM and Tannin should have known that the statements were incorrect.

256.    BSAM devised the idea for the "enhanced leverage" structure and came to Barclays seeking its participation in that new structure.

257.    BSAM and Tannin held themselves out as having a unique market position and special expertise with regard to the proposed transaction. The transaction proposed by BSAM and Tannin was allegedly built on their experience with the High-Grade Fund and their proprietary risk management and analysis tools.

258.    BSAM and Tannin, moreover, were uniquely situated to explain the details, attributes, and conditions of the transaction and of BSAM's structured credit business practices, for BSAM was involved in and had significant control over every aspect of the planned structure, and BSAM had the best access to information about its own business practices.

259.    BSAM and Tannin explicitly aimed with their representations to provide "comfort" to Barclays and thereby to convince Barclays to enter into the transaction and, subsequently, to increase its commitment to the structure.

59

260.    BSAM and Tannin made numerous and detailed representations personal to Barclays upon which they intended Barclays to rely.  BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was critical to Barclays' decision-making.

261.    BSAM and Tannin entered into a special relationship so close as to approach privity with Barclays.  Defendants BSAM and Tannin knew that Barclays was uniquely and specially relying on BSAM's and Tannin's representations in deciding whether to participate in the structure and/or in deciding whether to increase its financial commitment to the structure.  BSAM and Tannin thus owed a duty to Barclays to give Barclays accurate information and representations.

262.    Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations.  Without those material representations, Barclays would not have entered into the transaction or increased its commitment to the structure.

263.    As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

### THIRD CAUSE OF ACTION

(Negligent Misrepresentation—as to Defendants BSAM and Tannin During Management and Operation of the Structure)

264.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

265.    Once the "enhanced leverage" structure came into being and BSAM became the investment manager for the Enhanced Fund, BSAM and Tannin made myriad personal and material misrepresentations to Barclays about the performance and status of the fund or the pricing of its assets, as detailed above.

60

266. At the time BSAM or Tannin made those material misrepresentations, defendants BSAM and Tannin knew, or at a minimum were negligent in not knowing, that they were false and misleading. At a minimum, BSAM and Tannin should have known that the statements were incorrect.

267. Defendants BSAM and Tannin were acting as the investment manager for the Enhanced Fund, and as operators of the entire "enhanced" structure, with their claimed professional expertise. By virtue of the swap-and-hedge transaction, Barclays owns all of the participating shares in and thus has the sole direct financial stake in the Enhanced Fund. BSAM and Tannin arranged and negotiated for Barclays to have that distinct stake. With knowledge of, and specific commitments by BSAM to Barclays because of, Barclays' unique position in the structure, these defendants' role and duties as investment manager were undertaken specifically for the purpose of, inter alia, serving and protecting the economic interests of Barclays.

268. Barclays, as the sole participating shareholder in the Enhanced Fund, was the only target and recipient of BSAM's reports and representations about the performance of the Enhanced Fund alleged above.

269. Barclays made its financial commitment to the structure and the Enhanced Fund after personal negotiations with defendants BSAM and Tannin about the practices and care they would use in managing the Enhanced Fund, including but not limited to the Investment Guidelines and Reporting Requirements. BSAM and Tannin, as investment manager and operator of the overall structure, established and proceeded in a special relationship so close as to approach privity with Barclays. Defendants BSAM and Tannin knew that Barclays was uniquely and specially relying on their representations, and expected Barclays to do so.

61

270.    Similarly, BSAM and Tannin held themselves out as having a unique market position and special expertise with regard to the Enhanced Fund and its structured credit portfolio. BSAM and Tannin encouraged Barclays' special trust and confidence in them, including in their pricing expertise and their ability to report accurately and timely to Barclays on the performance of the Enhanced Fund and thus on the status of Barclays' commitment to the structure.

271.    BSAM and Tannin, during their management of the fund, made numerous and detailed reports and representations to Barclays upon which they intended Barclays to rely. BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was material to Barclays' decision-making, including with regard to staying in the structure or mandating actions to protect its financial stake.

272.    BSAM and Tannin owed a duty to give Barclays ongoing accurate information regarding the Enhanced Fund's performance and status.

273.    Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations. Without those material representations, Barclays would not have continued in the structure or would have required that steps be taken by BSAM to protect Barclays' financial commitment.

274.    As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

## FOURTH CAUSE OF ACTION

(Civil Conspiracy to Commit Fraud—as to Defendants BSAM, Cioffi and Tannin)

275.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

276.    Defendants BSAM, Cioffi and Tannin, acting together, and with others at times, planned and agreed to deceive Barclays in the manner described above. These defendants knew and understood at the time of their agreement that Barclays would be injured by their wrongful conduct.

277.    Defendant Cioffi was the creator and leader of the "enhanced" structure and the Enhanced Fund. Until June 2007, he was involved in all key decision-making and supervised Tannin in all Tannin's activities with regard to the structure and fund.

278.    Cioffi conspired with Tannin and BSAM to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible. As described above, Cioffi conspired with Tannin to deceive Barclays to commit initially and remain invested in the Enhanced Fund structure to conceal the High-Grade Fund's troubles from its own investors. Cioffi was also motivated in particular by the desire to hide his own self-dealing and insider trading with the Enhanced Fund, and to proceed with the (now-aborted) Everquest IPO and further enrich himself in the process, as well as by a desire to keep alive his fund and his reputation as a successful fund manager and expert on managing the risk of structured credit securities.

279.    In furtherance of the conspiracy, these defendants affirmatively deceived Barclays and concealed the poor performance of the Enhanced Fund.

280.    BSAM's, Cioffi's and Tannin's fraudulent conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

281.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial. As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## FIFTH CAUSE OF ACTION

(Breach of Fiduciary Duties Owed to Barclays—as to Defendants BSAM, Cioffi and Tannin

During Management and Operation of the Structure)

282.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

283.    Defendants BSAM, Cioffi and Tannin were acting as the investment manager for the

Enhanced Fund and as operators of the entire "enhanced" structure, with their claimed

professional expertise. By virtue of the swap-and-hedge transaction, Barclays owns all of the

participating shares in and thus has the sole direct financial stake in the Enhanced Fund. BSAM,

Cioffi and Tannin arranged and negotiated for Barclays to have that distinct stake. With

knowledge of, and commitments by BSAM to Barclays because of, Barclays' unique position in

the structure, these defendants' role and duties as investment manager were undertaken

specifically for the purpose of, inter alia, serving and protecting the economic interests of

Barclays.

284.    Barclays made its financial commitment to the structure and the Enhanced Fund after

personal negotiations with those defendants about the practices and care they would use in

managing the Enhanced Fund, including but not limited to the Investment Guidelines and

Reporting Requirements. BSAM specifically tailored its investment portfolio parameters to

Barclays' requirements and repeatedly stated to Barclays that BSAM would be protecting

Barclays' financial interests.

285.    As discussed above, defendants BSAM and Tannin made numerous and detailed

representations and assurances to Barclays. BSAM, Cioffi, and Tannin established and

proceeded in a special relationship of higher trust with Barclays, a relationship that was so close

as to approach privity. These defendants knew that Barclays was uniquely and specially relying

64

on them for their expertise and their specific commitments to Barclays in managing and operating the Enhanced Fund and the "enhanced" structure, and expected Barclays to do so.

286.     Given defendants BSAM's, Cioffi's and Tannin's role as investment manager for the portfolio that represented Barclays' stake in the structure, their particularized promises and representations to Barclays, their claimed unique market position and expertise with respect to the investments at issue, and the proprietary methodology they used in creating and monitoring the asset portfolio, these defendants owed a fiduciary duty to give Barclays ongoing accurate information about the performance and status of the Enhanced Fund. Barclays justifiably placed trust and confidence in BSAM, Cioffi, and Tannin to do so.

287.     Under the circumstances of this case, alleged in detail above, Defendants BSAM, Cioffi, and Tannin also each owed specifically to Barclays the duty to exercise due care and diligence in the management and operation of the Enhanced Fund, and in the use and preservation of Barclays' assets, consistent with BSAM's specific commitments to Barclays. These defendants also owed to Barclays duties of full and candid disclosure of all material facts with regard to the Enhanced Fund, duties of loyalty to Barclays, and duties to deal fairly and honestly with Barclays. Barclays justifiably placed trust and confidence in BSAM to act in accordance with those duties.

288.     Because Barclays effectively ceded to these defendants control over and discretion with regard to Barclays' financial exposure to the Enhanced Fund, subject to the Investment Guidelines and Reporting Requirements, and participated in the "enhanced" structure only because of BSAM's specific representations to Barclays, these defendants were obligated to ensure that they invested in accordance with their commitments to Barclays, that they placed Barclays' interests ahead of their own, and that they did not engage in any fraudulent, grossly

65

negligent, negligent, excessively risky, or imprudent investment practices to the detriment of Barclays.

289.    By engaging in the conduct alleged herein, including but not limited to false reports; failures to disclose; taking on excessive risk and breaching the Investment Guidelines; engaging with Bear Stearns and BSAM in transactions harmful to Barclays that involved a conflict of interest or self-dealing; and overvaluing assets in and later dissipating assets of the Enhanced Fund, all contrary to their commitments that were personal to Barclays, defendants BSAM, Cioffi and Tannin breached their fiduciary duties to Barclays.

290.    BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

291.    As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial. As a result of BSAM's, Cioffi's and Tannin's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## SIXTH CAUSE OF ACTION

(Gross Negligence and Negligence With Regard to Barclays—as to Defendants BSAM, Cioffi, and Tannin During Management and Operation of the Structure)

292.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

293.    Defendants BSAM, Cioffi and Tannin were acting as the investment manager for the Enhanced Fund and as operators of the entire "enhanced" structure, with their claimed professional expertise. By virtue of the swap-and-hedge transaction, Barclays owns all of the participating shares in and thus has the sole direct financial stake in the Enhanced Fund. BSAM, Cioffi and Tannin arranged and negotiated for Barclays to have that distinct stake. With

knowledge of, and commitments by BSAM to Barclays because of, Barclays' unique position in the structure, these defendants' role and duties as investment manager were undertaken specifically for the purpose of, inter alia, serving and protecting the economic interests of Barclays.

294.    Barclays made its financial commitment to the structure and the Enhanced Fund after personal negotiations with those defendants about the practices and care they would use in managing the Enhanced Fund, including but not limited to the Investment Guidelines and Reporting Requirements. BSAM specifically tailored its investment portfolio parameters to Barclays' requirements and repeatedly stated to Barclays that BSAM would be protecting Barclays' financial interests.

295.    As discussed above, defendants BSAM and Tannin made numerous and detailed representations and assurances to Barclays. BSAM, Cioffi, and Tannin established and proceeded in a special relationship of higher trust with Barclays, a relationship that was so close as to approach privity. These defendants knew that Barclays was uniquely and specially relying on them for their expertise and their specific commitments to Barclays in managing and operating the Enhanced Fund and the "enhanced" structure, and expected Barclays to do so.

296.    Given defendants BSAM's, Cioffi's and Tannin's role as investment manager for the portfolio that represented Barclays' stake in the structure, their particularized promises and representations to Barclays, their claimed unique market position and expertise with respect to the investments at issue, and the proprietary methodology they used in creating and monitoring the asset portfolio, these defendants owed a duty of care to give Barclays ongoing accurate information about the performance and status of the Enhanced Fund. Barclays justifiably placed trust and confidence in BSAM, Cioffi, and Tannin to do so.

67

297.    Under the circumstances of this case, alleged in detail above, defendants BSAM, Cioffi, and Tannin also each owed specifically to Barclays duties to exercise due care and diligence in the management and operation of the Enhanced Fund, and in the use and preservation of Barclays' assets, consistent with BSAM's specific commitments to Barclays. Barclays justifiably placed trust and confidence in BSAM to act in accordance with those duties.

298.    Because Barclays effectively ceded to these defendants control over and discretion with regard to Barclays' financial exposure to the Enhanced Fund, subject to the Investment Guidelines and Reporting Requirements, and participated in the "enhanced" structure only because of BSAM's specific representations to Barclays, these defendants were obligated to ensure that they invested in accordance with their commitments to Barclays, that they placed Barclays' interests ahead of their own, and that they did not engage in any grossly negligent, negligent, excessively risky, or imprudent investment practices to the detriment of Barclays.

299.    By engaging in the conduct alleged herein, including but not limited to false reports; taking on excessive risk and breaching the Investment Guidelines; engaging with Bear Stearns and BSAM in transactions harmful to Barclays that involved a conflict of interest or self-dealing; and overvaluing assets in and later dissipating assets of the Enhanced Fund, all contrary to their commitments that were personal to Barclays, defendants BSAM, Cioffi and Tannin breached their duties of care to Barclays.

300.    The BSAM Defendants were grossly negligent, or at a minimum negligent, toward Barclays in doing so.

301.    BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

302. As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial. As a result of BSAM's, Cioffi's and Tannin's gross negligence, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>SEVENTH CAUSE OF ACTION</u>

(Promissory Estoppel—as to Defendant BSAM)

303. Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

304. BSAM made clear and unambiguous promises to Barclays in the Investment Guidelines and the Reporting Requirements, which were the result of months of negotiations between BSAM and Barclays and which were reduced to writing and annexed to the Confirmations in order to memorialize BSAM's promises to Barclays.

305. BSAM, in addition, reiterated and reaffirmed those promises to Barclays throughout the history of the transaction.

306. Barclays reasonably and foreseeably relied on BSAM's promises to Barclays by entering into the transaction.

307. Barclays further reasonably and foreseeably relied on BSAM's promises to Barclays by increasing its financial commitment to the structure and by continuing to participate in the transaction into July 2007.

308. BSAM did not abide by, fulfill or keep its promises to Barclays, as detailed above.

309. BSAM's conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

310. As a direct, proximate and foreseeable result of Barclays' reliance on BSAM's promises, as memorialized in the Investment Guidelines and Reporting Requirements (and elsewhere, as

described above), Barclays has been damaged in an amount to be determined at trial. As a result of BSAM's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

### EIGHTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant

Bear Stearns)

311.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

312.    As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

313.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached their fiduciary duties to Barclays.

314.    Bear Stearns knew that BSAM and its managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood Barclays' unique position in the structure.

315.    Bear Stearns served as placement agent for the Feeder Funds, served as underwriter on the planned Everquest IPO, and served as underwriter on offerings of assets that were sold into the Enhanced Fund. In each of these capacities, Bear Stearns stood to gain financially – and aimed to guard its reputation – by hiding the performance problems of the Enhanced Fund, continuing the Enhanced Fund's operations, and continuing the Bear Stearns underwriting activities that related to that fund.

316.    Bear Stearns was a critical participant in the BSAM Defendants' Everquest maneuvers; sold assets to the Enhanced Fund to serve Bear Stearns' own interests, even when the Enhanced Fund was already failing; and was central to the cover-up of the Enhanced Fund's escalating troubles.

70

317.    In its activities as placement agent and underwriter, alleged above, and in its concealment of the performance problems in the Everquest assets and the Enhanced Fund as a whole, Bear Stearns substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays. Indeed, Bear Stearns itself took actions and made decisions that caused harm to Barclays.

318.    Bear Stearns knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

319.    Bear Stearns' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

320.    As a direct, proximate and foreseeable result of Bear Stearns' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of their fiduciary duties owed to Barclays, Barclays has been damaged in an amount to be determined at trial. As a result of Bear Stearns' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## NINTH CAUSE OF ACTION

(Civil Conspiracy to Breach Fiduciary Duties Owed to Barclays—as to Defendants BSAM,

Cioffi, Tannin and Bear Stearns)

321.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

322.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns planned and agreed to abuse the "enhanced" structure for their own gain. These defendants knew and understood at the time of their agreement that Barclays would be injured by their wrongful conduct.

323.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns acting together, and with others at times, participated in a plan to sell assets underwritten by Bear Stearns or accumulated and

71

managed by BSAM to the Enhanced Fund, contrary to BSAM's representations to Barclays, for the purpose of unloading those assets in a manner that was financially beneficial to Bear Stearns or BSAM and in disregard of BSAM's, Cioffi's and Tannin's fiduciary duties to Barclays.

324.    In furtherance of that conspiracy, Bear Stearns and/or BSAM caused Bear Stearns- and BSAM-affiliated assets that were excessively risky, troubled and/or overpriced to be purchased by the Enhanced Fund, including at a time when the Enhanced Fund was already faltering.  Bear Stearns and/or BSAM assets sold into the Enhanced Fund were prohibited by the Investment Guidelines that BSAM had agreed with Barclays to follow.

325.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns also agreed to conceal the true nature and performance of the Enhanced Fund, to transfer certain assets to Everquest, and to attempt to proceed with the Everquest IPO as a way of enriching themselves, without regard to their duties and obligations to Barclays.  In furtherance thereof, these defendants concealed the poor performance of the Enhanced Fund and eventually left the Enhanced Fund with an illiquid, impermissible and troubled investment in Everquest, to Barclays' detriment.

326.    These defendants' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

327.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## TENTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant Bear

Stearns Companies)

328.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

329.    As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

330.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached their fiduciary duties to Barclays.

331.    Bear Stearns Companies knew that BSAM and its managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood Barclays' unique position in the structure.

332.    In overseeing and directing the conduct of BSAM, especially in June 2007 and later, Bearn Stearns Companies substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays.  Indeed, Bear Stearns Companies itself took actions and made decisions that caused harm to Barclays.

333.    Bear Stearns Companies knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

334.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

335.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of their fiduciary duties owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns Companies' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

73

## ELEVENTH CAUSE OF ACTION

(Civil Conspiracy to Breach Fiduciary Duties Owed to Barclays—as to Defendants BSAM,

Tannin, Cioffi and Bear Stearns Companies)

336.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

337.    As described above, Bear Stearns Companies knew that BSAM and its managers, Cioffi and Tannin, owed fiduciary duties personal to Barclays, and conspired and agreed with those defendants to breach their duties.

338.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly took overt actions in breach of their fiduciary duties to Barclays.

339.    In overseeing and directing the conduct of BSAM, especially in June 2007 and later, Bear Stearns Companies knew that BSAM and its managers, Cioffi and Tannin, would be breaching their fiduciary duties to Barclays and would harm Barclays in the process, and Bear Stearns Companies directed and worked with those defendants to that end.  Bear Stearns Companies pursued its own interests and goals, and acted contrary to Barclays' interests.

340.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious, reckless, and without regard to Barclays' rights and interests.

341.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in conspiring with BSAM, Cioffi, and Tannin to sacrifice Barclays' stake in the structure and breach the fiduciary duties specifically owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of defendant's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## PRAYER FOR RELIEF

WHEREFORE, Barclays demands judgment and permanent relief against

Defendants as follows:

(a) awarding Barclays compensatory and punitive damages in amounts to be

determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

(b) awarding Barclays its reasonable costs and expenses incurred in this action,

including, to the extent applicable, counsel fees; and

(c) awarding Barclays all such other relief as the Court deems just and proper.

## JURY DEMAND

Barclays hereby demands a trial by jury.

Dated:    December 19, 2007
          New York, New York

Lawrence Byrne
James R. Warnot, Jr.
Lance Croffoot-Suede
Ruth E. Harlow
Brenda D. DiLuigi
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000 (phone)
(212) 903-9100 (fax)

Attorneys for Plaintiff, Barclays Bank PLC



Annex 2
Investment Guidelines

Bear Stearns High-Grade Structured Credit Strategies Enhanced
Leverage Master Fund, Ltd. (the "Fund")

### 1. General

The Investment Manager will operate the Fund in accordance with the limits and restrictions below.

The Investment Manager will provide Barclays with risk reports of a format to be agreed; including dv01 and Net Asset Value (NAV) and leverage calculations.

The Reference Fund Administrator will provide Barclays with the necessary information to monitor these guidelines and will detail on request how this information was compiled and will assist in the verification of the information.

### 2. Investment Objectives and Strategy

The Fund aims to seek high current income and capital appreciation relative to LIBOR. The Fund intends to achieve its investment objective primarily through leveraged investments in investment-grade structured finance securities, although the Fund intends to seek investment opportunities beyond the structured finance asset category. As part of its strategy, the Fund intends to gain exposure, on a non-recourse leveraged basis, to investment-grade structured finance securities by means of the purchase of the equity securities and other securities issued by structured vehicles (such as CDOs) that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities, The Fund invests in floating rate assets so does not does not intend to incur any Interest Rates exposure. The Fund does not intend to take on FX exposure.

### 3. Permitted instruments

In order to pursue its investment strategies the Investment Manager will invest exclusively in instruments detailed below and obey all the restrictions detailed.

a)  Overriding all other criteria, instruments, which cannot be independently priced daily by the Reference Fund Administrator, are not eligible as a permitted instrument. Instruments where there is no official public price available are only eligible if the Reference Fund Administrator is able to obtain independent pricings of the instrument on a regular basis from financial counterparties. The Investment Manager does use an internally approved pricing committee to price the Klio residual interests as discussed in the Fund's offering materials. The Investment Manager will share the data and the assumptions with Barcap. The Investment Manager will also provide Barcap with the underlying trustee reports for the Klio investment vehicle.

b)  Long positions in USD denominated, floating rate structured finance securities, with a particular focus on:

   1)  Collateralised Debt Obligations (CDO), this includes Synthetic CDO, High Grade and High Yield CDO,

   2)  Asset Backed Securities (ABS),

   3)  Mortgage Backed Securities (MBS), both Commercial and Residential (CMBS and RMBS respectively),

   4)  Collateralised Loan Obligations (CLO),

   5)  Adjustable Rate Mortgages (ARMS),

   6)  Corporate Bonds

   with minimum ratings breakdowns subject to the limits detailed in Table 1, 1a, and 1b.

- 18 -

c) Long positions in obligations of the United States of America, or any state thereof,

d) Long and short positions in Credit Default Swaps (CDS) and options on CDS on securities listed in point b) above and on individual credits and (for hedging purposes) on Indices with Counterparties listed in Table 3.

e) On an ancillary basis and for hedging purposes only, long and short positions in exchange traded Equity, Warrants and exchange traded Options on Equity Indices and Variance Swaps on Equities and Equity Indices.

f) For hedging purposes only, long and short positions on OTC and exchange-traded Interest Rate Futures, as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

g) For hedging purposes only, long positions in OTC and exchange-traded Options and Caps on Interest Rates Futures as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

## 4.    Leverage and exposure

a) The overall Net Leverage of the Fund shall be no greater than 2850% of the Fund's Net Asset Value, subject to the provisions detailed in Table 1 and Table 1a below;

b) Provided that KLIO Equity Tranches represents over 10% of NAV, then the maximum overall Net Leverage will be reduced to a maximum of 2000% of the Fund's Net Asset Value irrespective of the portfolio composition, should the KLIO Notes in the Fund's portfolio be in breach of any of the Overcollateralization Tests, as detailed in the Trustee monthly report (as detailed in Annex x "Reporting Requirements").

c) The Fund will not exceed interest rate risk exposure of 0.5% of the Fund's NAV.

d) The Weighted Average Life (WAL) of the portfolio must at all times be less than 6.0 years .

e) The Fund will only enter in Repo transactions with Permitted Repo Counterparties as detailed in Table 3 below.

## 5.    Diversification

a) The Fund will be well diversified at all times, with a minimum of two hundred (200) positions in different issues each representing at least TBD% of the Fund's Total Assets.

b) Maximum concentration by ratings as a % of the Fund's Total Assets as detailed in Table 1 and 1a will apply.

c) Maximum concentration per issue as a % of the Fund's Total Assets as detailed in Table 1b will apply.

d) The following concentration limits by asset classes will apply with respect to the assets of the Fund:

1.    CDO up to 60% of Total Assets,

2.    Synthetic corporate CDO up to 15% of Total Assets (only AAA rated issues),

3.    RMBS up to 60% of Total Assets.

4.    Synthetic ABS up to 20% of Total Assets

5.    Corporate Bonds up to 10%

## 6.    Remediation

Limits and restrictions specified in these Investment Guidelines are to be observed by the Investment Manager at all times.

Unless explicitly agreed by Barclays in advance, upon notice from Barclays to the Investment Manager any breach of any of these limits or restrictions must be remedied by the Investment Manager. Failure to initiate appropriate action to rectify the breaches within the remediation period set out below shall

constitute a Close Out Event and/or a change in the multiplier, as per the Risk Advisory Guidelines at the sole discretion of Barclays. During such remediation periods all contractual rights and obligations of the parties remain unaffected.

The remediation period shall be five (5) calendar days from the date of notice from Barclays.

### 7.    NAV Reduction Management

Based on the daily Investment Manager estimated profit and loss, if the Fund's NAV decreases by 10% during any Observation Period, the Investment Manager will provide a detailed action plan to reduce the risk profile of the portfolio. Any failure to do so within one business day will constitute a breach of the investment guidelines and necessitate remediation in accordance with Section 6 ("Remediation").

For the purposes of the above, "**Observation Period**" means the period, measured on any day, from the latest redemption date in the Fund to the next available redemption date in the Fund.

### Further Definitions

"**Asset-Backed Security**" or "**ABS**" means a security that entitles the holder thereof to receive payments that depend primarily on the cash flow from, the market value of, or the credit exposure to, a specified pool of financial assets, either fixed or revolving, that by its terms convert into cash within a finite time period, together with rights or other assets designed to assure the servicing or timely distribution of proceeds to the holder of the security.

"**Adjustable Rate Mortgage Securities** " or "**ARMS**" means Mortgage-Backed Securities backed by mortgages that features predetermined adjustments of the loan interest rate at regular intervals based on an established index. The interest rate is adjusted at each interval to a rate equivalent to the index value plus a predetermined spread, or margin, over the index, usually subject to per-interval and to life-of-loan interest rate and/or payment rate caps.

"**Auto Loans**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under automobile loans.

"**CMBS**" means Asset-Backed Securities (that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans.

"**Collateralised Debt Obligation**" or "**CDO**" means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets.

"**Credit Spread Risk**" – Definition and on-going, regular monthly information on portfolio Spread Risk to be provided by Investment Manager in the form of Manager calculated DV01 reports..

"**KLIO Notes / KLIO Equity Tranches**": CDO's issued by KLIO Funding Corp (I, II and III) where Bear Stearns Asset Management is Investment Advisor. With KLIO Equity Tranches we refer specifically to KLIO Notes which are either not rated or rated below BBB- by Standard and Poor's or equivalent.

"**NAV**" means Net Asset Value of the Fund, and is equivalent to investors' equity.

"**Net Leverage**" is defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges divided by the Net Asset Value of the Fund. Short CDS are considered as long Credit positions.

"**Other ABS**" means Asset-Backed Securities other than RMBS, CMBS, CDOs, Synthetic CDOs, Credit-Card Receivables or ABS Leasing Securities.

"**Residential Mortgage Securities**" or "**RMBS**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the

servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used).

**"Synthetic ABS"** means short protection (long risk) Credit Derivative positions where the reference obligation is a single name Asset Backed Security.

**"Synthetic CDO"** means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets, but which uses credit derivatives to transfer the credit risk of the reference assets from the issuer to the CDO vehicle without selling those assets.

**"Total Assets"** are defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges. In order to calculate the Total Assets, short CDS positions are taken with a positive sign

**"WAL"** means weighted average life.

**Table 1:** Maximum Net Leverage as % of NAV by ratings breakdown:

| Max Net Leverage of | Up to 2000% of NAV | Up to 2500% of NAV | Up to 2850% of NAV |
|---|---|---|---|
| Max allocation to paper rated less than BBB- (as % of NAV) | 35% | 25% | 20% |
| Minimum allocation to KLIO Equity tranches (as % of NAV) | 15% | 15% | 10% |

**Table 1a:** Minimum / Maximum aggregate exposure by Ratings as % of Total Assets

| | Limits for Maximum Net Leverage up to 2000% of NAV | | Limits for Maximum Net Leverage up to 2500% of NAV | | Limits for Maximum Net Leverage up to 2850% of NAV | |
|---|---|---|---|---|---|---|
| Ratings | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets |
| AAA through to AA- | 75% | 100% | 85% | 100% | 95% | 100% |
| A+ through to BBB- | - | 20% | - | 15% | | 5% |
| Below BBB- or not rated | - | 3.5% | - | 2% | | 0% |

**Table 1b:** Maximum exposure to single issue by Issue Ratings

| Ratings | Max % of Total Assets | Max % as NAV |
|---|---|---|
| AAA Super Senior | 2.5% | 20% |
| AAA | 2% | 15% |

| AA | 1% | 5% |
|---|---|---|
| A | 0.5% | 3.75% |
| Below A- | 0.1% | 2% |

**Table 2:** Permitted Derivatives Products (Please specify which Bond Futures, and on which exchanges they are traded)

| Derivative Products | Symbol | Exchange |
|---|---|---|
| UST Futures | USA,TYA,FVA etc | **CBOT** |
| CDS | ABX CMBX, IG HYVOL HYBOX Tranches off of INDEX Single Name EM Index and Single Country CDS. | OTC |
| | | |

**Table 3:** Permitted Counterparties for Repo / OTC trading (Please provide a list of the Counterparties you will trade Repos / OTC products with)

| |
|---|
| Bear Stearns |
| Goldman Sachs |
| Banc of America |
| Cantor Fitzgerald |
| Lehman Brothers |
| Deutsche Bank |
| Merrill Lynch |
| Morgan Stanley |
| West LB |
| HSBC |
| Countrywide Securities |
| Citigroup |
| ING |
| UBS |
| Barclays Bank |
| CSFB |
| Dresdner Bank |
| Greenwich Capital |

### Annex 3
### Reporting Requirements

1.  The Investment Manager agrees to accommodate on-site renewals of the initial due diligence of the Reference Fund and verification of the reports provided to Barclays, upon five Business Days notice of such proposed on-site due diligence.

2.  In addition the Investment Manager will provide Barclays (by email sent to funds.monitor@barcap.com) with:

    a.  Estimated daily trading profit & loss no later than one Business Day after the end of the respective trading day for the Reference Fund;

    b.  Notice as soon as reasonably possible of any change in circumstances, which might cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%;

    c.  Monthly Trustee Reports on any Asset Backed product Bear Stearns Asset Management Inc. acts as Investment Advisor included in the Reference Fund, including portfolio profile test summary;

    d.  Reports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis; and

    e.  Full investment positions reports on a weekly basis in Microsoft EXCEL format.

    f.  Weekly pricing sheets detailing the sources of the marks of the various underlying products.

3.  In addition the Reference Fund Administrator will provide Barclays with:

    a.  Estimated monthly net asset values for the Reference Fund no later than twelve Business Days following the end of each calendar month. If the Final Report is not ready by the 15th Business Day, the Investment Manager will highlight the missing marks and will report the reason for the missing marks.

# Exhibit B

### [2006 CILR 480]

## IN THE MATTER OF PARMALAT CAPITAL FINANCE LIMITED

COURT OF APPEAL (Zacca, P., Forte and Mottley, JJ.A.): December 5th, 2006

*Companies—compulsory winding up—creditors—"creditor" need not show substantial interest in relief sought (e.g. right to receive funds from liquidation) if charge placed on debt in favour of third party, so long as retains legal title and right to receive surplus—when beneficial interest assigned to third party, both are "creditors" and either can petition for winding up without joining other*

*Companies—compulsory winding up—creditors—creditor's petition based on disputed debt normally dismissed—court has discretion to allow creditor with disputed claim to succeed, if otherwise deprived of remedy, and company needs winding up and investigation*

Food Holdings Ltd. ("Food") and Dairy Holdings Ltd. ("Dairy") brought a petition in the Grand Court for the winding up of Parmalat Capital Finance Ltd. ("PCFL") (a subsidiary of the Parmalat Group), and confirmation of the joint provisional liquidators ("JPLs") as joint official liquidators of the company.

Food and Dairy were incorporated in the Cayman Islands as special purpose vehicles to raise money for Parmalat's Brazilian operations by issuing loan notes, which were governed by the laws of New York. Food and Dairy acquired 18.18% of the shares in the Brazilian subsidiary, which were later made the subject of a put agreement with PCFL under which PCFL would purchase the shares from Food and Dairy if a put event occurred. Put events occurred in November 2003, and subsequently PCFL became liable to pay a base option price of around US$270m. to Food and US$245m. to Dairy.

Whilst Food and Dairy retained legal title to these debts, as part of a security agreement the right to receive payment from PCFL was transferred to certain security trustees who would pay out the money in accordance with priorities set out in the agreement. Any remaining surplus would be paid to Food and Dairy, although at the time of the proceedings it appeared unlikely that any such surplus would exist. The right to demand payment of the debts was reserved to Food and Dairy.

It was clear that PCFL was hopelessly insolvent, and in December 2003 the current JPLs were appointed *ex parte*, and those appointments

were affirmed in a contested *inter partes* hearing in March 2004. Various creditors from the Parmalat Group and one other unrelated creditor ("the opposing parties"), owed a collective debt of around US$1bn., opposed the appointment of the JPLs as joint official liquidators and proposed that their own choice of liquidators be appointed instead. They additionally argued that Food and Dairy had no standing to petition for the winding up of PCFL as the debt, and consequent right to be treated as creditors, had been transferred to the security trustees and, furthermore, claimed no debt existed at all as consideration had not been given for the put agreements. The Grand Court (Henderson, J.) granted Food and Dairy's application, declaring that PCFL was hopelessly insolvent and its affairs required investigation, and appointed the provisional liquidators as official liquidators. The proceedings are reported at 2006 CILR 171.

The opposing parties appealed to the Court of Appeal, submitting that (a) a "creditor" required both "technical standing" and "substantial standing," in order to petition for winding up; (b) Food and Dairy lacked substantial standing because they would not receive any money from the winding up, and therefore lacked a proper interest in the relief sought and were not "creditors"; (c) alternatively, even if only one type of standing were required to be a "creditor," the respondents also lacked technical standing, as they had no right to receive the proceeds of the petition debt, and even if they were to receive payment, it would have to be held on trust for the security trustees; (d) as Food and Dairy were likely to have no beneficial interest in the debt, it was the security trustees, and not Food and Dairy, that should be treated as creditors; (e) the respondents had given no consideration for the put agreements, which had in fact been obtained through fraud, and therefore the debts did not exist; as this was a *bona fide* dispute of the debt on substantial grounds, the respondents had failed to prove they were creditors, and therefore did not have standing to petition for winding up; (f) as they were owed approximately 78% of PCFL's debts, the Grand Court should have appointed their own choice of liquidators, and in not doing so, it had failed to give appropriate weight to their views as the majority creditors; and (g) the JPLs were also the joint official liquidators of Food and Dairy, which could cause a conflict of interest; therefore, given the existence of alternative liquidators, Messrs. Cleaver and MacRae should not have been appointed.

Food and Dairy submitted in reply that (a) although they had transferred most of the beneficial interest in the debt to the security trustees, they had retained the legal title and therefore satisfied the requirements of s.96; as the categories of persons who could petition for winding up were set out in the statute, they did not need to go beyond this and show they were also "proper persons to invoke the jurisdiction"; (b) alternatively, they had retained some beneficial interest in the right to surplus money after payments had been made, and could therefore also be said to have an interest in the relief sought; (c) there could be more than one creditor for a debt, and in this case, both the security trustees as beneficial holders and Food and Dairy as legal holders of the debt should

be treated as creditors; (d) in the US proceedings, it was not alleged that the debts to Food and Dairy were void and should be set aside or rescinded; in fact the US proceedings were against the Bank of America, which they alleged was aware of the breach of fiduciary duty occurring within PCFL, and their claim relied on the existence and validity of the obligation to pay the sums due under the put agreements; (e) even in the existence of a claim that the debt owed to them had been *bona fide* disputed, the court had the jurisdiction to decide whether to allow the creditors to bring their petition; (f) although the Parmalat entities claimed to be entitled to the majority of PCFL's debt, they had formerly been linked with PCFL as shareholders or managers and therefore the Grand Court had been right to give their views less weight than those of unrelated creditors; and (g) there was no rule of law that the same liquidators could not be appointed for related entities because of the potential for a conflict of interest, and Messrs. Cleaver and MacRae had demonstrated to the Grand Court that they had devised a system for dealing with any conflicts that might arise.

**Held,** dismissing the appeal and affirming the orders of the Grand Court:

(1) The Grand Court had been right to conclude that Food and Dairy had standing to petition for the winding up, as they were "creditors" of PCFL within the requirements of s.96 of the Companies Law (2004 Revision). As the category of persons who could petition for winding up was stated by the statute to be "creditors," it was sufficient that the petitioners had retained legal title to the debt, and were entitled to receive any surplus once the security trustees had realized their security, even if there was unlikely to be any surplus and they therefore lacked a substantial interest in the winding up. Although they had assigned the beneficial interest in the debt to the security trustees, if only creditors who could expect to receive payment out of the assets of the liquidation were able bring a winding-up petition, companies with no assets would be protected from any creditor's petition for winding up, which was clearly not the intention of the law. It was possible for there to be more than one creditor for any given debt, and as with all charged property, the interest of the security trustees in the property was limited to the amount secured; the interests of Food and Dairy were not extinguished, even if limited to the equity of redemption. As this petition was for winding up, rather than payment of the debt, it was not necessary that the beneficial holders of the debt be joined as a party to the suit (para. 30; paras. 33–35; paras. 79–80; para. 83; para. 87).

(2) Usually, PCFL's allegation that the debts to Food and Dairy were brought about through fraud and therefore might not legally amount to debts owing at all would cause the court to dismiss the winding-up petition, as such a substantial dispute would mean they had not proved they were "creditors" under the law. However, the court had a discretion to allow creditors whose claims had been disputed on substantial grounds to petition for winding up where the effect of dismissing the petition

C.A.                                    IN RE PARMALAT CAPITAL FINANCE

would be to deprive the petitioners of a remedy, or there was another reason why the petition should proceed. It was willing to exercise the discretion in favour of Food and Dairy because the US proceedings by PCFL were based on the assumption that the debts under the put agreements were valid, casting doubt on the merit in their argument that the debts were not due, and because PCFL was clearly insolvent in circumstances which required investigation (paras. 41–42; para. 50).

(3) The appointment of Messrs. Cleaver and MacRae as joint official liquidators of PCFL was valid. The court would not interfere with the assessment of the Grand Court that less weight should be given to the views of those creditors related to PCFL than unrelated creditors, even though related creditors held around 78% of PCFL's debts, as it had not erred in principle or law in coming to that decision. It had followed the accepted legal position that the potential of a conflict of interest for liquidators appointed for related entities did not disqualify them from being appointed so long as they had put in place a mechanism for dealing with any conflicts that might arise (paras. 57–58; paras. 61–63).  ⎬

**Cases cited:**
(1) *Alipour* v. *Ary*, [1997] 1 W.L.R. 534; [1997] BCC 377, applied.
(2) *Arrows Ltd.*, *Re*, [1992] BCC 121, followed.
(3) *Bateman Television Ltd.* v. *Coleridge Fin. Co. Ltd.*, [1971] NZLR 929, followed.
(4) *Bayoil S.A.*, *Re*, [1999] 1 All E.R. 374; [1998] BCC 988; [1999] 1 BCLC 62, not followed.
(5) *Bell Group Fin. (Pty.) Ltd.* v. *Bell Group (U.K.) Holdings Ltd.*, [1996] BCC 505; [1996] 1 BCLC 304, applied.
(6) *Brinds Ltd.* v. *Offshore Oil N.L.* (1986), 2 BCC 98,916, followed.
(7) *Buchler* v. *Talbot*, [2004] 2 A.C. 298; [2004] 1 All E.R. 1289; [2004] UKHL 9, followed.
(8) *Claybridge Shipping Co.*, *Re*, [1997] 1 BCLC 572; [1981] Com. L.R. 107, referred to.
(9) *Deloitte & Touche A.G.* v. *Johnson*, 1999 CILR 297; [1999] 1 W.L.R. 1605, distinguished.
(10) *Great Britain Mutual Life Assur. Socy.*, *Re* (1880), 16 Ch. D. 246; 51 L.J. Ch. 10, considered.
(11) *Lowestoft Traffic Servs. Co. Ltd.*, *Re* (1986), 2 BCC 98,196, applied.
(12) *Lympne Invs. Ltd.*, *In re*, [1972] 1 W.L.R. 523; [1972] 2 All E.R. 385, not followed.
(13) *Mann* v. *Goldstein*, [1968] 1 W.L.R. 1091; [1968] 2 All E.R. 769, considered.
(14) *Maxwell Communs. Corp.*, *Re*, [1992] BCC 372; [1992] BCLC 465, followed.
(15) *Pantmaenog Timber Co. Ltd.*, *In re*, [2004] 1 A.C. 158; [2003] 4 All E.R. 18; [2003] UKHL 49, considered.
(16) *Performing Right Socy. Ltd.* v. *London Theatre of Varieties Ltd.*, [1924] A.C. 1; (1923), 93 L.J. K.B. 33, distinguished.

483

(17) *Russian & English Bank, In re*, [1932] 1 Ch. 663, referred to.
(18) *Southard & Co. Ltd., In re*, [1979] 1 W.L.R. 546; [1979] 1 All E.R. 582, applied.
(19) *Stonegate Secs. Ltd.* v. *Gregory*, [1980] Ch. 576; [1980] 1 All E.R. 241, not followed.
(20) *Three Rivers District Council* v. *Bank of England*, [1996] Q.B. 292; [1995] 4 All E.R. 312, distinguished.
(21) *Walter & Sullivan Ltd.* v. *J. Murphy & Sons Ltd.*, [1955] 2 Q.B. 584; [1955] 1 All E.R. 843, distinguished.

**Legislation construed:**
Companies Law (2004 Revision), s.96: The relevant terms of this section are set out at para. 72.

*G. Moss, Q.C., D. McCahill* and *Ms. A. Dunsby* for the appellants;
*M. Crystal, Q.C.* and *Ms. S. Corbett* for the respondents;
*C.G. Quin, Q.C.* for the Bank of America (a creditor).

1    **MOTTLEY, J.A.:** On December 29th, 2003, Food Holdings Ltd. ("Food") and Dairy Holdings Ltd. ("Dairy"), who alleged that they were creditors of Parmalat Capital Finance Ltd. ("PCFL"), presented a petition to the Grand Court seeking to wind up PCFL under the provisions of the Companies Law (2004 Revision) ("the Law"). On that day, Henderson, J. appointed James Cleaver and Gordon MacRae as joint provisional liquidators ("JPLs") of PCFL. The petition was based on debts which totalled at least US$516m. ("the petition debts") due by PCFL to Food and Dairy. These debts arose under put agreements dated respectively December 17th, 1999 between PCFL and Food, and June 22nd, 2001 between PCFL and Dairy. The debt due to Food was US$270,266,199, whilst that due to Dairy was US$245,999,252. Mr. Cleaver and Mr. MacRae had previously, on December 24th, 2003, been appointed joint provisional liquidators of Food and Dairy. The provisional appointment in respect of Food and Dairy was made permanent by the court on April 1st, 2005.

2    The petition to wind up came for hearing in the Grand Court in a trial that lasted over four days. It was opposed by PCFL together with Parmalat Finance Corp. BV, Olex SA, Parmalat Netherlands BV, Parmalat Soparifi SA, Parmalat SpA ("Old Parmalat"), Parmalat SpA ("New Parmalat") and Parmalat Participacoes do Brasil Ltda. ("the other companies"). On May 12th, 2006, Henderson, J. ordered that PCFL be wound up by the court subject to the provisions of the Law. The judge further ordered that Mr. James Cleaver and Mr. Gordon MacRae be appointed jointly and severally as joint official liquidators ("JOLs") of PCFL. The JOLs were "authorized to do any acts or things" they considered necessary or desirable in connection with the liquidation of

C.A.                  IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

PCFL and the winding up of its affairs. The order contains other terms but it is not necessary for the purpose of this appeal to set them out in greater detail.

3   In this appeal, the order of Henderson, J. is challenged by PCFL and the other companies on the ground that Food and Dairy had no standing to petition for the winding up or to apply for the appointment of official liquidators. In addition, or in the alternative, PCFL and the companies state that the alleged debts due to Food and Dairy are disputed on substantial grounds and, as such, the judge erred in appointing the JOLs. Finally, and without prejudice to their contention that the winding-up order ought not to have been made, PCFL and the other companies took issue with the identity of the JOLs appointed by the court.

**Background**

4   PCFL and the other companies were part of the Parmalat Group ("the Group"), a multinational food group with its operations centred in Italy. At the end of 2003, the Italian operations folded amidst allegations of criminal conduct on the part of the management of the Group. The Italian government appointed Dr. Enrico Bondi, known as an independent turn-around expert, to manage the Group and certain of its subsidiaries. The Italian courts subsequently confirmed Dr. Bondi's appointment. PCFL, which was managed and controlled in Malta from around March 2002, was used to raise finance for the Group.

5   Food and Dairy are companies incorporated in 1999 in the Cayman Islands on instructions from Bank of America to be used as special purpose vehicles for the sole purpose of raising money by issuing loan notes ("the notes") to institutions in the United States. Food and Dairy each issued notes of US$150m. on December 17th and 22nd respectively. This money was to be used by Food and Dairy to purchase shares in Parmalat Administracao SA ("Parmalat Admin."), a Brazilian company within the Parmalat Group. Food and Dairy acquired 18.18% of the share capital in Parmalat Admin. Around the time that Food and Dairy issued their notes, PCFL entered into put agreements with Food and Dairy. The Food put agreement is dated December 17th, 1999 while that with Dairy is dated June 22nd, 2001. PCFL agreed to buy the shares in Parmalat Admin. if the put events as described in the agreement occurred, or if Food and Dairy still owned their shares in Parmalat Admin. at a specified date in November 2003 for an "option price" which was to be calculated. On issuing their notes, Food and Dairy, by way of security trust agreements, assigned all rights and interest under the put agreements they had signed with PCFL to a security trustee, Wells Fargo Minnesota N.A. ("Wells Fargo"), for the benefit of the note holders. A notice of the assignment to the security trustee was served on PCFL by Food and Dairy.

485

6  In cl. 2.1 of the put agreements between PCFL and Food, the terms of
the put events are set out. If Food held its shares in Parmalat Admin. on
November 20th, 2003, PCFL was automatically required to pay Food the
option price by December 12th, 2003. This option price was stated as
US$150m. together with certain other amounts. In relation to the put
agreement between PCFL and Dairy, PCFL would be automatically
required to purchase Dairy's shares in Parmalat Admin. if Dairy still held
the shares on November 25th, 2003. PCFL was required to pay Dairy the
option price, which was stated as US$172,252,068 together with certain
other amounts, by December 17th, 2003.

7  In December 2003, the Parmalat Group collapsed. As a result, PCFL
was unable to meet its obligations to Food and Dairy under the put
agreements. The base option price which PCFL was obligated to pay
Food was US$270,266,199. The base option price which PCFL was
required to pay Dairy was US$245,999,252. It was the failure of PCFL to
pay these debts which led Food and Dairy to petition the court for the
order to wind up PCFL.

8  In February 2004, an application was made by PCFL and the other
companies to discharge the JPLs and to replace them with Dr. Bondi
and/or Mr. Russell Smith. This application was dismissed in March 2004
by Henderson, J. In that application, PCFL and other creditors supported
the making of the winding up order against PCFL. This was stated in the
second affidavit of Mariela Belmontes, dated February 26th, 2004.

9  Dr. Bondi proposed a restructuring plan for the Group which was
approved in July 2004 by the Italian government. In March 2005, a final
revised document entitled "Proposal of Composition With Creditors" was
prepared by Dr. Bondi. This composition was subsequently approved in
Italy by the court in Parma in October 2005. The result of this restruc-
turing led to a new entity called Parmalat SpA ("New Parmalat") being
established,[2] of which Dr. Bondi is the Chief Executive Officer. New
Parmalat is now listed on the Milan Stock Exchange.

10  In November 2005, the JPLs on behalf of PCFL instituted
proceedings in the United States, in North Carolina against the Bank of
America and in Illinois against Grant Thornton. These proceedings ("the
US proceedings") were considered by Henderson, J. as the most
significant asset of PCFL, which all parties to these proceedings agreed is
hopelessly insolvent.

11  In December 2005, PCFL and the other companies applied to the
Grand Court for an order to dismiss the petition filed by Food and Dairy
which sought to wind up PCFL. The application was made on the ground
that Food and Dairy were not creditors of PCFL within the meaning of
s.96 of the Law. The application also sought to replace the JOLs with

C.A.                    IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

liquidators suggested by Dr. Bondi. By the time of the hearing before
Henderson, J., Dr. Bondi had recommended other persons to be appointed
as JOLs.

12   On the hearing of the petition, Henderson, J. ordered that Messrs.
Cleaver and MacRae be appointed as JOLs of PCFL. In addition, the
judge held that the company was hopelessly insolvent and its affairs
required investigation in the Cayman Islands. It is against this decision
that the appellants have appealed to the court.

### The appeal

#### *Lack of standing*

13   In the first ground of appeal, the appellants alleged that Food and
Dairy had no "technical standing" or "standing in substance" to petition
the court for winding up or to apply for the appointment of joint official
liquidators. The appellants submit that the jurisdiction of the Grand Court
to wind up a company falls within the ambit of the provisions of the
Companies Law. Mr. Moss, Q.C. for the appellants submitted that the
burden of proof is on Food and Dairy as petitioners to demonstrate on the
balance of probability that they are creditors. Counsel further submitted
that even though Food and Dairy may have "technical standing," in order
to obtain an order to wind up PCFL, they had to show that they had
"substantial standing." Counsel further submitted that, in order to
establish substantial standing, Food and Dairy had to show that they had a
proper interest in the relief they were seeking. The petitioners had to
show that they were creditors. If they failed to do so they would not have
*locus standi.* Mr. Moss relied on the Privy Council case from the Cayman
Islands, *Deloitte & Touche A.G.* v. *Johnson* (9), in particular the passage
set out at para. 25 below.

14   It is the contention of PCFL and the other appellants that Food and
Dairy had assigned the right to receive the sums due by PCFL to Food
and Dairy under the put agreements to Wells Fargo as security trustee.
Consequently, counsel contended that Food and Dairy no longer had any
interest in the petition debt and, as such, could not qualify as creditors
within the provision of s.96 of the Law.

15   Mr. Moss stated that although the word "creditor" in s.96 was not
defined in the Law, nonetheless, the plain meaning of "creditor" in the
context of the Cayman legislation was a "person entitled to payment of a
liquidated debt presently due." As earlier stated, it was the view of the
appellants that the issue of who is a creditor under s.96 of the Law
involved a two-fold process of proving what counsel referred to as
"technical standing" and "substantial standing." He contended that, in
relation to the issue of technical standing, the critical question is whether

487

Food and Dairy are parties entitled to payment of the petition debt. The appellants contended that Food and Dairy are not creditors under s.96 of the Law and they do not even have technical standing. This submission is grounded on the allegation that Food and Dairy have no right to receive the proceeds of the petition debt. At any rate, it was alleged they certainly did not have the beneficial interest in the petition debt, this having been assigned to the security trustees. In any event, the appellants stated that even if Food and Dairy were to receive payment of the petition debt they would have to hold it in trust for Wells Fargo, the security trustee.

16   The appellants further submitted that, even if it might be said that Food and Dairy had technical standing, it certainly could not be said that they had any substantial standing. This proposition is based on the submission that Food and Dairy had no interest in the winding up of PCFL since they would receive nothing from it. It was contended that in order to have substantial standing, Food and Dairy would have to show that they were entitled to participate in the ultimate distribution of the assets of PCFL. Counsel asserted that Food and Dairy could not do this as they had assigned their beneficial interest to receive the money under the put agreement to Wells Fargo for the benefit of the note holders, and it was unlikely that any proceeds would remain which would revert to Food and Dairy.

17   Counsel for the appellants pointed out that, under the law of New York, which governed the security agreements under which the beneficial interest had been transferred to Wells Fargo, three propositions had been agreed to by the expert witnesses on New York law. These propositions which were accepted by Henderson, J. showed that, under the laws of New York, the right to receive payments from PCFL had been transferred to the security trustee by Food and Dairy. In these circumstances, any payment received by the security trustee would have to be deposited by it in the collection accounts. Money in the collection accounts would then be applied in accordance with priorities which were set out in the security agreement with any surplus reverting to Food and Dairy. Counsel relied heavily on the statement by Henderson, J. in his judgment to the effect that it was entirely unlikely that there would be a surplus after the security trustee had paid out the money which was paid into collection accounts. It was his contention that Food and Dairy would not in reality have any real or substantial interest in the prospective liquidation of PCFL.

18   The appellants submitted that, as the assets subject to the security, including the put agreement, belonged to the security trustee as holder of the security, they were to be administered by the security trustee on behalf of the beneficiaries, the holders of the notes. It was said that the result of this assignment was that the JOLs of Food and Dairy had no right to administer the options under the put agreements; for this proposition counsel relied on *Buchler* v. *Talbot* (7).

19  Counsel stated that the purpose behind the security agreement was to provide protection to the holders of the notes in the event of default by Food and Dairy. He said that Food and Dairy were now purporting to exercise rights which they had in fact transferred to Wells Fargo. It was argued that in these circumstances Food and Dairy were not creditors and therefore had no standing to petition the court for an order to wind up PCFL. The petition ought therefore to be dismissed. If this submission is correct, then Food and Dairy had no standing to apply for the appointment of Messrs. Cleaver and MacRae as JOLs. Consequently, if any winding-up order is to be made, the independent persons put forward by the appellants ought to be appointed as JOLs.

20  Mr. Crystal, Q.C. submitted that the argument of the appellants regarding the need for a creditor to have both technical standing and substantial standing should be rejected on the grounds that it reflects a misunderstanding of the case of *Deloitte & Touche A.G. v. Johnson* (9). Counsel contended that, while it is accepted by all parties that PCFL is insolvent, nonetheless PCFL does not dispute that the petition debt is owed, albeit to the security trustee under the assignments.

21  Counsel agreed with the conclusion reached by Henderson, J. that Food and Dairy retained the legal title to the petition debts. In such circumstances, Food and Dairy would have been entitled to any residue in the collection accounts after all priorities had been met. Indeed, the judge pointed out that "legal title without the beneficial interest is nonetheless sufficient to establish standing to request a winding up."

22  In order to present a petition to wind up a company, the petitioner must demonstrate with evidence that it has *locus standi*. To do this, the petitioner is obligated to show that it is a creditor within s.96 of the Law. Without such *locus standi*, the petition is bound to fail even if the evidence shows that the company is insolvent. In *Mann v. Goldstein* (13), Ungoed-Thomas, J. said ([1968] 2 All E.R. at 769):

> "To enable the companies court to make the winding-up order itself, not only must the petitioner have been shown to be entitled to present the petition, but one of the grounds specified in s. 222 of the Companies Act, 1948 must be established: and the only such ground relied on in the petition and before me was that the company is unable to pay its debts. This requirement is additional to the pre-condition of presenting the petition, that the petitioner must be a creditor, and is not alternative to it."

23  As stated earlier, Mr. Moss had argued that, in deciding whether Food and Dairy were creditors under the Law, the court had to approach the question on the basis of technical standing and substantial standing. In order to be satisfied that Food and Dairy had technical standing to present

a petition under s.96, the court had to be satisfied that they were "persons entitled to payment of a liquidation debt presently due." If the court was so satisfied, it was then necessary to decide whether Food and Dairy had substantial standing. In ascertaining whether substantial standing existed, the issue for the court was whether Food and Dairy had any right to participate in the ultimate distribution of the assets of PCFL by the liquidator. For this proposition Mr. Moss relied entirely on *Deloitte & Touche A.G.* v. *Johnson* (9). In the opinion of the court, this is a complete misunderstanding of what was said by Lord Millett in his judgment.

24   In that case, a company called Omni Securities Ltd. which was incorporated in the Cayman Islands was placed in voluntary liquidation in November 1991. The respondents in the appeal were appointed joint liquidators of the company. In March 1995, an action was instituted in the Grand Court against a number of defendants alleging negligence in the audit of the company's financial statements for the years 1988 and 1989. The appellants were the company's auditors who had signed off the audit report for the company's financial statements for 1990. Shortly after the service of the writ on the appellants, it applied by originating summons for an order removing the respondents as liquidators of the company on the ground of their conflict of interest. In the alternative the appellants sought to restrain the respondent from continuing the proceeding against it. The respondents issued a summons to strike out the originating summons on the grounds that the appellants had no *locus standi* or any real interest in applying for the relief sought in the originating summons. It is not necessary to consider the manner in which it was alleged that the conflict of interest arose.

25   In delivering the judgment of the Judicial Committee of the Privy Council, Lord Millett said (1999 CILR at 304):

> "In their Lordships' opinion, two different kinds of case must be distinguished when considering the question of a party's standing to make an application to the court. The first occurs when the court is asked to exercise a power conferred on it by statute. In such a case the court must examine the statute to see whether it identifies the category of person who may make the application. This goes to the jurisdiction of the court, for the court has no jurisdiction to exercise a statutory power except on the application of a person qualified by statute to make it. The second is more general. Where the court is asked to exercise a statutory power or its inherent jurisdiction, it will act only on the application of a party with a sufficient interest to make it. This is not a matter of jurisdiction; it is a matter of judicial restraint . . . It is therefore incumbent on the court to consider not only whether it has jurisdiction to make the order but whether the applicant is a proper person to invoke the jurisdiction."

C.A.                IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

Lord Millett went on (*ibid.*, at 304–305) to point out that—

> "where the court is asked to exercise a statutory power, therefore, the applicant must show that he is a person qualified to make the application. But this does not conclude the question. He must also show that he is a proper person to make the application. This does not mean, as the appellant submits, that he 'has an interest in making the application or may be affected by the outcome.' It means that he has a legitimate interest *in the relief sought.* Thus, even though the statute does not limit the category of persons who may make the application, the court will not remove a liquidator of an insolvent company on the application of a contributory who is not a creditor: see *Re Corbenstoke Ltd. (No. 2)* . . ."

26   In the opinion of this court, Lord Millett identified "two different kinds of cases" which must be distinguished. His Lordship clearly treated the situation of the persons who may apply to the court as falling within two different categories which are distinguishable from each other. In the first situation, his Lordship deals with the case where the statute itself confers on a particular person the right to invoke the power of the court. A case such as this exists under the provision of s.96 of the Law. Section 96 provides:

> "Any application to the Court for the winding up of a company shall be by petition which may be presented by the company, or by any one or more than one creditor or contributory of the company, or by all or any of the above parties, together or separately; and every order which may be made on any such petition shall operate in favour of all creditors and all the contributories of the company in the same manner as if it had been made upon the joint petition of a creditor and a contributory."

An examination of s.96 demonstrates that a petition to wind up a company may only be presented by the company itself, a creditor or a contributory of the company. The court has no jurisdiction to entertain a petition presented by any person who is not mentioned in s.96 of the Law.

27   The provisions of s.96 must be distinguished from the provisions of s.107(1) (which is the current equivalent of s.106(1) in the 1995 Revision), under which the appellants sought to invoke the jurisdiction of this court to remove the liquidators in *Deloitte & Touche A.G.* v. *Johnson* (9). Section 107(1) provides:

> "Any official liquidator may resign or be removed by the Court on due cause shown; and any vacancy in the office of an official liquidator appointed by the Court shall be filled by the Court."

An examination of this section shows that it does not provide that the application to the court must be made by any particular person or group.

491

In other words, the section does not contain any restrictions as to who may apply. This is an example of the second case referred to by Lord Millett. Any person may apply. However, in such a case Lord Millett says (1999 CILR at 304) that "it is therefore incumbent on the court to consider not only whether it has jurisdiction to make the order but whether the applicant is a proper person to invoke the jurisdiction." Clearly this section gives the court jurisdiction to remove a liquidator on due cause being shown. However, in order to invoke the jurisdiction under this section, the person making the application must show that he is a proper person. To decide whether that person has power to invoke such jurisdiction it will be necessary for the court to have regard to the nature of the relief that is being sought.

28    In *Deloitte & Touche A.G.* v. *Johnson* (9), Lord Millett stated that the plaintiff did not lack jurisdiction to invoke s.106(1). However, in order to decide whether the plaintiff could apply to have the official liquidators removed as liquidators, the court had to ask itself whether the applicant had a legitimate interest in the relief being sought. In order to establish that such interest existed, the plaintiff had to show that it was "entitled to participate in the ultimate distribution of the company's assets." Without such interest, the plaintiff could not be said to have any legitimate interest in having the liquidator removed.

29    In support of his proposition of the requirement of substantial standing, Mr. Moss relied on that passage of Lord Millett's judgment where, having acknowledged that the company was insolvent and that the liquidation was continuing under the supervision of the court, Lord Millett went on to state (1999 CILR at 305):

"The only persons who could have any legitimate interest of their own in having the respondents removed from office as liquidators are the persons entitled to participate in the ultimate distribution of the company's assets, that is to say the creditors."

Counsel relied on this statement as support for his proposition that a creditor means a person entitled to participate in the ultimate distribution of the company's assets. But this proposition ignores what Lord Millett had said earlier when he identified the question engaging the attention of the court (*ibid.*, at 301):

"The question on the appeal, therefore, is whether the appellant which is neither a creditor nor contributory, has any *locus standi* to invoke the statutory jurisdiction of the court to remove the respondents as liquidators of the company."

His Lordship made it abundantly clear the issue of who is, or is not, a creditor was not an issue in that case.

30   In our view, *Deloitte & Touche A.G.* v. *Johnson* (9) did not decide the issue for which the appellants contend on this appeal. That case has nothing to do with who is a creditor or who may petition. It simply decides that where the statute does not in any way limit the persons who may apply to the court for the exercise of a power given to it by statute, the person making the application must show that the court has power to make the order sought and that the person applying is the proper person to invoke the court's jurisdiction. In order for an appellant to show that he is the proper person in the context of an application to remove liquidators under s.106(1) (now s.107(1)) of the Companies Law, that person must show that he is "entitled to participate in the ultimate distribution of the company's assets."

31   The attack on the lack of standing by Food and Dairy was also based on the fact that Food and Dairy had transferred their right to receive payment from PCFL under the put agreements to the security trustees. Mr. Moss submitted that, in these circumstances, Food and Dairy "did not have and would never have any real or substantial financial interest" in the liquidation of PCFL. For this, he relied on the statement by Henderson, J. that "it is entirely unlikely" that there would be any surplus remaining after the security trustees had paid out any money received by it, in accordance with the given priorities.

32   Counsel contended that the assets which were subject to the security, including the payment under the put agreements, belonged to the security trustees and were to be administered by them on behalf of the beneficiaries, the holders of the notes. In these circumstances, he argued that Food and Dairy had no beneficial interest in the alleged debt. For this proposition he relied on *Buchler* v. *Talbot* (7) where Lord Millett said ([2004] 2 A.C. 298, at para. 51):

"Bankruptcy and companies liquidation are concerned with the realisation and distribution of the insolvent's free assets among the unsecured creditors. They are not concerned with assets which have been charged to creditors as security, whether by way of fixed or floating charge. Secured creditors can resort to their security for the discharge of their debts outside the bankruptcy or winding up. Assets subject to a charge belong to the charge holder to the extent of the amount secured by them; only the equity of redemption remains the property of the chargor and falls within the scope of the chargor's bankruptcy or winding up . . . As James L.J. observed in *In re Regent's Canal Ironworks Co.* (1877) 3 Ch. D. 411, 427 charge holders are creditors 'to whom the [charged] property [belongs] . . . with a specific right to the property for the purpose of paying their debts.' Such a creditor is a person who 'is to be considered as entirely outside the company, who is merely seeking to enforce a

493

claim, not against the company but to his own property' per James L.J. in *In re David Lloyd & Co.* (1877) 6 Ch. D. 339, 344."

33    Counsel did not appear to place much emphasis on that portion of the judgment of Lord Millett later in that paragraph, where he said:

> "Assets subject to a charge belong to the charge holder to the extent of the amount secured by them; *only the equity of redemption remains the property of the chargor and falls within the scope of the chargor's bankruptcy or winding up.*" [Emphasis supplied.]

The charge holders' interest in the charged property is not absolute but is limited to the extent of the amount secured. The interest of the charger in the property is not extinguished, and remains even if only limited to the equity of redemption.

34    Henderson, J., in dealing with the effect of the security documents which he characterized as complex, identified the following elements of those documents (2006 CILR 171, at para. 5):

> "(a) under New York law, the right to receive payment from PCFL was transferred to the security trustees by Food and Dairy;
>
> (b) upon receiving such payments, the security trustees were to deposit the money into the 'collection accounts';
>
> (c) money in the collection accounts had to be applied in accordance with certain priorities set out in the security agreements, after which any remaining surplus had to be paid to Food and Dairy;
>
> (d) legal title to the debts owed by PCFL remained at all times in Food and Dairy (this point was conceded during argument); and
>
> (e) the security documentation expressly retained with Food and Dairy the right to demand payment of the debts from PCFL."

The appellants did not challenge this assessment of the relevant element of the security documents by Henderson, J. Food and Dairy did exercise their right to demand payment from PCFL. However, according to this assessment, the legal title to the debts remained owned by Food and Dairy. Food and Dairy were entitled to receive any surplus after all payment from the collection accounts had been made by the security trustees. No challenge is made to the right of the security trustee to make payments out of the collection accounts. However, once these payments are made, the security trustees are obligated to pay any surplus to Food and Dairy.

35    In his judgment, Henderson, J. concluded that the "legal title without the beneficial interest is nonetheless sufficient to establish standing to request a winding up." For this proposition he relied on a statement by

C.A.             IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

Chadwick, J. in *Bell Group Fin. (Pty.) Ltd.* v. *Bell Group (U.K.) Holdings Ltd.* (5) ([1996] BCC at 510):

> "If the debenture is valid, the effect of crystalisation was that debts, wherever situated, acquired by BGF after 1 February 1990 became the subject of an assignment in equity by way of fixed charge to Westpac as security for the secured liabilities under the debenture. Prima facie, however, the legal title to the debts remained in BGF."

Applying that reasoning, which the Grand Court accepted was correct, this court is satisfied that even though Food and Dairy had transferred the beneficial interest to the security trustees, they nonetheless retained the legal title to the debts. For that reason also, this court concluded that Food and Dairy would have standing as creditors which would entitle them to present the petition to wind up PCFL. In the opinion of this court, it is the right to receive the payment of any surplus and not the actual payment which gives Food and Dairy sufficient interest to accord them standing as creditors and entitled them to present this petition. Consequently, the contention of the appellants that Food and Dairy had no *locus standi* to present the petition to wind up PCFL is rejected by the court.

### Absence of debt

36   In their second ground of appeal, the appellants allege that the trial judge erred in law in holding that the respondents were creditors within the meaning of s.96 of the Law as the petition debts were disputed on substantial grounds. If the judge had concluded that there was in fact a *bona fide* dispute on substantial grounds, it would mean that the applicants would have failed to establish that they were creditors and therefore did not have *locus standi* to present the petition for winding up. In those circumstances, the court would have been obligated to dismiss the petition.

37   This submission of the appellants is grounded upon the proceedings instituted in December 2005 by the JOLs (then JPLs) in the United States against Grant Thornton International (the auditors of PCFL) and others in Illinois for negligent misrepresentation, aiding and abetting breach of fiduciary duty, accounting malpractice and negligence. As against the Bank of America and others in North Carolina, the claim is for breach of fiduciary duty, civil conspiracy and unjust enrichment. (These proceedings will be referred to collectively as "the US proceedings.") Both companies allege that PCFL "never received any value in exchange for the put agreements." The appellants submit that a review of the US proceedings will show that the JOLs are alleging that the petition debts arose from a breach of fiduciary duty and/or a misfeasance by corrupt insiders of PCFL, of which Food and Dairy had knowledge through their then controller, Bank of America. The appellants further submit that the

495

effect of this was to render the put agreement transactions void and/or
voidable and/or unenforceable by the JOLs. Mr. Moss contended that if
the JOLs did not believe the facts alleged in the US proceedings they
could not properly plead them. He indicated that when PCFL entered into
the put agreements and undertook a substantial liability, it did so at a time
when it was insolvent and got nothing in return.

38  He suggested that on the basis of the facts pleaded in the US
proceedings by the JOLs there can be no doubt that entering into the
transactions including the put agreements amounted to a breach of
fiduciary duty on the part of Bank of America and the corrupt insiders of
PCFL who, as the JOLs allege, were in "control of and orchestrating the
acts of Food, Dairy and PCFL." In those circumstances, counsel argued,
there was a serious issue to be tried as to whether or not Food and Dairy's
claims are valid and enforceable, based as they are on fraudulent
transactions as pleaded by the JOLs on behalf of PCFL.

39  Counsel complained that the judge erred when he viewed the
appellants' submission that the petition debt was being disputed on
substantial grounds with an air of scepticism. In rejecting these
submissions, Henderson, J. held (2006 CILR 171, at paras. 15–16):

> "On February 3rd, 2006 the opposing parties gave notice for the first
> time that they considered the petition debts to be disputed on
> substantial grounds ... This proceeding was commenced in
> December 2003. No mention of the dispute on substantial grounds
> was made during an extended hearing in February 2004. When the
> existence of a *bona fide* dispute on substantial grounds is alleged for
> the first time over two years after the court is asked to wind up a
> company, as has occurred here, the court will naturally bring a
> degree of scepticism to its examination of the issue.
>
> The opposing parties have not chosen to adduce evidence from
> which I might infer that the petition debts are unenforceable. Their
> assertion is based upon isolated passages in two complaints (*i.e.*
> statements of claim) filed by the JPLs in US litigation."

The judge continued (*ibid.*, at para. 17):

> "Each of the complaints is a long and complex document. Overall,
> they seek to portray PCFL as an innocent victim, utilized by others
> as a vehicle for fraud. No clear basis can be found in either
> complaint for inferring that PCFL should have attributed to it any
> knowledge of the fraudulent activity. In any event, that is a question
> of fact, proof of which would require much more evidence than I
> have before me. Moreover, the assertion that PCFL received no
> value for entering into the put agreements may not succeed at trial in
> the United States. It is in this situation that I am asked to leave Food

C.A.                IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

and Dairy to their ordinary remedies and dismiss their application as
an abuse of process."

Henderson, J. concluded that he was "not prepared to dismiss the petition
on the basis of an alleged dispute on substantial grounds advanced for the
first time more than two years after the filing of the petition and supported
by assertions made in US pleadings."

40   Mr. Crystal supported the conclusion of the judge and pointed out
that this issue was raised for the first time in a letter by Turner &
Roulstone on February 3rd, 2006 which stated that:

> "On the basis of [the petitioners'] pleading against Bank of America
> in the US, the alleged debts are based on fraudulent transactions and
> in particular constituted breaches of fiduciary duty by those
> controlling the company of which breaches (or the facts constituting
> them) the controllers of [the petitioners] had knowledge or notice."

Mr. Crystal further submitted that the US proceedings did not in fact
challenge the put agreement or the debt arising under them. Those
proceedings, he stated, represent the only assets of substance of PCFL, as
Henderson, J. observed.

41   Mr. Crystal, Q.C. submitted that the approach adopted by the judge
was correct when he rejected the assertions made by the appellants as
there was no evidence to support them. He pointed out that the validity
and existence of the debts is a matter of New York law for which there
ought to be evidence of the law of New York. Unfortunately, there was
none. Further, Mr. Crystal submitted that the true nature of the complaint
being made by the appellants in this regard was one of inconsistency
between the allegations made in the US proceedings and the petition
debts. He asserted that there was no inconsistency in as much as the
assertions by the appellants were vague and based on a misreading of the
complaints in the US proceedings. He pointed out that nowhere in the
complaint in the US proceedings did the JOLs or PCFL assert that the put
agreements or the debt arising therefrom are, like the petition debts,
unenforceable. Further, PCFL does not assert that the JOLs fraudulently
induced PCFL to enter the put agreement. The fraud alleged in the US
proceedings is that of the Bank of America. In addition, Mr. Crystal also
contended that the complaints in the US proceedings do not allege that
PCFL was defrauded. A further reason given by Mr. Crystal for
supporting the judgment of Henderson, J. is the fact that in the US
proceeding there is no allegation that the put agreements can or should be
"avoided, set aside or rescinded" by PCFL so that it would have no
obligation to pay the amount due under the put agreements. Mr. Crystal
pointed out that, rather than seeking to "avoid, set aside or rescind" the
put agreements, PCFL is claiming damages against the Bank of America

497

which claim is predicated on the existence and validity of the obligations to pay the sums due under the put agreements.

42   We have examined carefully the submissions of Mr. Crystal and consider that they should be adopted. The complaints in the US proceedings do not in our opinion cast any doubt on the fact that PCFL is indebted to Food and Dairy under the terms of the put agreements. The claims for damages in the US proceedings are in fact predicated on the existence of the put agreements. Consequently, this court concludes that there is no *bona fide* dispute on a substantial ground that the petition debts are due from PCFL to Food and Dairy. The submissions of the appellants on this aspect are rejected.

43   The appellants, on their second ground, further submitted that where the petition debt is *bona fide* disputed on substantial grounds, the "alleged creditor" is not in fact "a creditor" who is entitled to present a petition to wind up the company. They submitted that if the petition debt is in fact *bona fide* disputed on substantial grounds the petition ought to be dismissed as an abuse of process. It was their contention that the court had no discretion to make the winding-up order. For the reasons set out below this submission was rejected.

44   As stated earlier, it was contended by counsel for the appellants that the issues raised in the US proceedings meant that the petition debt was *bona fide* disputed on substantial grounds and therefore that the petition should be dismissed. He relied on *Re Great Britain Mutual Life Assur. Socy.* (10) where Jessel, M.R. said (16 Ch. D. at 253):

"The company have disputed the claim. I have not a word to say at present with regard to the *bona fides* of the dispute. I will assume that the directors, advised by their solicitor, thought it proper to dispute the claim. But the claim was disputed upon the ground of fraudulent misrepresentations of the state of health of the assured. Of course the obligation of proof is upon the company . . . They must bring forward a *primâ facie* case which satisfies the Court that there is something which ought to be tried, either before the Court itself, or in an action, or by some other proceeding."

45   There are a number of cases dealing with the issue of a petition debt which is *bona fide* disputed on substantial grounds. In *Mann* v. *Goldstein* (13), Ungoed-Thomas, J. said ([1968] 2 All E.R. at 775):

"For my part, I would prefer to rest the jurisdiction directly on the comparatively simple propositions that a creditor's petition can only be presented by a creditor, that the winding-up jurisdiction is not for the purpose of deciding a disputed debt (that is, disputed on substantial and not insubstantial grounds) since, until a creditor is established as a creditor he is not entitled to present the petition and

**C.A.**        IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

has no locus standi in the companies court; and that, therefore, to invoke the winding-up jurisdiction when the debt is disputed (that is, on substantial grounds) or after it has become clear that it is so disputed is an abuse of process of the court."

The issue of a disputed debt in a petition to wind up a company also engaged the attention of the court in *In re Lympne Invs. Ltd.* (12). In delivering his judgment, Megarry, J. said ([1972] 2 All E.R. at 388–389):

"It therefore seems to me that this petition must fail. A real dispute, turning to a substantial extent on disputed questions of fact which require viva voce evidence, and involving charges of fraud or near fraud, cannot properly be decided on petition. Nor is it right, or in accordance with modern practice, to stand over the petition in order that the disputed issues may be resolved in other proceedings. That practice, I may say, seems to stem from *Re London & Paris Banking Corpn.* . . . Further, *Mann v Goldstein*, cited with approval in the New Zealand Court of Appeal in *Bateman Television Ltd. v Coleridge Finance Co. Ltd.* provides authority for saying that when a petition is based on a debt which is disputed on substantial grounds, the petitioner is not a 'creditor' within s. 224(1) of the Companies Act 1948 who has the locus standi requisite for the presentation of the petition, even if the company is in fact insolvent."

The final authority to which reference is made is *Stonegate Secs. Ltd.* v. *Gregory* (19). Buckley, L.J., in adopting that portion of the judgment of Ungoed-Thomas, J. in *Mann* v. *Goldstein* (13) referred to above, said ([1980] 1 All E.R. at 243–244):

"I gratefully adopt the whole of that statement, although I think it could equally well have ended at the reference to want of locus standi. In my opinion a petition founded on a debt which is disputed in good faith and on substantial grounds is demurrable for the reason that the petitioner is not a creditor of the company within the meaning of s 224(1) at all, and the question whether he is or is not a creditor of the company is not appropriate for adjudication in winding-up proceedings."

46   These authorities all show that in order to petition for the winding-up of a company, a person must show that he had *locus standi* as a creditor within s.96 of the Law. He must show that a debt is due to him by the company. If, however, the debt upon which the petition is based is disputed by the company in good faith and on substantial grounds, this would indicate that the petitioner does not have *locus standi* as a creditor and the presentation of the petition would be an abuse of process of the court. The onus is on the company, if it disputes the *bona fides* of the

499

debt, to show that it does so on substantial grounds. A dispute which is based on insubstantial grounds would not suffice.

47  Mr. Moss submitted that, as the debt is disputed in good faith on substantial grounds, the court had no discretion to make a winding-up order because the presentation of the petition is an abuse of process and in these circumstances must dismiss the petition. For this proposition he relied on a statement by Nourse, L.J. in *Re Bayoil SA* (4) where he said ([1999] 1 All E.R. at 377):

> "The question is whether the judge was right to hold that his discretion was at large or whether its exercise was governed by authority which requires the petition, except in special circumstances, either to be dismissed outright or to be stayed until after the cross-claim has been determined. In order to answer that question, it is necessary to refer first to the practice of the Companies Court to dismiss a petition where the petition debt is disputed in good faith and on substantial grounds. That practice, it appears, has been established since the end of the last century. It was explained by Buckley L.J. in *Stonegate Securities Ltd v Gregory* [1980] 1 All E.R. 241 at 243–244, [1980] Ch. 576 at 580, where, having adopted a passage in the judgment of Ungoed-Thomas J. in *Mann v Goldstein* [1968] 2 All E.R. 769 at 775, [1968] 1 W.L.R. 1091 at 1098–1099, he said:

> > 'In my opinion a petition founded on a debt which is disputed in good faith and on substantial grounds is demurrable for the reason that the petitioner is not a creditor of the company within the meaning of s. 224(1) at all, and the question whether he is or is not a creditor of the company is not appropriate for adjudication in winding-up proceedings.'

> So the dismissal of the petition in such a case is not, at any rate initially, a matter for the discretion of the court. It is founded on the petitioner's inability to establish the locus standi to present a petition under what is now s. 124(1) of the 1986 [Insolvency] Act. The case of an undisputed debt with a genuine and serious cross-claim is different, in that the dismissal or staying of the petition can only be a matter for the discretion of the court, albeit that its exercise may have been narrowed by authority. By way of shorthand I will refer to the two categories of cases as disputed debt and cross-claim cases respectively."

Counsel said that since the petition debt was *bona fide* disputed on substantial grounds this meant that there was no creditor with an undisputed debt who was willing to apply to be substituted as a petitioning creditor. In these circumstances, the petition to wind up should have been dismissed.

48  Mr. Crystal, on the other hand, submitted that the court had
jurisdiction to make a winding-up order on a winding-up petition in
circumstances where the petition is disputed. He relied on the following
cases: *In re Russian & English Bank* (17), *Brinds Ltd.* v. *Offshore Oil N.L.*
(6), and *Bateman Television Ltd.* v. *Coleridge Fin. Co. Ltd.* (3).

49  In *Brinds Ltd.* v. *Offshore Oil N.L.* Lord Brightman, in rendering the
judgment of the Judicial Committee of the Privy Council, adopted the
earlier reasoning of the Judicial Committee in *Bateman Television Ltd.* v.
*Coleridge Fin. Co. Ltd.* and said (2 BCC at 98,921):

> "It is a matter for the discretion of the judge whether a winding-
> up order should be made on a disputed debt, and it is also a matter of
> discretion whether he decides the substantive question of debt or no
> debt. Their Lordships agree with the observations of *Gibbs* J. in *Re
> Q.B.S. Pty. Ltd.* [1967] Qd. R. 218, at p. 225:
>
>> 'It seems to me that in every case it becomes necessary for the
>> court to exercise its discretion as to how far it will allow the
>> question whether or not the dispute is *bona fide* to be explored.
>> In some cases it may be very easy to decide this question on
>> the petition and affidavits in reply. In other cases however it
>> may be difficult to determine whether or not the dispute is *bona
>> fide* without determining the merits of the dispute itself. In
>> some such cases convenience may require that the court decide
>> the question whether or not a debt exists, but in other such
>> cases it may appear better to allow that question to be
>> determined in other proceedings before the petition for
>> winding up is heard.'"

In *Bateman Television Ltd.* v. *Coleridge Fin. Co. Ltd.*, the Judicial
Committee had said ([1971] NZLR at 932):

> "[T]he general rule is, no doubt, that no order will be made on a
> petition founded on such debts. But each case must depend upon its
> own circumstances and it is a question for the discretion of the
> Judge; a discretion to be exercised judicially, which is not open to
> review unless it is shown to be exercised on some wrong principle,
> or that the Judge relied on some fact irrelevant for the purpose, or
> omitted consideration of a relevant fact or finally that he was wholly
> wrong. As their Lordships have already pointed out, the disputed
> questions of indebtedness were fully investigated in a lengthy
> hearing before the learned Judge with oral and documentary
> evidence and he held that both the appellant companies were
> insolvent. Their Lordships add the very important fact that from
> start to finish neither side ever suggested to Macarthur J. that the
> petitions should be dismissed or even stayed on the ground of

disputed debts pending the bringing of appropriate proceedings at
law to determine these matters."

50   In *Alipour v. Ary* (1), Gibson, L.J. made it abundantly clear ([1997]
1 W.L.R. at 541) "that it is only a rule of practice not one of law for the
Companies Court to refuse to determine a dispute on the creditor
petitioner's locus standi." After reviewing the cases of *In re Russian &
English Bank* (17) and *Re Claybridge Shipping Co.* (8) the Lord Justice
concluded (*ibid.*, at 546):

"The position as we see it, in the light of the authorities as
affected by the current procedures of the Companies Court, is this.
(1) A creditor's petition based on a disputed debt will normally be
dismissed. (2) It will not be dismissed if the petitioning creditor has
a good arguable case that he is creditor and the effect of dismissal
would be to deprive the petitioner of a remedy or otherwise injustice
would result or for some other sufficient reason the petition should
proceed."

This court accepts this as representing the practice which should be
adopted in the Cayman Islands.

51   Based on these authorities, it is clear that the court does in fact have
a discretion which is to be exercised judicially. In our view, Nourse, L.J.
in *Re Bayoil SA* (4) was merely reiterating the rule of practice that where
there is a *bona fide* dispute on substantial grounds by a company as to the
petition debt, the court will dismiss the petition on the ground that the
evidence before the court did not disclose that the petitioner was a
creditor. Mr. Moss by his submission sought to elevate the rule of practice
into a rule of law. For the reasons given above, the court cannot accede to
this submission. While the US proceedings allege fraud against Bank of
America, no fraud is alleged in so far as the put agreements are
concerned. We earlier rejected the submission that the petition debts due
from PCFL to Food and Dairy are disputed on substantial grounds.

### *Identity of JOLs*

52   The third ground of appeal deals with the identity of the JOLs
appointed by the court. The appellants state, without prejudice to their
contention that no winding-up order ought to have been made, that New
Parmalat, Old Parmalat and the other companies, as shareholders, would
have been able to place PCFL into voluntary liquidations and choose
liquidators who would not have any conflict of interest. The appellants
contend that Messrs. Cleaver and MacRae have a conflict of interest by
reason of the fact that they are also the liquidators of Food and Dairy.

53   The complaint under this ground is four-fold:

C.A.          IN RE PARMALAT CAPITAL FINANCE (Mottley, J.A.)

(i) that the judge erred in law in not giving priority to the interests of creditors as a whole;

(ii) the appointment of Messrs. Cleaver and MacRae as JOLs of PCFL could give rise to a conflict of interest;

(iii) in appointing Messrs. Cleaver and MacRae, the judge failed properly to consider and/or to give appropriate weight to the conduct of the JOLs whereas JPLs sold a senior secured note in the sum of US$30m. issued by PCFL to Food and Dairy to an unnamed third party for $4,350,000; and

(iv) that in concluding that these matters did not constitute a clear and cogent reason for appointing suitable alternative individuals as JOLs of PCFL the judge also erred.

54  On the first issue, the appellants are critical of the judge for failing to give appropriate weight to the views of the appellants, who together constitute 78% of the creditors of PCFL and consequently, it is asserted, have the greatest interest in any liquidation of the company. They contend that the judge gave too much weight to the views of creditors who did not appear before the court and to the view of Bank of America which did appear but, because of the pending US proceedings, has a conflict of interest. Criticism is also made of the judge for affording less weight to the view of the appellants because they could be regarded as connected to the former management of PCFL. Counsel submitted that Henderson, J. erred in law because he failed to apply numerous *dicta* in reported cases to the effect that, in insolvency matters, the wishes of the majority of creditors on matters such as the selection of JOLs should prevail unless there are compelling reasons to depart from this rule. He contended that no such reasons existed in this case.

55  Henderson, J. pointed out that the proposal that Messrs. Cleaver and MacRae, the JPLs, continue in office as JOLs was supported by—

(i) Teachers Insurance & Annuity Association of America, a creditor holding US$86m. face value of 6.625% guaranteed notes due in 2008 issued by the company;

(ii) Cerberus Partners LP, a creditor holding US$30m. 8.80% senior notes due 2014 issued by the company;

(iii) HSBC Private Bank (Suisse) SA, a creditor (acting on behalf of clients) in the sum of US$3,075,000;

(iv) Bear, Stearns & Co Inc., a creditor in the sum of US$28,474,689;

(v) Bank of America Securities LLC, a creditor in the sum of US$10m.;

503

(vi) Blue Ridge Investments LLC, a creditor in the sum of US$40m.; and

(vii) Bank of America NA, a creditor in the sum of US$258m.

56   Whilst he accepted that the appellants represented about 78% of the total debt owed by PCFL, he indicated that, of the opposing parties, only Cargill Financial Markets PLC, a creditor of PCFL in the amount of US$52,362,000, is entirely independent of Parmalat Group. The judge expressed the view that compliance with the wishes of the majority of creditors is not automatic. He indicated that their views would be taken into consideration along with other relevant factors. He concluded that, in the absence of clear and cogent reasons for doing otherwise, Messrs. Cleaver and MacRae, who have been the JPLs for 2½ years, should continue as JOLs. The judge adverted to the fact that Dr. Bondi and the accounting firm retained by him in Italy have not been able to establish a working relationship with Messrs. Cleaver and MacRae. Indeed Dr. Bondi stated that he would not co-operate with Messrs. Cleaver and MacRae if they were appointed JOLs and would not be providing any funding for them to conduct the liquidation. It appeared that Dr. Bondi would only fund the liquidation if his nominees, Messrs. Stenger and Varga, were appointed.

57   Mr. Crystal, Q.C. submitted that the weight to be given to the views of creditors on any matter concerning winding-up proceedings is a matter for the assessment of the evidence of the judge at trial. Unless there is an error of principle or law, the Court of Appeal ought not to interfere with that assessment. This court agrees with Henderson, J. that it is not automatic for a judge to adopt the wishes of the majority of the creditors. In arriving at this conclusion, this court adopts the statement by Brightman, J., as he then was, in *In re Southard & Co. Ltd.* (18) ([1979] 1 All E.R. at 587):

"The petition is presented and supported only by creditors who belong to the same group of companies as the company in liquidation. Their wishes do not carry with me a weight commensurate with the size of the alleged indebtedness. The company is a subsidiary of the petitioning creditor. The petitioning creditor is prima facie morally responsible for the insolvency and large indebtedness of the company, unless and until the contrary is shown. The supporting creditor is a member of the same group. The insolvency of the company and its considerable indebtedness could be the result of mismanagement or lack of control by its parent company, which is the petitioning creditor. Certainly, in the absence of evidence to the contrary, I must assume that the petitioning creditor had it in its power to control the activities of the company which is now bankrupt. I therefore take the view that the size of the indebtedness

of the company to the petitioning creditor and the supporting creditor, all of which have operated under the same aegis, ought not to carry decisive weight."

58   The court also took into account *Re Lowestoft Traffic Servs. Co. Ltd.* (11) where Hoffmann, J. said (2 BCC at 98,948):

"In addition, it is, I think, proper to discount the position of those opposing creditors who are closely associated with the management of the company, particularly when, as is this case, it is said that the main reason why there should be an order for compulsory winding-up is the necessity for an independent investigation into their management."

In view of the state of the evidence, Henderson, J. was correct in giving less weight to the views of the majority of the appellants having regard to their connection with Parmalat Group and in particular the misman-agement of PCFL. This court has concluded that the appellants have not shown that there was an error of principle or of law in the assessment of the evidence.

59   Issue was also taken with the fact that Messrs. Cleaver and MacRae have entered into a note transaction without seeking the court's or creditors' approval. A note in the sum of US$30m. issued to PCFL by Food was sold by Messrs. Cleaver and MacRae as JOLs of Food to an unnamed third party for US$4,350,000. Of the sale price, the sum of US$2,298,542 was paid (a) to satisfy liabilities to Food and Dairy, (b) to remunerate Messrs. Cleaver and MacRae as JOLs of Food and Dairy, and (c) to satisfy liabilities of professionals retained by Messrs. Cleaver and MacRae in the liquidation of Food and Dairy. In short, the complaint is that beneficiaries of the realization of this asset of PCFL were the debtors to PCFL under the note. It was submitted on behalf of the appellants that no sufficient explanation was given for this transaction or why the JOLs did not seek the approval of the majority of creditors or of the court. It was suggested to Henderson, J. that this transaction should be investigated by independent liquidators. The appellants contend that it will be impossible for Messrs. Cleaver and MacRae, as JOLs of PCFL and JOLs for Food and Dairy, to adjudicate properly on the debts claimed by Food and Dairy, especially having regard to the support of the JOLs of the claims of Food and Dairy in these proceedings.

60   In dealing with this issue, Henderson, J. stated (2006 CILR 171, at para. 31):

"I asked during argument how this obvious conflict of interest has been managed. Mr. Crystal, Q.C. said that he gave detailed and considered advice to the JPLs on the subject. They concluded it was in the best interests of the general body of creditors to proceed with

the note purchase and acted on the advice. I consider that an adequate response to the situation in which the JPLs found themselves. There is no need for an investigation [on the issue of conflict of interest by Messrs. Cleaver and MacRae in the capacity of JOLs of PCFL and of Food and Dairy]."

It was recognized by the judge that the appointment of JOLs as liquidators of PCFL, being already JOLs of Food and Dairy, would require Messrs. Cleaver and MacRae to put in place some mechanism to prevent a conflict of interest when adjudicating the claim of Food and Dairy. We accept that in so concluding, Henderson, J. was following the accepted position where there is a possibility of a conflict of interest arising out of the performance of their duty as JOLs of two different entities which are in liquidation.

61   We accept and adopt as being correct, two statements by Hoffmann, J., as he then was, in *Re Arrows Ltd.* (2) and *Re Maxwell Communs. Corp.* (14). In *Re Arrows Ltd.* it was accepted that a conflict of interest could arise by the appointment of the same firm as receiver of another company. Hoffmann, J. said ([1992] BCC at 123):

> "It is by no means uncommon in the case of insolvency of a substantial group of companies for cross-claims and conflicts of interest to arise between companies within the group. That does not usually deflect the court from appointing a single firm of insolvency practitioners in the first instance to deal with the whole insolvency of the group, leaving the question of potential conflict of interests to be dealt with if and when it arises. In my view, that would be the proper course to adopt in this case."

In *Re Maxwell Communs. Corp.*, again dealing with a potential conflict of interest, Hoffmann, J., after rejecting the request to appoint an additional administrator, said ([1992] BCC at 375):

> "There are other ways of dealing with a potential conflict of interest. One of them is to leave the matter to be dealt with if and when it arises. It seems to me that any provision which I make to deal with it today could equally be made at some future date . . . If such a conflict should surface there should be no difficulty for the administrators, if they find themselves faced with any difficulty in the matter, in securing the appointment of the necessary independent persons by the Court . . . "

62   While it is recognized that the possibility exists that a conflict of interest could possibly arise when Messrs. Cleaver and MacRae in their capacity as JOLs of PCFL are adjudicating the claims made by Food and Dairy in respect of the amounts due to them, any potential conflict of interest could be dealt with if and when it arises. As shown above,

C.A.                    IN RE PARMALAT CAPITAL FINANCE (Zacca. P.)

however, this in itself does not disqualify them from being appointed JOLs of PCFL.

63    The final point raised under this ground was the all encompassing submission that the judge erred in law in concluding that the issues raised under this ground did not constitute clear and cogent reasons for appointing suitable alternative individuals as the JOLs of PCFL. No useful purpose will be served by embarking on a wholesale review of the evidence at this stage. It will suffice to state that for the reason given above we are satisfied that there was no error of principle or of law which would necessitate the intervention of this court.

64    The court agrees with the view that PCFL is hopelessly insolvent and in the circumstances the facts surrounding its downfall require investigation. The court is mindful of what was said by Lord Hoffmann in *In re Pantmaenog Timber Co. Ltd.* (15) ([2004] 1 A.C. 158, at para. 64):

"But I reject the unspoken assumption that the functions of a liquidator are limited to the administration of the insolvent estate. This is only one aspect of an insolvency proceeding; the investigation of the causes of the company's failure and the conduct of those concerned in its management is another."

From the nature of the allegations being made in the US proceedings, it would seem that the company's failure and the conduct of those in charge of PCFL, ought to be investigated. Henderson, J., in our view, was correct when he decided that the circumstances surrounding the downfall of PCFL required investigation by the JOLs.

65    It was for these reasons that the court dismissed the appeal and ordered the appellants to pay the costs of the respondents (certified fit for two counsel). The appellants were also ordered to pay the costs of the Bank of America.

66    **ZACCA, P.:** I have had the advantage of reading in draft the judgment of Mottley, J.A. I am in full agreement with his conclusions and reasons. I wish briefly to add a few words in relation to the issue as to whether the petitioners were creditors entitled to petition the court for a winding up order.

67    Mr. Moss, Q.C. submitted that Food and Dairy were not creditors and were not entitled to petition the court to wind up the company. He relied on the fact that although the company was indebted to the petitioners by virtue of the put agreements, both petitioners had assigned their debts to securities trustees and were therefore no longer creditors. He also argued that the petitioners had no technical standing and since the petitioners would only be entitled to any surplus which would either be minimal or non-existent, they had no standing of substance. For them to

507

be creditors they must have both "technical standing" and "standing in substance."

68   For these propositions, Mr. Moss, Q.C. relied on the cases of *Deloitte & Touche A.G.* v. *Johnson* (9) and *Three Rivers District Council* v. *Bank of England* (20). In my view, the issue in *Deloitte & Touche A.G.* v. *Johnson* was not who was or was not a creditor. In that case, the plaintiff was neither a creditor nor a contributor. Lord Millett distinguished between the case where the court had to examine the statute to see whether it identified the category of persons who might make the application, and the case in which a more general issue was involved, that is to say, the position of a person who was not a creditor or contributory. He said (1999 CILR at 301):

"The question on the appeal, therefore, is whether the appellant, which is neither a creditor nor a contributory, has any *locus standi* to invoke the statutory jurisdiction of the court to remove the . . . liquidators of the company."

69   I agree that *Deloitte & Touche A.G.* v. *Johnson* did not decide the issue for which the appellants are contending in this appeal. For this and the other reasons given by Mottley, J.A., I am of the view that Food and Dairy are creditors and therefore entitled to make the application for a winding-up order.

70   **FORTE, J.A.:** On August 11th, 2006, having heard the arguments of counsel, we dismissed the appeal and affirmed the orders of Henderson, J. in the court below. We promised then to put our reasons in writing and now do so.

71   I have read in draft the judgment of Mottley, J.A. I agree with the reasons stated therein. However, I wish to add a few words of my own in relation to the issue of whether the respondents are in fact creditors of the company to the extent that they are qualified to petition the court for its winding up. I will not rehearse the facts that give rise to this issue here in full, except where they are relevant to the principles I propose to address.

72   Section 96 of the Companies Law (2004 Revision) provides a convenient point of departure. It states:

"Any application to the Court for the winding up of a company shall be by petition which may be presented by the company, or by any one or more than one creditor or contributory of the company, or by all or any of the above parties, together or separately; and every order which may be made on any such petition shall operate in favour of all creditors and all the contributories of the company in the same manner as if it had been made upon the joint petition of a creditor and a contributory."

C.A.                    IN RE PARMALAT CAPITAL FINANCE (Forte, J.A.)

The section clearly empowers a creditor of the company to petition for the winding up of the company and stipulates that all other creditors and contributories shall also benefit from any order made on the petition.

73    The appellants, however, contended that Food and Dairy were not creditors and consequently were not entitled to petition for the winding up of PCFL. Mr. Moss, Q.C. submitted that—

(i) although it was accepted that PCFL was indebted to the petitioners by virtue of put agreements entered into between PCFL and the petitioners separately, both petitioners had since assigned their debts to securities trustees and therefore were no longer creditors; and

(ii) as a result of (i) above, the petitioners would only be entitled to any surplus which would remain in respect of the debts assigned which would be in the circumstances at the highest, minimal and at the lowest, non-existent and consequently the petitioners were not substantial creditors.

74    Mr. Moss, Q.C. maintained that, to determine whether a petitioner qualified as a creditor under s.96 of the Companies Law, one had to look first to see if the petitioner were technically a creditor and thereafter at whether he was a substantive creditor. He argued that the petitioners did not satisfy both categories and consequently did not qualify as creditors so as to petition the court for the winding up of the company. In support of the proposition that the respondents were not technically creditors, he relied on the case of *Three Rivers District Council v. Bank of England* (20) in which the majority (Waite and Gibson, L.JJ.) held ([1996] Q.B. at 292) that—

"... an equitable assignee of a chose in action, as the person in reality entitled to the chose, was entitled to sue the defendant on that chose in his own name but, save in special circumstances, the assignor should be joined as a party so that he might be bound and the debtor protected; that the assignor would not be allowed to maintain an action on the chose unless the assignee was joined as a party to the claim; and that, accordingly, the judge had exercised his discretion properly in refusing to allow the depositors to proceed with the action with B.C.C.I. joined as non-claiming plaintiffs."

Interestingly, Staughton, L.J., in his minority judgment, opined (*ibid.*, at 308):

"[T]he assignor still has a cause of action at law; and the assignee has a cause of action in equity . . . But where the assignee is a party to the action, and expressly declines to make a claim, I can see no reason why the assignor should not claim what is his legal right."

Waite, L.J. agreed (*ibid.*, at 304) with the words of Gibson L.J., which seem to have been the *ratio decidendi* of the case (*ibid.*, at 307):

509

"For my part, I regard it as sufficient to look at the position as established by the authorities since 1873. In doing so, it is important to distinguish between what is a requirement of substantive law and what is merely a procedural requirement. It is, in my judgment, elementary that where, as here, there is an agreement to assign a legal chose, in equity the assignee becomes the owner and controller of the legal chose. He is entitled to sue for the recovery of the chose, but as a matter of practice he will normally be required by the court to join the assignor either as plaintiff or, if he refuses to give his consent to this, as defendant. All this seems to me to be in conformity with section 49 of the Act of 1981. An assignor, if the assignment is known, will not be allowed to sue in his own name for himself. He may sue as trustee for the assignee if the assignee so wishes, but in that event he should reveal his representative capacity (R.S.C. Ord. 6, r 3(1)(a)), and if he attempts to recover for himself, even if, for example, only part of the debt has been assigned, he will be required to join the assignee."

75    In coming to his conclusion, Gibson, L.J. relied on the following passage from Viscount Cave, L.C. in the case of *Performing Right Socy. Ltd.* v. *London Theatre of Varieties Ltd.* (16) ([1924] A.C. at 14):

"That an equitable owner may commence proceedings alone, and may obtain interim protection in the form of an interlocutory injunction, is not in doubt; but it was always the rule of the Court of Chancery, and is, I think, the rule of the Supreme Court, that in general, when a plaintiff has only an equitable right in the thing demanded, the person having the legal right to demand it must in due course be made a party to the action: Daniell's Chancery Practice 7th ed. Vol. I, p. 172. If this were not so, a defendant after defeating the claim of an equitable claimant might have to resist like proceedings by the legal owner, or by persons claiming under him as assignees for value without notice of any prior equity, and proceedings might be indefinitely and oppressively multiplied."

Gibson, L.J. also relied on *dicta* of Lord Sumner in the same case, quoting from a passage (*ibid.*, at 29): "The latter is essentially a matter of practice, and the established practice ought not to be disturbed, or at any rate very sparingly." Then in reference to Lord Sumner's statement, Gibson, L.J. stated ([1996] Q.B. at 309):

"He held that there was no justification for departing from the general rule that the assignor should be joined so that he might be bound, saying (at p. 32): 'it is the right of the respondents that they should be protected.'"

76    As is obvious from the cited *dicta* from *Performing Right Socy. Ltd.* v. *London Theatre of Varieties Ltd.*, that case dealt with an action brought

C.A.                    IN RE PARMALAT CAPITAL FINANCE (Forte, J.A.)

by the assignee. That the principle relates to an action brought by an
assignor is made clear in the following reference by Gibson, L.J. to
*Walter & Sullivan Ltd.* v. *J. Murphy & Sons Ltd.* (21) (which he described
as a rare example of a case where an assignor sought to recover a debt
without joining the equitable assignee of part of that debt). He referred to
the judgment of Parker, L.J. in that case ([1955] 1 All E.R. at 845) in
which he said:

> "Normally, of course, it is the assignee who, if necessary, seeks to
> recover the debt, and in a case where, as here, s. 136 of the Law of
> Property Act, 1925, does not apply, he would, if the right assigned
> were equitable, have to join the assignor in order to bind him at
> law ... In the present case, however, it is the assignor who is
> seeking to recover, and in his own right, and it is strongly urged that
> he is entitled to do so without joining the assignee. We think that is
> an impossible contention. The whole object of the notice to the
> debtor is to protect the assignee. After receipt of that notice the
> debtor pays the assignor at his peril."

77   The significance of this judgment is the requirement, in practice, that
if an assignee or assignor of a debt wishes to sue for its recovery, then
either has to join the other in such an action. It is not a matter of
substantive law, but a procedural requirement for the protection of each,
as the case may be, and also of the defendant. Gibson, L.J. recognized
this in the *Three Rivers District Council* v. *Bank of England* (20) when he
stated ([1996] Q.B. 309):

> "These cases therefore confirm the existence of a rule of practice
> that an equitable assignee, while able to sue in his own name and to
> obtain an interlocutory injunction, will not be able to obtain a
> perpetual injunction or damages without joining the assignor save in
> special circumstances, the reasons given being practical, for the
> protection of the debtor and to avoid multiplicity of suits. But an
> action commenced without the assignor as a party is not a nullity
> and the non-observance of the rule can be cured by the appropriate
> joinder at any stage."

It follows from the cited *dicta* from *Three Rivers District Council* v. *Bank
of England* that, in the present case, both Food and Dairy could bring
actions for the recovery of the debts from PCFL so long as the securities
trustees were joined as a party to any such action.

78   *Three Rivers District Council* v. *Bank of England*, however, deals
with actions for the debt in the courts and the necessity in practice, in
those circumstances, for the joinder of the assignor as a party where an
action is brought for the recovery of the debt by the assignee. To my
mind, this principle of practice is not applicable to the petition for the

511

winding up of a company by either assignor or assignee, both of whom, in my opinion, would qualify as creditors for that purpose. *Three Rivers District Council* v. *Bank of England* demonstrates that either could bring an action against the company, so long as the other was joined as a party.

79   In this case, it is common knowledge that the debt had been assigned to the security trustees, who themselves could petition for the winding up. The basis for adding the other party (assignor or assignee), is to protect each, and the defendant also, as the case may be, and to avoid multiplicity of actions. That would not arise in a winding-up petition, the assignor, as in this case, retaining legal title to the debt and being entitled to sue the company, so long as it joins the assignees in the action. Significantly, the company was aware of the assignment of the debt to the security trustees by Food and Dairy, a fact that was not in dispute. Both Food and Dairy, on the one hand and the securities trustees on the other, would have a legitimate interest in the winding up of the company. In any event, the security trustees, to the extent that they are entitled, will benefit from the distribution of the assets, such as they are. In my judgment, the assignors, Food and Dairy, being holders of the legal title to the debt, are qualified as creditors under s.96 of the Companies Law.

80   Mr. Moss, Q.C., however, contended that a petitioner must not merely be a creditor in the technical sense but must be so substantially. For the reasons already stated, I find no merit in the submission that the petitioners are not technically creditors.

81   I therefore turn now to his second contention, that the petitioners are not substantial creditors because in the circumstances they could recover only a minimal sum, if any at all, as a result of the winding up. Before addressing this, however, I should state that I have great difficulty accepting the appellants' projection of "two limbs," as it were, in the definition of a "creditor." I am of the view that if the company is indebted to a person to any extent at all then he is a creditor and entitled to petition for the winding up of the company, taking into consideration that he would have to show the company's inability to pay the debt unless, of course, he petitions on other grounds. If the appellants' submissions on this point were accepted, that would make it possible for a company without any assets to be protected from the granting of a creditor's petition for its winding up. This cannot be so, as the purpose of liquidation is not merely to give creditors and contributories the opportunity to recover their debts, or a portion thereof, but also to make it possible for the investigation of the company.

82   Common sense dictates that a company whose assets are nil should be wound up. However, the fact that a company without assets can be the subject of a winding-up order, on the basis of a petition by a creditor, is supported by the case of *In re Pantmaenog Timber Ltd.* (15) ([2004] A.C.

at 158–159) where the court held, according to the headnote to the case in *The Law Reports*, that—

> "a liquidator's functions in relation to a company which was being wound up were not limited to the recovery and distribution of the company's assets but extended to the investigation of the causes of the company's failure, and the conduct of those concerned in its management, in the wider public interest of the appropriate action being taken against those engaged in commercially culpable conduct . . . "

83   The following statement by Lord Millett in his speech in the House of Lords in the above case ([2004] 1 A.C. 158, at para. 64) speaks to this:

> "But I reject the unspoken assumption that the functions of a liquidator are limited to the administration of the insolvent estate. This is only one aspect of an insolvency proceeding; the investigation of the causes of the company's failure and the conduct of those concerned in its management are another. Furthermore such an investigation is not undertaken as an end in itself, but in the wider public interest with a view to enabling the authorities to take appropriate action against those who are found to be guilty of misconduct in relation to the company."

In my view, once a person establishes that he is a creditor, no matter what the possibilities of recovery of the debt are, that person, by virtue of s.96 is entitled to petition for the winding up of the company, provided that all the other conditions are met.

84   Mr. Moss, Q.C., however, sought support for the contrary in the case of *Deloitte & Touche A.G.* v. *Johnson* (9). In that case a company incorporated in the Cayman Islands was placed in voluntary liquidation, which was subsequently ordered to continue subject to the supervision of the Grand Court. The joint liquidators caused the company to institute proceedings for negligence in relation to the audit of the company's financial statements. By originating summons, the plaintiff, which was not a creditor or contributory to the company but one of the defendants to the company's action, applied under s.106(1) of the Companies Law (1995 Revision) for an order removing the liquidators, or alternatively, restraining them from continuing the conduct of the proceedings against the plaintiff, on the ground that the liquidators had a conflict of interest. The liquidators applied for the plaintiff's originating summons to be struck out on the ground that the plaintiff had no *locus standi* to make the application or real interest in seeking such relief. The judge dismissed the liquidators' summons, but this court allowed the liquidators' appeal and struck out the plaintiff's originating summons (see the headnote to the report of the case (1999 CILR at 297)).

85   The plaintiff appealed to the Judicial Committee of the Privy Council. In coming to his conclusion, when delivering the opinion of the Board, Lord Millett had this to say (1999 CILR at 305):

"The company is insolvent. The liquidation is continuing under the supervision of the court. The only persons who could have any legitimate interest of their own in having the [liquidators] removed from office as liquidators are the persons entitled to participate in the ultimate distribution of the company's assets that is to say, the creditors."

He then went on to conclude (*ibid.*) that "the appellant is not merely a stranger to the liquidation; its interests are adverse to the liquidation and the interests of the creditors." The Board concluded that the plaintiff had no legitimate interest in the identity of the liquidators and was "not a proper person to invoke the statutory jurisdiction of the court to remove the incumbent office-holders."

86   Against that background, I now turn to examine the passages from Lord Millett's opinion, from which Mr. Moss, Q.C. (for the appellants) sought support for his contention that in the circumstances of the instant case, where the court is asked to exercise its statutory power under s.96 of the Companies Law, the petitioner must show that he/she is not only technically a creditor but also substantially so. It is necessary to refer to the passages relied on to understand the gravamen of the appellants' contention. Lord Millett stated in *Deloitte & Touche A.G.* v. *Johnson* (9) (1999 CILR at 304):

"In their Lordships' opinion, two different kinds of case must be distinguished when considering the question of a party's standing to make an application to the court. The first occurs when the court is asked to exercise a power conferred on it by statute. In such a case the court must examine the statute to see whether it identifies the category of person who may make the application. This goes to the jurisdiction of the court, for the court has no jurisdiction to exercise a statutory power except on the application of a person qualified by the statute to make it. The second is more general. Where the court is asked to exercise a statutory power or its inherent jurisdiction, it will act only on the application of a party with a sufficient interest to make it. This is not a matter of jurisdiction; it is a matter of judicial restraint. Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made and sometimes (as in the present case) of other parties as well. It is therefore incumbent on the court to consider not only whether it has jurisdiction to make the order but whether the applicant is a proper person to invoke the jurisdiction."

514

**C.A.**                 IN RE PARMALAT CAPITAL FINANCE (Forte, J.A.)

87   This passage clearly speaks to two different situations; the first, to circumstances in which the statute names the category of person who may make the application, and the second, to circumstances in which the statute is silent in that regard. In the first, as it is in the instant case, there is no necessity for the court to examine whether the applicant is a proper person to invoke the jurisdiction of the court once he comes within the stipulated category of persons in the statute. It is in the second set of circumstances, where the statute is silent as to the category of persons who may invoke the jurisdiction of the court, that it becomes necessary for the court to examine whether the applicant is a proper person to do so.

88   The following paragraph taken from the judgment of Lord Millett, and upon which the appellants rely, relates in my view to the second set of circumstances to which he had already referred. He continued (*ibid.*, at 304–305):

"Where the court is asked to exercise a statutory power, therefore, the applicant must show that he is a person qualified to make the application. But this does not conclude the question. He must also show that he is a proper person to make the application. This does not mean, as the appellant submits, that he 'has an interest in making the application or may be affected by its outcome.' It means that he has a legitimate interest *in the relief sought*. Thus, even though the statute does not limit the category of person who may make the application, the court will not remove a liquidator of an insolvent company on the application of a contributory who is not also a creditor: see *Re Corbenstoke Ltd. (No. 2)* . . ."

This latter passage puts it beyond doubt that Lord Millett was, in the words expressed therein, addressing his mind to circumstances where the statute does not limit the category of person who can invoke the court's jurisdiction to exercise the statutory power given to the court in the particular section of the law, as is done in s.96 of the Companies Law. In those circumstances which Lord Millett was addressing, the court has to decide not only whether the applicant is a person qualified to make the application but also if the applicant is a proper person to invoke the jurisdiction of the court.

89   In cases such as the present, the statute gives the court the jurisdiction to exercise its power on the application of a specific category of person *e.g.* a creditor. There would therefore be no necessity, having determined that the applicant is a creditor, for the court to further determine "that he has a legitimate interest in the relief sought" because the statute, by endowing a creditor with the right to petition for the winding up, indicates that such a person does have a legitimate interest in the winding up of the company. This is also evident in the Board's conclusion, in which Lord Millett stated that the only persons who could

515

have any legitimate interest of their own in having liquidators removed from office as liquidators are those persons entitled to participate in the ultimate distribution of the company's assets, that is to say the creditors.

90   These passages relied on by Mr. Moss, Q.C. are therefore, in my judgment, unhelpful to the appellants' case as the opinions expressed therein by the Board are clearly the result of an examination of the case before their Lordships, which related to the exercise of a statutory power in circumstances where there are no limitations on the category of person entitled to invoke the court's jurisdiction. As has been seen, those circumstances called for different considerations, which are not relevant in the present case.

91   Having come to the conclusion that the respondents in this appeal are, indeed, creditors, then, in my judgment, this ground must also fail. It is for the reasons I have set out above that I agreed that the appeal be dismissed and the orders made.

*Appeal dismissed.*

Attorneys: *Turner & Roulstone* for the appellants; *Walkers* for the petitioners; *Quin & Hampson* for the Bank of America (a creditor).

[*December 7th, 2006: The Court of Appeal (Zacca, P., Taylor and Forte, JJ.A.) granted the appellants leave to appeal to the Judicial Committee of the Privy Council.*]